**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

----------------------------------------------------------------- x
   :
JAMES DOLAN and JAMES MORRIS,    :
individually and on behalf of all others similarly    :    Case No. 3:23-cv-00512
situated,    :
   :    Judge Robert E. Payne
   Plaintiffs,    :
   :    **Oral Argument Requested**
   -against-    :
   :
FORD MOTOR COMPANY,    :
   :
   Defendant.    :
   :
----------------------------------------------------------------- x

**FORD MOTOR COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**RENEWED MOTION TO EXCLUDE THE TESTIMONY OF STEVEN GASKIN**

Hector Torres (admitted *pro hac vice*)
Cindy C. Kelly (admitted *pro hac vice*)
Stephen P. Thomasch (admitted *pro hac vice*)
Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
htorres@kasowitz.com
ckelly@kasowitz.com
sthomasch@kasowitz.com

Perry W. Miles IV (#43031)
Brian D. Schmalzbach (#88544)
Jonathan T. Tan (#88037)
Juliet B. Clark (#96918)
McGuire Woods LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
Telephone: (804) 775-1000
pmiles@mcguirewoods.com
bschmalzbach@mcguirewoods.com
jtan@mcguirewoods.com
jbclark@mcguirewoods.com

Jodi Munn Schebel (admitted *pro hac vice*)
Bowman and Brooke LLP
101 W. Big Beaver Road, Suite 1100
Troy, Michigan 48084
Telephone: (248) 205-3500
jodi.schebel@bowmanandbrooke.com

*Attorneys for Defendant Ford Motor Company*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ...................................................................................................................... 3

I.    Plaintiffs Allege That The Purported Transmission Defect Caused Them And
      Members Of The Putative Class And Subclasses Damages .............................................. 3

II.   Conjoint Surveys Can Only Measure Consumer Demand For Product Features ............. 5

III.  Gaskin Proposes A Potential Methodology For Conducting A Conjoint Analysis
      On F-150s, But Fails To Conduct That Analysis Or Even Propose Methodologies
      For The Other Putative Class Vehicles ............................................................................. 6

ARGUMENT ........................................................................................................................... 9

I.    Legal Standard .................................................................................................................. 9

      A.    Gaskin's Testimony Is Subject To "Full *Daubert*" Scrutiny ................................. 9

      B.    Federal Rule of Evidence 702 ............................................................................. 10

II.   Gaskin's Testimony Must Be Excluded As Unreliable ................................................... 13

      A.    Gaskin's Proposed Methodology Cannot Produce A Reliable Market Price
            Premium Because It Fails to Account For Supply-Side Factors .......................... 13

      B.    Gaskin Cannot Show That His Proposed Survey Can Reliably Calculate
            Classwide Damages Or That It Is Helpful Because It Is Unperformed,
            Applies Only To F-150s, And Does Not Fit Plaintiffs' Liability Theories ......... 19

      C.    Gaskin's Proposed Survey Methodology Fails To Incorporate
            Generally-Accepted Principles of Survey Research ............................................ 27

      D.    Gaskin Proposes To Cherry-Pick The Overpayment Percentage ........................ 30

CONCLUSION ...................................................................................................................... 30

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Acosta v. Vinoskey*,
  310 F. Supp. 3d 662, 667 (W.D. Va. 2018) ...............................................................13

*Alig v. Rocket Mortg., LLC*,
  126 F.4th 965 (4th Cir. 2025) ..................................................................................24

*Am. Honda Motor Co. v. Allen*,
  600 F.3d 813 (7th Cir. 2010) ...................................................................................19

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018)........................................................................................9

*Bayliner Marine Corp. v. Crow*,
  257 Va. 121 (1999) ...................................................................................................26

*In re Blackbaud, Inc., Customer Data Breach Litig.*,
  2024 WL 2155221 (D.S.C. May 14, 2024)....................................................9, 10, 19

*Bresler v. Wilmington Tr. Co.*,
  855 F.3d 178 (4th Cir. 2017) ...................................................................................13

*Childress v. JPMorgan Chase & Co.*,
  2019 WL 2865848 (E.D.N.C. 2019)..........................................................................10

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)....................................................................................................25

*Competitive Edge, Inc. v. Staples, Inc.*,
  763 F. Supp. 2d 997 (N.D. Ill. 2010) ......................................................................27

*In re ConAgra Foods, Inc.*,
  302 F.R.D. 537 (C.D. Cal. 2014).............................................................................23

*Creekmore v. Truist Bank*,
  2025 WL 1717647 (E.D. Va. May 29, 2025) ...........................................................21

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)......................................................................................9, 10, 13

*Davis v. Capital One, N.A.*,
  2023 WL 6964051 (E.D. Va. Oct. 20, 2023),
  *aff'd*, 2025 WL 2445880 (4th Cir. Aug. 26, 2025)..........................................10, 21

*Davis v. Capital One, N.A.*,
  2025 WL 2445880 (4th Cir. Aug. 26, 2025)...................................................................20, 21

*E.E.O.C. v. Freeman*,
  778 F.3d 463 (4th Cir. 2015) ...............................................................................................12

*In re Emerson Elec. Co. Wet/Dry Vac Mktg. & Sales Litig.*,
  2021 WL 5003102 (E.D. Mo. Oct. 28, 2021) ......................................................................16

*ePlus, Inc. v. Lawson Software, Inc.*,
  764 F. Supp. 2d 807 (E.D. Va. 2011),
  *aff'd,* 700 F.3d 509 (Fed. Cir. 2012) ..................................................................................23

*Erickson v. Baxter Healthcare, Inc.*,
  131 F. Supp. 2d 995 (N.D. Ill. 2001) ...................................................................................27

*In re Fluidmaster, Inc. Water Connector Components Prods. Liab. Litig.*,
  2017 WL 1196990 (N.D. Ill. Mar. 31, 2017)..................................................................28, 30

*Freeman v. Progressive Direct Ins. Co.*,
  149 F.4th 461 (4th Cir. 2025) ..............................................................................................23

*In re Gen. Motors LLC Ignition Switch Litig.*,
  407 F. Supp. 3d 212 (S.D.N.Y. 2019)........................................................................14, 15, 16

*Glass v. Commonwealth*,
  74 Va. App. 214 (2022) ........................................................................................................13

*Gov't Emps. Health Ass'n v. Actelion Pharms. Ltd.*,
  2024 WL 4122123 (D. Md. Sept. 6, 2024) ...........................................................................10

*Hadley v. Kellogg Sales Co.*,
  324 F. Supp. 3d 1084 (N.D. Cal. 2018) ................................................................................15

*Keener v. Exxon Co., USA*,
  32 F.3d 127 (4th Cir. 1994) ..................................................................................................13

*Kruglyak v. Home Depot USA, Inc.*,
  750 F. Supp. 3d 644 (W.D. Va. 2024) ..................................................................................26

*Lee v. City of Richmond, Va.*,
  2014 WL 5092715 (E.D. Va. Sept. 30, 2014)........................................................................19

*LeGrand v. Abbott Laboratories*,
  2025 WL 2323352 (N.D. Cal. Aug. 12, 2025) ................................................................24, 25

*Lytle v. Nutramax Labs., Inc.*,
  114 F.4th 1011 (9th Cir. 2024) ...............................................................................................9

*In re Marriott Int'l, Inc., Customer Data Sec. Breach. Litig.*,
  602 F. Supp. 3d 767 (D. Md. 2022) ..........................................................9, 10, 17, 31

*In re Marriott*,
  602 F. Supp. 3d at 785–86 .............................................................................................19

*McMorrow v. Mondelez Int'l, Inc.*,
  2020 WL 1157191 (S.D. Cal. Mar. 9, 2020) ...........................................................26

*Mier v. CVS Pharmacy, Inc.*,
  2022 WL 1599633 (C.D. Cal. May 9, 2022), *aff'd in relevant part sub nom*
  *Mier v. CVS Health*, 2023 WL 4837851 (9th Cir. July 28, 2023) ...........................16

*Mr. Dee's Inc. v. Inmar, Inc.*,
  127 F.4th 925, 2025 WL 467566 (4th Cir. 2025) ...................................................24

*Nease v. Ford Motor Co.*,
  848 F.3d 219 (4th Cir. 2017) ...................................................................................10, 19

*Owens v. Ford Motor Co.*,
  297 F. Supp. 2d 1099 (S.D. Ind. 2003) ...................................................................15

*PBM Prods., LLC v. Mead Johnson & Co.*,
  639 F.3d 111 (4th Cir. 2011) ...................................................................................29

*In re: Pella Corp. Architect & Designer Series Windows Mktg., Sales Pracs. &*
  *Prods. Liab. Litig.*,
  214 F. Supp. 3d 478 (D.S.C. 2016).............................................................................14

*Prantil v. Arkema, Inc.*,
  986 F.3d 570 (5th Cir. 2021) .......................................................................................9

*Robinson v. Nationstar Mortg. LLC*,
  2019 WL 4261696 (D. Md. Sept. 9, 2019) .............................................................10

*Saavedra v. Eli Lilly & Co.*,
  2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ........................................................14

*Sardis v. Overhead Door Corp.*,
  10 F.4th 268 (4th Cir. 2021) ...................................................................................10, 13

*Schechner v. Whirlpool Corp.*,
  2019 WL 4891192 (E.D. Mich. Aug. 13, 2019).....................................................16

*Soutter v. Equifax Info. Servs., LLC*,
  299 F.R.D. 126 (E.D. Va. 2014) ...............................................................................10

*Speerly v. General Motors*,
    143 F.4th 306 (6th Cir. 2025) ..............................................................................26

*Tunnell v. Ford Motor Co.*,
    330 F. Supp. 2d 707 (W.D. Va. 2004) ..................................................................28

*United States v. Bonner*,
    648 F.3d 209 (4th Cir. 2011) ...............................................................................10

*Valador, Inc. v. HTC Corp.*,
    242 F. Supp. 3d 448 (E.D. Va. 2017) .............................................................17, 29

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Prod. Liability Litigation*,
    500 F. Supp. 3d 940, 949 (N.D. Cal. 2020) ..........................................15, 16, 20, 31

*vonRosenberg v. Lawrence*,
    413 F. Supp. 3d 437 (D.S.C. 2019),...................................................................29, 30

**Statutes**

Va. Code § 8.2-313 ......................................................................................................3

Va. Code § 8.2-314 ......................................................................................................3

Va. Code § 8.2-714(2) ................................................................................................26

Virginia Consumer Protection Act, Va. Code § 59.1-198 *et. seq.*....................................3

**Other Authorities**

"Report of the Judicial Conference Committee on Rule of Practice and
    Procedure," 22–23 (Sept. 2022),
    https://www.uscourts.gov/file/45210/download ....................................................12

3 Newberg & Rubenstein on Class Actions § 7:24 (6th ed. 2022) .................................10

*Fair Market Value*, Black's Law Dictionary (11th ed. 2019).......................................13

Fed. R. Evid. 702 ................................................................................................. *passim*

## PRELIMINARY STATEMENT[1]

Plaintiff James Dolan, the former owner of a 2018 F-150, and James Morris, the former owner of a 2020 Ford Expedition, do not allege that they have suffered personal injury or property damage in connection with the alleged transmission defect in their Ford vehicles.  Instead, they contend that they suffered economic damages based on their vehicle purchases because "had Plaintiffs and Class Members known about the Transmission Defect" they "would have paid less for them," even as both Plaintiffs failed to make any such disclosure when they subsequently sold their vehicles.  Rather than have experts opine on actual data from the used car market to assess damages, as this Court recommended at the January 24, 2024 conference (ECF No. 67, at 33:18-34:17), Plaintiffs instead proffered two putative experts, Steven Gaskin and Colin Weir, who propose to use a "conjoint survey" to provide a single class-wide overpayment figure.  This proposed but unexecuted method is fatally flawed and inadmissible.

Gaskin proposes to eventually pre-test and conduct anywhere from one to six separate consumer surveys—one initially for the F-150, and "if asked," five subsequent surveys for the Expedition, Mustang, Ranger, Transit, and Navigator.  Gaskin's report proposes a method only for the F-150 survey, and, as to the others, merely states that they would be "substantially similar" without clarification.  For the F-150 survey, Gaskin proposes to ask respondents nationwide the prices they would pay for F-150s with and without the alleged defect, but he does not propose to ask Ford or any Ford dealers what prices they would accept for F-150s.  Gaskin then proposes to run a regression on the respondents' answers followed by a "market simulation" to estimate eight different class-wide overpayment figures, of which he would select the smallest as his result "to be conservative."  He will then convert that figure to a percentage and provide it to Weir, who

---

[1] Exhibits attached hereto are referenced as "Ex."  All emphases are added unless otherwise noted.

would multiply it by the cost of all class vehicles.

First, Gaskin's proposed methodology is unreliable because it fails to account for supply-side considerations.  It is fundamental that the "market value" of a good is determined by the interaction of supply *and* demand.  Gaskin, however, focuses exclusively on the effect on *demand* of a disclosure of the alleged defect.  In doing so, he fails to account, as he must, for Ford's conduct in a but-for universe where the alleged defect is disclosed and consumer demand drops.  Gaskin assumes—in contravention of basic economic principles—that Ford would manufacture and sell the same number of vehicles in the but-for world despite a significant reduction in consumer demand resulting in significantly-reduced prices.  Gaskin also fails to simulate a real market by comparing only F-150s against each other without considering competitive vehicles.

Second, Plaintiffs cannot meet their burden of proving that Gaskin's proposed methodology can reliably calculate class-wide damages because he has not actually executed it.  Nor has he even proposed a specific methodology for calculating damages for the 42% of putative class vehicles that are not F-150s.  Indeed, by limiting his proposal to F-150s, Gaskin has excluded Morris and his 2020 Expedition from its scope.  And he certainly has proposed no methodology for combining the results for the various vehicles into a single class-wide damages figure.  Gaskin's opinion also will not assist the trier of fact because the expert disclosure deadline has passed, and he failed to execute his survey.  Thus, he will be unable to provide a class-wide overpayment percentage that can be used by Weir to calculate class-wide damages.  Gaskin's methodology also fails because it does not fit Plaintiffs' theory of liability on their express warranty, implied warranty, and VCPA claims.

Third, Gaskin's conjoint survey is also unreliable because it fails to follow generally accepted principles of survey research.  Specifically, it fails to use a representative sample of the

2

market, including by sampling respondents nationwide rather than in Virginia, excluding used vehicle purchasers and lessees, and failing to distinguish between "fleet" (*i.e.*, commercial) and "retail" (*i.e.*, consumer) transactions. Gaskin's survey also employs biased descriptions of product attributes and omits key factors in consumer purchasing decisions, which may bias results.

Fourth, Gaskin's proposed methodology is not sound, reliable or valid because, even though he intends to calculate eight overpayment percentages, he proposes to cherry-pick data by arbitrarily selecting the lowest one to make his flawed conclusion more palatable.

## BACKGROUND

I. **Plaintiffs Allege That The Purported Transmission Defect Caused Them And Members Of The Putative Class And Subclasses Damages**

Plaintiffs James Dolan and James Morris allege that they purchased a 2018 Ford F-150 and a 2020 Ford Expedition, respectively, equipped with allegedly defective 10R80 transmissions. (ECF No. 523, Second Amended Complaint ("SAC") ¶¶ 5-6, 14.) Plaintiffs allege that this defect, which purportedly causes their vehicles to suffer from harsh shifting, is present in all vehicles equipped with the 10R80. (*Id.* ¶ 14.) Based on those allegations, the SAC asserts four claims against Ford, one on behalf of only Dolan—breach of express warranty pursuant to Va. Code § 8.2-313 (Count 1) (SAC ¶¶ 166-232)—and three on behalf of both Plaintiffs: breach of implied warranty of merchantability pursuant to Va. Code § 8.2-314 (Count 2) (SAC ¶¶ 233-54); fraudulent inducement by omission (Count 3) (*id.* ¶¶ 255-87); and violation of the Virginia Consumer Protection Act, Va. Code § 59.1-198 *et. seq.* ("VCPA") (Count 4) (*id.* ¶¶ 288-309).

In connection with those claims, Plaintiffs seek to represent one statewide class and two statewide subclasses. First, Plaintiffs seek to represent the "Class," which the SAC defines as: "All persons residing in Virginia who formerly or currently own(ed) or leased one or more Class Vehicles with a 10R80 10-speed automatic transmission." (*Id.* ¶ 155.) The SAC, in turn, defines

3

the putative "Class Vehicles" as all Model Year 2017-2023 F-150s, 2018-2023 Expeditions, Mustangs, and Navigators, 2019-2023 Rangers, and 2020-2023 Transits equipped with the 10R80 that were sold in Virginia.  (*Id.* ¶ 12.)  Second, Plaintiffs seek to represent the "Sought Repair Subclass," which the SAC defines as:

> All Class members who contacted or visited Ford, or a Ford dealership or service center in Virginia, to report abnormal operation of their 10R80 10-speed automatic Transmission with respect to harsh, hard, jerky, or erratic shifting, or surging, lunging, clunking, hesitation, or loss of power when shifting between gears or between gear engagements.

(*Id.* ¶ 156.)  Third, Plaintiffs also seek to represent the "VCPA Subclass," which the SAC defines as: "All persons in Virginia who formerly or currently own(ed) or leased one or more Class Vehicles who received personal property tax relief under Virginia law for their Class Vehicle(s)." (*Id.* ¶ 157.)

Plaintiffs do not allege personal injury or property damage, yet seek alleged economic damages.  Plaintiffs allege that they have suffered two forms of damage.  First, in connection with all their claims, Plaintiffs seek the amount that they allegedly overpaid for their vehicles.  (SAC ¶¶ 231, 253, 284, 306.)  But the basis for the overpayment varies among claims.  For the express warranty claim it is based on "Ford's breach of the express warranties stated on its Monroney stickers" (*id.* ¶¶ 230-31), for the implied warranty claim it is based on Plaintiffs' purchase of allegedly unmerchantable vehicles (*id.* ¶¶ 250, 253), for the fraud claim it is based on Ford's non-disclosure of the purported defect (*id.* ¶¶ 284), and for the VCPA claim it is based on "Ford's misrepresentations and failure to disclose material information and refusal to provide effective and free repairs pursuant to its warranties" (*id.* ¶ 306).  Second, in connection with their express and implied warranty claims, Plaintiffs seek damages arising from "the cost of repairs, diminished

4

value of their vehicles, and loss of use of their vehicles."[2]  (*Id.* ¶¶ 230, 252.)[3]

Plaintiffs offer Steven Gaskin and Colin Weir as damages experts, contending that their expertise in conjoint analysis allows them to construct a framework for calculating a class-wide overpayment amount.  (Ex. 1 ("Gaskin Report"), ¶¶ 8–11; Ex. 2 ("Weir Report"), ¶¶ 9-15.) Working in tandem, Gaskin proposes a methodology for a consumer survey that he claims would generate an overpayment percentage—a value by which the class allegedly overpaid for their vehicles—and Weir plans to use that percentage to calculate class-wide damages by multiplying it by the total cost of all Class Vehicles.  (Gaskin Report, ¶¶ 12, 60; Weir Report, ¶¶ 57-60.)

## II.    Conjoint Surveys Can Only Measure Consumer Demand For Product Features

Conjoint surveys measure consumer demand (or preference) by presenting respondents with a series of choices between products with different prices and features (or "attributes").  (Ex. 3 ("Rossi Rebuttal"), ¶¶ 41-44, 76-78.)  For example, a choice set may present a respondent with a comparison between a $500 cell phone by Brand A with a five-inch screen and a $550 cell phone by Brand B with a six-inch screen.  In response to each choice set, the respondents select the product they would prefer and state whether they would be willing to buy that product at the price presented.  Through a series of choice sets where the attributes are varied, these surveys purport to identify a value for each individual attribute (a "partworth").  (*Id.* ¶ 146.)

Because these surveys are intended to calculate a consumer's willingness to pay for a specific product in the real world, the hypothetical product profiles that the consumer compares in each "choice task" must include attributes that a purchaser or lessor would actually consider and,

---

[2] Plaintiffs' most recent initial disclosures, which were served before the filing of the SAC, disclosed similar damages theories, but also sought "out-of-pocket costs, loss of time, inconvenience, loss of use of vehicle, and expenses to repair the defect" damages on their VCPA claim.  (Ex. 5, at 18.) Plaintiffs' omission of such a request from the later-filed SAC signifies that they have withdrawn the request.

[3] Plaintiffs also seek statutory damages, punitive damages, and costs and attorney fees.  (Ex. 5, at 14-18.)

in turn, trade-off against, in the real world.  (*E.g.*, Rossi Rebuttal ¶¶ 21(b), 54-56, 73-76, 93.)  In other words, to test consumer preference (or demand), the survey must mimic a consumer's real-world choices.  (*Id.*)  To effectively create such a world, the survey should include the core features or attributes that consumers looking to buy/lease *that product* would typically consider.  (*Id.* ¶¶ 73-74, § V.A.1.)  Omitting a core-feature undermines the survey's reliability as it may create a false dichotomy between unequal attributes (*e.g.*, comparing a phone's cosmetic feature with its core-processing speeds) or unreasonably inflate an attribute's importance.  (*Id.*)

If executed reliably, these surveys can measure consumer demand for product features, but the surveys cannot measure the differences in *market prices* for features because they measure only the *demand* side of the supply-and-demand equation that determines prices.  (Rossi Rebuttal § IV.C.1 & ¶¶ 41-44.)  The survey does not measure the *supply* side of that equation.  (*Id.* ¶ 47.)  To reliably calculate a market price, a conjoint survey must be supplemented by a market simulation that considers both supply and demand.  (*Id.* § IV.C.1.)

### III.    Gaskin Proposes A Potential Methodology For Conducting A Conjoint Analysis On F-150s, But Fails To Conduct That Analysis Or Even Propose Methodologies For The Other Putative Class Vehicles

Gaskin proposes to use a made-for-litigation survey "to determine the reduction in market value that *might* result from the existence of the Automatic Transmission Defect at issue in this lawsuit."  (Gaskin Report ¶ 26.)  In theory, the survey would present respondents with twelve choice tasks, each asking the respondent to choose between three hypothetical vehicle profiles that include different permutations of the same eight features.  (*Id.* ¶¶ 23-25.)  Gaskin claims that, based on the responses, he will be able to calculate a single percentage by which the Class overpaid for their vehicles, which he will then provide to Weir for the calculation of class damages.  (*See id.* ¶ 60; Weir Report ¶ 56.)  Gaskin has not pre-tested or finalized the survey and, as such, has yet to administer it and gather the data necessary to calculate an overpayment percentage (if any).

6

The survey, as currently planned, would proceed as follows:

First, Gaskin would "pretest[]" the survey questionnaire with 20 respondents "to identify and correct any possible issues with the survey." (Gaskin Report ¶ 37.) Gaskin testified that he was reserving the right to change his survey methodology, including the specific attributes that he is testing, based on the results of that pre-test. (Ex. 4 ("Gaskin Dep."), at 179:9-20, 180:22-181:7.)

Second, after finalizing the methodology, Gaskin will identify a survey sample of "at least 300" respondents who "are United States residents" who indicate that they have purchased or leased a new 2017-2023 Ford F-150 or competitive pickup truck. (Gaskin Report ¶¶ 38, 44.) This sample will not be randomly selected, but identified by an unnamed "leading Internet survey panel company" whose "respondent panel" will select the respondents from a pool of "pre-recruited potential respondents" who, at some earlier time, indicated a willingness to trade their opinions for cash. (Gaskin Report ¶¶ 39–40; Gaskin Dep. at 196:16-198:4.)

Third, after selecting the sample, Gaskin intends to conduct the consumer survey. The survey would begin with Gaskin showing the respondents descriptions of the eight vehicle features being tested, respondents' completion of a "sample choice task," and then the actual survey consisting of twelve choice tasks. (Gaskin Report ¶¶ 49-50; Gaskin Dep. 202:2-7.) Each "task" will contain three hypothetical vehicle profiles, with each profile presenting a different variation of these eight features (or attributes): (1) make/model; (2) trim level; (3) automatic transmission; (4) cab type; (5) bed length; (6) driver's seat; (7) door latches; and (8) price. (Gaskin Report ¶¶ 25, 50.) Gaskin plans to use a broad range for the price attribute ($30,000 to $90,000), with price points varying by $15,000 increments. (*Id.* ¶¶ 33, 49.) He will, moreover, instruct respondents to assume that all other features are the same and that "each truck . . . comes with the engine type that [they] would most prefer to buy." (*Id.* ¶ 48 n.24.)

For the transmission attribute, respondents will be given two options: (1) "The automatic transmission *may* shift gears harshly and erratically, causing the vehicle to jerk, lunge, clunk, and hesitate between gears;" and (2) "The automatic transmission *works reliably* when shifting between gears." (*Id.* ¶ 49.) To purportedly distract respondents from identifying the "automatic transmission" attribute as the "main feature of interest in the survey," Gaskin plans to include two "distractor" defects: the door latches and driver's seat. (*Id.* ¶ 31.)

Fourth, Gaskin will then run a regression of the responses to determine value placed on each attribute (the "partworth"). (*Id.* ¶ 53.) He will then input those partworths into a "market simulator" to assess how a consumer would react if the alleged defect was disclosed. (*Id.* ¶¶ 57–59.) This simulator—which assumes the alleged defect is known and that the available market consists of just one car make/model—can supposedly simulate a consumer's hypothetical decisions if asked to choose between a perfectly functioning and defective F-150. (*Id.*) The simulator will run ten separate analyses—five that assess the *increase* in price for vehicles without the defect (one at each of Gaskin's five arbitrarily selected price points between $30,000 and $90,000), and five that assess the *decrease* in price for vehicles with the defect (again, at Gaskin's five price points). (*Id.* ¶ 59.) Gaskin will then exclude any results outside the "bound" minimum and maximum prices of, respectively, $30,000 and $90,000, leaving him with eight computations. (*Id.* ¶ 59 n.32.) Gaskin will then select "the smallest" of the eight to represent "the reduction in market value" (*id.* ¶¶ 59-60) and the related percentage change will be given to Weir (*id.* ¶ 60; Weir Report ¶ 56). Upon receipt of the overpayment percentage, Weir intends to multiply it by the total cost of all class vehicles to quantify class-wide damages. (Weir Report ¶¶ 56-60.)

Gaskin confirmed that his proposed conjoint analysis, and any resulting overpayment percentage, would be applicable *only* to F-150s. (Gaskin Dep. at 12:20-13:3, 224:12-225:5;

8

Gaskin Report ¶¶ 8 & n.2.)  Indeed, he confirmed that he would plan to run separate conjoint surveys and analyses for Mustangs, Rangers, Expeditions, Transits, and Navigators.  (Gaskin Dep. at 23:16-26:22; Gaskin Report ¶¶ 8 & n.2.)  Gaskin admitted that he has not identified or proposed specific methodologies for those conjoint surveys, that he does not know when he plans to do so, and that those surveys might result in different overpayment percentages than his F-150 survey. (Gaskin Dep. at 21:4-17, 22:14-27:4, 28:21-29:4.)  And, while Gaskin confirmed that his proposed F-150 survey does not apply to F-150 Raptor vehicles ("Raptors"), he also failed to state that he plans to run a separate conjoint survey and analysis for Raptors.  (*Id.* at 17:11-18:1.)

**ARGUMENT**

**I.    Legal Standard**

**A.    Gaskin's Testimony Is Subject To "Full *Daubert*" Scrutiny**

Courts nationwide are split as to the application of Federal Rule of Evidence 702 at the class certification stage.  *In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239, 253 (6th Cir. 2024) (recognizing that "the Third, Fifth, Seventh, and Eleventh Circuits" apply a full *Daubert* analysis, while "the Eighth and Ninth Circuits perform a more limited *Daubert* analysis" and adopting "the majority view" that "if challenged expert testimony is material to a class certification motion, the district court must demonstrate the expert's credibility under *Daubert*").  Though the Fourth Circuit has not definitively ruled, the better reasoned and majority view is that "the metric of admissibility [is] the same for certification and trial."  *Prantil v. Arkema, Inc.*, 986 F.3d 570, 575 (5th Cir. 2021).  Thus, the Rule 702 "hurdle must be cleared when scientific evidence is relevant to the decision to certify," because "expert testimony that is insufficiently reliable to satisfy the *Daubert* standard . . . can[not] establish 'through evidentiary proof' that Rule 23(b) is satisfied." *Id.*; *see also In re Asacol Antitrust Litig.*, 907 F.3d 42, 53 (1st Cir. 2018) ("The fact that plaintiffs seek class certification provides no occasion for jettisoning the rules of evidence and procedure,

9

the Seventh Amendment, or the dictate of the Rules Enabling Act.").

Under that rigorous inquiry, commonly known as a "full *Daubert*" inquiry, which has not been contested by Plaintiffs,[4] courts "must conclusively rule on any challenge to the expert's qualifications or submissions[.]" *In re Blackbaud, Inc., Customer Data Breach Litig.*, 2024 WL 2155221, at *4 (D.S.C. May 14, 2024). As applied to a damages model, this includes a rigorous assessment of all aspects, including its results. *E.g.*, *In re Marriott Int'l, Inc., Customer Data Sec. Breach. Litig.*, 602 F. Supp. 3d 767, 772-73 (D. Md. 2022) (applying "full" *Daubert* to overpayment damages model and considering expert's testing of "his methodology" as to "bellwether plaintiffs"); *see also Lytle v. Nutramax Labs., Inc.*, 114 F.4th 1011, 1031 (9th Cir. 2024) (noting that a "full-blown *Daubert*" involves an "assessment of the results of the application of the model"). Fourth Circuit district courts typically conduct full Rule 702 analyses "especially where the expert opinion is *critical* to class certification," *Gov't Emps. Health Ass'n v. Actelion Pharms. Ltd.*, 2024 WL 4122123, at *4 (D. Md. Sept. 6, 2024); *see also* 3 Newberg & Rubenstein on Class Actions § 7:24 (6th ed. 2022) ("[Reported decisions suggest that courts in the . . . Fourth . . . Circuit[] follow a serious *Daubert* approach[.]").[5] Because Gaskin's conjoint survey is critical to class certification, including whether damages can be measured on a classwide basis, all of his testimony is subject to a "full" inquiry under Rule 702.

### B.    Federal Rule of Evidence 702

"Federal Rule of Evidence 702 appoints trial judges as 'gatekeepers of expert testimony' to protect the judicial process from 'the potential pitfalls of junk science.'" *Sardis v. Overhead*

---

[4] Plaintiffs have not contested that Gaskin's testimony is subject to a "full *Daubert*." (ECF No. 334, at 4.)
[5] *See, e.g.*, *Davis v. Capital One, N.A.*, 2023 WL 6964051, at *5-6 & n.5 (E.D. Va. Oct. 20, 2023) (applying "full *Daubert* analysis" where "plaintiff's expert opinion are central and critical to his class certification motion"), *aff'd*, 2025 WL 2445880 (4th Cir. Aug. 26, 2025); *Blackbaud*, 2024 WL 2155221 (applying "full *Daubert*" on class certification); *see also Soutter v. Equifax Info. Servs., LLC*, 299 F.R.D. 126, 131 (E.D. Va. 2014) (Payne, J.).

*Door Corp.*, 10 F.4th 268, 275 (4th Cir. 2021) (citing *United States v. Bonner*, 648 F.3d 209, 215 (4th Cir. 2011)).  A court that abdicates that duty "expos[es] jurors to 'dubious scientific testimony' that can ultimately 'sway' their verdict," a "risk [that] is notably amplified in products liability cases" where expert testimony is often necessary to establish or refute liability.  *Sardis*, 10 F.4th at 275 (cleaned up).  To manage risk and effectively exercise their gatekeeping function, trial judges must "ensur[e] that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand."  *Nease v. Ford Motor Co.*, 848 F.3d 219, 229-30 (4th Cir. 2017) (italics in original) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).

To bolster that rule, a substantive revision of Rule 702 took effect on December 1, 2023. According to the Rules Advisory Committee, that revision rebuked those lower courts that failed to rigorously evaluate expert reliability and reaffirmed that "[j]udicial gatekeeping [of expert witnesses] is *essential*."  Fed. R. Evid. 702 (Advisory Committee Notes – 2023 Amendment) (the "*2023 Advisory Committee Notes*").  The revised Rule states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise *if the proponent demonstrates to the court that it is more likely than not that*:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion *reflects a reliable application of the principles and methods to the facts of the case*.

Fed. R. Evid. 702.  The 2023 amendments made two changes to the Rule's text important here.

First, the amendment clarifies the proponent's burden of proof by adding the phrase "if the proponent demonstrates to the court that it is more likely than not that."  Amendments to the Federal Rules of Evidence, Communication from the Chief Justice, the Supreme Court of the United States," H.R. Doc. 118-33, at 18 (April 25, 2023) ("*H.R. Doc. 118-33*").  As the Advisory

Committee explained, this amendment sought to "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that is it *more likely than not* that the proffered testimony meets the admissibility requirements set forth in the rule." *2023 Advisory Committee Notes*.  This standard of proof applies to all "three reliability-based requirements" set forth in the Rule—(1) "the testimony is based on sufficient facts or data"; (2) "the testimony is the products of reliable principles and methods"; and (3) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  *Id.*; Fed. R. Evid. 702(b)–(d).

In adopting that change, the Advisory Committee specifically criticized the erroneous holdings of "many courts" that "the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." *2023 Advisory Committee Notes*.  The 2023 amendment reaffirms that courts must consider questions of reliability before evidence is presented to the jury.  That revision "reject[s] . . . more broadly [the view] that expert testimony is presumed to be admissible." "Report of the Judicial Conference Committee on Rule of Practice and Procedure," 22–23 (Sept. 2022), https://www.uscourts.gov/file/45210/download.

Second, in subsection (d), the phrase "expert's opinion reflects a reliable application of" replaced the earlier language "expert has reasonably applied," to now read: "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  H.R. Doc. 118-33, at 18.  This change "emphasize[s] that each expert opinion *must* stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *2023 Advisory Committee Notes*.  An expert must prove that his conclusions stem from *both* reliable data and reliable application of that methodology.  Indeed, the Committee on Rules of Practice and Procedure wrote that it adopted this language to "more clearly empower the court to pass judgment

12

on the conclusion that the expert has drawn from the methodology." "Report of the Judicial Conference Committee on Rule of Practice and Procedure," at 23.

## II.    Gaskin's Testimony Must Be Excluded As Unreliable

Federal Rule of Evidence 702 require trial courts "verify that expert testimony is 'based on sufficient facts or data.'" *E.E.O.C. v. Freeman*, 778 F.3d 463, 472 (4th Cir. 2015) (Agee, J., concurring) (quoting Fed. R. Evid. 702(b)). In cases of scientific opinion, this means conducting an "assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. To assess "the validity" of a proposed expert's methodology, courts "may consider whether the expert witness' theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a high known or potential rate of error; and (4) is generally accepted within a relevant scientific community." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017) (cleaned up). This list is not exhaustive, *see Acosta v. Vinoskey*, 310 F. Supp. 3d 662, 667 (W.D. Va. 2018), and does not absolve the court of its obligation, as "gatekeeper," to ensure that the putative expert's opinion is "based on scientific, technical, or other specialized *knowledge* and not on belief or speculation" and that his factual inferences are "derived using scientific or other valid methods." *Sardis*, 10 F.4th at 281-82.

### A.    Gaskin's Proposed Methodology Cannot Produce A Reliable Market Price Premium Because It Fails to Account For Supply-Side Factors

For over one hundred years, Virginia courts have remained steadfast in their definition of "fair market price," seeing it as an expression of what "a seller who desires but is not obliged to sell" and "a buyer under no necessity of purchasing [ ]" agree upon. *Glass v. Commonwealth*, 74 Va. App. 214, 221 (2022); *see also Keener v. Exxon Co., USA*, 32 F.3d 127, 132 (4th Cir. 1994) (market value is set by the market and remains "necessarily speculative" until an actual buyer and an actual seller meet and disclose their respective positions); *Fair Market Value*, Black's Law

13

Dictionary (12th ed. 2024) ("The price that a seller is willing to accept and a buyer is willing to pay in an arm's-length transaction; the point at which supply and demand intersect.").  Even Gaskin himself admits that his understanding of the definition of market price is the price paid at the time when there "was a willing buyer and a willing seller."  (Gaskin Dep. at 70:18-71:5.)  But Gaskin's proposed conjoint analysis ignores that undisputed foundational principle—it considers only half of the equation—the class's willingness to buy.[6]

As Dr. Rossi details in his rebuttal report, a conjoint analysis "can only be used to assess demand."  (Rossi Rebuttal ¶ 41.)  Courts have recognized this deficiency, finding that a conjoint analysis model that "look[s] only to consumer demand while ignoring supply . . . converts the lost-expectation theory from an objective evaluation of relative fair market values to a seemingly subjective inquiry of what an average consumer wants."  *Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930, at *5 (C.D. Cal. Dec. 18, 2014) ("no case hold[s] that a consumer may recover based on consumers' willingness to pay irrespective of what would happen in a functioning market (*i.e.* what could be called sellers' willingness to sell)"); *In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 236 (S.D.N.Y. 2019) (rejecting conjoint analysis because the "demand-side-only" survey methodology "measures consumers' private valuations . . . of certain hypothetical GM vehicles sold with fully disclosed defects; it does not measure the *market value* of those vehicles"); *see also In re: Pella Corp. Architect & Designer Series Windows Mktg., Sales Pracs. & Prods. Liab. Litig.*, 214 F. Supp. 3d 478, 485-86 (D.S.C. 2016) (methodology that rests on "unrealistic conditions" and fails to account for "actual conditions [that] the product experienced" is not reliable).  Gaskin's proposed survey and market value testimony is unreliable because he

---

[6] Plaintiffs' opposition to Ford's prior motion to exclude Gaskin's testimony did not contest that (i) market value is derived from the agreement on a sale price by a willing buyer *and* a willing seller, and (ii) a conjoint analysis is subject to exclusion where it does not adequately consider supply-side factors because, by failing to do so, it cannot demonstrate market value.  (*See* ECF No. 334, at 5-10.)

would only attempt to assess demand but fail to conduct a supply-side analysis.  (Rossi Rebuttal § V.C.2.)

Nor can Gaskin cure this critical deficiency with a single-sentence and unsupported reference to "conversations" with Weir.  Gaskin claims that his "opinion [is], based on conversations with Plaintiffs' economics expert, Colin Weir, that the conjoint methodology. . . accounts for appropriate supply side factors" because (1) its price range will reflect "actual market prices;" and (2) "the quantity of Class Vehicles to be used (or assumed) . . . will reflect the actual quantity" sold.  (Gaskin Report ¶ 26.)[7]  Gaskin does not—and could not—explain how these factors will meet the supply-side requirements.

Indeed, courts have excluded Gaskin's conjoint analysis and testimony as unreliable on similar grounds.  For example, the *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Product Liability Litigation* court reasoned that:

> Gaskin does not actually calculate a market price premium; he examines only what consumers say they would be willing to pay for certain vehicles. . . . [T]his ignores the 'supply' part of the supply/demand curve . . . Calculating a premium by comparing (1) the actual price of vehicles sold with defeat devices to unwitting consumers, and (2) consumers' willingness-to-pay for vehicles with the defeat device (as opposed to the market price of vehicles with the defeat device) is comparing apples and oranges.  And presuming that Defendants would have sold the same number of cars at the exact price that consumers would have been willing to pay is not a way to reliably incorporate supply-side considerations.

500 F. Supp. 3d 940, 949 (N.D. Cal. 2020); *see also Mier v. CVS Health*, 2023 WL 4837851, at *1 (9th Cir. July 28, 2023) (affirming exclusion of conjoint analysis and holding that "the district court reasonably concluded that [plaintiff's] damages model does not adequately account for

---

[7] Gaskin incorporates by reference Weir's discussion of supply-side factors. (Gaskin Report ¶ 26.)  As detailed in Ford's contemporaneously filed renewed motion to exclude the testimony of Weir, which is incorporated herein, Weir's failure to account for supply-side factors also renders his opinions unreliable.  Thus, should this Court excludes Weir's report, Gaskin's reliance on it renders his methodology inadmissible too.

15

market supply and thus cannot measure class-wide damages based on market value").[8]    That reasoning is fully applicable here, where Gaskin relies on the same unreliable supply-side "analysis" rejected in *Volkswagen*.  (*See* Gaskin Report ¶ 27 & n.14.)

Likewise, Gaskin's admission that his conjoint analysis reflects the "actual quantity of such vehicles sold," proves that he has failed to consider supply-side factors.  (Rossi Rebuttal ¶ 153-56.)  As explained in *Ignition Switch*, any assumption that a manufacturer would be willing to sell the same number of vehicles in the but-for world—where disclosure of the alleged defect has reduced consumer demand—defies "logic and common sense," 407 F. Supp. 3d at 237, and is "fundamentally flawed" because it would "mean that a given product is supplied by the manufacturer in the same quantity no matter what the price is," *id.* at 239.  But as the *Ignition Switch* court made clear, "GM's willingness to sell would undoubtedly be different in the but-for world . . . in which the alleged defects in GM's cars had been fully disclosed." *Id.* at 238.  The court held the same in *Volkswagen*, 500 F. Supp. 3d at 949; *see also Schechner v. Whirlpool Corp.*, 2019 WL 4891192, at *7 (E.D. Mich. Aug. 13, 2019) ("historical transactions reflect only historical supply-side factors, not what the prevailing market conditions would have been absent the alleged wrongful conduct"); *In re Emerson Elec. Co. Wet/Dry Vac Mktg. & Sales Litig.*, 2021 WL 5003102, at *2, *6 (E.D. Mo. Oct. 28, 2021) (finding "the reasoning of [*Ignition Switch*] particularly applicable to the issues herein" and excluding conjoint analysis as unreliable for failing to consider changes in "market supply").

---

[8] And as the court in *Ignition Switch* explained, 407 F. Supp. 3d at 238-40, while some courts, especially before the Rule 702 amendments, declined to exclude certain conjoint analyses, they either failed to consider the supply side of the market or concluded that the conjoint at issue *did* consider the role of supply in assessing market prices.  *See, e.g.*, *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1105-1106 (N.D. Cal. 2018).  An expert's bare representation that the conjoint analysis considered supply "does not cut it if the analysis reflected in that expert report does not actually include meaningful consideration of supply-side factors." 407 F. Supp. 3d at 239.

Instead, to reliably determine the market price in the but-for world (*i.e.*, where the alleged defect was disclosed), Gaskin would need to adjust the supply curve through the analysis of supply-side factors such as Ford and its competitors' production costs, profit margins, manufacturing capacity, and competitor reactions to the proposed defect disclosure. (Rossi Rebuttal § IV.C.1.) Gaskin's proposed survey is fatally flawed because it includes no such analysis.[9] *See Mier v. CVS Pharmacy, Inc.*, 2022 WL 1599633, at *4 (C.D. Cal. May 9, 2022) (excluding expert testimony on the market price calculated by conjoint survey because expert "did not calculate a supply curve in his analysis," but instead "presumed the supply curve was the same in his model as in reality" because "without defining the supply curve, [the expert] only calculated the change in consumer willingness-to-pay . . . , not the market price"), *aff'd in relevant part sub nom*, *Mier v. CVS Health*, 2023 WL 4837851, at *2 (9th Cir. July 28, 2023) ("The district court reasonably concluded that [the expert's] testimony and report are irrelevant to market price because he failed to analyze where the supply curve intersects with market demand").

Gaskin's proposed "market simulation" is also unreliable because it fails to simulate any actual market. Gaskin's proposed simulated market consists of only one make/model—two hypothetical Ford F-150s, identical in all aspects except for the presence or absence of the alleged defect. No such market—entirely devoid of competitor vehicles—exists. (Rossi Rebuttal ¶ 22.) *See also Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 462 (E.D. Va. 2017) (survey unreliable because it did not mimic the "actual market conditions in which consumers might encounter [and be forced to choose among] the [products]"), *aff'd*, 707 F. App'x 138 (4th Cir. 2017).

The reasoning in *In re Marriott* is instructive. There, a putative class of consumers claimed

---

[9] Plaintiffs' opposition to Ford's original motion to exclude Gaskin's testimony did not contest that Gaskin fails to consider whether Ford would be willing to sell the same number of vehicles if disclosure of the purported defect would cause prices of Class Vehicles to drop significantly. (*See* ECF No. 334, at 5-10.)

17

that they would have paid less for their hotel rooms had the consumers known of Marriot's allegedly deficient data-security practices. To prove classwide damages, plaintiffs submitted—and the court admitted—an overpayment damages model that relied on a conjoint consumer survey. 602 F. Supp. 3d at 775-76, 782-83. That model, like Gaskin's, included a market simulation between the actual world and a hypothetical but-for world. *Id*. at 778, 780 (defining hypothetical but-for world as one in which the consumers knew of Marriott's allegedly derelict data-security policies (*i.e.*, their version of a "defect")). Critical for the court was the model's ability to account for competition, with the court recognizing that the model was *designed* to "replicate" the defendant's mechanism for "pricing hotel rooms against the competition" and accounted for competitor pricing by considering testimony of a Rule 30(b)(6) witness who was "familiar with [defendant's] pricing of hotel rooms," *id*. at 779, and that, as run, could account for changes in competition, *id*. at 780–81. Ability to account for changes in supply and demand is thus critical to determining an overpayment model's reliability: something that Gaskin cannot do.

Plaintiffs' contention (ECF No. 334, at 5-10) that "Ford's criticisms go to the weight of the proposed conjoint analysis" and cited cases ignore the import of the 2023 Amendments to Rule 702. The 2023 Advisory Committee Notes explained that the amendment sought to "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is *more likely than not* that the proffered testimony meets the admissibility requirements set forth in the rule." *2023 Advisory Committee Notes*. Post-amendment challenges to the reliability of expert testimony, such as Gaskin's here, cannot be waved away as going to the "weight" without the Court first affirmatively assessing whether the Plaintiffs have demonstrated that it is "*more likely than not*" that the testimony is reliable. Neither consideration of historical pricing and sales data or his "conversations" with Weir meet that standard because neither analyzes

18

whether Ford would still have been willing to sell the same number of vehicles at a lower price.

**B.    Gaskin Cannot Show That His Proposed Survey Can Reliably Calculate Classwide Damages Or That It Is Helpful Because It Is Unperformed, Applies Only To F-150s, And Does Not Fit Plaintiffs' Liability Theories**

Plaintiffs cannot demonstrate that Gaskin's survey can reliably calculate classwide damages or that it is helpful because, despite the passage of the expert disclosure deadline, he has failed to finalize his methodology or run the analysis, and has not even proposed a methodology applicable to vehicles other than the F-150, and it does not fit Plaintiffs' liability theories.

First, Gaskin's testimony should be excluded as unreliable because, by failing to actually conduct the survey and calculate the resulting overpayment percentage before the January 3, 2025 expert disclosure deadline (ECF No. 236), Plaintiffs have failed to meet their burden of proving that his proposed methodology can yield reliable results. Courts in this Circuit are clear that, in addition to showing reliable application, proponents of a damages model must also demonstrate that the model can yield reliable results. *See, e.g.*, *In re Marriott*, 602 F. Supp. 3d at 786 (reliability requires experts test their models to show that they "can in fact produce reliable results" and failure to do so, despite having "ample time" and opportunity, is a mark against admissibility); *Blackbaud*, 2024 WL 2155221, at *9-10, *13-14 (failure to provide an error rate or conduct testing renders the underlying expert testimony both "unreliable and unhelpful"); *Lee v. City of Richmond, Va.*, 2014 WL 5092715, at *7 (E.D. Va. Sept. 30, 2014) (expert's analysis unreliable because it failed to "account for certain variables within the [applicable field]" and incorporate a margin of error). Such testing is "especially important" in product liability cases. *Nease*, 848 F.3d at 231.

There are, however, no testing or results for this Court to assess. Gaskin has not pre-tested, let alone administered, the survey. He, likewise, has not conducted his regression, calculated the eight overpayment figures, or selected the final overpayment percentage. Nor is there time for Gaskin to perform all the steps necessary to fill the black hole of information that faces this Court.

The expert disclosure deadline has long since passed, and class certification briefing begins imminently, and, in this Circuit, issues of reliability that go "to establishing any of the Rule 23 requirements" must be conclusively resolved *before* class certification. *Blackbaud*, 2024 WL 2155221, at *4 (quoting *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 816 (7th Cir. 2010)); *see supra* p. 10. Plaintiffs, as such, are out of time and fail to carry their burden in showing the damages model can yield reliable results. *See 2023 Advisory Committee Notes* (challenges to the sufficiency of an expert's basis or reliable application of her methodology are in the first instance questions of admissibility, not weight, and an opponent's attacks thereon go to weight *only after* reliability is shown by a preponderance of the evidence).

The holding in *Volkswagen* is instructive. There, Gaskin not only proposed, but also conducted his survey prior to the filing of Rule 702 motions. 500 F. Supp. 3d at 944-45. In excluding Gaskin's opinion, the Court found that "the *results* of Mr. Gaskin's analysis indicate that his methodology was not reliable." *Id.* at 950. The court identified two specific results as problematic. First, the "results suggest that certain consumers value a $2,000 navigation system in a $16,000 vehicle at $9,000." *Id.* Second, Gaskin ran eight calculations of the overpayment percentage and used the lowest result (as he proposes to do here), and the court found that the fact that "Gaskin calculated radically different 'overcharge' percentages . . . ranging from 8.5% to 60.5%" reflected his methodology's unreliability. *Id.* The court also found that while "an overpayment ratio might sensibly vary depending on price . . . a range that resembles 'somewhere between almost nothing and almost everything' is facially unrealistic.'" *Id.* Here, by failing to perform his proposed F-150 survey, Gaskin has precluded Ford from challenging, and the Court from considering, the reliability of his methodology based on those results. Thus, Plaintiffs cannot demonstrate that his methodology produces reliable results.

20

The recent decision in *Davis v. Capital One, N.A.*, 2025 WL 2445880 (4th Cir. Aug. 26, 2025), is on point. There, the plaintiff in a putative class action asserting violations of the Telephone Consumer Protection Act retained an expert to identify putative class members and thereby render the class ascertainable. *Id.* at *4-5. The expert's report "outlined a four-part methodology" for identifying the putative class members, but only tested the first three steps on a small sample of the relevant phone numbers and "forwent entirely the fourth and final step." *Id.* at *4. The Fourth Circuit affirmed as "well supported" the District Court's exclusion of her testimony as unreliable, finding that the District Court "had ample bases to question the reliability of [the] testimony." *Id.* at *5. The primary basis identified by the Fourth Circuit for questioning the testimony's reliability was that the expert "never fully tested her own methodology." *Id.*; *see also id.* (finding that the expert's "failure to fully test her methodology . . . calls into question its reliability"). When coupled with competing expert testimony calling into question the reliability of the testimony, the Fourth Circuit found no abuse of discretion in excluding the testimony. *Id.* The *Davis* reasoning likewise applies here—Gaskin has failed to test *any* of his proposed methodology and Ford's expert, Dr. Peter Rossi, has demonstrated that his proposed methodology cannot reliably establish the change in fair market value in a but-for world. (*Supra* pp. 14-15.)

Plaintiffs argue (ECF No. 334, at 11) that Gaskin can demonstrate that his model "can yield reliable results" without actually performing the analysis because "conjoint analysis is widely accepted as a methodology in consumer class actions." That argument fails because it ignores the revised Rule 702(d) mandate that "the expert's opinion *reflects a reliable application of* the principles and methods to the facts of the case." A reliable methodology for determining classwide damages in consumer class actions is necessary, but not sufficient. Plaintiffs must prove by a preponderance of the evidence that Gaskin's application of conjoint analysis as to the facts of the

21

case is reliable. His failure to apply his analysis precludes any finding that he has reliably applied his methodology to the facts of this case. *See Creekmore v. Truist Bank*, 2025 WL 1717647, at *8 (E.D. Va. May 29, 2025) (excluding damages expert and holding that "while the court expresses no doubt as to the reliability of the Weed and Field method when properly applied, mere reference to this method—without its application—does not render [expert's] opinion a product of reliable principles and methods"). For instance, Gaskin proposes to identify a representative sample of consumers (Gaskin Report § VII), but has not done so, precluding the Court from assessing whether he reliably applied standards for selecting a sample. Gaskin also proposes to run a Hierarchical Bayesian regression on the survey results (*id.* § IX), but has not done so, precluding the Court from assessing whether he reliably applied that regression. Gaskin also proposes to conduct a market simulation (*id.* § XI), but has not done so, precluding a finding that he reliably conducted that simulation. Gaskin's dismissive treatment of the law of supply and demand makes it especially important to test the reliability of his purported market simulation. His failure to actually perform that simulation prevents Plaintiffs from carrying their burden under Rule 702(d).

Second, Gaskin's proposed conjoint survey cannot reliably compute class-wide damages here because, among other failings, it explicitly applies only to F-150s and he has not proposed a specific survey methodology for the other putative Class Vehicle models.

Gaskin's proposed conjoint survey methodology specifically defines the "Class Vehicles" at issue in his survey as Model Year 2017-2023 F-150s. (Gaskin Report ¶ 8.) It then proposes to query current and former owners or lessees of such F-150s or competitive vehicles about various vehicle attributes applicable to F-150s and competitive vehicles, and run a regression of those results. (*Id.* ¶¶ 38, 48-50, 53-54.) Gaskin specifically concludes that "any reduction in value calculated through the conjoint analysis will be equally applicable across *the Class Vehicles for*

22

*which this survey is performed*," *i.e.*, 2017-2023 F-150s. (*Id.* ¶ 61.) Indeed, Gaskin specifically acknowledged that this survey would not produce an overpayment amount for other vehicles. (Gaskin Dep. at 12:6-13:24, 20:9-27:4.) Instead, Gaskin simply notes that "[a] similar methodology would apply equally" to those models and that "if [he is] asked" to do so, he would "propose substantially similar surveys." (Gaskin Report ¶ 8 n.2.)

Beyond the cursory statement that his other surveys would be "substantially similar," the Gaskin Report does not identify how he proposes to change his methodology to address the other vehicle models. For instance, he does not identify what competitive vehicles he would test each model against, what attributes he would use in each survey, or how he would intend to sample the relevant population. In essence, Gaskin is asking this Court to forfeit its gatekeeping obligations and pre-approve *five* separate surveys—without ever seeing them or ruling on their admissibility— because *he says* they will not substantially differ and vouches for their admissibility. Gaskin's claim that the *other* surveys will be reliable is "quintessential *ipse dixit*." *See ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 815 (E.D. Va. 2011) (Payne, J.) (finding an expert's assertion—without explanation—that certain factors would inflate a royalty rate's range by approximately 100 percent to be "quintessential *ipse dixit*"), *aff'd,* 700 F.3d 509 (Fed. Cir. 2012); *see also In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552-53 (C.D. Cal. 2014) (excluding Weir's proposal to calculate classwide damages using a conjoint survey because "the court is thus left with only Weir's assurance that he can build a model to calculate damages" which renders his report "so incomplete as to be inadmissible as irrelevant").

The omission of any proposed methodology to address the non-F-150s among Plaintiffs' putative class is critical because to obtain certification Plaintiffs must show that each individual class member was harmed. *See Freeman v. Progressive Direct Ins. Co.*, 149 F.4th 461, 468-69

(4th Cir. 2025) (requiring under *TransUnion* that "every class member . . . must have been concretely harmed" and reversing certification where many class members "could [not] claim injury," holding that "[t]his characteristic of the certified class alone justifies reversal of the class certification order"). Plaintiffs' putative class includes 75,558 vehicles of seven types: F-150s, Rangers, Expeditions, Transits, Mustangs, Raptors, and Navigators. F-150s constitute only 58% of Class Vehicles. (Rossi Rebuttal, ¶ 115 n.170 & Table D-5.)[10] Thus, Gaskin's survey identifies no methodology for assessing—and fails to assess—damages for over 40% of the putative class, including Morris who asserts claims about an Expedition.[11] That failure is fatal to Plaintiffs' ability to certify a class under Rule 23(b)(3). *See Mr. Dee's Inc. v. Inmar, Inc.*, 127 F.4th 925, 933 (4th Cir. 2025) (affirming denial of certification where plaintiffs' damages expert failed to provide evidence of damages for 32% of the putative class, finding that "the high share of class members with no demonstrable injury presented a predominance problem").

Even if that were not the case, and Gaskin had proposed five additional surveys covering the remaining 42% of the putative class, Gaskin proposes no methodology for how the six resulting overpayment percentages can be reconciled into a single class-wide damages figure. For example, does he propose to weigh them evenly and take the average? Or would he weigh it by the number of class vehicles sold per model, *i.e.*, providing F-150s with 58% weight? Or would he simply take the lowest number to be conservative, like he proposes to do for the F-150 overpayment

---

[10] While Plaintiffs' counsel has contended that Raptors should be considered "F-150s" for certification purposes—a contention that Ford denies—Gaskin confirmed at his deposition that his proposed F-150 survey is not intended to apply to Raptors. (Gaskin Dep. at 17:11-18:1.) Regardless, even if Raptors were grouped with F-150s for this analysis, Gaskin's survey would still only address 61% of putative class vehicles. (*See* Rossi Rebuttal, Table D-5 (Raptors make up 3.38% of class vehicle transactions).)

[11] And, even among the F-150 owners for which Gaskin's survey would apply, Gaskin fails to consider F-150 owners that suffered no damages, such as Morris. Prior to owning his Expedition, Morris purchased a 2017 F-150 equipped with the 10R80, drove it for 3.5 years and 73,000 miles without issue, testified that he was satisfied with its performance, and sold it for fair market value. (Ex. 6, at 45:4-21, 114:11-115:7, 141:6-12.)

24

number?  Again, Gaskin's bare-bones proposal asks the Court simply to trust that he will conduct his analysis reliably without any ability for the Court to provide oversight of that process.

The recent holding in *LeGrand v. Abbott Laboratories*, 2025 WL 2323352 (N.D. Cal. Aug. 12, 2025), is illustrative.  In *LeGrand*, the plaintiff challenged eleven statements made on three different Ensure products, contending that they were misleading and caused the consumers to overpay for the products.  *Id.* at *1-2.  Gaskin proffered an "illustrative survey" that he would conduct post-certification focused on only two of the challenged statements on the labels of only one Ensure product.  *Id.* at *5.  Like here, Gaskin stated that he intended to "conduct additional surveys for the additional Class Products at issue in th[at] lawsuit" using a "similar" methodology, but failed to actually propose those methodologies.  *Id.* at *5-6.  The court excluded the survey under Rule 702, holding that the proposed model "cannot practically account for all the Challenged Statements" rendering it unable to "reliably calculate damages in a manner common to the class at trial."  *Id.* at *6.  That identical reasoning and conclusion is appropriate here because Gaskin's proposed F-150 survey has failed to account for all the putative Class Vehicles.

Third, while Plaintiffs seek overpayment damages on all claims, Gaskin's proposed methodology fails to fit their theory of liability for the express warranty, implied warranty, and VCPA claims.  As the Supreme Court confirmed in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), "any model supporting a plaintiff's damages case must be consistent with its liability case."  *Id.* at 35.  Gaskin is clear that his model is "designed to estimate the reduction in market value . . ., if any, caused by the disclosure of the [alleged defect]" (Gaskin Report ¶ 11; *see also id.* ¶ 61), but Dolan's express warranty claim is premised on Ford's alleged "breach of the express warranties stated on its Monroney stickers" (SAC ¶ 230), *i.e.*, its alleged failure to conduct warranted repairs (*see id.* ¶¶ 226, 229).  Thus, Gaskin's model measures something different than Dolan's express

25

warranty theory of liability, and as such it cannot reliably measure classwide damages. *E.g.*, *McMorrow v. Mondelez Int'l, Inc.*, 2020 WL 1157191, at *6-9 & n.2 (S.D. Cal. Mar. 9, 2020) (excluding conjoint survey that was not consistent with plaintiffs' theory of liability).

Similarly, Plaintiffs' implied warranty claim, for which damages are limited by Va. Code § 8.2-714(2) to "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted," rests on Ford's alleged failure to sell a merchantable vehicle (SAC ¶¶ 243, 252). But Gaskin's model purports to measure something different—the value of a perfectly functional transmission, not the value of a merchantable vehicle. As the *en banc* Sixth Circuit recently held, the existence of a defective component alone, does not render an entire vehicle unmerchantable, which instead requires a holistic approach. *See Speerly v. General Motors*, 143 F.4th 306, 325-26 (6th Cir. 2025) (recognizing "the commercial norm that a 'product is merchantable' if a defective 'feature does not make the product as whole unfit'" and holding that under the laws of fourteen states "unmerchantability does not turn alone on whether there is a defect in a component part" but instead "the class must prove that the defect made the entire product unfit for ordinary use").[12] Thus, Gaskin's model does not measure the damages arising from any breach of implied warranty.

Likewise, Plaintiffs allege that they suffered damages for their VCPA claim "caused by Ford's misrepresentations and failure to disclose material information and refusal to provide effective and free repairs pursuant to its warranties." (SAC ¶ 306.) But Gaskin does not measure

---

[12] Virginia applies the same standard. *See, e.g.*, *Bayliner Marine Corp. v. Crow*, 257 Va. 121, 128-29 (1999) (considering whether a boat was rendered unmerchantable where its engine could not exceed 17 miles, holding that such a finding that required the boat to not be "such as would pass without objection in the trade" or be "fit for the ordinary purposes for which such goods are used," and finding no evidence to support that finding); *Kruglyak v. Home Depot USA, Inc.*, 750 F. Supp. 3d 644, 662 (W.D. Va. 2024) (holding tub was not unmerchantable merely because it "was missing certain features . . . including a control panel, LED lights, and a water heater").

damages suffered due to *any* representation or failure to provide repairs. (Gaskin Dep. at 48:16-49:21 (confirming that he is not testing any false claims, but only omissions).) And, while Gaskin purports to measure damages attributable to the non-disclosure of the defect, he does not provide any method for apportioning VCPA damages among the three violations alleged by Plaintiffs.

Fourth, Gaskin's testimony should be excluded because it will not help the factfinder resolve any dispute. Under Federal Rule of Evidence 702(a), to be admissible, Gaskin's testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." But Gaskin's testimony will not be helpful because he has not conducted the survey despite the passage of the expert disclosure deadline. Plaintiffs' affirmative expert disclosures and reports were due on January 3, 2025. (ECF No. 236.) Despite that deadline, Gaskin has taken no steps to implement his proposed analysis. He has not pretested it, identified the sample respondents, conducted the survey, simulated the market, or identified the overpayment percentage among the eight results. Gaskin has also failed to even propose a specific methodology that would apply to Mustangs, Expeditions, Rangers, Transits, Raptors, or Navigators. Because the expert disclosure deadline has passed, he will not be able to do so, rendering his entire conjoint analysis proposal academic.

### C. Gaskin's Proposed Survey Methodology Fails To Incorporate Generally-Accepted Principles Of Survey Research

Survey evidence requires a "substantial showing of reliability" to be admissible under Rule 702. *See Tunnell v. Ford Motor Co.*, 330 F. Supp. 2d 707, 716 (W.D. Va. 2004). To establish reliability, a survey's proponent must show that it was "'conducted in accordance with generally accepted survey principles,' and [that] '[its] results are used in a statistically correct manner.'" *Id.* Gaskin's proposed F-150 survey cannot meet that standard.

First, Gaskin's survey is unreliable because he does not use a representative sample of the putative class. It is well-established that "[f]or a survey to be valid, the persons interviewed must

adequately represent the opinions which are relevant to the litigation." *In re Fluidmaster, Inc. Water Connector Components Prods. Liab. Litig.*, 2017 WL 1196990, at *29 (N.D. Ill. Mar. 31, 2017). While Gaskin's survey is put forward concerning a class of persons residing "in Virginia" (SAC ¶ 155), Gaskin's proposed universe includes residents of the "United States" generally (Gaskin Report ¶ 38), ensuring that virtually all respondents will reside *outside* of Virginia. Virginia constitutes 2.6% of the national population, meaning that of Gaskin's proposed 300 respondents, approximately eight will be from Virginia. (Rossi Rebuttal, ¶ 128 & n.189.)[13] Gaskin cannot draw "statistically valid inferences" based on a sample size of eight. And, even though the putative Class includes both new and used vehicles, Gaskin proposes only to survey new vehicle purchasers and lessees. (Gaskin Report ¶ 38.) Gaskin also fails to differentiate between fleet (*i.e.*, commercial) and retail (*i.e.*, consumer) purchasers and lessees.[14] Gaskin fails to justify any of these inclusions or exclusions, each of which may skew the results because of the different considerations undertaken by each group of consumers. (Rossi Rebuttal ¶¶ 125-26.)

Gaskin's failure to use a representative sample renders the results of his survey unreliable. And courts in this Circuit agree—"[a] survey of the wrong universe [is] of little probative value in litigation." *PBM Prods., LLC v. Mead Johnson & C*o., 639 F.3d 111, 123 (4th Cir. 2011); *Valador*, 242 F. Supp. 3d at 459–461 (survey improperly designed because it focused on persons likely to *view* advertisements of a certain product rather than prospective *purchasers*).

Second, Gaskin uses biased language to describe the alleged defect and, in so doing, predisposes respondents to certain responses. He proposes to describe the alleged defect as one

---

[13] Gaskin's overinclusive group fails to address that vehicle purchasing preferences may vary around the country. For example, F-150s constituted 0.166% of per capita vehicle transactions in Virginia in 2022, but 0.327% of such transactions nationwide, meaning that F-150s were twice as popular nationwide as in Virginia. (Rossi Rebuttal, Figure D-1.)

[14] Collectively, "fleet" transactions make up 23% of all nationwide class vehicle transactions and 19% of all F-150 transactions. (Rossi Rebuttal at Table D-2.)

that "*may* cause the automatic transmission to shift gears harshly and erratically" and "*may or may not* be able to be repaired and *may or may not* be covered by the warranty." (Gaskin Report at 23.) Each specific choice set also provides respondents with the options of a transmission attribute that (i) "*may* shift gears harshly and erratically" or (ii) "*works reliably* when shifting between gears." (*Id.*) The use of "may" is inherently ambiguous, particularly because Gaskin has not proposed to provide any data clarifying the incidence rate of the alleged defect. (*See* Rossi Rebuttal ¶¶ 21(e), 108-110.) The court's reasoning in *vonRosenberg v. Lawrence*, 413 F. Supp. 3d 437 (D.S.C. 2019), is instructive. There, the parties disagreed whether the word "can" was so imprecisely used that it would result in respondents providing irrelevant responses. *Id.* at 448 (defining the term "category name" to mean: "a name that identifies a category that *can* include various organizations that are not affiliated with each other" and "*can* be used by more than one organization to identify what type of organization they are" (emphasis in original)). The court found that respondents could select the defined term for two, inapposite reasons—either because they believed the "term that 'can' be, but is not necessarily, used by organizations that are not affiliated with each other" or because they believed the "mark refer[ed] to a 'type of organization' that *is* affiliated with another organization. *Id.* The same concern exists here: Gaskin's use of the word "may" is so imprecise that it undermines the survey's reliability.

Third, Gaskin's survey is also unreliable because it is not objective. Specifically, Gaskin omits attributes that real-world purchasers and lessors would actually consider and, in so doing, places disproportionate importance on the biased transmission attribute. Indeed, in 2013, Gaskin agreed, writing that "it is critical to assess whether . . . product attributes . . . include all of the important attributes that drive people's purchase choices. *Leaving out an important attribute can render the research's results invalid and/or misleading*." (Rossi Rebuttal ¶ 95.) Yet, here, he

29

makes no such efforts and, as a result, fails to consider attributes that an actual purchaser would trade-off against—*e.g.*, gas mileage and performance, engine size, type, and power, and the option for hybrid power.  (*See id.* § V.A.1.)  By selecting attributes "without determining if they play an important role in real-world consumers' preferences," Gaskin's proposed methodology "potentially elevates" attributes linked to Plaintiffs' damages claims and "inflates respondents' [willingness to pay] estimate for these attributes."  *In re Fluidmaster*, 2017 WL 1196990, at \*31.

### D.   Gaskin Proposes To Cherry-Pick The Overpayment Percentage

The results of Gaskin's conjoint analysis are also unreliable because he proposes to cherry-pick the final overpayment figure.  As detailed *supra* pp. 8-9, Gaskin intends to run separate tests on the effect of disclosure of the alleged defect at the various price levels, which may each result in different overpayment figures.  Cognizant of his need to quantify a single class-wide damages figure, and under the guise of being "conservative," Gaskin proposes to select the lowest of the eight figures.  (Gaskin Report ¶¶ 59-60.)  Arbitrarily selecting the "lowest" number does not reliably prove that the figure represents the difference in market price between the actual and but-for worlds, particularly where the range of numbers is implausible and incorrect.  (Rossi Rebuttal § V.C.4.)  As such, Gaskin's decision to select the "most conservative" number does not render it reliable, particularly when contradicted by seven-eighths of his own results.  *In re Marriott*, 602 F. Supp. 3d at 787 (algorithms that support damages models are neither infallible nor omniscient and unless the expert shows that it "is the product of a system or process capable of producing accurate results (a condition precedent to their admissibility), then the results they generate cannot be shown to be" admissible); *see also Volkswagen*, 500 F. Supp. 3d at 950 ("Merely picking the lowest number in that range does not remove doubt").

### CONCLUSION

Ford respectfully requests that the Court exclude the testimony of Steven Gaskin.

Dated:  December 17, 2025

KASOWITZ LLP

By: */s/      Hector Torres*
Hector Torres (admitted *pro hac vice*)
Cindy C. Kelly (admitted *pro hac vice*)
Stephen P. Thomasch (admitted *pro hac vice*)
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
htorres@kasowitz.com
ckelly@kasowitz.com
sthomasch@kasowitz.com

MCGUIREWOODS LLP

By: */s/ Juliet B. Clark*
Perry W. Miles IV (#43031)
Brian D. Schmalzbach (#88544)
Jonathan T. Tan (#88037)
Juliet B. Clark (#96918)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
Telephone: (804) 775-1000
pmiles@mcguirewoods.com
bschmalzbach@mcguirewoods.com
jtan@mcguirewoods.com
jbclark@mcguirewoods.com

By: */s/ Jodi M. Schebel*
Jodi M. Schebel (admitted *pro hac vice*)
BOWMAN AND BROOKE LLP
101 W. Big Beaver Rd., Suite 1100
Troy, MI 48084
Telephone: (248) 205-3300
jodi.schebel@bowmanandbrooke.com

*Attorneys for Defendant Ford Motor
Company*

31

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served on December 17, 2025, on all counsel of record via CM/ECF, pursuant to the Federal Rules of Civil Procedure.

*/s/ Juliet B. Clark*
Juliet B. Clark
