UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

JAMES DOLAN and JAMES MORRIS,
individually and on behalf of all others similarly
situated,

        Plaintiffs,

v.

                                      Case No. 3:23-cv-512-REP

FORD MOTOR COMPANY,

        Defendant.

## REVISED SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs James Dolan ("Dr. Dolan") and James Morris ("Mr. Morris") (collectively, "Plaintiffs"), by and through counsel, bring this Second Amended Class Action Complaint against Defendant Ford Motor Company ("Defendant" or "Ford"), individually and on behalf of all others similarly situated, and allege, upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon their counsel's investigations, as follows:

## I.      PRELIMINARY STATEMENT

1.     Plaintiffs bring this case individually and on behalf of the other members of the below-defined class and subclasses they respectively seek to represent ("Class Members") who purchased or leased a Ford vehicle equipped with a 10R80 10-speed transmission ("10R80" or "Transmission") that was designed, manufactured, distributed, advertised, marketed, sold, and/or leased by Defendant or Defendant's parent, subsidiary, or affiliates. Plaintiffs assert claims related to and resulting from the defective design of the Transmission, including for Defendant's breach of express and implied warranties, fraud, and violations of the Virginia Consumer Protection Act, Va. Code §§ 59.1-196 *et seq.* ("VCPA").

1

## II.    JURISDICTION

2.      The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000.00 exclusive of interest and costs, and Plaintiffs and Class Members are citizens of states different from Defendant.

3.      The Court has personal jurisdiction over Ford because, through its business of distributing, selling, and leasing vehicles in this District, Ford has established sufficient contacts in this District such that personal jurisdiction is appropriate.

4.      Venue is proper in this District under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Venue is proper in this Division under L. Civ. R. 3(C) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this Division. Specifically, Plaintiffs purchased their vehicles, used their vehicles, experienced the symptoms and malfunctions in their vehicles which underly their claims, and/or had their vehicles serviced by authorized Ford dealerships in this District and Division.

## III.    PARTIES

5.      Plaintiff James Dolan is a Virginia citizen who lives in Henrico County. Dr. Dolan purchased a 2018 Ford F-150 with the 10R80. This vehicle was designed, manufactured, sold, distributed, advertised, marketed, and/or warranted by Ford.

6.      Plaintiff James Morris is a Virginia citizen who lives in Spotsylvania County. Mr. Morris purchased a 2020 Ford Expedition with the 10R80. This vehicle was designed, manufactured, sold, distributed, advertised, marketed, and/or warranted by Ford.

2

7.     Ford is a publicly traded corporation organized under the laws of the State of Delaware with CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060 as its registered agent in Virginia. Ford's principal place of business is at One American Road, Dearborn, Michigan 48126.

8.     Ford, on its own and through its various entities, designs, manufactures, advertises, markets, distributes, and sells and/or leases its vehicles in this District and many other locations in the United States and worldwide. Ford and/or its agents designed, manufactured, and installed the Transmissions in thousands of vehicles sold in Virginia. Ford also developed and disseminated the owner's manuals, advertisements, and other promotional materials pertaining to vehicles equipped with the 10R80 that it sold in Virginia.

9.     Ford's authorized dealerships are Ford's agents.

10.     Ford remains in continuous communication with its authorized dealerships on nearly every issue conceivable pertaining to advertising, sales, and marketing; warranty repairs and service; brand representation; training and standards; and new and used vehicles.

11.     Ford controls all decisions and conduct material to this action through its franchise agreements; dealers' use of Ford's trademarks and logos and the ongoing requirements and oversight Ford imposes on dealers to be able to do so; Ford's training programs and standards for dealership employees, including sales representatives; the advertising materials and guidelines Ford provides to its dealerships, influencing the way Defendant's vehicles are promoted and creating a cohesive brand image; and control over the warranty process.

## IV.    FACTUAL ALLEGATIONS

### FORD'S VEHICLES WITH A 10R80 TRANSMISSIONS ARE DEFECTIVE

12.     Defendant designed and manufactured, and then distributed, advertised, marketed and sold in Virginia Ford Expeditions (Model Years ("MYs") 2018–2023), Mustangs (MYs 2018–

2023), Rangers (2019–2023), F-150s (MYs 2017–2023), Transits (MYs 2020–2023), and Lincoln Navigators (MYs 2018–2023) equipped with the 10R80 (collectively, the "Class Vehicles"). Ford introduced the Transmission in its 2017 F-150 pickup trucks, which were first made available to Virginia consumers in late-2016.

13.    No material engineering differences exist as to Ford's 10R80 Transmissions equipped in the Class Vehicles.

14.    A common design defect in Ford's 10R80 is a potentially life-threatening safety issue, and Ford has refused to recall or replace these defective Transmissions. The design defect (the "Transmission Defect") is the inability of the Transmission to maintain the intended and necessary internal pressure to ensure secure and timely engagements of each clutch required for a specific gear.

15.    All told, Ford has published *at least thirty-three Technical Service Bulletins* ("TSBs")[1] related explicitly to "harsh," "bumpy," "rough" and "delayed" shifting or gear engagement in Vehicles equipped with the 10R80 (the "Harsh Shift TSBs"). The Harsh Shift TSBs are collected and summarized in the attached **Exhibit A**.

16.    Additionally, Ford published TSB 23-2120 on May 15, 2023 identifying the "issue" as:

> Some 2018-2021 Expedition/Navigator and 2020-2021 Explorer/Aviator vehicles equipped with a 10R80/10R80 MHT or 10R60 may exhibit a momentary transmission neutral-out condition while in drive. Vehicle may also have diagnostic trouble code (DTC) P07E6 and/or P07E4 stored in the powertrain control module (PCM) or transmission control module (TCM) and/or a possible audible noise. This may be due to a leak in the park valve circuit. To correct the condition, follow the Service Procedure to inspect the park system hardware for wear or damage and

---

[1] According to Ford, TSBs "are a supplement to a vehicle's repair manual but do not cover the cost of repairs or replacement parts." *Where Can I Search for Ford Technical Service Bulletins?*, *available at* https://www.ford.com/support/how-tos/ford-services/parts-and-service/where-can-i-search-for-technical-service-bulletins/ (last accessed on Sept. 4, 2024).

4

replace the valve body separator plate with an improved valve body separator plate.

17.     The Transmission Defect makes the Class Vehicles unreasonably dangerous.

18.     Because of the Transmission Defect, the Class Vehicles are likely to suffer serious damages and potentially catch fire if accidents occur, and there is an unreasonable and extreme risk of serious bodily harm or death to the vehicle's occupants and others in the vicinity.

## FORD MISREPRESENTS THE FUNCTIONALITY OF THE 10R80

19.     Ford has designed, manufactured, advertised, sold, and leased its vehicles for decades, including its Mustang model for nearly 60 years, its F-150 trucks for nearly 50 years, its Transit vans and Ranger trucks for more than 40 years, and its Expeditions and Lincoln Navigators for 25 years.

20.     Ford has touted the superiority of its vehicles, particularly the smoothness of the shifting provided by the Transmission since before it was first released on the market.

21.     The "smoothness" of shifting is not a subjective assessment at Ford, but rather an objective metric which is tested for, measured, and the subject of Ford's design and manufacturing efforts.

22.     Further, even before its release of the Transmission, Ford has acknowledged shift-"smoothness" as a material consideration amongst its customers (and consumers generally), including by including questions regarding shift-quality in its customer surveys.

23.     For the 2017 F-150—the first vehicle equipped with the 10R80—Ford advertised the "improved acceleration and performance" and "enhanced shifting performance" offered by the Transmission, "compared with previous six-speed automatic transmissions."

24.     Ford's claims that the 10R80's acceleration, performance, and "shifting performance" are "improved" and "enhanced" were intended to, and explicitly did, convey

objective and fact-based comparisons to Ford's 6R80 6-speed transmission.

25.    Such claims can be seen in advertisements such as those presented on Ford's website in or around February 2017:

## New 10-Speed Transmission

For 2017, F-150 pairs an all-new 10-speed transmission with its 3.5-liter EcoBoost® engine. The transmission delivers improved acceleration and performance compared with previous six-speed automatic transmissions, thanks to optimized wide-span gear spacing, coupled with drag-reduction actions. Three overdrive gears and a wider ratio span help improve fuel efficiency at highway speeds, while maintaining F-150's best-in-class towing. The 10-speed transmission uses advanced materials and alloys to save weight, which translates into enhanced shifting performance.

26.    Ford also regularly touts the F-150's superiority among its competitors.

27.    Such claims can be seen in advertisements such as the following:

## CLASS-LEADING CAPABILITY

The Ford F-150 makes tough tasks look easy, whether it's working on the job or heading out on a weekend of recreation. F-150 outperforms every other truck in its class when hauling cargo in the bed or towing a trailer.* No wonder the competition is always in a scramble to follow the leader.

28.    Ford claimed that the 10R80 "delivers improved overall performance" and "enhanced acceleration" were intended to, and explicitly did, convey objective and fact-based comparisons to Ford's 6R80 6-speed transmission.

29.    Such claims can be seen in advertisements such as those presented on Ford's website in or around April 2019:

## 10-SPEED AUTOMATIC TRANSMISSION

F-150 EcoBoost®, V8 and diesel engines deliver their power through an advanced 10-speed automatic transmission. Compared with the 6-speed, the 10-speed delivers improved overall performance, with enhanced acceleration at the low and mid ranges of the power band. Features include optimized wide-span gear spacing coupled with drag-reduction actions plus three overdrive gears. What's more, you can choose from selectable modes: Normal, Tow-Haul, Snow-Wet, EcoSelect, and Sport.



30.     Ford explicitly directed its dealerships, through its eSourceBook for the 2018 Mustang, to represent to consumers that the 10R80 available in the 2018 Mustang "deliver[s] smooth and responsive shifting" with "engine rpm matching on coast-down shifts provides a seamless transition to lower gears." FORD_DOLAN_000004527. But it simultaneously included language in the eSourcebook designed to misdirect customers away from investigation of possible low shift quality: "MAKE THE POINT: Smarter Shift Logic Customers may notice that the Mustang does not always shift sequentially . . . This is because of the Skip Lift logic with real-time adaptive shift-scheduling algorithms which monitor more than a dozen powertrain- and driver-control signals to ensure the right gear at the right time." FORD_DOLAN_000004528.

31.     Ford explicitly directed its dealerships, through its eSourceBook for the 2018 Expedition, to represent to consumers that the 10R80 available in the 2018 Expedition "deliver[s] smooth and responsive shifting" with "engine rpm matching on coast-down shifts provides a seamless transition to lower gears." FORD_DOLAN_000004154. But it simultaneously included language in the eSourcebook designed to misdirect customers away from investigation of possible low shift quality: "MAKE THE POINT: Smart Shift Logic Customers may notice that an Expedition with the 10-speed transmission does not always shift sequentially . . . This is because of the smart shift logic with real-time adaptive shift-scheduling algorithms which monitor more than a dozen powertrain- and driver-control signals to ensure the right gear at the right time." FORD_DOLAN_000004154.

32.     In its showroom brochures for the 2019 Expedition equipped with the 10R80, Ford represented that "[t]he wide 7:4:1 gear ratio span of the 10-speed transmission helps smooth out steps between gears—delivering the engine's power consistently for an enjoyable driving experience" and the "10-speed automatic transmission with SelectShift capability utilizes [engine]

power smoothly and confidently." FORD_DOLAN_000008321. Ford represented that "[w]ith its 375-horsepower EcoBoost engine mated to a smooth-shifting 10-speed automatic transmission, XLT [Expedition] puts the 2019 Expedition lineup in motion." FORD_DOLAN_000008323.

33.    Ford has claimed that its 2018 Expedition, equipped with the 10R80 had a "Power Upgrade" so that it has "more responsive performance as you pass others on the highway."

34.    Ford claims that the 10R80 provides "more responsive performance as you pass others on the highway" is intended to, and does, convey objective and fact-based comparisons to Ford's 6R80 6-speed transmission.

35.    Ford introduced the 10R80 in its luxury vehicle line, the Lincoln Navigator, in 2018.

36.    Ford claimed, as to the 2018 Navigator, that "the new 10-speed SelectShift automatic transmission is designed to adapt in real time. Using input from a dozen sensors, it determines what you want, then engages the right gear at the right time to deliver the performance you seek." FORD_DOLAN_000008263.

37.    Ford's claims that the 10R80 Transmission "delivers improved overall performance, with enhanced acceleration," were intended to, and explicitly did, convey objective and fact-based comparisons to Ford's 6R80 6-speed transmission.

38.    Such claims can be seen in advertisements such as those on Ford's website.

## NEW 10-SPEED AUTOMATIC TRANSMISSION

All Transit engines now deliver their power through an advanced 10-speed automatic transmission. Compared with the 6-speed it replaces, the 10-speed delivers improved overall performance, with enhanced acceleration at the low and mid ranges of the power band. Features include wide-span gear spacing coupled with drag-reduction actions plus three overdrive gears.

39.    The showroom brochure for the 2020 Navigator represents that "[t]he 3.5-liter is mated to a 10-speed SelectShift automatic transmission designed to adapt in real time, engaging the right gear at the right time to deliver the performance you seek." FORD_DOLAN_000008475.

40.    Plaintiffs could recite numerous representations by Ford about the functionality of the Transmission in Class Vehicles materially similar to those set forth above.

41.    Ford uniformly represents to consumers that the 10R80 offers excellent shift quality. It does not, and Ford has known this since before it released the first F-150 with a 10R80 to the public in late-2016.

### FORD KNEW OF, MISREPRESENTED, AND ACTIVELY CONCEALED THE TRANSMISSION DEFECT BEFORE AND AFTER PLAINTIFFS' PURCHASES

42.    Ford has known about the tendency for production 10R80 Transmissions to shift harshly and/or with a delayed engagement since at least 2016, when it first manufactured and sold vehicles equipped with the 10R80 to the public.

43.    Since the 10R80 was introduced and equipped in the Class Vehicles, drivers have repeatedly complained to Ford about problematic shifting, including vehicles lunging, jerking, hesitating, clunking, and otherwise shifting erratically. During the Class Period there was an unusually large number of complaints of harsh, erratic, unusual, and belabored transmission shifting such that Ford was put on notice of a specific problem.

44.    Ford introduced the Transmission in its 2017 MY F-150 pickup trucks, which were first made available to consumers in late-2016.

45.    Ford identified shift quality failures and design defects during the design and development process for the 10R80.

46.    In a PowerPoint presentation dated May 1, 2013, Kurt Nickerson, a Ford transmission calibration engineer, identified challenges related to shift quality:

9

- Challenges in 10R
  - 10 gears providing 90 possible shifts compared to 6 gears providing 30 possible shifts
  - Sync 1-2 upshift, 2-1 downshift
  - Park clunk mitigation not available on park-by-cable applications due to kinematic limitations
  - Engagement delay due to four clutch engagement required in reverse
  - 360% increase in clutch transitions
  - Engagement delay challenge due to 4 clutch kinematic arrangement.

FORD_O'CONNOR_000061953. Mr. Nickerson identified "things gone wrong" (TGW)[2] risks

for the 10R80 that manifested themselves once the 10R80 was released to the public:

- 10R V48TGW Risks
  - 10 Speed Shift Busyness penalty
  - Sync 1-2 shift quality
  - Engagement delay*
  - Calibration & Software DV Challenge**

  *10R Kinematics require 4 clutch engagement to achieve Reverse, 3 clutch engagement for Drive. Primary risk is on quick start P-R event due to minimal time to prepare clutches in Neutral.

  ** 10R shift event matrix 3X larger than 6 speed

FORD_O'CONNOR_000061954. He noted another challenge: "Balance Dams: C/D/E/F rotating

clutches fed by 15 psi regulated lube oil. Closed center for reduced oil usage for FE. Risk of

capacity cross-talk[3] during stroke/destroke due to inability to quickly exhaust – XO development

task. Similar architecture to 6F35/50 C35R/C456." FORD_O'CONNOR_000061961.

47.    According to a 2024 PowerPoint presentation, Jim Farley, the President and CEO

of Ford, approved a significant investment for a "unit program" for "Shift Quality driving design

---

[2] Ford derives its TGWs rates, i.e., problems per thousand vehicles, from customer surveys that allow customers to check a box indicating they have encountered a problem with a feature or function.

[3] Cross-talk refers to transmission fluid leakage across seals.

changes to improve performance on 10R60, 10R80, 10R80 MHT and 10R100 Transmissions." FORD_DOLAN_000147544, 147547. Much of the approved investment amount for the "unit program" is attributable to "Input Shaft Seal Changes." FORD_DOLAN_000147547. These design changes are intended to reduce fluid leakage across seals within the Transmission, i.e., cross-talk. This is the exact problem that Kurt Nickerson noted as a challenge *in 2013*, more than three years before release of the 10R80 to the public.

48. In the early stages of development—March 2013—Ford recognized that "vibration was a concern in the 10R80 because "Transmission internals imbalance will be significantly worse than 6R80 due to new powerflow" and "will be affected by most internal components." FORD_O'CONNOR_000055589, 55590, 55602, 55606. Ford was also aware that "10R80's long input shaft and lack of center support drive unique dynamics" introduced problems. FORD_O'CONNOR_000055596.

49. By 2014, Ford recognized that its calibration for the Transmission would fail its customers: "Calibration will NOT demonstrate intended functionality. High risk that users will complain about function. Transmissions as shipped will fail due to converter and main control defects. Risk of added work streams for damage control." FORD_O'CONNOR_000057144. Ford's calibration efforts, which were understaffed and under-resourced, simply cannot offset the Transmission Defect. FORD_O'CONNOR_000062149 (Kurt Nickerson's PowerPoint stating— "10R has 3.6X the shift transition complexity of our 6 Speed transmissions. How do we handle the increased calibration workload without 3.6X program timing or 3.6X resources."); FORD_DOLAN_00014752–147557 (confirming very little expenditure or effort to update calibration while spending significant sums to improve shift quality).

50. At least initially, Ford worked collaboratively with GM to develop a 10-speed

transmission, sharing insights and "learnt lessons" as the 10R80 was designed. As part of this process, in mid-2014, a Technical Specialist regarding Sealing Systems for GM's Powertrain Transmission Engineering, notified Ford that "during the development of [a prior transmission, GM learned] that if the axial gap (seal to groove wall) was larger than 0.2 mm, there were shift related issues as the ATF [automatic transmission fluid] will leak during the seal shuttle from one side of the groove wall to the other side." FORD_O'CONNOR_000042373–74. Ford confirmed that "[w]e had those leakage issues in the past in our products sometimes too," but the 10R Transmission Calibration Supervisor disclaimed responsibility: "I don't disagree that the calibration team would SEE any issues, but . . . I don't think that it's the calibration team's responsibility." FORD_O'CONNOR_000042372.

51.     Accordingly, early in development and years before releasing the Transmission, Ford was not only aware that leaking seals would cause shifting concerns, but was already passing the buck as to which department—calibration or engineering—would be responsible for resolving the problem. The leakage concerns remained unresolved, as Ford investigated "leakage test results" in August 2014, and noted "[v]ariations in transmission to transmission leakage due to variations in valve clearance, and individual seal performances." FORD_O'CONNOR_000053354.

52.     By at least February 2015, the concerns about leakage had borne fruit, and Ford was trying to develop strategies to address "the data we have so far[:] that even BOB [best-of-best] parts do not meet functional leak requirements." FORD_O'CONNOR_000068269. Ford engineering prepared a PowerPoint presentation in February 2015 titled "10R Control System Status: P552 "75% Chief Drive" Results & Required Actions to Recover Shift Quality." FORD_O'CONNOR_000069220. The presentation included a list of "Problem Statements":

- 10R Shift Quality does not meet GPDS [Global Product Development System] deliverables.
- The capability of the 10R control system can be seen, but shift quality is not nearly consistent nor robust as it needs to be approaching M3
- The questions from management are:
  - "How will the upcoming Director and FDJ drives be supported?"
  - When will the control system "catch up," and what is required to do so?" […]

FORD_O'CONNOR_000069222. And a list of "10R Hardware Actions":

- In parallel to the software work, there are significant 10R control system hardware actions & plans underway.
  - Main control – CIDAS valve & bolt torque changes to improve cold response
  - Input shaft seal modification to reduce clutch pressure cross-leak
  - A clutch cushion spring for VP
  - Revised main control and TCC hardware to improve converter slip capability/robustness

FORD_O'CONNOR_000069225.

53.    Ford continued to document seal leakage in the 10R80 despite efforts towards improvement. FORD_O'CONNOR_000068266. This caused Ford's 10R80 Systems Engineer to query: "One must wonder if our basic architecture of 3 sets of seals in series can ever be made to be as good as 6F without only single set of seals to separate circuits. If it can't is there anything in the calibration bag of tricks…?" FORD_O'CONNOR_000068266. In response, the Technical Leader of Ford's Transmission Attributes & Calibration department explored drastic alterations to the Transmission's design: "This may be far-fetched but is there any chance the order of the circuits can be changed … so that we have no adjacent circuits for a given shift that share a single set of seals?" FORD_O'CONNOR_000068267. He then proposed a configuration that, he believed, "would be ideal – no cross talk on any of the shifts," but wondered, "is it moving a mountain at this point [in March 2015] to change the circuit order to avoid cross-talk?"

13

FORD_O'CONNOR_000068267–68268 ("obviously cutting down the number of interactions can only help . . . could eliminate the potential for cross talk [i.e. leakage] on stationary seals.").

54.     A couple of months later, in April 2015, Ford "still need[ed] to improve the cross-leak issue on adjacent clutch circuits. Traditional Z-lock seals did not improve the x-leak [i.e. cross-leak]." FORD_O'CONNOR_000103837.

55.     By the end of 2015, Ford was still studying seal leakage in the 10R80. FORD_O'CONNOR_000062299-62300. And even though Ford had only explored the "Implications of cold seal leakage"—i.e. "cross leak between rotating clutches at cold temperatures is sufficient to prevent clutch release in a timely manner"—it nevertheless admitted that, with respect to the "Customer Impact," "A substantial percentage of the NA market will experience restricted transmission operation during cold weather starts." FORD_O'CONNOR_000062301. Months later, in February 2016, Ford was still exploring possible causes, but believed that it involved at least the "C clutch bleeding into F." FORD_O'CONNOR_000066554.

56.     The defect discovered and known to Ford was not occasional, insubstantial or uncertain. The drive testing results for the Transmission in production vehicles were so bad that Ford decided to limit the scope of the testing to improve the results. FORD_O'CONNOR_000043682. Gail Hansen, New Model Programs Launch Supervisor, had previously sent an email to engineers requesting warranty cost management:

> **Subject:** Warranty Cost
> **Importance:** High
>
> . . . .
>
> I need help obtaining this info ASAP per direction from upper management. Can you please tell me who I can get this data from?
>
> 1) Average warranty cost for a transmission replacement

Average warranty cost for a Powertrain warranty claim overall . . . .

FORD_O'CONNOR_000043686. Bob Fascetti, a senior executive in powertrain, advised a subordinate that lower level engineers "should not be spending more time discussing [the reduced testing scope] given the decision is made based on the low fallout."[4] FORD_O'CONNOR_000043682.

57.    Despite knowledge of shift quality failures and design problems in the 10R80, Ford installed the 10R80 in Class Vehicles that it began selling late in 2016.

58.    Just weeks after the 10R80 Transmission was released, in November 2016, Ford was already aware of dozens of Class Vehicles "identified by drivers for Pump Whine or Harsh 3-5 [shifts] or Harsh Reverse." FORD_O'CONNOR_000043666; FORD_O'CONNOR_000061040 ("Nov. 2016 emails re "Transmation [sic] Jerky Shit [sic]": "A truck at [Dearborn Transmission Plant] was written up for this. Unfortunately, its kinda true – pbo 3-5 upshifts flare-bump badly … Interesting 4-5 slip-bumps too.").

59.    The internal discovery of the defect was so serious that Ford convened an "Early Warning Response Team" for the 10R80, which by January 2017 was already receiving reports of "Harsh 6-5 and 5-4 down shift [with] no [diagnostic trouble] codes," which were not improved by the "adaptive drive cycle" that Ford's Harsh Shift TSBs repeatedly recommended. FORD_O'CONNOR_000054058–54059 ("Performed adaptive relearn drive as per [Workshop Manual]. Concern still present.").

60.    As predicted before release of the Transmission to the public, its defect was presented to Ford immediately. For example, only a few months later, Ford was investigating an issue with a 10R80 Transmission which, at only 1,256 miles, was experiencing the Transmission

---

[4] "Low fallout" refers to expected warranty costs.

15

Defect's malfunctions: "During low speeds trans feels like it is shift hunting." FORD_O'CONNOR_000038252. A Diagnostic Design Engineer for Ford reported that, "[f]rom speaking with the dealer, the 'harsh' Shift was verified and deemed to be harder than 'normal' or expected when compared to previous gen F150s [i.e., with different transmissions]. When compared with another like unit (Another 10R equipped truck) it is equivalent in feel." FORD_O'CONNOR_000038251. Thus, already in March 2017, Ford recognized that harsh and erratic shifting in the Class Vehicles was different than its previous generations with different transmissions but was consistent with the 10R80 Transmission. FORD_O'CONNOR_000038251.

61.    In fact, reviewing three other trucks exhibiting harsh shifting, Ford employees confirmed that "I do not feel we can send them to our customer," that "[a]ll data points are in the normal range" so they are not "'outliers' to the population," and that "there was no improvement to shifting" after performing additional test-driving "to see if it adapts in" FORD_O'CONNOR_000052069–52070, 52072. But rather than trying to advance and promote this concern for resolution as quickly as possible—and despite "agree[ing] based on the data"— Ford's 10R Transmission Calibration Supervisor insisted that "we cannot have these pulls end up on Hard Rocks or Director calls or tracked against LTP quality numbers or any of that drama," and instead hoped the issues could be recategorized ("I'm hoping that they can be binned to a TBD BSAQ project"). FORD_O'CONNOR_000052072. In other words, Ford's response to consumers' confirmation of the problems it had known about throughout the development process was to suppress them, and prevent them from counting against their "quality numbers or any of that drama." FORD_O'CONNOR_000052072.

62.    In an investigative report dating from September 2017, and examining the rate of TGWs for the 2017 MY Class Vehicles, Ford acknowledged that it already had nearly five times

more "Things Gone Wrong" for the 10-speed transmission, compared to the predecessor 6-speed transmission, and more than four times Ford's target (or "Commitment"). FORD_O'CONNOR_000032423. This report further noted that more than three-quarters of these problems with the 10R80 Transmission were related to "Shift Rough/Jerky While Driving" and "Shift Trbl – Takes Too Long To Complete." FORD_O'CONNOR_000032424. The report even compared its TGW rates to competitors offering high-speed transmissions, and determined that the TGW for Ford's Class Vehicles was significantly higher than the "[20]17 [MY] Segment Average. FORD_O'CONNOR_000032429.

63.    Just three months later, in December 2017, now investigating the TGW rate for 2018 Model Year F-150s equipped with the Transmission, Ford admitted that rather than improve the harsh shifting concerns, its 2018 Class Vehicles were experiencing TGWs at 150% of even the 2017 MYs already ballooning TGW rate, and nearly five and a half times Ford's target (or "Plan"). FORD_O'CONNOR_000032633. Model Year 2018 F-150s with 10R80s were experiencing 179.2 TGWs in their first month of service. FORD_DOLAN_000448455. Again, the overwhelming majority of these "Things Gone Wrong" were identified as concerns relevant to this case: "Firm Shifts," transmission "Engagements," and "Tip In Clunk." FORD_O'CONNOR_000032634.

64.    In December 2017 Ford's Calibration Supervisor for the 10R80 concluded that "due to some unholy combination of hardware/software/service tools/release process", the fix or solution that Ford had devoted its resources to developing "cannot be released in its current form. This is extremely frustrating, both from a resource/time and the continued delay of fixes to customer standpoint." FORD_O'CONNOR_000032348, 32345. Among his "Open Questions/Comments" Ford's management employee warned that such "fix may be a long way off." FORD_O'CONNOR_000032348, 32345.

17

65.    Despite this overwhelming evidence of the Transmission Defect, Ford continued (and continues) to represent the opposite to consumers, claiming publicly that the 10R80 delivers excellent shift quality.

66.    During the same period, Ford also prepared a "10R TGW Task Hardware Observations" report which concluded that amongst all of the problems to be solved, the "Shifting Issue comprise[s] the biggest opportunity" for improvement, and admitted that there were several "Hardware Concerns calibration cannot fix." FORD_O'CONNOR_000037798, 37801, 37803, 37810 ("3-5 Flare Trans Data…[s]howed that the cross talk…took ~180-200msec to reseal [] as we suspected. No hope adaptive [algorithm] could fix that"); FORD_O'CONNOR_000037812 ("There is no way to 'calibrate' out of this."). This report also acknowledged that Ford employees were "very concerned about what we are seeing at our onsite drives." FORD_O'CONNOR_000037803.

67.    During a "10R Systems Design Review" in June 2018, a "Trans[mission] Cal[ibration] Manager" expressed that after "call[ing] in for the 3-5 shift flare topic" and discovering that the meeting had been cancelled for the second time in a row, "[i]t is a little disappointing to see this topic kicked down the road." FORD_O'CONNOR_000037791. In light of this delay, by August 2018, Ford had apparently accepted that an actual "fix [was] a long way off" (FORD_O'CONNOR_000032345), issuing another report on "Things Gone Wrong" in F-150s equipped with 10R80 Transmissions, wherein it discussed the "[l]atest calibration update" but that the TGWs demonstrated that "[p]erformance not tracking with improvements," investigating "Rough Shifts," and so the "[MY 20]19 F150 MP1 release contains additional TGW counter-measures." FORD_O'CONNOR_000032780-82.

68.    "Harsh shifting" for the 10R80 Transmission was the "NUMBER ONE ISSUE" for

Ford in September 2018, with "a steady high number of warranty concern." FORD_O'CONNOR_000041103. "It started off with 2017 and increased due to capacity into 2018 with F150." FORD_O'CONNOR_000041103.

69.    Things had not improved by January 2019. FORD_O'CONNOR_000041103. Responding to an inquiry about whether there were any "calibration updates" planned, Ford's 10R80 Transmission Calibration Supervisor acknowledged that something would need to be done, but there were no actual plans in place. FORD_O'CONNOR_000037316.

70.    By February 2019, Ford had become so inured to the ongoing problems that in an email titled "Cold C/F Crossleak and VERY POOR Shift Quality," a supervisor for the 10R80MHT Calibration team joked, "It's a new year, and the crossleak / static adaptive / overboost issues are in season," even while he admitted that the truck he was investigating contained "error-states that would have deserved a trip to the dealership if I owned this truck." FORD_O'CONNOR_000068474; *see also* FORD_O'CONNOR_000109462 ("So we know the new-out of the container Ford production seals did not improve things.").

71.    In May 2019, Ford recognized that the Transmission Defect was continuing to cause major concerns, and so the Chief Engineer and Director of Transmission & Driveline Engineering agreed:

> On 10R80 [] we need to take a hard look at shift quality … the #1 item is shifts rough jerky NPF [i.e. No Problem Found] … In order to get down in the 1 R/1000 range we will need to take a significant chunk of the shift quality claims out also. Right now I believe we are a little disjointed on this item … we don't come together often enough. … I don't think we can get to the next level of quality on this product without focusing on the big hitter of shift quality and also how the transmission hardware is interacting with shift quality.

FORD_O'CONNOR_000054511.

72.    A couple months later, in July 2019, Ford again acknowledged that "[t]he

19

transmission intermittently slips between 3-5 gear," despite a "Customer Requirement" that vehicle speed must be predictable and consistent during D3-D5 shift at all times," and continuing to investigate "[w]hy might 3-5 shift be so sensitive to cross leak?" FORD_O'CONNOR_000097875, 97878. Ford noted, "[b]ecause a transmission with a 3-5 shift issue could be replicated in different vehicles, with different drivers and multiple measurement systems, the focus is the transmission system and components." FORD_O'CONNOR_000097880, 97885.

73.    In early-2020, in a discussion about "10R Hardware," Ford's responsible employees confirmed that the Transmission Defect had been causing issues since before the 10R80 was sold to consumers ("I hope that we haven't just been sitting around for the last 4 years with these seals when they could have been fixed") but Ford still had not explored sufficient options for a fix. FORD_O'CONNOR_000068557.  They explained:

> I think "could have been fixed" depends on the parameters considered. Did we look at grinding the seal grooves? What about various glass content in the seals? Some sort of pre-energized seals etc. If we have decided that the pain is too great (and it is), then we may need to spend some money on this that we were not willing to do in the past. The 3-5 x-leak work that Shannon spearheaded was more manufacturing oriented - could we make a shift within the current population and make it work? I would say after trying for 18 months, we need to look to something beyond Shannon's scope. … I am hopeful that we can make progress without having to tear the transmission controls up . . . .

> 3-5 BOB-WOW project was closed last year . . .We received enough data points showing that the machining changes to groove wall surface finish did not improve the agreed upon metric … Grinding was not on the table due to cost . . .We did get improved groove wall [surface finish], but it not get us improvements in vehicle . . .

> My request might be to review what you did with the team, possibly in the 10R design review. …a few on the cal[ibration] side need to get up to speed on what was done, what wasn't done and why. … The fact is that we still have leaky seals on several shifts and this leads to unacceptable shift quality. My hope was that we would look at your results and move on to an increased scope that includes some of the items that were "off the table" at the time of the original study. Figure out

what it takes to fix it … and what it costs. Then, we can decide what shift quality is worth. Sometimes, timing is everything and it seems as though there may be some traction to improve shift quality. . . . After four years of stating that this is a seal ring issue, perhaps it is time to step back and ask what other components or design issues in the system might be causing the intermittent cross-talk hydraulic circuit shift issues.

. . . There is no physics based analysis that explains why the seal ring systems randomly leak and then suddenly stop leaking during a cross-talk hydraulic event. [] Seal ring interface optimization did not improve shift performance in either 10R80 or 10R140.

FORD_O'CONNOR_000068554-56.

74.    Nearing the end of 2020, the Sr. Technical Leader for Transmission Attributes & Calibration noted that "[w]eather is getting colder and you're going to start hearing the litany of complaints for leaking C clutch," even while he admitted that "[e]very single unit is affected by this to some extent or another." FORD_O'CONNOR_000068585, 68586, 68588 (emphasis supplied). "I don't want to debate TGW [Things Gone Wrong] or R/1000 [problem incidence rate] – this needs to be fixed asap. The parts simply don't work at temperatures that a majority of customers experience." FORD_O'CONNOR_000068584.

75.    Faced with the fact that Class Vehicles were not properly shifting due to the Transmission Defect, Ford has issued numerous TSBs (i.e., Technical Service Bulletins) and SSMs (i.e. Special Service Messages) with respect to the "harsh," "delayed," and "bumpy shift[ing]," "harsh/delayed engagement," and general "engagement concerns." **Exhibit A**.

76.    Notably, the Harsh Shift TSBs consistently state that the "harsh engagement/harsh shift/delayed shift" symptoms might occur *without* (1) the malfunction-indicator light ("MIL," or "check-engine light") illuminating, or (2) any diagnostic trouble codes ("DTCs") being generated or recorded in the vehicles' computer. **Exhibit A**.

77.    Ford has also produced at least 5 SSMs directly related to Ford's awareness of harsh

21

and delayed shifts, and generally harsh engagements, related to the Transmission, experienced by consumers driving its vehicles.

78.    Ford has published a TSB related to concerns for problematic or delayed shifting, including vehicles lunging, jerking, hesitating, clunking, and otherwise shifting erratically for every model type and year vehicle it manufactures and sells equipped with a 10R80. **Exhibit A**.

79.    Stated conversely, there are no Vehicles equipped with the 10R80 that are not subject to at least one Harsh Shift TSB.

80.    These substantial TSBs were issued at least by March 2, 2018, and numerous others each year into this very litigation. Each TSB confirms Ford's knowledge of the defect as well as its complete inability to resolve it.

81.    Despite this knowledge, Ford took no steps to remedy this issue, beyond releasing repeated and ineffective TSBs, leaving Plaintiffs and the other Class Members with knowingly defective Class Vehicles.

### FORD ISSUED NUMEROUS INSTRUCTIONS TO MISLEAD ITS AUTHORIZED DEALERS AND SERVICE CENTERS TO PERFORM PHONY REPAIRS

82.    Ford published the first of its Harsh Shift TSBs at the end of 2017, long after it received numerous complaints regarding 10R80 shift quality and knew of hardware problems in the 10R80 and that calibration updates could not remedy the Transmission Defect.

83.    Prior to issuing this first TSB, Ford issued communications to its authorized dealers and service centers to normalize poor shift quality in the 10R80, advising that gear "skipping" was a normal operating characteristic for the Transmission. Ford explicitly acknowledged that it drafts communications regarding the Class Vehicles to its authorized dealers and service centers not to accurately depict an issue concerning customers, but rather shield Ford's bottom line: "It's not 'some' 10R80 vehicles, its all of them … but we use the word 'Some' to protect the company. Yes

our engineering leads know is all; however, all documents in the data base [] start with the word 'Some.'" FORD_O'CONNOR_000054063–54064.

84.     Nonetheless, for more than five-and-a-half years after it began selling vehicles equipped with the 10R80—Ford's only public recommendations for remediation of the Transmission Defect were (1) reprogramming the PCM or TCM, even while acknowledging that this "may result in firmer than normal upshifts and downshifts," or (2) cleaning contamination from valves. Ford knew these "repair" recommendations would not remediate the hardware problems resulting from the design of the Transmission.

85.     TSB 17-2262 instructed that service technicians "[r]eprogram the powertrain control module (PCM)" to remediate "intermittent runs rough, hesitation and/or transmission shudder" in "[s]ome 2018 F-150 vehicles." 2017 F-150 vehicles also suffer from the Transmission Defect, but this TSB omits any reference to those vehicles. Ford knew at the time it issued TSB 17-2262 that reprogramming the PCM in 2018 F-150 vehicles would not remediate the Transmission Defect or poor shift quality. Nonetheless, Ford issued TSB 17-2262 to squelch public recognition of the Transmission Defect by propagating the falsehood that the harsh, jerky, bumpy, clunky, hesitating, and erratic shifting in Class Vehicles is "normal," or simply a limited period of adjustment and adaptation, to limit its exposure to warranty costs attributable to performance of repairs which would actually resolve the Transmission Defect, and to obstruct its customers from pursuing their legal rights arising out of the Transmission Defect.

86.     Ford's driving motivation in publishing ineffective Harsh Shift TSBs was to avoid expending the money to meaningfully remediate the Transmission Defect in its vehicles. Ford sought to avoid warranty costs during the warranty coverage period for its vehicles—once the warranty coverage period expires on a vehicle, Ford refuses to pay for any repairs or services to

23

repair the Transmission Defect.

87.    For years, the Harsh Shift TSBs proposed nothing more than "reprogram[ming] the powertrain control module (PCM)," but as each subsequent (literally "superseding") TSB established, such "reprogramming" was insufficient to resolve the consistent "harsh engagement/harsh shift/delayed shift" in Class Vehicles. Indeed, in response to another TSB that simply proposed recalibration, a Ford service technician declared in May 2023:

> This recal[ibration] does not work on 99.9% of F150s and expeditions/navigators. When a person does an air pressure test on C, D, F, and E clutchs, most will have excessive cross leaking. Some are from the CDF bushing that has shifted out of place (updated one is needed) but most is due to the input shaft seals and out put shaft seals are drying/ brittle from the additive in the ULV fluid.[] But you do what you believe works. This grunt is getting tired of wasting money and time.

FORD_O'CONNOR_000121630. In September 2021, the Harsh Shift TSBs began to concede that mere "reprogramming" did not resolve the Transmission Defect's malfunctions, as they began to propose an "[o]verhaul [to] the main control valve body" as an additional repair after confirming that "the vehicle still exhibit[s] the condition after performing the transmission strategy download." FORD_DOLAN_205611–205613. (TSB 21-2315). In May 2023, Ford added a complete replacement "of the CDF clutch cylinder sleeve" with a newly designed component as another possibility for a repair. FORD_DOLAN_205619–205642 (TSB 22-2428). None of these worked and none of these recommendations were supported by Ford's internal analysis.

88.    Ford continued to publish sham Harsh Shift TSBs in Class Vehicles. FORD_DOLAN_000205677–205690 (TSB 23-2250). In fact, despite taking over a year to develop TSB 22-2428 (and repeatedly claiming that the delay was caused by unavailable parts), on the day of its publication Ford made rushed edits which immediately caused dealership technicians to protest that it missed relevant repair steps and included duplicative ones, placed unreasonable limits on labor time, and unnecessarily kept customers out of their vehicles for an

24

extended time. FORD_O'CONNOR_000120811–120817; FORD_O'CONNOR_000120906-120907 ("This could be republished to correct this, but will it ever be right?"). Ford was therefore forced to begin developing TSB 23-2250 within days. FORD_O'CONNOR_000122035–122036 (Meeting invite, noting "TSB 22-2428 not being received very well.")

89.    Ford knew that its later TSBs were also inadequate. In May 2023, a 10R transmission Systems Supervisor sought and a received a "favor"[5] to teardown a 10R80 Transmission from a Class Vehicle (i.e. a 2020 F-150), which was suffering "the shift quality issues" (i.e., "drove poorly in vehicle. Poor shift quality"). FORD_O'CONNOR_000120987–120992. Given its symptoms, this vehicle was considered likely to benefit from the repair proposed by Ford's (at that time) latest Harsh Shift TSB, but when it was disassembled "[t]he technician did not observe anything abnormal," which is "what [Ford's] dealer techs are dealing with" when they try all of Ford's sham solutions, but it "doesn't have any positive effect on shift issue complaint then they teardown and find nothing." FORD_O'CONNOR_000120987–120988.

90.    But resolving the Transmission defect was not Ford's goal when it published its Harsh Shift TSBs—at the end of 2021, Ford admitted, after the TSB was published, that calibration related to the transmission ID ("TRID") had not been included in the "transmission strategy download," and so "the strategy download will theoretically do nothing[.]" FORD_O'CONNOR_000031992, 31996.

91.    Ford's internal records show that the problems continued in the post-2020 model years of the F-150. FORD_O'CONNOR_000054699 (identifying "Shifts roughly" and "Hesitation/shifts at wrong times" as largest concerns in JD Power Initial Quality Study for 2020

---

[5] A "favor" was required because this three-year-old vehicle was considered "higher time in service [with] known issues [and so it] is the lowest [priority] item on the list." FORD_O'CONNOR_00012098–120990.

and 2021 F150).

92.     Ford knows that its Harsh Shift TSBs are fundamentally ineffective in remediating the Transmission Defect, hence the decision made and approved by Ford's President and CEO more than seven years after release of the 10R80 to the public, to spend substantial sums to improve shift quality. FORD_DOLAN_00014752–147557.

### CUSTOMERS REPEATEDLY COMPLAINED ABOUT HARSH AND ERRATIC SHIFTING AND VEHICLE LUNGING, HESITATION, AND JERKING

93.     When Ford released the 10R80 10-speed automatic Transmission beginning with the 2017 F-150, purchasers and lessees began filing complaints with the NHTSA almost immediately. These complaints demonstrate Ford's awareness of the Transmission Defect from the beginning of its sales of vehicles equipped with the 10R80 Transmission, and the potential danger it presented.

94.     Hundreds, if not thousands, of purchasers and lessees of the Class Vehicles have experienced the Transmission Defect. Complaints filed by consumers with NHTSA and posted on the Internet demonstrate that the Transmission Defect is widespread. Not only have consumers complained about harsh, bumpy, jerky, and erratic shifting, as well as hesitation, clunking, and even loss of power, but this defect has often led to potentially life-threatening situations. These complaints illuminate, and are merely a sample of, Ford customers' experiences with the Transmission Defect and its potential danger (note that spelling and grammar mistakes remain as found in the original). A non-exhaustive list of 220 relevant public NHTSA complaints is attached as **Exhibit B**.

95.     Ford nevertheless failed to disclose the Transmission Defect or to conduct sufficient testing or research that would have revealed and/or allowed Ford to resolve the Transmission Defect prior to sale of the Class Vehicles. As a result, Ford has caused Ford drivers to spend money

and time at its dealerships or other third-party repair facilities and/or take other remedial measures related to the Transmission Defect in the Class Vehicles.

96.     As evidenced by the customer complaints, Ford was put on sufficient notice regarding harsh and abnormal shifting and loss of vehicle power.

**FORD MISREPRESENTED AND ACTIVELY CONCEALED THE DEFECT**

97.     Beginning in 2016 and continuing to the present, Ford has misrepresented the safety, performance and reliability of the 10R80, through its website, multimedia advertisements, brochures, and in-person statements by its employees, authorized dealers, agents, sales representatives and/or repair technicians—touting the defective Transmission's safety, reliability, enhanced responsiveness and performance.

98.     To this day, and despite publishing at least thirty-three Harsh Shift TSBs over more than five years (*see* **Exhibit A**), Ford refuses to even acknowledge the existence of the Transmission Defect, let alone disclose the Transmission Defect to consumers. Instead, from 2016 to present, Ford has attempted to squelch public recognition of the Transmission Defect by propagating the falsehood that the harsh, jerky, bumpy, clunky, hesitating, and erratic shifting in Class Vehicles is "normal," or simply a limited period of adjustment and adaptation, through statements made to consumers and the general public by Ford employees, authorized dealers, agents, sales representatives and/or repair technicians, and through TSBs which sought to normalize the poor performance and safety issues, as described herein.

99.     For instance, Ford's Harsh Shift TSBs uniformly direct dealerships and service technicians to "[a]dvise the customer" that the primary method of addressing "harsh engagement/harsh shift/delayed shift"—specifically reprogramming the PCM/TCM, and "perform[ing] an adaptive learning drive cycle"—"may result in firmer than normal upshifts and downshifts for several days."

27

100.    An example of this can be seen in the following excerpts from TSB 21-2315:

**TECHNICAL SERVICE BULLETIN**
**10R80 - Harsh Engagement/Harsh Shift/Delayed Shift With Or Without DTCs**

21-2315
27 September 2021

Model:

| Ford 2018-2021 Expedition | Transmission/Transaxle: (10R80) |
|---|---|
| 2017-2020 F-150 | Transmission/Transaxle: (10R80) |
| 2018-2021 Mustang | Transmission/Transaxle: (10R80) |
| 2019-2021 Ranger | Transmission/Transaxle: (10R80) |
| Lincoln 2018-2021 Navigator | Transmission/Transaxle: (10R80) |

Issue: Some 2017-2020 F-150, 2018-2021 Expedition/Navigator/Mustang and 2019-2021 Ranger vehicles equipped with a 10R80 automatic transmission may exhibit a harsh engagement/harsh shift/delayed shift. It is possible the vehicle may also have an illuminated malfunction indicator lamp (MIL) or diagnostic trouble codes (DTC) P0751, P0752, P0756, P0757, P0761, P0762, P0766, P0767, P0771, P0772, P2700, P2701, P2702, P2703, P2704, P2705, P2707, P2708, P0729, P0731, P0732, P0733, P0734, P0735, P0736, P076F, P07D9, P07F6 and/or P07F7 stored in the powertrain control module (PCM) or transmission control module (TCM). This may be due to incompatibility of the adaptive calibration to adapt to hardware wear-in over time. To correct the condition, follow the Service Procedure steps to overhaul the main control valve body and/or perform an adaptive learning drive cycle.

NOTE: Advise the customer this vehicle is equipped with an adaptive transmission shift strategy which allows the vehicle's computer to learn the transmission's unique parameters and improve shift quality. When the adaptive strategy is reset, the computer will begin a relearning process. This relearning process may result in firmer than normal upshifts and downshifts for several days.

101.    Ford has allowed Plaintiffs and Class Members to continue to drive the Class Vehicles, despite knowing that they may exhibit harsh or abrupt shifting, hesitation, and surging.

28

102.    Specifically, in its Harsh Shift TSB published in March 2018 (TSB 18-2079), Ford acknowledged that 2017 F-150/Raptor vehicles—i.e. the first Vehicles equipped with the 10R80 Transmission—"may exhibit harsh or delayed shifts" with or without an illuminated "check-engine" light:

**TECHNICAL SERVICE BULLETIN**
**10R80 Automatic Transmission – Harsh Or Delayed Shift Concerns And/Or Illuminated MIL - DTC P0711 - Built On Or Before 1-Aug-2017**

18-2079
02 March 2018

**Model:**

Ford
2017 F-150

**Issue:** Some 2017 F-150/Raptor vehicles equipped with a 10R80 automatic transmission built on or before 1-Aug-2017 may exhibit harsh or delayed shifts and/or an illuminated malfunction indicator lamp (MIL) with diagnostic trouble code (DTC) P0711 stored in the transmission control module (TCM).

**Action:** Reprogram the powertrain control module (PCM) using Integrated Diagnostic System (IDS) or Ford J2534 Diagnostic Software (FJDS) release 108.04 or higher. Make sure you are connected to the internet when entering module programming to obtain the latest updates. Calibration files may also be obtained at www.motorcraftservice.com.

**Warranty Status:** Eligible Under Provisions Of New Vehicle Limited Warranty Coverage And Emissions Warranty Coverage Warranty/ESP coverage limits/policies/prior approvals are not altered by a TSB. Warranty/ESP coverage limits are determined by the identified causal part and verified using the OASIS part coverage tool.

**Labor Times**

| Description | Operation No. | Time |
|---|---|---|
| 2017 F-150 3.5L GTDI: Retrieve DTCs And Reprogram The PCM (Do Not Use With Any Other Labor Operations) | 182079A | 0.3 Hrs. |

**Repair/Claim Coding**

| | |
|---|---|
| Causal Part: | RECALEM |
| Condition Code: | 04 |

**Service Procedure**

NOTE: ADVISE THE CUSTOMER THAT THIS VEHICLE IS EQUIPPED WITH AN ADAPTIVE TRANSMISSION SHIFT STRATEGY WHICH ALLOWS THE VEHICLE'S COMPUTER TO LEARN THE TRANSMISSION'S UNIQUE PARAMETERS AND IMPROVE SHIFT QUALITY. WHEN THE ADAPTIVE STRATEGY IS RESET, THE COMPUTER WILL BEGIN A RE-LEARNING PROCESS. THIS RE-LEARNING PROCESS MAY RESULT IN FIRMER THAN NORMAL UPSHIFTS AND DOWNSHIFTS FOR SEVERAL DAYS.

103.    Despite its knowledge since before releasing the 10R80 to the public that the 10R80 is defective such that it causes harsh or delayed shifts, Ford has not recalled the Class Vehicles to address their propensity for harsh engagements, harsh shifts, or delayed shifts.

104.    Despite its knowledge before releasing the 10R80 to the public that the 10R80 may cause harsh or delayed shifts, Ford has not offered to reimburse Class Vehicle owners and lessees

29

who incurred costs in an attempt to address harsh engagements, harsh shifts, or delayed shifts in Vehicles.

105.    Despite its knowledge since before releasing the 10R80 to the public that the 10R80 may cause harsh or delayed shifts, Ford has not offered to reimburse Class Vehicle owners and lessees for any diminished value of their Class Vehicles resulting from the Transmission Defect their propensity for harsh engagements, harsh shifts, or delayed shifts.

106.    Plaintiffs and Class Members are reasonable consumers who reasonably expect their Class Vehicles will not harshly and abruptly shift and will not experience sudden and unexpected power surges and losses.

107.    Plaintiffs and Class Members reasonably expected that Ford would not sell or lease Class Vehicles with known defects, including the Transmission Defect, and that it would disclose any such defects to its customers before they purchased or leased Class Vehicles. Plaintiffs and Class Members did not expect Ford to conceal the Transmission Defect, or to continually deny its existence. Further, Ford uniformly represents to consumers that the 10R80 offers excellent shift quality and directs its authorized dealerships to do the same but has never disclosed the Transmission Defect to Plaintiffs (or any other consumers).

108.    Consequently, Plaintiffs and Class Members have not received the benefit for which they bargained when they purchased or leased the Class Vehicles.

109.    As a result of the Transmission Defect, the value of the Class Vehicles has diminished, including without limitation the resale value of the Class Vehicles. They are worth less than under the conditions represented and disclosed by Ford at sale.

**FORD DISCOURAGES CUSTOMERS FROM REPORTING ISSUES REGARDING, AND OBTAINING REPAIRS AND REPLACEMENT OF, THEIR 10R80 TRANSMISSIONS**

110.    For as long as Ford's customers have been complaining about the poor function and

30

reliability of the 10R80, Ford has implemented policies which discourage, and often prevent, owners of Class Vehicles from obtaining inspections and diagnoses of Class Vehicles, repairs or replacement of their Transmission, and which even prevent the customer's complaints and concerns related to the Transmission from being recorded at all.

111.    All of the Harsh Shift TSBs published by Ford instruct dealerships, in bold text, to "NOTE: Advise the customer [that the primary attempted repair] may result in firmer than normal upshifts and downshifts for several days." On the basis of this and other instructions from Ford, employees at its dealerships regularly advised customers that harsh, jerky, and erratic shifting was "normal operation," would resolve itself with more driving of their vehicle, or otherwise not an issue that could be resolved.

112.    Ford's Harsh Shift TSBs offered no resolution other than reprogramming, or "reflashing," the Transmission/Powertrain Control Module ("TCM/PCM") from 2017 until September 2021.

113.    Ford failed to sufficiently advise its dealerships and service technicians that a vehicle can suffer from harsh and delayed shifting without illuminating the MIL/check-engine light, and/or without recording any DTCs, such that Plaintiffs and Class Members were regularly refused an inspection or repair-attempt because the check-engine light had not illuminated and/or no DTCs were recorded in the Vehicle.

114.    Once Ford's Harsh Shift TSBs began proposing additional repair attempts—e.g., overhauling the main control valve body, replacing the CDF clutch cylinder—it required that dealerships only make repair attempts sequentially, such that even if a service technician determined that a mere TCM/PCM reprogramming would not resolve a vehicle's problems, they could not undertake the appropriate repair attempt under warranty. As a result, Ford's customers—

31

including Plaintiffs and Class Members—were required to make several separate visits to a dealership in order to seek repairs to their Transmission.

115. In order to be compensated by Ford for service to a Vehicle's Transmission related to "Harsh/Delayed Engagement and/or Harsh/Delayed Shift" (i.e. pursuant to one of the Harsh Shift TSBs), Ford dealerships were required to follow the steps detailed in the Harsh Shift TSBs, and could only seek reimbursement for the time spent on such service according to the time-allotments dictated in the Harsh Shift TSBs.

116. However, the Harsh Shift TSBs under-calculated the amount of time required to perform necessary inspections and repairs on Class Vehicles.

117. As a result, Ford dealerships avoided performing inspections and repairs pursuant to the Harsh Shift TSBs, in order that they would not be forced to provide uncompensated labor to cover the full cost of a warranty claim related to the Transmission Defect.

118. By failing to have an adequate number of replacement parts available, thereby requiring that a concerned owner of a Class Vehicle wait weeks or months for any attempted resolution—either foregoing use of their vehicle during that time, or being forced to drive a demonstrably unsafe vehicle, sometimes past the warranty limits—Ford discouraged customers from seeking or obtaining repairs.

119. Even when agreeing to cover vehicle inspections, repairs, and Transmission replacements related to the Transmission Defect under warranty, Ford regularly refused to provide a loaner vehicle or cover the cost of a rental vehicle. Because many customers are unable to afford the cost of a rental vehicle—particularly in addition to the ongoing payments related to their vehicle—they are prevented from seeking or obtaining repair of their Transmission.

### PLAINTIFFS' EXPERIENCES

A.    *Plaintiff James Dolan*

32

120. Dr. Dolan was shopping for a safe and reliable vehicle for general use as his personal vehicle. He had previously driven Ford F-150s for work and had never had problems with these trucks. Therefore, in or around October 25, 2018, he purchased a new 2018 Ford F-150 (the "Dolan Vehicle") with a 10R80 from an authorized Ford dealership, believing it to be suitably safe and reliable.

121. A fundamental and essential consideration in obtaining the Dolan Vehicle was that it would shift smoothly and consistently, such that it could be relied upon to switch between gears at anticipated intervals when accelerating and/or decelerating; although implicit, it was reasonably anticipated that the Dolan Vehicle would execute gear-shifts without extended disengagement of the engine, or rough, jerky, erratic, or "clunky" transitions between gears.

122. At the time of Dr. Dolan's purchase, Ford knew the Transmissions were defective, but neither Ford, nor the Ford sales representative, disclosed the Transmission Defect to Dr. Dolan when advertising or discussing the features, components, and performance of the Dolan Vehicle prior to its sale. Further, Ford failed to correct its uniform and false representations, through its website, multimedia advertisements, brochures, and in-person statements by its employees, authorized dealers, agents, sales representatives and/or repair technicians, touting the defective Transmission's safety, reliability, enhanced responsiveness and performance. In reliance on these material omissions, including failures to correct prior false representations, Dr. Dolan purchased and operated the Dolan Vehicle on the belief that the Dolan Vehicle's transmission would operate properly as warranted. Had Dr. Dolan been informed of the Transmission Defect prior to or at the time of purchase, he would not have purchased the Dolan Vehicle or else would have paid significantly less for the Dolan Vehicle.

123. Neither Ford nor any of its agents, dealers, or representatives informed Dr. Dolan

of the Transmission Defect prior to his purchase of the Vehicle.

124.   After driving the Vehicle for less than a year, Dr. Dolan started to notice the Dolan Vehicle's harsh shifting. He  made an appointment with Richmond Ford's service department and took the Dolan Vehicle in on or about October 14, 2019. It had 8,424 miles on the odometer at the time. Richmond Ford ignored Dr. Dolan's concerns about the Transmission's harsh shifting.

125.   Dr. Dolan made another appointment with Richmond Ford's service department because he continued to experience harsh shifting, especially in lower gears while in drive. He took the Dolan Vehicle to Richmond Ford on or about November 14, 2019. It had 10,491 miles on the odometer at the time.

126.   Richmond Ford was obligated by Ford to perform warranty service and repairs as to the Dolan Vehicle. As part of these agreements, Richmond Ford was obligated to submit detailed information directly to Ford in a prompt manner to receive payment from Ford for any warranty service or repairs. These obligations apply to any authorized dealer or service center performing warranty service or repairs for Ford customers. Ford receives notice "[a]ll pertinent facts regarding a repair or related repair (i.e. maintenance, condition of vehicle, observations, test results, previous repair attempts, etc." when its authorized dealers and service centers make a claim for payment to Ford for warranty services and repairs. FORD_DOLAN_000284403. In this way, Ford receives notice of customer concerns leading to the warranty services and repairs and details regarding pertinent technician assessments of the presented vehicle and the service and/or repairs completed by the technician.

127.   Within days (if not hours) of the evaluation and service of the Dolan Vehicle on November 14, 2019, Ford received detailed information about the concern regarding the Transmission Dr. Dolan relayed to Richmond Ford and the details of the warranty service

performed on the Dolan Vehicle:

| CONCERN INFORMATION: | |
|---|---|
| Cust. Concern Code: | P65 - AT - TRANSMISSION SHIFTS ROUGH/JERKY |
| Condition Code: | 42 - DOES NOT OPERATE PROPERLY |
| Technician Comment: | SELF TEST NO DTCS = 7001D = .6 HRS NO AVAILABLE UPDATES FOR PCM NO TSBS OR SSMS PID MONITOR ROAD TEST - NO ERRATIC READINGS = 7001D1 = .5 HRS DUPLICATED ONE HARSH SHIFT INTO THIRD ON ACCELERATION PERFORMED PINPOINT TEST BY SYMPTOM HARSH SHIFT = 7001D45 = .3 HRS CONCERN SEEMS TO BE AMELIORATED BY CLEARING TRANSMISSION ADAPTIVE SHIFT TABLES AND RELEARNING ADAPTIVE DRIVE CYCLE |
| Customer Comment: | CUSTOMER STATES - HAVING TROUBLE WITH 3RD, 4TH & 5TH GEARS -HARD SHIFT IN THOSE GEARS. PLEASE CHECK & ADVISE. COMPUTER LOCKED UP DURING WRITE UP - KENT ADVISED KATHRYN WILL PROBABLY CALL LATER TO MAKE SURE SHE HAS ALL INFO NEEDED FROM CUSTOMER |

LABOR INFORMATION:    Note: All costs are in US dollars

| Labor Op Code | Labor Op Description | Labor Op Cost |
|---|---|---|
| 7001D | AUTOMATIC TRANSMISSION / ELECTRIC DRIVE - DIAGNOSIS | 72.69 |
| 7001D1 | PID RECORDER/MONITOR TEST WITH ROAD TEST | 60.58 |
| 7001D45 | AUTOMATIC TRANSMISSION / ELECTRIC DRIVE - DIAGNOSTIC PIN POINT TEST | 36.35 |

FORD_DOLAN_000032758–59.

128.    The "repair" performed by Richmond Ford, i.e. "clearing transmission adaptive shift tables and relearning adaptive drive cycle," was ineffective, as known to Ford, but in accordance with Ford's directives to Richmond Form to perform such a "repair" even though Ford knew it was ineffective. Dr. Dolan reasonably expected that Ford would not instruct its authorized dealers to perform ineffective repairs.

129.    Over the next two years, Dr. Dolan experienced harsh and delayed shifting in the Truck, including gear engagement failures while accelerating. On or about October 12, 2021, Dr. Dolan took the Truck, with less than 26,000 miles, for service and repair at Richmond Ford because he continued to experience harsh engagements with the Transmission. Richmond Ford appears to have recommended a "valve body overhaul," but could not perform this repair because it was "AWAITING ON SEPERATOR ETA 11/15." The "valve body overhaul" was another phony

35

"repair" Ford directed Richmond Ford and its technicians to implement, knowing it would not remediate the Transmission Defect causing the malfunctions described by Dr. Dolan.

130.    Plaintiff Dolan again reported harsh shifting concerns to Richmond Ford in September 2022 when the Truck had been driven less than 35,000 miles.

131.    Richmond Ford implemented TSB 22-2139, which noted that "[s]ome 2017-2020 F-150, 2018-2022 Expedition/Navigator/Mustang and 2019-2022 Ranger vehicles equipped with a 10R80 automatic transmission may exhibit a harsh engagement/harsh shift/delayed shift." TSB 22-2139 directed Richmond Ford and its technician's to "[r]eprogram the transmission strategy download into the PCM/TCM. Perform adaptive learning drive cycle" and/or "[o]verhaul the main control valve body and road test vehicle following the adaptive learning drive cycle."

132.    Ford knew that neither of the "repairs" recommended in TSB 22-2139 were sufficient to remediate the Transmission Defect. Given the details pleaded above, it was dishonest for Ford to claim that "reprogramming the transmission strategy download" would remediate the Transmission Defect underlying the malfunctions experienced by Dr. Dolan.

133.    Nonetheless, in perpetuation of its willful effort to withhold material facts, Ford has represented that no Transmission Defect exists, and the "reprogramming" and "overhaul [of] the main control valve body" recommended was sufficient.

134.    TSB 22-2139 further directed Richmond Ford to advise the customer this vehicle is equipped with an adaptive transmission shift strategy which allows the vehicle's computer to learn the transmission's unique parameters and improve shift quality. Ford also instructed its dealer agents to represent that when the adaptive strategy is reset, the computer will begin a relearning process and this relearning process would result in firmer than normal upshifts and downshifts only for several days.

36

135. Richmond Ford followed Ford's instructions and advised Dr. Dolan as directed and appears to have provided a copy of TSB 22-2139 to Dr. Dolan. The repairs slightly ameliorated the shifting problems, but Plaintiff continued to experience gear engagement failures on a regular basis.

136. Within days (if not hours) of the evaluation and service of the Dolan Vehicle on September 28, 2022, Ford received detailed information about the concern regarding the Transmission Dr. Dolan relayed to Richmond Ford and the details of the warranty repairs performed on the Dolan Vehicle:

CONCERN INFORMATION:

| Cust. Concern Code: | P59 - OTHER AUTOMATIC TRANSMISSION |
|---|---|
| Condition Code: | 49 - CONTAMINATED/FOREIGN |
| Technician Comment: | tsb 22-2139 2018-2020 F-150 4X4 5.0L: Retrieve DTCs, (No) Reprogram The Transmission Strategy Download Into The PCM/TCM And Perform Adaptive Learning Drive Cycle (Yes) Overhaul The Main Control Valve Body And Perform Adaptive Learning Drive Cycle (Do Not Use With Any Other Labor Operations) 222139C |
| Customer Comment: | C/S: install ordered parts FOR CONCERN RO 271998 CUSTOMER STATES TRAN DIAG WHEN IN REVERSE 50% OF THE TIME FEELS LIKE TRANS IS GOING TO FALL OUT OF VEH TRANSMISSION HITS HARD AND MAKES A CLANK SOUND--HAPPENS WHEN VEHICLE HAS BEEN SITTING FOR A PERIOD OF TIME |

LABOR INFORMATION: Note: All costs are in US dollars

| Labor Op Code | Labor Op Description | Labor Op Cost |
|---|---|---|
| 222139C | HARSH ENGAGEMENT/HARSH SHIFT/DELAYED | 838.31 |

FORD_DOLAN_000032763–64.

137. Ford knew that the warranty repairs performed by Richmond Ford on September 28, 2022 were incapable of remediating the Transmission Defect.

138. Dr. Dolan did not receive the benefit of his bargain.

139. Dr. Dolan eventually traded in the Dolan Vehicle to Richmond Ford and purchased another vehicle because of his concerns related to the Transmission and future service and repair costs related to the Transmission after his extended warranty expired.

140. Ford's efforts to promulgate and direct its authorized dealers and service centers to

perform phony repairs under its TSBs succeeded in obstructing Dr. Dolan from asserting his legal rights against Ford.

### B. *Plaintiff James Morris*

141. Mr. Morris was shopping for a safe and reliable vehicle to serve as his personal general-purpose vehicle. Accordingly, on September 13, 2020, he purchased a brand new 2020 Ford Expedition (the "Morris Vehicle") with a 10R80 from an authorized Ford dealership.

142. A fundamental and essential consideration in obtaining the Vehicle was that it would shift smoothly and consistently, such that it could be relied upon to switch between gears at anticipated intervals when accelerating and/or decelerating; although implicit, it was reasonably anticipated that the Vehicle would execute gear-shifts without extended disengagement of the engine, or rough, jerky, erratic, or "clunky" transitions between gears.

143. At the time of Mr. Morris's purchase, Ford knew that the Transmission was defective, but the Ford sales representative did not disclose the Transmission Defect to Mr. Morris when discussing the features, components, and performance of the Vehicle prior to purchase. Further, Ford failed to correct its uniform and false representations, through its website, multimedia advertisements, brochures, and in-person statements by its employees, authorized dealers, agents, sales representatives and/or repair technicians, touting the defective Transmission's safety, reliability, enhanced responsiveness and performance. In reliance on these material omissions, including failures to correct prior false representations, Mr. Morris purchased and operated the Morris Vehicle on the reasonable but incorrect belief that its Transmission would operate properly as warranted. Had Mr. Morris been informed of the Transmission Defect prior to or at the time of purchase, he would not have purchased the Morris Vehicle or else would have paid significantly less for the Morris Vehicle.

144. Neither Ford nor any of its agents, dealers, or representatives informed Mr. Morris of the Transmission Defect prior to his purchase of the Vehicle.

145. Approximately one year after purchasing the Morris Vehicle, Mr. Morris started to notice the Transmission was jerking, shifting harshly, and clunking in reverse. He experienced engagement delays and inability to accelerate.

146. Mr. Morris attempted to obtain repairs for the Transmission at Purvis Ford in October 2023, but Purvis Ford made no effort to remediate the Transmission Defect. Mr. Morris noted on the "After Hours Service" form he filled out and provided to Purvis Ford on or about October 2, 2023, in a section for him to identify his service needs and/or describe a problem that "transmission seem like it miss gear w/ coast over a hill." Mr. Morris signed and dated the "After Hours Service Form" with this information. Purvis Ford's service records do not indicate that it provided any evaluation or service for Mr. Morris's complaint about the Transmission, and he did not remember to follow up when he later picked up his vehicle.

147. Mr. Morris continued to experience malfunctions caused by the Transmission Defect. He later called Purvis Ford back and told them he wanted to make an appointment for service on the Transmission, but he was told Purvis Ford did not have a "transmission tech" to assist with his request. In or around January 2024, Purvis Ford advised Mr. Morris that it was not taking any appointments for transmission repairs.

148. He then took the Morris Vehicle to Bayside Ford in February 2024, and he was informed that a part needed to be ordered to make repairs on the Transmission.

149. In March 2024, Bayside Ford contacted him to drop off the Morris Vehicle on March 5, 2024. After he dropped off the Morris Vehicle at Bayside Ford, he repeatedly followed up to obtain status updates but was unable to obtain any information. Bayside Ford eventually

contacted Mr. Morris and advised him that he could pick up the Morris Vehicle on April 10, 2024. According to the service order he received from Bayside Ford, the service technician "Found Delayed Forward and Reverse Engagement- Found Multiple Shifts Delayed/Harsh on Test Drive." The concern remained after the service technician "Performed Transmission Strategy Relearn and Drive Cycle" and "Overhauled Transmission Main Control," so he "Replaced CDF Drum and All Required Seals- Flushed Torque Converter and Transmission Oil Cooler" and "Reinstalled Transmission" and "Reset Adaptives."

150.    On his way home from Bayside Ford on April 10, 2024, Mr. Morris experienced engagement delays and harsh shifting. He subsequently traded in the Morris Vehicle to Safford Chrysler-Jeep-Dodge of Fredericksburg.

151.    Within days (if not hours) of the evaluation and service of the Morris Vehicle on April 10, 2024, if not earlier, Ford received detailed information about the concerns regarding the Transmission Mr. Morris relayed to Bayside Ford and the details of the warranty repairs performed on the Morris Vehicle:

**CONCERN INFORMATION:**

| | |
|---|---|
| Cust. Concern Code: | P65 - AT - TRANSMISSION SHIFTS ROUGH/JERKY |
| Condition Code: | 42 - DOES NOT OPERATE PROPERLY |
| Technician Comment: | Found Delayed Forward and Reverse Engagement- Found Mutliple Shifts Delayed/Harsh On Test Drive- Checked Fluid Level- Full-Slightly Dark In Color- TSB 23-2350 Pertaining To Concern- No Codes In PCM- Performed Transmission Strategy Relearn and Drive Cycle- Concern Still Present- Need To Overhaul Transmission Main Control and Retest// Found Vehicle Still Has Harsh/ Delayed Shifting in Multiple Gears- Removed Transmission and Tore Down- Found CDF Drum Bushing Has Shifted and Causing Shifting Issues- Overhaul Transmission Per The WSM- Replace CDF Drum and All Required Seals- Flush Out Cooler and Torque Converter- Reinstall Transmission and Perform Adaptive Relearn Test Drive Overhauled Transmission- Replaced CDF Drum and All Required Seals- Flushed Torque Converter and Transmission Oil Cooler- Reinstalled Transmission- Reset Adaptives and Test Drove- Concern Not Present at This Time |

**LABOR INFORMATION:**    Note: All costs are in US dollars

| Labor Op Code | Labor Op Description | Labor Op Cost |
|---|---|---|
| 7001D | AUTOMATIC TRANSMISSION / ELECTRIC DRIVE - DIAGNOSIS | 91.51 |
| 7001D1 | PID RECORDER/MONITOR TEST WITH ROAD TEST | 76.26 |
| 7001D45 | AUTOMATIC TRANSMISSION / ELECTRIC DRIVE - DIAGNOSTIC PIN POINT TEST | 45.76 |
| 7001D2 | LINE PRESSURE AND STALL - TEST | 30.50 |
| MT7001D15 | | 289.79 |
| 7000A | TRANSMISSION ASSEMBLY REMOVE AND INSTALL OR REPLACE | 1128.65 |
| 7000AZJ | EXTRA TIME TO MOUNT TRANSMISSION ON A BENCH FIXTU | 45.76 |
| 7000A2 | TRANSMISSION ASSEMBLY OVERHAUL | 1037.14 |
| 7000A50 | AUTOMATIC TRANSMISSION TORQUE CONVERTER - FLUSH | 122.02 |

40

FORD_DOLAN_000795749–795750.

### C.   *Putative Class Members*

152.   Putative Class Members have experienced similar problems with their Class Vehicles as a result of the Transmission Defect.

153.   Hundreds, if not thousands, of purchasers and lessees of the Class Vehicles have experienced the Transmission Defect. Complaints filed by consumers with the NHTSA and posted on the Internet demonstrate that the Transmission Defect is widespread. Not only have consumers complained about harsh, bumpy, jerky, and erratic shifting, as well as hesitation, clunking, and even loss of power, but the Transmission Defect has often led to potentially life-threatening situations. The complaints filed by consumers and attached as **Exhibit B** illuminate, and are merely a sample of, Ford customers' experiences with the Transmission Defect and its potential danger.

## V.   CLASS ACTION ALLEGATIONS

154.   Plaintiffs bring this lawsuit individually and as a class action on behalf of all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

155.   The Class is defined as:

All persons residing in Virginia who formerly or currently own(ed) or leased one or more Class Vehicles with a 10R80 10-speed automatic transmission.[6]

156.   The Sought Repair Subclass is defined as:

All Class members who contacted or visited Ford, or a Ford dealership or service center in Virginia, to report abnormal operation of their 10R80 10-speed automatic Transmission with respect to harsh, hard, jerky, or erratic shifting, or surging,

---

[6] Plaintiff reserves the right to amend or modify his Class and Subclass definitions to include or exclude model years of Vehicles with a 10R80 10-speed automatic transmissions after he has had an opportunity to conduct further discovery related to changes made to the 10R80 transmission in each model year, if any.

41

lunging, clunking, hesitation, or loss of power when shifting between gears or between gear engagements.

157.    The VCPA Subclass is defined as:

All persons in Virginia who formerly or currently own(ed) or leased one or more Class Vehicles who received personal property tax relief under Virginia law for their Class Vehicle(s).

158.    Excluded from the Class and Subclasses are Defendant and its subsidiaries and affiliates, any class that is certified in *O'Connor, et al. v. Ford*, Case No. 1:19-cv-05045 (N.D. Ill.), Defendant's executives, board members, legal counsel, the judges and all other court personnel to whom this case is assigned, their immediate families, and those who purchased Class Vehicles for the purpose of resale.

159.    Numerosity: Fed. R. Civ. P. 23(a)(1). The Class and Subclasses are so numerous that the joinder of all members is unfeasible and not practicable. While the precise number of Class Members has not been determined at this time, thousands of Virginians have purchased or leased the Class and Subclass Vehicles in Virginia.

160.    Commonality: Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the Class and Subclasses, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

A.    Whether the Class Vehicles and their Transmissions are defectively designed;

B.    Whether the Class Vehicles and their Transmissions are defective;

C.    Whether the Class Vehicles and their Transmissions are re fit for the ordinary purposes for which such goods are used;

D.    Whether the Class Vehicles' propensity to shift harshly or erratically, to lunge, hesitate, or otherwise experience symptoms related to the Transmission Defect

42

would be considered material to a reasonable consumer;

E.      Whether, as a result of Ford's concealment or failure to disclose material facts, Plaintiffs and Class Members acted to their detriment by purchasing Class Vehicles manufactured by Ford;

F.      Whether Ford was aware of the Transmission Defect;

G.      When Ford became aware of the Class Vehicles' propensity to shift harshly or erratically, to lunge, hesitate, or otherwise experience symptoms related to the Defect;

H.      Whether the Transmission Defect constitutes an unreasonable safety risk;

I.      Whether Ford breached express and/or implied warranties with respect to the Class Vehicles;

J.      Whether Ford violated the VCPA in connection with its advertising, sale, or other activities related to the Vehicles and the Transmission;

K.      Whether Plaintiffs and Class Members are entitled to actual damages as a result of Ford's wrongful conduct;

L.      Whether Ford had a duty to disclose the Transmission Defect; and

M.      Whether Ford violated the VCPA when it refused to disclose the defect to consumers.

161.    Predominance: Fed. R. Civ. P. 23(b)(3). These common questions predominate over any individual questions that might arise, including questions regarding entitlement to and amount of damages. Even if individual questions are required, answers to the above common questions will advance the litigation for all parties.

162.    Typicality: Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of those of other Class and Subclass Members because all purchased or leased Class Vehicles equipped with the

43

10R80 Transmission.

163.    <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of Class and Subclass Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously. They have no conflicts with Class and Subclass Members.

164.    <u>Superiority</u>: Plaintiffs, Class and Subclass Members have all suffered and will continue to suffer harm and damages as a result of Ford's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class and Subclass Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of Class Members' individual claims, it is likely that few Class Members could afford to seek legal redress for Ford's misconduct. Absent a class action, Class Members will continue to incur damages, and Ford's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

165.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

A.    Whether the Class Vehicles and their Transmissions are defectively designed;

B.    Whether the Class Vehicles and their Transmissions are defectively

manufactured;

C.    Whether the Class Vehicles and their Transmissions are fit for the ordinary purposes for which such goods are used;

D.    Whether the Class Vehicles' propensity to shift harshly or erratically, to lunge, hesitate, or otherwise experience symptoms related to the Defect would be considered material to a reasonable consumer;

E.    Whether, as a result of Ford's concealment or failure to disclose material facts, Plaintiffs and Class Members acted to their detriment by purchasing Class Vehicles manufactured by Ford;

F.    Whether Ford was aware of the Transmission Defect;

G.    When Ford became aware of the Class Vehicles' propensity to shift harshly or erratically, to lunge, hesitate, or otherwise experience symptoms related to the Defect;

H.    Whether the Transmission Defect constitutes an unreasonable safety risk;

I.    Whether Ford breached express and/or implied warranties with respect to the Class Vehicles;

J.    Whether Ford violated the VCPA in connection with its advertising, sale, or other activities related to the Class Vehicles and the Transmission;

K.    Whether Plaintiffs and Class Members are entitled to actual damages as a result of Ford's wrongful conduct;

L.    Whether Ford has a duty to disclose the Transmission Defect to Plaintiffs and Class Members; and

M.    When Ford's duty to disclose the Transmission Defect to Plaintiffs and Class Members arose.

45

## VI.   CAUSES OF ACTION

### COUNT ONE: BREACH OF EXPRESS WARRANTY

**Virginia Code § 8.2-313**
**(Plaintiff Dolan, individually, and on behalf of the Class)**

166.    Plaintiffs incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

#### FORD'S WINDOW STICKER WARRANTY REPRESENTATIONS

167.    Federal law requires automobile manufacturers to affix a Monroney sticker "securely . . . to the windshield, or side window" of new vehicles delivered to dealers. 15 U.S.C. § 1232. The Monroney sticker requirement mandates disclosure of material information on new automobiles and can only be removed by the consumer after purchase.

168.    Ford affixed federally-mandated Monroney stickers to each Class Vehicle that contained express warranty language. Specifically, these stickers prominently displayed a section under the heading "**WARRANTY**."

169.    All Class Vehicles other than Navigators included under "WARRANTY" the statement that the sale included "3 YR/36,000 BUMPER TO BUMPER" and "5 YR/60,000 POWERTRAIN." The Navigators included under "WARRANTY" the statement that the sale included "4YR/50,000 MILE WARRANTY" and "6YR/70K MIL POWERTRAIN WARR."

#### JAMES DOLAN'S WINDOW STICKER

170.    Plaintiff Dolan brings this cause of action individually and on behalf of the Class.

171.    When Plaintiff Dolan went to Ford's dealership to determine whether he was going to purchase the Ford vehicle he ultimately purchased, that vehicle had the Monroney sticker.

172.    The window sticker Ford prepared and placed on the vehicle Dolan purchased was typical of the stickers disclosed by Ford for every Class member. The "Warranty" section appeared

in the primary sections of the sticker under its own heading as follows:



173.    Dr. Dolan relied on the representations and details within his window sticker and, as the Court learned at the June hearings, he has even testified to that fact in his under oath deposition: "Q. In purchasing your vehicle, did you rely on the contents of the sticker on the vehicle?  A. I mean, I looked at the specs on the vehicle, and that played into my decision, yes." Dolan Dep. 161:16–19.[7]

174.    Dr. Dolan understood that the language in the window sticker under "WARRANTY" meant that he had a comprehensive warranty such that the Dolan Vehicle was free from defect and would be properly functional for the stated period or mileage and Ford would repair, replace or otherwise correct all defects and defective components on the vehicle, including the transmission, that fail during the warranty period.

---

[7] Reliance of course is not an element of an express warranty claim.  As this Court previously held, "[n]either reliance on nor actual knowledge of the warranty-triggering language is required to create an express warranty." *Benedict v. Hankook Tire Co. Ltd.*, 295 F. Supp. 3d 632, 653 (E.D. Va. 2018) (citing *Daughtrey v. Ashe*, 243 Va. 73, 413 S.E.2d 336, 336, 339 (1992)) and *Martin v. Am. Med. Sys., Inc.*, 116 F.3d 102, 105 (4th Cir. 1997)).

## PLAIN AND COMMON USAGE OF THE "WARRANTY" TERMS

175.    The terms contained under "WARRANTY" in Ford's contract stickers are not ambiguous and are universally understood in the consumer automotive market to mean that the manufacturer warrants that the respective components will be free from defect and properly functional for the stated period or mileage. Ford's warranty statements on the Monroney stickers are unambiguous affirmations that Ford would provide warranty coverage for powertrain components, including the transmission, for five years or 60,000 miles, whichever occurs first.

176.    The term "BUMPER / BUMPER" is universally understood in the automotive industry to mean comprehensive coverage for nearly all vehicle parts and systems, excluding only normal wear items like tires and brake pads.

177.    The terms "BUMPER TO BUMPER" and "POWERTRAIN" are industry-standard terminology that has well-established meaning in the automotive industry and to reasonable consumers, referring respectively to comprehensive vehicle coverage and coverage of engine and transmission components.

178.    For example, U.S. News & World Report's "Car" research pages define the common understanding:

> Among the various types, bumper-to-bumper warranties are the gold standard, offering coverage for most of your car's systems and components from end to end. Whether it's a purchased, leased or pre-owned ride that you're taking home, bumper-to-bumper protection is worth understanding.
> […]
> A bumper-to-bumper warranty, sometimes called a comprehensive plan, provides protection for nearly every part of your car, truck or SUV. It provides coverage for repairs or replacements of faulty components until your car reaches a preset age or mileage limit.

U.S. NEWS & WORLD REPORT, *Bumper-to-Bumper Warranty Guide*, *available at*

https://cars.usnews.com/cars-trucks/advice/bumper-to-bumper-warranty  (last accessed on July

48

14, 2025.[8]

179.   The language "3 YR/36,000 BUMPER TO BUMPER" on the Monroney sticker is an express promise the vehicle will be free from defect and properly functional for the stated period or mileage and that Ford will repair or replace all defects and defective components on the vehicle, including the transmission, that fail during the warranty period. The language "4YR/50,000 MILE WARRANTY" on the Navigator Monroney sticker is the same thing—an express promise that the vehicle will be free from defect and properly functional for the stated period or mileage and that Ford will repair or replace all defects and defective components on the vehicle, including the transmission, that fail during the warranty period.

180.   The "3YR/36,000" limitation is clear and generally interpreted by reasonable consumers to mean coverage expires after three years from purchase or 36,000 miles, whichever occurs first, without ambiguity or need for further clarification.

181.   The language "5YR/60,000 POWERTRAIN" on the Monroney sticker is an express promise that the "powertrain" will be free from defect and properly functional for the stated period or mileage and repairs or replacements and Ford will repair or replace all powertrain defects and defective components, including the transmission, that fail during the warranty period. The language "6YR/70K MIL POWERTRAIN WARR" on the Navigator Monroney sticker is the same express promise— the "powertrain" will be free from defect and properly functional for the stated period or mileage and Ford will repair or replace all powertrain defects and defective components, including the transmission, that fail during the warranty period.

182.   "POWERTRAIN" is a term with a standard meaning in the industry, covering the engine, transmission, driveshaft, axles, and related components that generate and deliver power to

---

[8] By quoting this excerpt, Plaintiffs do not incorporate any additional content from the subject webpage into this Second Amended Complaint.

the wheels, as explained by Kelley Blue Book and other automotive authorities.

183.    Consumers universally understand "powertrain warranty" to promise the "powertrain" will be free from defect and properly functional for the stated period or mileage and repairs or replacements for defects in these core mechanical systems, often for longer periods than bumper-to-bumper coverage, reflecting the higher durability expected of these parts.

184.    The "5YR/60,000" specification for the "powertrain warranty" is plainly comprehensible, indicating coverage for five years or 60,000 miles, and is consistent with FTC guidelines requiring warranty terms to be straightforward to avoid misleading buyers.

### THE SUBSTANTIVE STATEMENTS IN THE WINDOW STICKERS CREATED AN EXPRESS WARRANTY

185.    Plaintiff Dolan and the Class base their express warranty claim on the written affirmation made in each window sticker for each class member.

186.    The warranty statements are listed on the Monroney sticker in all capital letters and are positioned with other essential disclosures required by law, thereby signaling to consumers that they are part of the purchase offering and not marketing puffery.

187.    The Monroney sticker also affirmatively identifies these warranty terms as "STANDARD EQUIPMENT INCLUDED AT NO EXTRA CHARGE," further confirming their incorporation into the basis of the bargain.

188.    Ford's warranty language on the Monroney stickers was prominently displayed, clearly worded, and easily understood by reasonable consumers to mean that Ford was promising specific warranty coverage for the stated time periods and mileage limits.

189.    The warranty terms on Ford's Monroney stickers were presented in a format and manner that would be understood by reasonable consumers as Ford's binding promise to provide warranty coverage, not merely as informational or aspirational statements.

190.    Virginia has adopted the Uniform Commercial Code, including U.C.C. § 2-313, which covers express warranties. Va. Code § 8.2-313. That section provides that "any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." U.C.C. § 2-313(1)(a). Further, "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the good shall conform to the description." *Id*. § 2-313(1)(b).

191.    The Class Vehicles alleged herein are each a "consumer product" governed by the Federal Magnuson-Moss Warranty Federal Trade Commission Improvement Act, 15 U.S.C. §§ 2301 *et seq*. The class vehicles are tangible personal property which is distributed in commerce and normally used for personal, family, or household purposes. 16 C.F.R. § 702.1(b).

192.    In a consumer transaction such as those alleged herein, a "*Written warranty*" includes—

> (1) Any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or (2) Any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking, which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.

16 C.F.R. §702.1(c).

193.    The warranty language on Ford's Monroney stickers constitutes an express warranty under Virginia law because it consists of affirmations of fact and promises and description of the goods made by Ford as the seller to purchasers relating to the Class Vehicles that became part of the basis of the bargain between Ford and Class Members.

51

194.    Because the Monroney sticker is the only warranty language provided to consumers at or before the time of sale, it constitutes the full and complete expression of Ford's warranty obligations under applicable law.

195.    Under Virginia law, "[n]either reliance on nor actual knowledge of the warranty-triggering language is required to create an express warranty." *Benedict*, 295 F. Supp. 3d at 653 (E.D. Va. 2018).  Instead, "[t]he sole question is whether the language . . . [is] fairly to be regarded as part of the contract" and "all of the statements of the seller [are part of the basis of the bargain] unless good reason is shown to the contrary." *Id*. (cleaned up).

196.    Ford's warranty statements on the Monroney stickers are fairly to be regarded as part of the contract of sale because they were affixed to each Class Vehicle as required by federal law, were prominently displayed for consumers to see, and represented Ford's commitment regarding warranty coverage included with each vehicle purchase.

197.    The warranty language on Ford's Monroney stickers became part of the basis of the bargain between Ford and Class Members because these warranties were presented as standard equipment included at no extra charge, meaning the warranty coverage was part of what Ford was providing in exchange for the purchase price.

198.    The Monroney sticker warranty language constitutes the complete and unambiguous terms of Ford's express warranty obligations, without reference to or incorporation of any separate warranty guides, manuals, or documentation that might contain additional limitations, conditions, or exclusions.

### OUTSIDE LITIGATION, FORD AGREES THERE IS AN APPLICABLE EXPRESS WARRANTY IN ACCORDANCE WITH THE TERMS IN THE WINDOW STICKER

199.    Ford agreed to provide Dr. Dolan with an express warranty bumper-to-bumper for the lesser of three years from ownership and 36,000 miles driven.

52

200. Ford agreed to provide Dr. Dolan with an express warranty for the powertrain, which includes the Transmission, for the lesser of five years from ownership and 60,000 miles driven.

201. Ford's position in litigation has been that the 10R80 Transmission defect that the Plaintiffs and Class Members suffered as alleged in this action is a design defect and is not covered by the express warranties it agrees otherwise exist (the "Claimed Design Defect Limitation.").

202. Outside litigation, Ford has not regularly taken the position that the Claimed Design Defect Limitation means that it will not cover warranty claims for the 10R80 Transmission issues alleged in this case.

203. Ford did not deny Dr. Dolan's warranty claims based on the Claimed Design Defect Limitation.

204. In advertising and selling Class Vehicles other than with Lincoln branding, Ford advertised and represented that the class vehicles were sold with a warranty for three years or 36,000 miles, whichever occurs first.

205. Ford also stated in writing that its sales of these Class Vehicles included extended warranty coverage for powertrain components for five years or 60,000 miles, whichever occurs first. This "powertrain warranty" coverage includes the engine, transmission, driveshaft, axles, and related components that generate and deliver power to the wheels.

206. For Lincoln-branded Class Vehicles, Ford advertised and represented that the class vehicles were sold with a warranty for four years or 50,000 miles, and a "powertrain warranty" for six years or 70,000 miles.

207. As evidenced by the Harsh Shift TSBs, the Transmission Defect is covered by the express warranties alleged herein. For example, TSB 22-2428 added a complete replacement "of

the CDF clutch cylinder sleeve" with a *newly designed component* as a warranty "repair" option, and, indeed, paid millions of dollars to its authorized dealers and service centers for such warranty "repairs."

### THE CLAIMED DESIGN DEFECT LIMITATION IS NOT APPLICABLE EVEN UNDER FORD'S THEORY BECAUSE IT WAS NOT DISCLOSED TO DOLAN AND CLASS MEMBERS BEFORE DELIVERY

208.    At no time during the Class Period did Ford make conspicuously or even reasonably available to prospective purchasers or even just curious shopping consumers detailed information about exclusions or limitations on its written express warranties beyond these terms above.

209.    The limitations asserted by Ford in this litigation based on the text in its warranty guides, such as the exclusion of design defects—were not disclosed, advertised or presented to consumers, including Plaintiff Dolan and Class Members, prior to sale.

210.    In all regards alleged in herein, Defendant was the "Warrantor" of the class vehicles." It gave and offered to give a written warranty as to each vehicle to each class member. 16 C.F.R. § 702.1(d).

211.    For all purposes in this case, Defendant was also a "Seller" of the class vehicles. 16 C.F.R. §702.1(e). It offered the Class Vehicles for sale through its restricted dealer network. Both the buying consumer and Defendant understood that Ford was selling the vehicle. The Class Vehicles were not being resold and were being titled directly from Ford to the buyer.

212.    Defendant was also a "Supplier" as engaged in the business of making the Class Vehicles directly or indirectly available to consumers. 16 C.F.R. § 702.1(f).

213.    Defendant was as well a "Manufacturer" as it in fact made each Class Vehicle. 16 C.F.R. § 702.1(g).

214.    Ford may not disclaim or alter these express obligations post-sale by reference to limitations or exclusions in a warranty guide not made available to Plaintiffs and Class Members

54

prior to purchase. *See* 15 U.S.C. § 2302; 16 C.F.R. §§ 702.1–702.3.

215.    By federal law, Ford's attempts to impose restrictions or exclusions of its express written warranty are legally ineffective where, as here, the terms of restriction or exclusion within the written warranty were not made available to the consumer (or prospective consumer) prior to sale of the vehicle at the location of the sale to the consumer. *See e.g.* 15 U.S.C. § 2302.

216.    Ford did not itself or through its authorized dealers make the text of its written warranty readily available for examination by the prospective buyer, including Plaintiff Dolan and each Class Member.[9] It did not provide ae warranty guide or other warranty text to the Plaintiffs or other Class Members for request and/or place signs reasonably calculated to elicit the prospective buyer's attention in prominent locations in the dealerships, in its marketing materials or on its website advising such prospective buyers of the availability of warranties upon request. 16 C.F.R. § 702.3(a).

217.    Further, Ford did not provide its dealers with warranty materials necessary for such dealers to comply with the requirements set forth in the preceding paragraph. Ford did not provide "a tag, sign, sticker, label, decal or other attachment to the" class vehicles "which contains the full text of the written warranty." Ford also did not provide its dealers "a notice, sign, or poster disclosing the text of" its express written warranty. 16 C.F.R. § 702.3(b).

218.    Ford did not provide the express written warranty terms in an accessible digital format on its Internet Web site, and as well did not provide information to Plaintiffs, Class Members and other consumers informing them before purchase.

219.    The imposition of a limitation in a warranty guide delivered post-sale is just not

---

[9] Like Dr. Dolan, Mr. Morris also did not receive Ford's warranty guide until after the contract and delivery. However, such allegation is not necessary as he is not asserting an express warranty claim.

possible for Ford. In addition to all of the requirements and restrictions cited above,

> [I]f a print or broadcast ad for a consumer product mentions a warranty, and the advertised product is covered by the Pre Sale Availability Rule (that is, the product is sold in stores for more than $15) the ad should inform consumers that a copy of the warranty is available to read prior to sale at the place where the product is sold. Print or broadcast advertisements that mention a warranty on any consumer product that can be purchased through the mail or by telephone should inform consumers how to get a copy of the warranty.

FEDERAL TRADE COMMISSION, *Businessperson's Guide to Federal Warranty Law*, *available at*

https://www.ftc.gov/business-guidance/resources/businesspersons-guide-federal-warranty-law#makingwarranties (last accessed on July 12, 2025).

220.    Even beyond the Magnuson-Moss regulations and statute, Ford's attempt to impose limitations on Dolan and Class Member express warranties fails under Virginia's Uniform Commercial Code (and common contract law generally) as the Claimed Design Defect Limitation was never disclosed and provided to Dolan or Class Members before sale.

221.    In fact, Ford instructs its Dealer agents to provide its warranty guide to consumers post-sale: "The Dealer . . . shall deliver a copy of the warranty, in the form furnished by the Company, to the owners at the time the VEHICLE is delivered to the owner." FORD_DOLAN_000779307.

**FORD RECEIVED SUFFICIENT NOTICE**

222.    Ford was provided with notice of these issues by numerous customer complaints regarding the Transmission Defect before or within a reasonable amount of time after the allegations of the Transmission Defect became public.

223.    In addition, Plaintiff Dolan and all Class Members provided Ford with notice of claims they make on behalf of themselves and similarly situated consumers. Although Ford responded to the notice letter, it suggested only a possibility of individual resolution rather than Class-wide relief. Ford's response makes clear that their efforts for early resolution were futile.

224.    Plaintiff Dolan is also a member of the Sought Repair Subclass and he and each member of that Subclass directly notified Ford and/or its dealer agent.

225.    Plaintiff Dolan was not required to notify Ford of its breach and/or were not required to do so because affording Ford a reasonable opportunity to cure any breach of written warranty would have been futile. Ford was also on notice of the Transmission Defect from the complaints and service requests it received from Class Members, from repairs and/or replacements of the Transmission or a component thereof, through TSBs acknowledging the Transmission Defect, and through other internal sources.

<strong>FORD BREACHED THE EXPRESS WARRANTY</strong>

226.    Since first selling vehicles equipped with the 10R80, Ford has refused, or otherwise failed to fully address the Transmission Defect through repair and/or replacement of a non-defective Transmission in Plaintiffs' and Class Members Vehicles. In instances where Ford replaces a defective 10R80 based on customer concerns, the replacement 10R80 installed in the customer's vehicle is likewise defective.

227.    The express warranties to repair defective parts fail in their essential purpose because the contractual remedy is insufficient to ever correct the 10R80 defect and make Plaintiff Dolan and Class Members whole.

228.    Accordingly, recovery by Plaintiff Dolan and the Class is not limited to the express warranties of repair to defective parts, and Plaintiff Dolan and the Class seek all remedies as allowed by law.

229.    In the alternative to such contention, as to Plaintiff Dolan and Sought Repair Subclass Members, Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time and has been unwilling to and it appears incapable of reasonably repairing same.

230.    As a direct result of Ford's breach of the express warranties stated on its Monroney stickers, Plaintiffs and Class Members have suffered damages including the cost of repairs, diminished value of their vehicles, and loss of use of their vehicles.

231.    Plaintiff Dolan and other Class Members are entitled to statutory damages and other legal and equitable relief including, at their election, the purchase price of or a buyback of their Ford vehicles, and/or the overpayment or diminution in value of their Class Vehicles.

232.    Plaintiff Dolan and Class Members are also entitled to costs and reasonable attorneys' fees.

## COUNT TWO: BREACH OF IMPLIED WARRANTYOF MERCHANTABILITY

### Virginia Code § 8.2-314
### (Plaintiffs Dolan and Morris, individually, and on behalf of the Class)

233.    Plaintiffs incorporate by reference and reallege the preceding paragraphs as if fully set forth herein.

234.    Plaintiffs bring this cause of action individually and on behalf of the Sought Repair Subclass.

235.    Virginia has adopted the Uniform Commercial Code, including U.C.C. § 2-314, which covers the implied warranty of merchantability. Va. Code § 8.2-314. That section provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Va. Code §8.2-314(1).

236.    Ford is and was at all relevant times a merchant with respect to the Class Vehicles.

237.    Ford was and is in actual or constructive privity with Plaintiff and all Class Members.

238.    Plaintiffs had sufficient direct dealings with Ford and/or its authorized dealers, franchisees, representatives, and agents to establish any required privity of contract. Ford's

authorized dealers, franchisees, representatives, and agents were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranties provided with the Class Vehicles. The warranties were designed for and intended to benefit only the ultimate purchasers and lessees of the Class Vehicles, i.e., Plaintiffs and Class Members.

239.    Privity is not required to assert this claim because Plaintiffs and the Class Members are the intended consumers of the Class Vehicles and intended third-party beneficiaries of contracts between Ford and its dealers, franchisees, representatives, and agents.

240.    By extending express written warranties to end-user purchasers and lessees, brought itself into privity with Plaintiffs and all Class Members.

241.    Pursuant to Va. Code § 8.2-314, the Class Vehicles owned or leased by Plaintiffs and Class Members were defectively designed and posed a serious and immediate safety risk to consumers and the public. The Class Vehicles were subject to an implied warranty of merchantability, did not comply with the warranty in that they were defective at the time of sale, and as a proximate result of the Transmission Defect, the Plaintiff and Class Members sustained damages.

242.    The Class Vehicles left Ford's facilities and control with a defect caused by defective design incorporated into the manufacture of the Class Vehicles. The Transmission Defect puts consumers' safety at risk upon driving the Class Vehicles. At all times relevant hereto, there was a duty imposed by law which requires that a manufacturer or seller's product be reasonably fit for the ordinary purposes for which such products are used, and that the product be acceptable in trade for the product description. This implied warranty of merchantability is part of the basis of the bargain between Ford, on the one hand, and Plaintiffs and Class Members, on the other.

243.    Notwithstanding its duty, at the time of delivery Ford breached the implied

59

warranty of merchantability in that the Class Vehicles transmissions were defective and posed a serious safety risk at the time of sale, would not pass without objection, are not fit for the ordinary purposes for which such goods are used, failed to conform to the standard performance of like products used in the trade, and failed to conform to the promises or affirmations of fact made on the Monroney stickers.

244. Ford has not validly disclaimed, excluded, or modified the implied warranties or duties described above, and any attempted disclaimer or exclusion of the implied warranties was and is ineffectual.

245. Ford knew, or should have known, that the Class Vehicles posed a safety risk and contained the Transmission Defect, and knew, or should have known, of these breaches of implied warranties prior to sale or lease of the Class Vehicles to Plaintiffs and Class Members.

246. Plaintiffs and Sought Repair Subclass Members used their Class Vehicles in a manner consistent with their intended use and performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Ford or by operation of law in light of Ford's unconscionable conduct.

247. Ford had actual knowledge of, and received timely notice regarding, the Transmission Defect at issue in this litigation and, notwithstanding such notice, failed and refused to offer an effective remedy.

248. In addition, Ford received, on information and belief, numerous consumer complaints and other notices from customers advising of the Transmission Defect associated with the Transmissions installed in the Class Vehicles.

249. By virtue of the conduct described herein and through this Complaint, Ford breached the implied warranty of merchantability.

250. As a direct and proximate result of Ford's breaches of its implied warranties, Plaintiffs and Sought Repair Subclass Members bought the Class Vehicles without knowledge of the Transmission Defect or their serious safety risks and purchased unsafe products which were not fit for the ordinary purposes for which such goods are used.

251. Plaintiffs and each member of the Sought Repair Subclass contacted or visited Ford, or a Ford dealership or service center in Virginia, to report abnormal operation of their 10R80 10-speed automatic Transmission with respect to harsh, hard, jerky, or erratic shifting, or surging, lunging, clunking, hesitation, or loss of power when shifting between gears or between gear engagements. At a minimum, each such notice alerted Ford that the class member found the condition and operation of the vehicle troublesome and in a condition other than as the vehicle should have operated.

252. As a direct and proximate result of Ford's breach of its implied warranties, Plaintiffs and Sought Repair Subclass Members have suffered economic damages, including loss attributable to the diminished value of their Class Vehicles, loss of use of their Class Vehicles and other tangible property, as well as the monies spent and to be spent to repair and/or replace their 10R80. Ford kept the profits for its unsafe products while never having to incur the cost of an effective repair, replacement or recall.

253. Plaintiffs and other Sought Repair Subclass Members are entitled to statutory damages and other legal and equitable relief including, at their election, the purchase price of or a buyback of their Ford vehicles, or the overpayment or diminution in value of their Class Vehicles.

254. Plaintiffs and Sought Repair Subclass Members are also entitled to costs and reasonable attorneys' fees.

**COUNT THREE: FRAUD IN THE INDUCEMENT BY OMISSION**

**(Plaintiffs Dolan and Morris, individually, and on behalf of the Class)**

61

255. Plaintiffs incorporate by reference and realleges the preceding paragraphs as if fully set forth herein.

256. This claim is brought by Plaintiffs individually and on behalf of Class Members.

257. The allegations relevant to Counts 3 and 4 are pled within these Counts, as well as in the Plaintiffs "Factual Allegations." More specifically, Plaintiff alleges Fords deceit in multiple parts.

258. First, Plaintiffs allege that Ford designed, manufactured and sold to Plaintiffs and Class Members' vehicles with a Transmission that would not and will not operate as represented and necessary. *Supra* ¶¶19–41, 107. It misrepresented that its Transmissions were smooth when they were the opposite of smooth.

259. Second, Plaintiffs allege Ford knew of the Transmission defect before and after Plaintiffs' and Class Members' purchases, and knew with certainty that it had no repair or solution that would fix it. *Supra* ¶¶42–81.

260. Third, Plaintiffs allege that Ford made significant and successful efforts to suppress, hide, disguise and prevent investigation of its 10R80 defect. *Supra* ¶¶ 82-92, 97-102, 107.

261. Ford consistently attempts to undermine and dismiss claims that the Transmission is defective by asserting—through statements made to consumers and the general public by Ford employees, authorized dealers, agents, sales representatives and/or repair technicians—that the harsh, jerky, bumpy, clunky, lunging, hesitating, and erratic shifting in Class Vehicles is "normal," or simply a limited period of adjustment and adaptation.

262. Similarly, Ford has implemented a number of policies and strategies which discourage Class Vehicle owners and lessees from seeking and obtaining repairs or inspections related to the harsh, jerky, bumpy, clunky, lunging, hesitating, and erratic shifting their Class

Vehicles are exhibiting.

263.    These policies include requiring additional and unnecessary steps in the repair process, increasing the burden on Plaintiffs and Class Members by requiring repeated appointments and visits to Ford's dealerships. *Supra* ¶¶110-119.

264.    Ford also under-compensates dealerships for the warranty repairs required under the relevant TSBs, increasing the incentive and motivation for dealerships to refuse to perform repairs related to harsh, jerky, bumpy, clunky, lunging, hesitating, and erratic shifting. *Id.*

265.    Ford also failed to sufficiently instruct dealerships, and even encouraged misunderstandings regarding the harsh and delayed shifting symptoms, and the related TSBs, which led Ford's service technicians to consistently, but incorrectly, tell Class Vehicle owners and lessees that their symptoms (1) were "normal operation," (2) would resolve with additional driving, (3) were the result of user error, or (4) could not be diagnosed or resolved without a check-engine light or diagnostic code.

266.    These policies even regularly prevent Class Vehicle owners and lessees from having their concerns and experiences memorialized.

267.    Prior to purchasing or leasing the Class Vehicles, Plaintiffs and other Class Members did not know that the Class Vehicles would abruptly and harshly shift unexpectedly surge, hesitate, and/or jerk.

268.    Had Plaintiffs and Class Members known about the Transmission Defect at the time of sale or lease, as well as the associated costs related to the Transmission Defect, Plaintiffs and the Class Members would not have purchased the Class Vehicles or would have paid less for them.

269.    As a result of their reliance on Defendant's omissions and/or misrepresentations, Plaintiffs and other owners and/or lessees of the Class Vehicles have suffered ascertainable loss of

money, property, and/or loss in value of their Class Vehicles.

270. Defendant knew or should have known that the Class Vehicles are defective and suffer from the Transmission Defect and are not fit for their ordinary purpose of providing consumers with safe and reliable transportation. Nevertheless, Defendant failed to disclose the Transmission Defect to Plaintiffs and Class Members at the time of purchase or lease, or thereafter, and, as detailed above, directly and indirectly obstructed, through "'trick [and] contrivance'" their discovery of the Transmission Defect, Ford's longstanding awareness of the Transmission Defect, and the filing of the Complaint in this case. *Culpeper Nat. Bank v. Tidewater Improvement Co.*, 89 S.E. 118, 121, 119 Va. 73, 83 (1916) (quoting *Wood v. Carpenter*, 101 U.S. 135, 143 (1879).

271. The "who" of "who committed the fraud" was Ford through its employees, authorized dealers, agents, sales representatives and/or repair technicians. The "what" and "how" was Ford's simultaneous false representations about the 10R80 Transmission quality while withholding and failing to disclose its knowledge just the opposite. The "when" is the period beginning with sales of the 2017 MY F-150 equipped with the 10R80, to the present. The "where" is in its advertisement, sales, and business decisions in and directed towards Virginia's consumers.

272. Ford concealed and suppressed material facts concerning the performance and quality of the Class Vehicles—namely, the Transmission Defect—and the quality of the Ford brand. Specifically, Ford knew (or should have known of) the Transmission Defect but failed to disclose it prior to or at the time it sold or leased Class Vehicles to consumers. Ford did so to boost sales and leases of Class Vehicles.

273. Plaintiffs and Class Members had no way of knowing that Ford's representations were false and gravely misleading, or that Ford had omitted imperative details. Plaintiffs and Class Members did not, and could not, unravel Ford's deception on their own.

64

274.    As detailed above, Ford orchestrated a campaign to squelch public recognition of the Transmission Defect and repeatedly issued TSBs and SSMs designed to deceive its customers and potential customers. Ford directed its authorized dealers and service centers to perform phony repairs on Plaintiffs and Class Members' vehicles that it knew would not remediate the Transmission Defect.

275.    Ford had a duty to disclose the true performance of Class Vehicles and the Transmission Defect because knowledge thereof and the details related thereto were known and/or accessible only to Ford; Ford had superior knowledge and access to the facts; and knew the facts were not known to, or reasonably discoverable, by Plaintiff and the Class. Ford also had a duty to disclose because it made many false affirmative representations about the qualities of the Class Vehicles and the Transmission, including specifically as to the shift quality provided by the Class Vehicles and the Transmission. Further, Ford had a duty to either repurchase defective vehicles from its dealers or "immediately...give to the...dealer at the manufacturer's...own expense, the part or equipment needed to...correct the defect." 49 U.S.C. § 30116. Federal law expressly required Ford to report the Transmission Defect to customers and dealers and remediate it immediately (which it has never done) or repurchase the defective vehicles from its dealers.

276.    Virginia law also imposed a duty to disclose on Ford to "clearly and unequivocally indicate in [its] advertisement[s] or offer[s] for sale [of the Class Vehicles] that the [Class Vehicles] are defective . . . or are 'seconds,' irregulars, imperfects, or 'not first class.'" Va. Code § 59.1-200(7).

277.    Virginia law additionally imposed a duty to disclose on Ford through multiple provisions of its criminal code.

278.    Va. Code § 18.2-216(A):

Any person, firm, corporation or association who, with intent to sell or in anywise dispose of merchandise, securities, service or anything offered by such person, firm, corporation or association, directly or indirectly, to the public for sale or distribution or with intent to increase the consumption thereof, or to induce the public in any manner to enter into any obligation relating thereto, or to acquire title thereto, or any interest therein, makes, publishes, disseminates, circulates or places before the public, or causes, directly or indirectly to be made, published, disseminated, circulated or placed before the public, in a newspaper or other publications, or in the form of a book, notice, handbill, poster, blueprint, map, bill, tag, label, circular, pamphlet or letter or in any other way, an advertisement of any sort regarding merchandise, securities, service, land, lot or anything so offered to the public, which advertisement contains any promise, assertion, representation or statement of fact which is untrue, deceptive or misleading, or uses any other method, device or practice which is fraudulent, deceptive or misleading to induce the public to enter into any obligation, shall be guilty of a Class 1 misdemeanor.

*Id*.

279.    Va. Code § 18.2-217(A): "Any person, firm, corporation or association who in any manner advertises or offers for sale to the public any merchandise, goods, commodity, service or thing with intent not to sell, or with intent not to sell at the price or upon the terms advertised or offered, shall be guilty of a Class 1 misdemeanor." *Id*.

280.    Va. Code § 18.2-218:

Any person, firm, corporation or association who in any manner knowingly advertises or offers for sale to the public any merchandise, goods, commodity or thing which is defective, blemished, secondhand or used, or which has been designated by the manufacturer thereof as "seconds," "irregulars," "imperfects," "not first class," or words of similar import without clearly and unequivocally indicating in the advertisement or offer of the merchandise, goods, commodity or thing or the articles, units or parts, thereof so advertised or offered for sale to the public is defective, blemished, secondhand or used or consists of "seconds," "irregulars," "imperfects" or "not first class," shall be guilty of a Class 1 misdemeanor.

*Id*.

281.    Ford still has not made full and adequate disclosures and continues to defraud consumers by concealing and misrepresenting material information regarding the Transmission Defect and the performance and quality of Class Vehicles.

66

282.    Plaintiffs and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or leased the Class Vehicles. The actions of Plaintiffs and Class Members were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or Class Members.

283.    Plaintiffs and Class Members relied upon Ford's concealment and omissions regarding the quality of Class Vehicles and the Transmission Defect in deciding to purchase or lease Class Vehicles, including its failure to correct its uniform and false representations, through its website, multimedia advertisements, brochures, and in-person statements by its employees, authorized dealers, agents, sales representatives and/or repair technicians, touting the defective Transmission's safety, reliability, enhanced responsiveness and performance.

284.    Because of the concealment, omission, and/or suppression of the facts, Plaintiffs and Class Members sustained damage because they did not receive the value of the price paid for their Class Vehicles. Plaintiffs and Class Members would have paid less for Class Vehicles had they known about the Transmission Defect, or they would not have purchased or leased Class Vehicles at all.

285.    Accordingly, Ford is liable to Plaintiff and Class Members for actual damages in an amount to be proven at trial.

286.    Ford's actions and omissions were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights and well-being, to enrich Ford at the expense of Plaintiffs and Class Members. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

287.    Plaintiffs and Class Members are also entitled to costs and reasonable attorneys' fees.

## COUNT FOUR: VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT

### Virginia Code § 59.1-200
### (Plaintiffs Dolan and Morris, individually, and on behalf of the Subclass)

288.    Plaintiffs incorporate by reference and reallege the preceding paragraphs as if fully set forth herein. Most specifically, they identify the same averments stated in the preceding Count Three (Fraud).

289.    Plaintiffs bring this cause of action individually and on behalf of the VCPA Subclass.

290.    The sale and offering for sale of the Dolan and Morris Vehicles to Plaintiffs were "consumer transaction[s]" under the VCPA. Va. Code § 59.1-198. Each sale and offering for sale of the VCPA Subclass Vehicles[10] to the VCPA Subclass Members was a "consumer transaction" under the VCPA. *Id*.

291.    The Dolan Vehicle, Morris Vehicle, and VCPA Subclass Vehicles are "good[s]" under the VCPA.

292.    At all times relevant, Ford was a supplier under the VCPA.

293.    Defendant's conduct, as described herein, took place within the state of Virginia and constitute prohibited practices in violation of the VCPA.

294.    Defendant violated the VCPA, in its sale and offering for sale of the VCPA Subclass Vehicles, on its own and by and through its authorized dealerships, acting as authorized agents of Defendant, including but not limited to as follows:

---

[10] I.e., Class Vehicles purchased or leased as to which the Class Members received personal property tax relief under Virginia law for those Class Vehicle(s).

A.    Advertising the Subclass Vehicles with intent not to sell them as advertised, or with intent not to sell upon the terms advertised;

B.    Advertising and offering for sale the Class Vehicles without clearly and unequivocally indicating in the advertisement or offer for sale that the goods are defective, seconds, irregulars, imperfects, or not first class; and

C.    Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction, including its failure to correct its uniform and false representations, through its website, multimedia advertisements, brochures, and in-person statements by its employees, authorized dealers, agents, sales representatives and/or repair technicians, touting the defective Transmission's safety, reliability, enhanced responsiveness and performance..

295.    Ford's conduct, as detailed in this Complaint, violated Va. Code §§ 59.1-200(A)(7), (A)(8), and (A)(14).

296.    Ford has known of the Transmission Defect since before it released vehicles with the 10R80 to the public, as detailed above. Ford received confirmation of the existence of the Transmission Defect almost immediately after it sold the first vehicle equipped with the 10R80. However, Ford continued to allow unsuspecting new and used car purchasers to buy or lease the Subclass Vehicles and allowed them to continue driving dangerous vehicles.

297.    Ford owed Plaintiffs and the VCPA Subclass Members a duty to disclose the true safety and reliability of the Subclass Vehicles and/or the defective Transmissions installed in them because Ford: (a) possessed exclusive knowledge of the dangers and risks posed by the foregoing; (b) intentionally concealed the foregoing from Plaintiffs and the VCPA Subclass Members; (c) made incomplete representations about the safety and reliability of the foregoing generally, while

withholding material facts from Plaintiff and the VCPA Subclass Members that contradicted these representations; and (d) owed a duty under the VCPA to disclose that the Subclass Vehicles were defective, seconds, irregulars, imperfects, or not first class.

298.   Defendant intended that Plaintiffs and other VCPA Subclass Members would, in the course of their decision to expend monies in purchasing, leasing and/or repairing Subclass Vehicles, reasonably rely upon the misrepresentations, misleading characterizations, warranties and material omissions concerning the quality of the Subclass Vehicles and Transmissions with respect to materials, workmanship, design and/or manufacture.

299.   Ford's failure to disclose and active concealment of the dangers and risks posed by the defective Transmissions in Subclass Vehicles were material to Plaintiffs and the VCPA Subclass Members, and any reasonable consumer would have considered those facts important in deciding whether to purchase or lease a Subclass Vehicle. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

300.   Ford's misrepresentations, concealment, omissions and other deceptive conduct were likely to deceive and cause misunderstanding and/or, in fact, caused Plaintiffs and other the VCPA Subclass Members to be deceived about the safety and reliability of the Subclass Vehicles and their Transmissions, and that such Subclass Vehicles would be backed by both express and implied warranties that would, in fact, be honored by Defendant.

301.   Although Ford and its agents were aware that the Subclass Vehicles were equipped with defective Transmissions at the time that Plaintiffs and the VCPA Subclass Members purchased or leased their Subclass Vehicles, Ford refused to provide a fix for its defective

70

Transmissions, free-of-charge in accord with the terms of its written warranty and to prevent the damages described herein.

302.    Ford's violations of the VCPA were intentional and willful because Ford engaged in a calculated campaign to protect its bottom line from damage caused by its mass marketing and sale of millions of vehicles with defective, unsafe transmissions. Ford shifted the burden and costs of its failed transmission system onto consumers like Plaintiffs and the VCPA Subclass Members instead of honoring its warranty obligations and purported commitment to safety.

303.    Plaintiffs and the VCPA Subclass Members reasonably relied on Ford's misrepresentations and omissions and expected that the Subclass Vehicles would not be equipped with a defective Transmission, such that it would render the Subclass Vehicles unsafe and not fit for their ordinary use. Further, Plaintiffs and the VCPA Subclass Members reasonably expected Ford would honor its warranty obligations, as represented to them at the time they purchased or leased their Subclass Vehicles.

304.    The conduct of Defendant offends public policy, as established by statutes and common law; is immoral, unethical, oppressive and/or unscrupulous and caused avoidable and substantial injury to Plaintiffs and VCPA Subclass Vehicle owners and lessees (who were unable to have reasonably avoided the injury due to no fault of their own) without any countervailing benefits to consumers.

305.    Plaintiffs and the VCPA Subclass Members have been damaged as a proximate result of Defendant's violations of the VCPA and have suffered damages as a direct and proximate result of purchasing or leasing defective Subclass Vehicles.

306.    As a direct and proximate result of Defendant's violations of the VCPA, as set forth above, Plaintiffs and VCPA Subclass Members have suffered ascertainable loss of monies and

71

property, caused by Ford's misrepresentations and failure to disclose material information and refusal to provide effective and free repairs pursuant to its warranties. Had they been aware of the defective Transmissions installed in the Subclass Vehicles, Plaintiffs and VCPA Subclass Members either would have paid less for their Subclass Vehicles or would not have purchased or leased them at all. Plaintiffs and VCPA Subclass Members did not receive the benefit of their bargain as a result of Ford's misconduct.

307.    Ford's violations of the VCPA were intentional, willful, and designed to deprive Members of the consuming public, including Plaintiffs and VCPA Subclass Members, of fair and ethical consumer transactions.

308.    In the alternative, Ford's violations of the VCPA were non-willful and deprived Members of the consuming public, including Plaintiffs and VCPA Subclass Members of fair and ethical consumer transactions.

309.    Plaintiffs and the VCPA Subclass Members are therefore entitled to relief, pursuant to Va. Code § 59.1-204(A), including actual and statutory damages, treble damages, and reasonable attorneys' fees and costs. In the alternative, Plaintiffs and VCPA Subclass Members are entitled to restitution and payment of reasonable attorneys' fees and costs pursuant to Va. Code § 59.1-207.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Members of the Class and Subclasses proposed in this Second Amended Complaint, respectfully request that the Court enter judgment in their favor and against Ford, as follows:

A.    Declaring that this action is a proper class action, certifying the Class and Subclasses as requested herein, designating Plaintiffs as Class and Subclass

72

Representatives as requested herein, and appointing the undersigned counsel as Class Counsel;

B.    Ordering Ford to pay actual damages (and no less than the statutory minimum damages) and equitable monetary relief to Plaintiffs and the other Members of the Class and Subclass, as allowable by law, including the statutes asserted herein;

C.    Ordering Ford to pay treble damages for willful violation of the VCPA, pursuant to Va. Code § 59.1-204;

D.    Ordering Ford to pay punitive damages, as allowable by law, to Plaintiffs and the other Members of the Class;

E.    Ordering Ford to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiffs and the other Members of the Class and Subclasses;

F.    Ordering Ford to pay attorneys' fees and litigation costs incurred by Plaintiffs for the benefit of the Class and Subclasses, as allowable by law, including the statutes asserted herein;

G.    Ordering Ford to pay both pre- and post-judgment interest on any amounts awarded; and

H.    Ordering such other and further relief as may be just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs, individually and all others similarly situated, hereby demand a trial by jury as to all matters so triable.

Dated: December 19, 2025

Respectfully submitted,

**JAMES DOLAN and JAMES MORRIS**

By */s/ Drew D. Sarrett*
Drew D. Sarrett, VSB #81658
**CONSUMER LITIGATION ASSOCIATES, P.C.**
626 E. Broad Street, Suite 300
Richmond, Virginia 23219
Telephone: (804) 905-9900
Facsimile: (757) 930-3662
Email: drew@clalegal.com

Leonard A. Bennett, VSB #37523
Craig C. Marchiando, VSB #89736
Mark C. Leffler, VSB #40712
Adam W. Short, VSB #98844
John J. Maravalli, VSB #99000
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: craig@clalegal.com
Email: mark@clalegal.com
Email: adam@clalegal.com
Email: john@clalegal.com

W. Randolph Robins, Jr., VSB #80868
**LANTZ & ROBINS, P.C.**
4900 Augusta Avenue, Suite 120
Richmond, VA 23230
Telephone: (804) 404-7870
Email: rrobins@lantzrobins.com

Leland Belew (admitted *pro hac vice*)
Ryan P. McMillan (admitted *pro hac vice*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
800 S. Gay Street
Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0080
Email: lbelew@milberg.com
Email: rmcmillan@milberg.com

74

75

Mitchell M. Breit (admitted *pro hac vice*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
405 East 50th Street
New York, NY 10022
Telephone: (347) 668-8445
Email: mbreit@milberg.com

John R. Fabry (admitted *pro hac vice*)
Morgan Ferrell (admitted *pro hac vice*)
**THE CARLSON LAW FIRM**
1717 N. 1-35
Suite 305
Round Rock, TX 78664
Telephone: (512) 671-7277
Fax: (512) 238-0275
Email: jfabry@carlsonattorneys.com

Mark Miller (admitted *pro hac vice*)
Julia Ozello (admitted *pro hac vice*)
**WALLACE MILLER**
200 W. Madison Street, Suite 3400
Chicago, IL 60606
(312) 261-6193
Email: mrm@wallacemiller.com

***Attorneys for Plaintiffs and the Proposed Class***