IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JAMES DOLAN, et al.,
Individually and on behalf
of all others similarly situated,

    Plaintiffs,

v.                                                    Civil Action No. 3:23cv512

FORD MOTOR COMPANY,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on FORD MOTOR COMPANY'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT (the "MOTION TO DISMISS") (ECF No. 492), the supporting, opposing, and reply briefs (ECF Nos. 493, 502, and 508). Ford Motor Company will be referred to as "Ford." For the reasons set forth below, the MOTION TO DISMISS (ECF No. 492) will be denied.

## I. BACKGROUND

### A.  Procedural Background

The SECOND AMENDED CLASS ACTION COMPLAINT (the "SAC") (ECF No. 464) presents four claims. Count One is a claim for breach of express warranty. Count Two is a claim for breach of the implied warranty of merchantability. Count Three is a claim for fraud in the inducement by omission. And, Count Four is a claim for a violation of the Virginia Consumer Protection Act. The SAC was

filed with so many redactions that it was difficult to understand the SAC as a whole.[1] Pursuant to instructions from the Court, the parties agreed to eliminate most of those redactions.

Then, the Plaintiffs filed a document entitled "SECOND AMENDED CLASS ACTION COMPLAINT" (ECF No. 523) (the "RSAC"); but, in so doing, they failed to title the pleading to reflect that it was a revised version of the SAC. Accordingly, at the Court's direction, the Plaintiffs refiled the SAC and entitled the pleading as the REVISED SECOND AMENDED CLASS ACTION COMPLAINT (ECF No. 560). However, in so doing, they failed to make some of the agreed redactions and forgot to include two exhibits. Therefore, the RSAC had to be revised yet again. The revised, and operative, RSAC became ECF No. 564-1 and its exhibits A and B are ECF Nos. 564-2 and 564-3, respectively. At the Court's direction, the Clerk deleted ECF No. 560, and replaced it with ECF Nos. 564-1, 564-2 and 564-3. Therefore, what was ECF Nos. 564-1, 564-2, and 564-3 is now ECF Nos. 560, 560-1, and 560-2.

There appears to be no substantive difference between the SAC (ECF No. 464) and the RSAC (now ECF No. 560). The MOTION TO DISMISS (ECF No. 492) and supporting memorandum (ECF No. 493) is keyed to the original SAC (ECF No. 464) which has been replaced by the RSAC

---

[1] The redactions were made necessary because, under the terms of a protective order, Ford had designated so many documents as confidential (mostly because they purportedly contained trade secrets or confidential business information).

(ECF No. 560). So, all citations to the operative complaint will be to the RSAC. Neither the MOTION TO DISMISS (ECF No. 492) nor the Answer (ECF No. 494) have been amended. The RSAC makes the same four claims that were made in the SAC.

B.    **The Factual Allegations In The RSAC About The Alleged Defect**

To understand the four claims in the RSAC, it is necessary to examine the detailed allegations on which they are founded. That is best done with reference to the RSAC, ECF No. 560, which, without the redactions, is much easier to follow.

The RSAC is pled in great detail and many of its allegations are supported by Ford documents or specific quotations from Ford documents. That level of detail was possible because the Plaintiffs have documents that Ford has produced in cases pending in other jurisdictions. The fact that the RSAC refers to, and is supported by, that kind and extent of evidence is somewhat unusual. And, it makes the analysis of the Rule 12(b)(6) motion more detailed than is usual.

The RSAC recounts startling, detailed allegations which, if proved, would establish that: (1) Ford knowingly put a defective transmission into many of its vehicles over many years; (2) when marketing those vehicles to unsuspecting consumers, touted them as if there was no such defect; and (3) implemented elaborate schemes to conceal the defect.

3

The allegedly defective product is referred to as Ford's 10R80 transmission (the "Transmission"). The Transmission is alleged to have been placed first in the 2017 F-150 pickup trucks which were made available to consumers in Virginia in late 2016. The Transmission also was in:

- Ford Expeditions for model years 2018-2023,

- Ford Mustangs for model years 2018-2023,

- Ford Rangers for model years 2019-2023,

- Ford F-150 pickup trucks for model years 2017-2023,

- Ford Transits for model years 2020-2023, and

- Lincoln Navigators for model years 2018-2023.

RSAC ¶ 12 (the "Class Vehicles"). "The [alleged] design defect (the 'Transmission Defect') is the inability of the Transmission to maintain the intended and necessary internal pressure to ensure secure and timely engagements of each clutch required for a specific gear." Id. at ¶ 14 The alleged defect causes "harsh, bumpy, rough and delayed shifting or gear engagement." Id. at ¶ 15 (citation modified).

It is alleged (and there are supporting documents) that, for years, "Ford has touted the superiority of its vehicles [with the 10R80 Transmission], particularly the smoothness of the shifting provided by the Transmission since before it was first released on

4

the market." Id. at ¶ 20.[2] When the Transmission was first introduced in the 2017 Ford F-150 pickup truck, Ford is said to have advertised the "'improved acceleration and performance' and 'enhanced shifting performance' offered by the Transmission, 'compared with previous six-speed automatic transmissions.'" Id. at ¶ 23. Ford documents support that allegation, the import of which is that Ford knew that the quality of shifting in an automatic transmission was (and always has been) a factor on which consumers rely in deciding to buy vehicles.

Ford, of course, like most manufacturers, sells its vehicles through dealerships, some of which are company-owned and some of which are franchises that are alleged to be agents of Ford. The RSAC alleges that Ford explicitly directed all dealerships (company-owned and franchises) to "represent to consumers that the 10R80 available in [several of the Class Vehicles] 'deliver[s] smooth and responsive shifting' with 'engine rpm matching on coast-down shifts provides a seamless transition to lower gears.'" Id. at ¶¶ 30-31. The RSAC makes similar allegations with respect to the Transmission in all Class Vehicles. Id. at ¶¶ 32-41.

However, according to the RSAC, Ford knew of, misrepresented, and actively concealed the Transmission Defect before and after

---

[2] And, it is said that "[t]he 'smoothness' of shifting is not a subjective assessment at Ford, but rather an objective metric which is tested for, measured, and the subject of Ford's design and manufacturing efforts." Id. at ¶ 21.

the class plaintiffs, Dr. Dolan and Mr. Morris, purchased their vehicles. Indeed, it is said that Ford knew about the tendency of the Transmission to shift harshly and with delayed engagement "since at least 2016, when it first manufactured and sold vehicles equipped with the [Transmission] to the public." Id. at ¶ 42. The RSAC cites Ford documents supporting that allegation.

The RSAC alleges that the Transmission Defect was so pervasive that, since the Transmission was introduced, customers have "repeatedly complained to Ford about problematic shifting, including vehicles lunging, jerking, hesitating, clunking, and otherwise shifting erratically." Id. at ¶ 43. Indeed, the Transmission Defect was so troublesome that Ford's engineers studied it extensively and in 2024, Ford's president and Chief Executive Officer found it necessary to approve "a significant investment for a 'unit program' for 'Shift Quality driving design changes to improve performance on 10R60, 10R80, 10R80 MHT, and 10R100 Transmissions.'" Id. at ¶ 47. In other words, that 2024 project was designed to remedy the Transmission Defect, a defect that Ford allegedly had identified before the Transmission was installed in any vehicle for sale to the public in late 2016.[3] And, the RSAC cites, and quotes from, Ford documents and numerous

---

[3] With full knowledge of the Transmission Defect, and, "[d]espite knowledge of shift quality failures and design problems in the 10R80, Ford installed the 10R80 in Class Vehicles that it began selling late in 2016." Id. at ¶ 57.

6

reports to Ford dated in 2016 and forward, that directly, and by way of its dealerships, documented the nature and extent of the Transmission Defect. E.g., id. at ¶¶ 58-74. The many remedial efforts attempted by Ford between 2016 and 2020 did not produce results. Id.

All the while, Ford issued what were called Technical Service Bulletins ("TSBs") and Special Service Messages ("SSMs") that provided information to its dealers about how to try to address the troublesome vehicles that were being brought in to the dealers for repair. Id. at ¶ 75. The TSBs and the SSMs which are cited and quoted in the RSAC permit the inference that there "are no Vehicles equipped with the 10R80 [transmission] that are not subject to at least one Harsh Shift TSB." Id. at ¶ 79; ECF 560-1.

The RSAC also alleges that Ford addressed the troublesome Transmission Defect by issuing "numerous instructions to mislead its authorized dealers and service centers to perform phony repairs." RSAC ¶¶ 82-92. The alleged "driving motivation" in "publishing ineffective Harsh Shift TSBs was to avoid expending the money to meaningfully remediate the Transmission Defect . . . [and to] avoid warranty costs during the warranty coverage period for its vehicles." Id. at ¶ 86. And, the RSAC cites to a Ford document showing that Ford was informed by a service technician that the reprograming (or recalibration of the Transmission)

7

"[did] not work on 99.9% of F150's and [E]xpeditions/[N]avigators." Id. at ¶ 87.

The RSAC also alleges that, to make matters worse, Ford misrepresented and actively concealed the Transmission Defect. Those allegations are presented line by line and detail by detail, and many are supported by Ford documents. E.g., id. at ¶¶ 97-105.

C.    **Class Plaintiffs' Purchases**

From paragraphs 120 through 140, the RSAC outlines Dr. Dolan's purchase of, and experience with, a 2018 Ford F-150. Dr. Dolan previously owned an F-150 (which did not have the Transmission), and he was comfortable with that F-150, so he purchased a new F-150 on October 25, 2018 (the "Dolan Vehicle"). Id. at ¶ 120. It is alleged that "[a] fundamental and essential consideration in obtaining the Dolan Vehicle was that it would shift smoothly and consistently, such that it could be relied upon to switch between gears at anticipated intervals when accelerating and/or decelerating; although implicit, it was reasonably anticipated that the Dolan Vehicle would execute gear-shifts without extended disengagement of the engine, or rough, jerky, erratic, or 'clunky' transitions between gears." Id. at ¶ 121.

According to the RSAC, at the time Dr. Dolan purchased the 2018 F-150, Ford knew that the Transmission Defect existed in its F-150 models and deliberately chose not to disclose the Transmission Defect to Dr. Dolan when it was advertising or

discussing the features, components and performance of the vehicle before he bought it. Id. at ¶ 122. The RSAC alleges also that Ford failed "to correct its uniform and false representations through its website, multimedia advertisements, brochures, and in-person statements by its employees, authorized dealers, agents, sales representatives and/or repair technicians" all of whom touted "the [10R80's] safety, reliability, enhanced responsiveness and performance." Id. at ¶ 122.

In other words, it is alleged that Ford intentionally omitted the truth about the Transmission Defect; and, "[i]n reliance on these material omissions, including failures to correct prior false representations, Dr. Dolan purchased and operated [his vehicle] on the belief that the [his vehicle's] transmission would operate properly as warranted." Id. According the RSAC, "[h]ad Dr. Dolan been informed of the Transmission Defect prior to or at the time of purchase, he would not have purchased [the vehicle] or else would have paid significantly less for [it]." Id. at ¶ 122.

It came to be that, after driving his vehicle for slightly less than a year, Dr. Dolan started to notice harsh shifting and made an appointment with the Richmond Ford Service Department to have it fixed. Id. at ¶ 124. He took the Dolan Vehicle there for service on October 14, 2019 (odometer reading 8,424 miles), but Richmond Ford "ignored" Dr. Dolan's concerns about the harsh shifting. Id. As a result, Dr. Dolan made another appointment and

9

took the vehicle to Richmond Ford on November 14, 2019, at which time it had 10,491 miles on the odometer. Id. at ¶ 125. On November 14, 2019, Richmond Ford made a detailed analysis of the situation and "[w]ithin days (if not hours) of the evaluation and service. . . Ford received detailed information" about the troublesome matters that had prompted Dr. Dolan's request for the Transmission to be repaired.[4] Id. at 127. The information provided to Ford is reflected in the RSAC at ¶ 127. Dr. Dolan was told that a repair was made; but the RSAC alleges that Ford was aware that the repair was ineffective to cure the Transmission Defect. Id. at ¶ 128.

Off and on over the next two years, Dr. Dolan continued to experience harsh and delayed shifting and gear engagement failures. Id. at ¶ 129. But, the RSAC alleges that, when he took the vehicle for repair, the Ford dealer recommended phony repairs Ford knew would not work. Id. At no time was Dr. Dolan informed of the Transmission Defect or what Ford then knew about it.

Again in September 2022, Dr. Dolan reported the shifting troubles to Richmond Ford and again repairs were made, but, says the RSAC, Ford knew that none of the repairs that were recommended by it to Richmond Ford were sufficient to remediate the Transmission Defect. Id. at ¶¶ 130-133. The RSAC alleges that,

---

[4] Dr. Dolan is not alleged to have used that specific language but it accurately describes what he told Ford's dealership which related it on to Ford.

10

throughout the repair process, Ford was informed promptly by the dealership (Richmond Ford) of Dr. Dolan's complaints about the Transmission and the nature of the troubles that necessitated bringing the vehicle to Richmond Ford for examination and repair. Id. at ¶ 136. And, the RSAC cites documents to support those allegations.

The situation respecting Mr. Morris is much the same. Id. at ¶¶ 141-51. In the particulars respecting his experience, the RSAC asserts that a smooth-shifting vehicle that would switch between gears appropriately was an essential consideration in the purchase of a new car by Mr. Morris. Id. at ¶ 142. And he "reasonably anticipated that the Vehicle would execute gear-shifts without extended disengagement of the engine, or rough, jerky, erratic, or 'clunky' transitions between gears." Id. The RSAC recites too that Mr. Morris relied on the non-existence of what Ford knew, but had not disclosed, respecting the Transmission Defect when he decided to buy his vehicle acting "on the reasonable but incorrect belief that its Transmission would operate properly as warranted." Id. at ¶ 143. And it also alleged that had Mr. Morris been informed of the Transmission Defect before or at the time of purchase, he would not have purchased the vehicle or would have paid less for it. Id. And, like Dr. Dolan, approximately a year after purchasing the vehicle, Mr. Morris began to notice the Transmission "was jerking,

11

shifting harshly and clunking in reverse. He experienced engagement delays and inability to accelerate." Id. at 145.

So, Mr. Morris took his vehicle to a Ford dealership for repairs and reported the troublesome performance of the Transmission. Id. at ¶ 146. Notwithstanding those complaints, there was no service performed. Thereafter, Mr. Morris continued to experience malfunctions caused by the Transmission Defect. Id. at ¶ 147. And, he continued to attempt to have his vehicle repaired. Id. at ¶¶ 148-49. And, after one of those subsequent repair visits, "[o]n his way home . . . Mr. Morris experienced engagement delays and harsh shifting." Id. at ¶ 150. He subsequently bought a different vehicle from a different dealership and traded in the old one as part of the transaction. Id.

According to the RSAC, Ford received detailed information about the troubles reported by Mr. Morris. Id. at ¶ 151. The service ticket that went to Ford bore the notations "TRANSMISSION SHIFTS ROUGH/JERKY" and "DOES NOT OPERATE PROPERLY." Id. The technician's comments about the troublesome performance reported by Mr. Morris accurately describe the Transmission Defect.

It is in the context of these allegations, and the documents cited to support them, that Ford's MOTION TO DISMISS must be considered. Factual allegations unique to the legal sufficiency of

12

each individual count in the RSAC will be taken into account in the assessment of the legal sufficiency of that count.

## II. DISCUSSION

### A.    COUNT ONE: Breach of Express Warranty

COUNE ONE is based on Va. Code Ann. § 8.2-313 which defines an express warranty as:

> (a)    [a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

Va. Code Ann. § 8.2-313(1)(a) (2025) (emphasis added).

### 1.    The Alleged Express Warranty

The RSAC proceeds on the premise that the express warranty is found in the sticker that is affixed to the windshield or side window of new vehicles (the so-called "Monroney sticker") and on the understanding of that text in the automotive industry, among the consuming public, and by the Plaintiffs. RSAC ¶¶ 167-198; 15 U.S.C. § 1232. The substantive part of that sticker begins with the statement "STANDARD EQUIPMENT INCLUDED AT NO EXTRA CHARGE." Below that text, there is a list of that "standard equipment" by category: to-wit, EXTERIOR, INTERIOR, FUNCTIONAL, SAFETY/SECURITY, and WARRANTY. Beneath each of those headings, there is additional text. Beneath the heading "WARRANTY," there is the following text:

· 3YR/36,000 BUMPER/BUMPER

13

- 5YR/60,000 POWERTRAIN

- 5YR/60,000 ROADSIDE ASSIST

Id. at ¶ 172. The RSAC alleges that "Dr. Dolan relied on the representations and details within his window sticker" when purchasing the vehicle. Id. at ¶ 173.[5] According to the RSAC:

> Dr. Dolan understood that the language in the window sticker under "WARRANTY" meant that he had a comprehensive warranty such that [the vehicle he purchased] was free from defect and would be properly functional for the stated period or mileage and Ford would repair, replace or otherwise correct all defects and defective components on the vehicle, including the transmission, that fail during the warranty period.

Id. at ¶ 174 (emphasis added).

In addition to reciting the Plaintiffs' understandings of the WARRANTY'S text, the RSAC also alleges that:

- the terms within the scope of "WARRANTY" in the stickers "are universally understood in the consumer automotive market to mean that the manufacturer warrants that the respective components will be free from defect and properly functional for the stated period or mileage. Id. at ¶ 175;

- "[t]he term 'BUMPER/BUMPER' is universally understood in the automotive industry to mean comprehensive coverage for nearly all vehicle parts and systems, excluding only normal wear and tear items like tires and brake pads." Id. at ¶ 176;

- "[t]he terms 'BUMPER TO BUMPER' and 'POWERTRAIN' are industry-standard terminology that has well-established meaning in the automotive industry and to reasonable consumers, referring respectively to comprehensive vehicle

---

[5] The included question and answer from Dr. Dolan's deposition is as follows: Q: In purchasing your vehicle, did you rely on the contents of the sticker on the vehicle? A: I mean, I looked at the specs on the vehicle, and that played into my decision, yes. Id.

coverage and coverage of engine and transmission components." Id. at ¶ 177 (emphasis added);

- "[t]he language '3 YR/36,000 BUMPER TO BUMPER' on the Monroney sticker is an express promise the vehicle will be free from defect and properly functional for the stated period or mileage and that Ford will repair or replace all defects and defective components on the vehicle, including the transmission, that fail during the warranty period. The language '4 YR/50,000 MILE WARRANTY' on the Navigator Monroney sticker is the same thing—an express promise that the vehicle will be free from defect and properly functional for the stated period or mileage and that Ford will repair or replace all defects and defective components on the vehicle, including the transmission, that fail during the warranty period." Id. at ¶ 179;

- "the '3 YR/36,000' limitation is clear and generally interpreted by reasonable consumers to mean coverage expires after three years from purchase or 36,000 miles, whichever occurs first, without ambiguity or need for further clarification." Id. at ¶ 180;

- "[t]he language '5 YR/60,000 POWERTRAIN' on the Monroney sticker is an express promise that the 'powertrain' will be free from defect and properly functional for the stated period or mileage and repairs or replacements and Ford will repair or replace all powertrain defects and defective components, including the transmission, that fail during the warranty period. The language '6 YR/70K MIL POWERTRAIN WARR' on the Navigator Monroney sticker is the same express promise—the 'powertrain' will be free from defect and properly functional for the stated period or mileage and Ford will repair or replace all powertrain defects and defective components, including the transmission, that fail during the warranty period." Id. at ¶ 181;

- the term "POWERTRAIN" has "a standard meaning in the industry, covering the engine, transmission, driveshaft, axles, and related components that generate and deliver power to the wheels, as explained by Kelley Blue Book and other automotive authorities. Id. at ¶ 182; and

- "[c]onsumers universally understand 'powertrain warranty' to promise the 'powertrain' will be free from defect and properly functional for the stated period or mileage and repairs or replacements for defects in these core mechanical systems, often for longer periods than bumper-

15

to-bumper coverage, reflecting the higher durability expected of these parts." Id. at ¶ 183.

In sum, the RSAC alleges that the affirmative statements made in the sticker about WARRANTY constituted affirmations of fact or promises made by Ford to the buyers of its vehicles which "relate[] to the goods and become[] part of the basis of the bargain" thereby creating an express warranty that the goods shall conform to the affirmation or promise. Va. Code Ann. § 8.2-313(1)(a) (2025). And, the RSAC avers that evidence of industry practice, industry understanding and consumer expectation all support the view that the statements in the window stickers created an express warranty and that the warranty in the stickers "[was] presented in a format and manner that would be understood by reasonable consumers as Ford's binding promise to provide warranty coverage, not merely as informational or aspirational statements." Id. at ¶ 189. And, according to the RSAC, the window sticker was the only warranty provided to consumers, including the Plaintiffs, at, or before, the time of sale and that warranty language constituted the affirmations of fact and promises relating to the vehicles that became part of the basis of the bargain, i.e., the sale and purchase of the vehicles. Id. at ¶ 194.

Ford takes the position that the only express warranty that it supplied was its New Vehicle Limited Warranty ("NVLW"), which is limited to the repair or replacement of manufacturing defects, and thus does not cover the design defect asserted in the RSAC.

16

ECF No. 493, 27. However, the Plaintiffs assert that "Outside Litigation, Ford Agrees There is an Applicable Express Warranty in Accordance with the Terms in the Window Sticker." RSAC, p. 52. That contention is based on the facts that, with full knowledge of the Transmission Defect (including knowledge that it was a design defect) and fully aware of the limiting text in the NVLW, Ford nonetheless treated the troublesome Transmission performance reported by the Plaintiffs (the Transmission Defect) when the Plaintiffs sought repairs (1) as covered by the NVLW; and (2) as covered by the express warranties which were the basis of the bargain.

In particular, it is alleged that Dr. Dolan presented his vehicle for repair of what Ford clearly knew was a design defect (not a manufacturing defect), and that Ford nonetheless undertook efforts to repair that are described in the RSAC. Id. ¶ 203. Say the Plaintiffs, that constitutes conduct by Ford acknowledging that there is an express warranty that is not confined to a manufacturing defect and that belies its position that the NVLW is the governing express warranty.

### 2.  Ford's Asserted Grounds for Dismissal of COUNT ONE

In the MOTION TO DISMISS, Ford assails the express warranty claim in COUNT ONE for several reasons. The first three are that:

17

(1)   the language in the window stickers plainly advertise only that the vehicle includes the described warranty, which was provided inside the vehicle when it was delivered; and

(2)   even assuming that the window sticker text constitutes a warranty, that text must be construed consistent with the NVLW which excludes design defects claims; and

(3)   under both Virginia law and the Magnuson-Moss Warranty Act ("MMWA"), the referenced language does not constitute a warranty.

ECF No. 493, 27(emphasis added).[6]

Each of those theories will be examined in turn.

### a.   Warranty Included Inside The Car Theory

According to Ford, the window sticker "only advertised that [its vehicles] would come with a warranty," and the NVLW was in the glove compartment of the vehicle that was delivered after the purchase of the vehicle was completed. ECF No. 493, 27-28. The factual predicate for that argument is based on Ford's assertion that:

> The warranty description [in the sticker] is part of a section titled "STANDARD EQUIPMENT INCLUDED AT NO EXTRA CHARGE." That [immediately preceding text] unambiguously denotes that all of the items described in that section . . . [including the warranty] are included in the subject vehicle.

---

[6] This Opinion cites to ECF assigned pagination, not internal pagination to keep references uniform.

18

ECF No. 493, 28 (emphasis added in second sentence). Even a cursory examination of the cited text demonstrates that Ford's asserted meaning is far from unambiguous. To start, it is not readily apparent, nor does Ford explain, how a buyer could conclude from the text "STANDARD EQUIPMENT INCLUDED AT NO EXTRA CHARGE" and the term "WARRANTY" that the warranty (which, of course, is described on the sticker that is located outside the vehicle) is inside the vehicle. And, nothing in the text under the heading WARRANTY tells of any limitation or mentions the word "inside." And, even if that might be inferable at first glance, the inference is dispelled by the fact that immediately beneath the word "WARRANTY," there are three detailed warranty terms. And, where nothing in the sticker text suggests that the real (or only) warranty is inside the vehicle, it cannot be said that the sticker "unambiguously" says that. Of course, if that text is ambiguous, it is a fundamental principle of contract interpretation that any ambiguity is resolved against the drafter, here, Ford. <u>See, e.g.</u>, <u>Doctors Co. v. Women's Healthcare Assocs., Inc.</u>, 740 S.E.2d 523, 526 (Va. 2013) (citation omitted).

More importantly, it appears from the RSAC that the NVLW was never presented to either Plaintiff before the bargain was struck and the vehicle was purchased. And, of course, if that is so, the NVLW could not be, either factually or legally, a basis upon which the bargain (the agreement to purchase the car) was struck. At

19

this stage, the record is that the only express warranty provided to the Plaintiffs that related to the goods and that became a basis for the bargain is the WARRANTY in the window sticker. Ford's reliance on the NVLW as a limitation on its warranty obligations will fail if the NVLW was not an "affirmation of fact or promise" that became a "basis of the bargain." Va. Code Ann. § 8.2-313(1)(a) (2025).

Further, there are allegations that evidence will show what the language on the sticker means both in the automobile industry and to consumers, including the Plaintiffs, and how those consumers reasonably interpret the language. Ford's view of the record ignores the effect of the understanding of the terms in the sticker in the automobile industry or the reasonable consumer understanding thereof.

Instead, Ford relies on two decisions, neither of which aid its case because neither resembles the facts alleged in the RSAC. First, Ford points to Anderson v. 1399557 Ontario Ltd., Case No. 18-CV-1672, 2019 WL 5693749, at *1-2 (D. Minn. Nov. 4, 2019), which involved a plaintiff who bought windows after receiving a flyer which stated "Lifetime Warranty." The court in Anderson acknowledged that the particular flier was susceptible of creating an express warranty,[7] but its decision that there was no express warranty turned on the fact that there was no promise "to refund,

_____

[7] Id. at *6.

20

repair, replace or take other remedial action." Id. at *6. As Ford correctly says, the sticker here does not do those things either. However, in this case, the RSAC alleges that support exists for the correct understanding of those terms both in the automobile industry, and in the minds of consumers, including the Plaintiffs. None of that was present in Anderson or considered by the Anderson court in making its decision. So, Anderson does not help Ford.

Ford next relies upon Marksberry v. FCA US LLC, 606 F. Supp. 3d 1075 (D. Kan. 2022). Marksberry addressed a Magnuson-Moss warranty and held that the window sticker on the Plaintiff's truck did not contain representations required by the Magnuson-Moss Warranty Act and was therefore not a warranty under that statute. Id. at 1079, 1084-85. According to Ford, "the same reasoning applies here." ECF No. 493, 30. Not so, because here there are allegations in the RSAC about what the industry and consumers reasonably understand the term to mean. Nothing in Marksberry suggests that the court was confronted with similar allegations.

Ford also points to Hanson v. Suzuki Motor of America, Inc., No. 17-0478, 2018 WL 2175548, at *4 (W. Va. May 11, 2018) wherein the court, for reasons not entirely clear, held that the sticker did not meet the definition of a warranty under the West Virginia Code, which was identical to Va. Code § 59.1-207.11, both of which are lemon law statutes. Hanson does not apply here because the allegations of the RSAC are entirely different than those that

21

appear in Hanson and the issue here is whether a claim is made out, not under lemon laws, but under Virginia's express warranty law.

Taking the plausible allegations of the RSAC as true, and considering its allegations about: (i) what the window sticker actually says; (ii) the understanding of that text in the automobile industry (i.e., sellers); and (iii) the reasonable understanding of consumers (buyers), including the Plaintiffs, there exists a factual dispute about whether there is an express warranty and what it means. Thus, those issues are not amenable to resolution under Rule 12(b)(6).

### b.    Contract Consistency

Ford next argues that, if the window sticker is considered to be a warranty, its text must be construed consistently with the NVLW that was left in the glove compartment and was delivered to the Plaintiffs after the sale transaction was completed. That argument is predicated upon the notion that the Plaintiffs' interpretation of the WARRANTY text in the sticker animates a Virginia rule of contractual interpretation which requires that a contract is to be "construed as a whole" and that "the intention of the parties is to be collected from the entire instrument." Sweely Holdings, LLC v. SunTrust Bank, 820 S.E.2d 596, 601-602 (Va. 2018) (citation omitted). In particular, Ford cites Va. Code Ann. § 8.2-317 which provides:

22

> Warranties whether express or implied shall be <u>construed as consistent with each other and as cumulative,</u> but if such construction is <u>unreasonable</u> the <u>intention</u> of the parties <u>shall determine which warranty is dominant.</u>

Va. Code Ann. § 8.2-317 (2025) (emphasis added).[8]

The contract consistency argument, of course, assumes that the NVLW has been shown to be a "basis of the bargain." The RSAC does not allege that the NVLW has that stature. And, the record presented to date just does not support the conclusion that the NVLW was in any way a basis for the bargain. So, Ford's contract consistency argument, which is based on the premise that the NVLW creates an express warranty that must be used as a comparator in its contract consistency theory, fails for lack of a predicate. And, because that failure precludes use of the NVLW as a part of the purchase contract, the remainder of Ford's position on contract consistency (which is based on how the NVLW would relate to the WARRANTY in the window sticker) likewise fails.

But, if that rule were to be applied here, the intentions of the parties would then come into play. It is rather clear that Ford promised a smooth-shifting transmission that did not have the Transmission Defect. It is thus plausible and reasonable to think

---

[8] The next sentence contains three topics that can be considered—subsections (a), (b) and (c). Clearly, neither (a) nor (c) apply to the issue here. And, (b)—the effect of conflict between express and implied warranties—does not apply to deciding conflict between two express warranties.

that representation would reflect Ford's intention.[9] And, the allegations of the RSAC establish that to have been the intention of the Plaintiffs. In any event, the intentions of the parties is a quintessential factual issue. And, such questions cannot be resolved in deciding a motion under Rule 12(b)(6).

### c.    Compliance With Virginia Law And MMWA

In Ford's brief, this argument appears under the heading "Ford Provided The Warranty In Accordance With Governing Law." ECF No. 493, 32. With this argument, Ford seeks to address a contention in the RSAC that Ford did not make the text of its NVLW available for examination to prospective buyers, including the Plaintiffs, until after the vehicle was purchased. The argument is premised entirely upon the assertion that the window sticker only promised that somewhere inside the vehicle Ford would provide the warranty that was described in the window sticker. Because that argument fails, so too does this one.

Ford seeks to escape that consequence by asserting that Ford made "the warranty available to every consumer prior to sale despite the absence of any such obligation on the warrantor." Id. at 34.[10] Nothing in the record supports that assertion and the

---

[9] Given the allegations and the Ford documents that describe the long-standing Transmission Defect and Ford's knowledge of that defect, it might be difficult for Ford to take that view, but taking the opposite view would present, perhaps fatal, difficulties for Ford in defending COUNTS THREE and FOUR.

[10] It appears that, by this statement, Ford is pointing to information on its website. That a statement is available on a

24

Plaintiffs deny it. So, that is a factual issue, and cannot be the basis for granting a motion to dismiss under Rule 12(b)(6).

### 3.    Ford's Notice Arguments

Those three basic contentions, however, do not constitute the end of Ford's effort to secure dismissal of COUNT ONE. In particular, Ford also asserts, as a fourth reason, that "PLAINTIFFS' WARRANTY CLAIMS FAIL BECAUSE THEY DID NOT PROVIDE PRE-SUIT NOTICE." ECF No. 493, 37. That argument is based on Va. Code § 8.2-607(3)(a), which provides that:

> where a tender has been accepted [] the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.

Va Code Ann. § 8.2-607(3)(a) (2025). The argument is presented in two different ways. First, Ford takes that view that notice must be pleaded and proved;[11] that notice has not been pleaded; and therefore COUNT ONE fails as a matter of law.  Second, Ford contends that it was not given adequate notice. Each will be addressed in turn.

### a.    Does Notice Need To Be Pleaded

It is settled that, for a legally sufficient claim to be

---

website does not mean that it somehow becomes the basis of a bargain.

[11] ECF No. 493, 38 (citing <u>Yates v. Pitman Mfg., Inc.</u>, 514 S.E.2d 605, 607 (Va. 1999)).

presented, all elements of a claim must be pleaded in the complaint. E.g., Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 764-65 (4th Cir. 2003). So, the threshold issue is whether notice is an element of express warranty claims.

The Supreme Court of Virginia has held that:

> A plaintiff seeking to recover for any breach of warranty has the dual burden of proving the pertinent terms of the warranty and the fact that those terms were breached.

Collier v. Rice, 356 S.E.2d 845, 847 (Va. 1987) (emphasis added); Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 624 (4th Cir. 1999) (citing Collier); What Hurts, LLC v. Volvo Penta of the Ams., LLC, 710 F. Supp. 3d 502, 520 (E.D. Va. 2024) (citing Hitachi and Collier); McPike v. Zero-Gravity Holdings, Inc., Case No. 1:17-cv-562, 2019 U.S. Dist. LEXIS 227509, at *9-10 (E.D. Va. March 14, 2019) (citing Hitachi and Collier)). Clearly, Collier does not identify notice as an element of a viable claim for breach of express warranty. And, the Supreme Court of Virginia has not otherwise held that presuit notice is an element of a breach of warranty claim under Virginia's UCC. Neither party identified such a decision. Nor could the Court find one.

However, when deciding who had to give the notice specified in Section 8.2-607(3)(a), the Supreme Court of Virginia expressed the view that a buyer of goods "must give notice of breach of warranty to the seller as a prerequisite to recovery." Yates v. Pitman Mfg., Inc., 514 S.E.2d 605, 607 (Va. 1999) (emphasis added).

26

In so saying, Yates cited the text of the Virginia UCC, which, of course, provides that a plaintiff is "barred from any remedy" upon failure to give presuit notice. Va. Code Ann. § 8.2-607(3)(a) (2025).

Black's Law Dictionary, defines an "element" of a claim as a "constituent part of a claim that must be proved for the claim to succeed." Element, Black's Law Dictionary (12th ed. 2024). That definition of element has been adopted by the Fourth Circuit and the Supreme Court of the United States. United States v. Hayes, 482 F.3d 749, 756 (4th Cir. 2007), rev'd on other grounds by 555 U.S. 415 (2009); United States v. Hayes, 555 U.S. 415, 422 (2009) (citing Black's Law Dictionary definition of element).

The language used in Yates could be understood to be consistent with the definition of an "element." And, if a plaintiff must demonstrate presuit notice of a breach of warranty as a "prerequisite to recovery,"[12] lest it be "barred from any recovery" at all,[13] then it might be thought that notice is a "constituent part" of the claim itself, i.e., an element. But, that is neither without debate nor as straightforward as it might first appear.

First, Yates did not actually delineate the elements of a claim for breach of warranty. However, when holding that the trial court had erred in entering judgment for the defendant

---

[12] Yates, 514 S.E.2d at 607.
[13] Va. Code Ann. § 8.2-607(3)(a) (2025).

(Pitman Mfg.), the Supreme Court of Virginia found that Yates (the breach of warranty plaintiff) had proved: (a) the existence of a warranty; and (b) breach. Specifically, the Supreme Court of Virginia held:

> Thus, we hold that Pitman's affirmation of fact created an express warranty [existence of warranty] that applied to Yates even though he was not the purchaser of the crane unit. We also hold that Yates presented evidence from which a jury could reasonably conclude that the crane unit did not comply [breach] with ANSI Standard B30.5-1968.

Yates, 514 S.E.3d at 608. That, of course, is the two-element formulation from Collier v. Rice that also appears in What Hurts, Hitachi, and McPike. And, as in those cases, Yates does not identify notice as an element of the breach of warranty claim.[14]

So, the "element" analysis begins with the premise that the leading Virginia authority (Collier v. Rice) does not include notice as an element of a breach of warranty claim. And, indeed, neither Yates nor any other decision of the Supreme Court of Virginia says that notice is an element of a breach of warranty claim. Ford cites no such decision. And, the Court did not locate one.

For its part, Ford relies on several decisions of other courts holding that Virginia's notice requirement constitutes an element

---

[14] It is significant that Yates did not include notice as an element of a breach of warranty claim, notwithstanding that, earlier in the opinion the Court had cited § 8.2-607(3) and had acknowledged its "barred from any recovery" language. Id. at 607.

that must be pleaded if the complaint is to survive a motion to dismiss. For example, in Bindra v. Michael Bowman & Associates, Inc., the court found that "notice must be pleaded in order to properly state a cause of action for direct damages on a breach of implied warranty claim" because "failure to give notice is a bar to recovery." No. 191866, 2001 WL 1829999, at *5 (Va. Cir. Ct. Sept. 19, 2001) (quoting Va. Code Ann. § 8.2-607(3) (2025)). The United States District Court for the District of Minnesota, when interpreting Virginia law, held that failure to allege notice necessitated dismissal of the warranty claim based on Virginia law. Hammerschmidt v. Gen. Motors LLC, 583 F. Supp. 3d 1215, 1224-25 (D. Minn. 2022). Hammerschmidt relied on the decision in Kerr v. Hunter Division, Nos. 78-L-491, 78-L-492, 1981 WL 394232 (Va. Cir. Ct. 1981).

Kerr is a thoughtful analysis of § 8.2-607(3) made in deciding a motion to set aside the verdict in a breach of warranty-based wrongful death case. Id. at *1. The court cited several treatises, among them, Williston on Sales. And, the cited passage from 3 Alphonse M. Squillante and John R. Fonesca, Williston on Sales, 296-97 (4th ed. 1973) does take the view that notice of breach is an element of the claim that must be pleaded and proved. Kerr, 1981 WL 394232, at *5 (citing Williston). However, the court also cited Anderson, a leading authority on the UCC. 2 Ronald Anderson, Anderson on the Uniform Commercial Code 210 (2d ed. 1970). In that

passage, Anderson takes the view that, "notice of a breach of warranty is in the nature of a condition precedent to the right of the warranty plaintiff to recover damages." Kerr, 1981 WL 394232 at *6 (quoting Anderson).

Thoughtful as it is, the decision in Kerr did not decide whether notice was an element of a breach of warranty claim. That likely is because, in Kerr, the notice issue actually was presented as a defense in the Grounds of Defense filed by the defendants. Id. at *2. There was much evidence about notice, and it was stipulated that the notice was the filing of suit. The defendants moved for judgment on the issue at the end of all the evidence. Id. That motion was overruled. The jury verdict ensued. Then came the motion to set aside the verdict and the citations to Williston and Anderson. Whatever else can be said about the decision in Kerr, it did not hold that notice was an element of a breach of warranty claim under Virginia law. To the extent that Kerr purported to put a label on notice, the decision seems to have been based on the understanding that notice was a condition precedent (a topic that is addressed later in the Memorandum Opinion).

Ford also cites In re Lumber Liquidators Chinese-Manufactured Flooring Durability Marketing and Sales Practice Litigation, MDL No. 1:16md2743, 2017 WL 2911681 (E.D. Va. July 7, 2017).[15] In Lumber

---

[15] Ford also cites in briefing on a prior Motion to Dismiss in this case to Prince v. Johnson Health Tech Trading, Inc., 653 F. Supp. 3d 307 (W.D. Va. 2023) for support of its position that presuit

Liquidators, the court did state that "courts may dismiss a claim where it is clear on the face of the complaint that the plaintiff has not alleged any valid form of notice, and the complaint has therefore failed to state a claim." Id. at *13. However, Lumber Liquidators did not cite authority for the dismissal observation. Nor did it mention Collier v. Rice.

The Plaintiffs offer several decisions that, they argue, refute the position that presuit notice is an element of a breach of warranty claim. And, on the basis of that authority, they argue that a legally sufficient complaint need not allege facts to demonstrate that presuit notice has been given.[16]

The Plaintiffs primarily rely on Campbell v. Ethex Corp., 413 F. Supp. 2d 738 (W.D. Va. 2006), wherein the court held that a plaintiff need not "include a notice allegation in a breach of warranty complaint, even assuming that notice was required under the circumstances of the case." Id. at 740. Ford notes that, in reaching that conclusion, Campbell relied on an outdated federal

---

notice is an element to a breach of warranty claim that must be pleaded if the claims are to survive a motion to dismiss. ECF No. 168, 28. However, Prince dealt with whether already-alleged purported presuit notice was "reasonably" given, rather than if such notice itself needed to be alleged in a complaint. Prince, 653 F. Supp. 3d at 314-15. Therefore, Prince does not address the relevant question and does not provide support for Ford's position.

[16] The Plaintiffs make this argument while arguing in the alternative that they have alleged sufficient facts to demonstrate that they provided presuit notice to Ford of breach of the express warranty and of the implied warranty of merchantability.

standard for assessing the legal sufficiency of complaints at the motion to dismiss stage. Id. (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). It is correct that the Campbell court stated that it "may not dismiss a complaint unless the plaintiff can prove no set of facts that would entitle the plaintiff to relief" and, in so doing, cited Conley v. Gibson. Id. And, it is also correct that Conley v. Gibson has been explicitly overruled by decisions of the Supreme Court of the United States, which changed the analysis of the sufficiency of a complaint's factual allegations from a conceivability to a plausibility standard. Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007); Ashcroft v. Iqbal, 556 U.S. 662 (2009).

Ford says that, because Campbell relied primarily on the outdated pleading standard established in Conley v. Gibson, Campbell's conclusion that a plaintiff need not allege presuit notice is not correct. However, the notice issue in Campbell was not resolved entirely on the abrogated Conley standard (could prove "any set of facts"). In fact, Campbell turned on the more fundamental point: whether notice was an element of a breach of warranty claim under Virginia law, and thus whether notice needed to be included in the complaint. That is evident from the fact that the Campbell analysis focused on decisions (one out-of-state federal decision and two Virginia circuit court decisions) that

turned on whether notice was an element that needed to be pleaded. Campbell, 413 F. Supp. 2d at 740, 740 n.5.

Moreover, as was the case in Lumber Liquidators, Campbell makes no reference to the decision in Collier v. Rice which actually delineates the elements of a breach of express warranty claim. So, although Campbell does not cut against the Plaintiffs' case, it does not help much either.

Nor do the other cases upon which the Plaintiffs rely resolve the issue. True, in Hoffman v. Daimler Trucks North America, LLC, 940 F. Supp. 2d 347 (W.D. Va. 2013), the court did state that the "motion to dismiss [stage] is a premature stage" to address the issue of whether presuit notice was provided.[17] But, in so saying, the Hoffman court relied on Campbell, so Hoffman suffers from the same precedential infirmity as Campbell. Further, Hoffman's reliance on Semitekol is misplaced because that case was not interpreting Virginia law. 582 F. Supp. 2d at 1017-18. So, the Hoffman holding, like the one in Campbell, is only so helpful.[18] And, the same is true of Providence Village Townhouse Condominium

---

[17] Hoffman, 940 F. Supp. 2d at 360 n.14 (citing Campbell, 413 F. Supp. 2d at 740; Semitekol v. Monaco Coach Corp., 582 F. Supp. 2d 1009, 1018 (N.D. Ill. 2008)).

[18] MJL Enterprises, LLC v. Eco Lighting USA Limited Liability Co., similarly fails to provide the Plaintiffs with the support that they seek because it deals with the factual scenario of what and when presuit notice is reasonable—a second-step inquiry under the presuit notice requirement. Civil No. 2:20cv437, 2021 WL 5192376, at *5 (E.D. Va. July 14, 2021).

Association v. Amurcon-Loudoun Corp., 33 Va. Cir. 165, 173 (1994) (stating, without any further explication, that the "Court does not believe that notice of breach of warranty must be specifically pleaded. It is instead a matter for consideration upon the merits of the claim." (citing Va. Code § 8.2-607)). In sum, the Plaintiffs' view finds some, albeit weak, support in Virginia decisions.

The analysis is further complicated by the fact that there is considerable professional writing that considers notice under § 8.2-607(3) to be a defense. For example, two well-respected Virginia treatises list § 8.2-607(3) notice as a defense. However, they provide no analysis or citation to support that categorization. See Kent Sinclair, Personal Injury Law in Virginia § 22.6(K) (4th ed. 2019); 2 Charles E. Friend & Kent Sinclair, Friend's Virginia Pleading and Practice, § 29.02(4)(h) (3d ed. 2017).

The leading treatise on the UCC takes the same view. In particular, 1 James J. White, Robert S. Summers & Robert A. Hillman, Uniform Commercial Code § 12:19 (6th ed. 2010) is entitled: "Buyer's failure to give notice as a defense to an action for breach of warranty." (emphasis added). And, § 12:20 is entitled: "Buyer's failure to give notice as a defense to an action for breach of warranty-Who must give notice and to whom." (emphasis added). Professional literature points to the acceptance of that

34

view among practitioners. For example, in "Defenses to Breach of Warranty Actions,"[19] defense number 5 is listed as "Insufficient Notice."

More importantly, Ford itself considers the failure to give notice and the inadequacy of notice to be affirmative defenses. Thus, in its Twenty-Second Affirmative Defense, Ford says:

> The claims of Plaintiffs and the members of the putative Class and Subclasses are barred, in whole or in part, to the extent that they failed to give proper or timely notice and/or they failed to present their vehicles in a timely fashion to an independent Ford dealership for repair of the alleged defect, including the allowance of a reasonable number of attempts to repair the alleged defect. For example, Dolan failed to allege that he provided Ford with the opportunity to inspect and service the vehicle following his September 2022 service visit. Similarly, Morris failed to timely seek repairs for his vehicle following his allegation that he began to experience shifting concerns on or around September 2021, and he failed to provide Ford with the opportunity to inspect and service the vehicle following his April 2024 service visit.

ECF No. 494, 60.

And, in its Twenty-Third Affirmative Defense, Ford says:

> The claims for breach of express and implied warranty of Plaintiffs and the members of the putative Class and Subclasses are barred to the extent that Plaintiffs and the members of the putative Class and Subclass failed to

---

[19] Bradley C. Nahrstadt, Defenses to Breach of Warranty Actions (Int'l Soc. Of Primerus Law Firms, Oct. 2010), https://perma.cc/NG6V-RSJY. And, of course, in Kerr v. Hunter Division, the notice issue was presented as a defense in the Grounds of Defense. 32 Va. Cir. 497, 499 (Va. Cir. Ct. 1981).

> comply with the pre-litigation notice and demand requirements codified in Virginia Code § 8.2-607(3)(a).

ECF No. 494, 60. What does that mean for the present analysis? It says that, in this case, by way of the RSAC and the Answer, the parties have presented the notice issue, not as an element of the breach of warranty claim, but as an affirmative defense to such a claim. And, it is well-settled that complaints need not negate affirmative defenses. E.g., Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007). It also is clear beyond question that courts operate on the predicate of the party-presentation principle. Clark v. Sweeney, 607 U.S. 7, 9 (2025). As we were recently reminded:

> 'In our adversarial system of adjudication we follow the principle of party presentation.' [citation omitted]. The parties 'frame the issues for decision,' while the court serves as 'neutral arbiter of matters the parties present.'

Id. (emphasis added) (citation omitted). Here, the issue of notice was presented by Ford as an affirmative defense.

But, in the MOTION TO DISMISS, Ford changed its tune and contends that the RSAC is legally insufficient for failure to plead that notice was given, contending that notice (both the giving and the adequacy of the notice) is an element of the Plaintiffs' claim. ECF No. 493, 38. Should Ford be held to its Answer (affirmative defense)? Or, may it be heard to take another, dramatically opposed view in the MOTION TO DISMISS (element)?

36

Of course, alternative pleading is permitted by the Federal Rules. Fed. R. Civ. P. 8(d)(2) and (3). So, staking out a position that notice is an affirmative defense when filing an Answer, and then contending otherwise is not, in itself, fatal to the MOTION TO DISMISS. But, the alternative, inconsistent positions illustrate, at the very least, that Ford itself recognizes that there are two views on the subject.[20]

In the final analysis, whether notice of a breach of warranty claim is an element is a matter of state law because that law defines the elements of claims that arise under state law. In 1987, in Collier v. Rice, the Supreme Court of Virginia defined the elements of a breach of warranty claim under Virginia law: (1) "the pertinent terms of the warranty;" and (2) "the fact that those terms were breached." 356 S.E.2d at 847. The Fourth Circuit, in Hitachi, and this Court in What Hurts and McPike, continue to apply that formulation which does not include notice as an element of a legally sufficient breach of warranty claim.

Then came Yates wherein the Supreme Court of Virginia addressed Va. Code Ann. § 8.2-607(3) and held that the text requires "notice of breach. . . from the 'buyers' of the goods." 514 S.E.2d at 607. And, because Yates was not the buyer, the Court held "the notice requirement of Code § 8.2-607(3) does not preclude

---

[20] In any event, the notice issue is an important one that should not be resolved on the basis of an inconsistency in position.

Yates from maintaining a breach of warranty action." Id. But, nothing in Yates altered the decision set in Collier v. Rice.

It is the task of this Court to discern what the Supreme Court of Virginia would conclude. To do that, the Court must consider the decisions of the Supreme Court of Virginia, and also may take into account the views of Virginia's other courts and those of the courts elsewhere. Assicurazioni Generali, S.p.A v. Neil, 160 F.3d 997, 1002 (4th Cir. 1998).

What then does the analysis tell. First, Collier v. Rice does not include notice as an element of a breach of express warranty claim under Virginia law. Second, nothing in Yates changes the rule in Collier v. Rice. Third, the lower state courts are divided on the issue.[21] Fourth, several courts elsewhere have said that notice is an element. Fifth, respected authorities on the UCC describe notice a defense, and Ford, itself, has formally stated that the lack and inadequacy of notice are matters of defense and are elements. Sixth, in Yates, the Supreme Court of Virginia actually used, albeit without so stating, the two-part test from Collier v. Rice in deciding that the trial court had erred.

Taking all that into account, it seems that as matters now stand, Collier v. Rice remains the controlling law of Virginia on

---

[21] Compare Providence Vill. Townhouse Condo. Ass'n, 33 Va. Cir. at 173 with Bindra, 2001 WL 1829999, at *5.

elements of a breach of warranty claim. And, notice is not an element of that claim.

There is yet a third possibility – that notice is a condition precedent. Whether notice is a condition precedent is a matter of state law, but the pleading standard by which Plaintiffs must allege a condition precedent is determined by federal law.

Virginia decisions teach that a condition precedent is something that must occur before a right to a remedy exists. While conditions precedent typically arise from contractual language, Virginia courts have held that a statute mandating that certain action be taken before a statutory right is available is a condition precedent to recovery. Nationwide Mut. Ins. Co. v. Clark, 194 S.E.2d 699, 702 (Va. 1973). In Nationwide, the Supreme Court of Virginia held that reporting an accident was a condition precedent to recovery based on a statute that provided, "the insured or someone on his behalf, in order for the insured to recover under the endorsement, shall report the accident as required by s 46.1-400 . . . ." Id. Similarly, in Breeding ex rel. Breeding v. Hensley, 519 S.E.2d 369, 372-73 (Va. 1999), the Supreme Court of Virginia held that notice was a condition precedent in a statute providing that: "[n]o action shall be maintained against any city or town for injury to any person . . . unless a written statement . . . shall have been filed with the city attorney. . . ." The rule to be distilled from those decisions is

39

that the Supreme Court of Virginia reads statutes that mandate certain actions be taken before the right to recovery exists as conditions precedent.

Section 8.2-607 provides that, if, after accepting goods, the buyer does not provide notice within a reasonable time, the buyer shall be "barred from any remedy." Va. Code Ann. § 8.2-607(3)(a) (2025). Applying the reasoning in Nationwide and Breeding, the Court concludes that the Supreme Court of Virginia likely would consider the notice required by § 8.2-607(3)(a) to be a condition precedent. That conclusion is supported by the Supreme Court of Virginia's interpretation of Section 8.2-607 in Yates, wherein the Court stated that notice was a "prerequisite to recovery," language which is identical to language that the Court previously had used in describing a condition precedent in Nationwide. Compare Yates, 514 S.E.2d at 607, with Nationwide, 194 S.E.2d at 702.

What then is the pleading standard for a condition precedent? Fed. R. Civ. P. 9(c) states, "it suffices to allege generally that all conditions precedent have occurred or been performed." The meaning of that standard following the Supreme Court's decision in Ashcroft v. Iqbal is unclear. See Chesapeake Square Hotel, LLC v. Logan's Roadhouse, Inc., 995 F. Supp. 2d 512, 516 (E.D. Va. 2014) (citing Ashcroft v. Iqbal, 556 U.S. 662 (2009)). In Chesapeake Square, the court noted a split of authority, and then assumed, but did not decide, that Iqbal meant that Rule 9(c) required the

40

same pleading standard as Rule 8(a). Id. at 516-17. Similarly, in Polykon Manufacturing LLC v. Gea Process Engineering Inc., Civil No. 3:23cv751, 2024 U.S. Dist. LEXIS 166745, at *12-13 (E.D. Va. Feb. 21, 2024), the court noted that the question remained open.

Chesapeake Square thoroughly analyzed whether Iqbal had changed the pleading standard in Rule 9(c). 995 F. Supp. 2d at 516-17. Chesapeake Square points to Iqbal, which held that "allege generally," as used in Rule 9(b), did not create a lesser pleading standard than Rule 8(a) and only meant that there was no "elevated pleading standard" as compared to the particularity required for other states of mind in Rule 9(b). Id. at 516 (citing Iqbal, 556 U.S. 662, 686 (2009)) (emphasis in original). Then, the court applied the Supreme Court's reasoning on Rule 9(b) to the language in Rule 9(c). Id. at 517. Both rules require some elements to be pled generally, and some to be pled with particularity. Id. Given the linguistic similarity, and the proximity of the rules to each other, the court found that the two rules should be treated the same under Iqbal, but, when so doing, noted that its conclusion ran counter to those reached by other courts. Id. at 517, 517 n.2.[22] Then, the court concluded that, under either pleading

---

[22] The authority to the contrary was rejected because the decisions had not "discuss[ed] the final section of [] Iqbal" or analyzed "the nearly identical language contained in Rule 9(b)." Id.

41

standard the Plaintiff had sufficiently alleged a condition precedent. Id. at 517-19.

The Court here assumes, without deciding, that Iqbal modified Rule 9(c), and concludes that the RSAC sufficiently pleads notice as a condition precedent (if indeed, that is what it is). Like in Chesapeake Square, the Plaintiffs here do not rely on conclusory allegations but allege specific facts that speak to the condition precedent, here, notice. Id. at 519. So, even if notice is a condition precedent (and not a defense),[23] it is adequately pleaded in the RSAC.

### b.   Whether Plaintiffs Sufficiently Allege Adequate or Timely Notice

Ford also argues that the breach of express warranty claims fail, as a matter of law, because the RSAC does not allege sufficient facts to demonstrate that the Plaintiffs provided Ford with adequate or timely notice of breach of warranty as required under Virginia law and the federal pleading requirement. ECF No. 493, 37-39.

As briefed by the parties, this aspect of the notice issue can be thought of as presenting three questions: (i) must Plaintiffs have given notice to Ford? (ii) did Plaintiffs give

---

[23] It is not now necessary to decide whether the notice provision or § 8.2-607(3)(a) is a defense or a condition precedent. That can be addressed later where the parties have had an opportunity to brief more thoroughly the role of notice and which party must prove what.

adequate notice to Ford? and (iii) was the notice reasonably timely?

### (i)    Notice to Ford?

The Plaintiffs raise the first question in their Response Brief, namely, that, because Ford is not the "seller," the Plaintiffs were under no obligation to provide Ford with notice. ECF No. 502, 27-28. The Plaintiffs rely on Kerr v. Hunter Division, 32 Va. Cir. 497, 501 (Va. Cir. Ct. 1981), wherein the court held that the buyer had to give notice to her immediate seller, not to the manufacturer who sold to the seller. Plaintiffs also cite Robert E. Draim, Virginia Practice Series: Products Liability § 8.11 (2022), which states "most courts have interpreted 'seller' to include only the buyer's immediate seller." However, the cases cited for that proposition are not Virginia cases. Id. at n.10. The Plaintiffs then point to the Colorado case mentioned in Virginia Practice Series: Products Liability, interpreting Colorado law. There, the court held that "the word 'seller' . . . refer[s] only to the immediate seller who tendered the goods to the buyer." Palmer v. A.H. Robins Co., Inc., 684 P.2d 187, 206 (Colo. 1984) (en banc).

The argument that Ford is not the seller for the purposes of § 8.2-607(3)(a) fails for two reasons. First, the Plaintiffs themselves allege in the RSAC that Ford was the seller:

> For all purposes in this case, Defendant [Ford] was also a "Seller" of the Class Vehicles. 16 C.F.R. § 702.1(e). It

43

offered the Class Vehicles for sale through its restricted dealer network. Both the buying consumer and Defendant understood that Ford was selling the vehicle. The Class Vehicles were not being resold and were being titled directly from Ford to the buyer.

RSAC ¶ 211 (emphasis added); id. ¶¶ 193 ("The warranty language on Ford's Monroney stickers constitutes an express warranty under Virginia law because it consists of affirmations of fact and promises and description of the goods made by Ford as the seller to purchasers relating to the Class Vehicles . . . .") (emphasis added); id. ¶¶ 235-36 ("That section provides that 'a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.' Va. Code § 8.2-314(1). Ford is and was at all relevant times a merchant with respect to the Class Vehicles.") (emphasis added). The allegations in the RSAC that Ford is the seller for "all purposes," standing alone, constitute sufficient reason to reject the Plaintiffs' argument that they need not have given notice to Ford.

However, the Plaintiffs' argument fails for a second reason: the plain language of the statute—and caselaw interpreting it—demonstrates that it applies to the situation where, as here, a buyer makes a purchase (vehicle) from an intermediary seller but must still provide presuit notice to the "remote manufacturer" (Ford) which sold that vehicle to the intermediary (Ford dealerships) in the first instance.

44

The Virginia UCC defines seller as "a person who sells or contracts to sell goods," and a buyer as "a person who buys or contracts to buy goods." Va. Code Ann. §§ 8.2-103(1)(d), (1)(a) (2025). That definition of "seller" is broad and indicates no intention to limit itself to only "immediate" sellers of goods. It does not foreclose its applicability to sellers of that same good (here, a vehicle) by a more downstream manufacturer who sells to an intermediary (dealership) that then sells to the ultimate consumer-buyer. Indeed, this broad definition is what provides the very basis for the Plaintiffs' claims of breach of warranty against Ford as a seller.

Without directly holding that buyers must provide remote manufacturers with notice, several other decisions interpreting § 8.2-607(3)(a) have concluded that the notice must go to remote manufacturers as sellers. E.g., Hebron v. Am. Isuzu Motors, Inc., 60 F.3d 1095, 1097-99 (4th Cir. 1995); What Hurts, LLC v. Volvo Penta of the Ams., LLC, 710 F. Supp. 3d 502, 508, 524 (E.D. Va. 2024); Bindra, 2001 WL 1829999, at *5.

Therefore, the facts as pleaded in the RSAC (that Ford is the seller), the plain language of § 8.2-607(3)(a), and persuasive caselaw, teach that the notice to be given by purchasers of the Class Vehicles was to be given to Ford as a remote manufacturer of the Class Vehicles because remote manufacturers are sellers under the Virginia UCC.

## (ii) Is Adequate Notice Alleged?

The inquiry now turns to whether the RSAC alleges sufficient facts that the Plaintiffs provided adequate notice to Ford. The statute requires the Plaintiffs to have notified Ford in a reasonably timely fashion after they "discover[ed] or should have discovered any breach." Va. Code Ann. § 8.2-607(3)(a) (2025). An adequate notice must be timely ("within a reasonable time after [the buyer] discovers or should have discovered any breach") and must inform the seller of "any breach." Id. Whether notice was sufficient and reasonable is typically a question of fact for a jury. See, e.g., Cancun Adventure Tours, Inc. v. Underwater Designer Co., 862 F.2d 1044, 1047 (4th Cir. 1988).

Because the Plaintiffs are retail consumers, rather than merchants, they are held to a lesser standard of notice. So, they were required to notify Ford that the "transaction is 'troublesome' and should be watched." Id. (quoting Va. Code Ann. § 8.2-607, cmt. 4). They need not have given Ford a statement of "all objections" that they would rely on later in a legal action. Id.

However, the notice that the transaction is troublesome and should be watched must relate to the Plaintiffs' vehicles. So, as a general proposition, neither complaints by other consumers, nor consumer grievances posted on the Internet, nor information from the company's internal product testing, nor the knowledge that Ford may have received from other sources, standing alone, are the

46

notice that is contemplated by Section 8.2-607(3). <u>Aqualon Co. v. Mac Equip., Inc.</u>, 149 F.3d 262, 266 (4th Cir. 1998) (citing <u>E. Air Lines, Inc. v. McDonnell Douglas Corp.</u>, 532 F.2d 957, 972 (5th Cir. 1976)); <u>In re Lumber Liquidators</u>, 2017 WL 2911681, at *13-14.[24]

Analysis of the notice issue is informed by the fundamental principle that the notice requirement exists "to defeat commercial bad faith" (where goods are accepted and then found to be in breach of a warranty), "not to deprive a good faith consumer of his remedy." Va. Code Ann. § 8.2-607(3) cmt. 4 (2025). In furtherance of that fundamental purpose, notice under the statute serves several other underlying purposes: (1) providing an "opportunity for the seller to cure the defect"; (2) giving the "seller a fair chance to prepare for litigation"; (3) prompting "negotiation and settlement of claims"; and (4) protecting the "seller from stale claims and provid[ing] certainty in contractual arrangements." <u>Aqualon</u>, 149 F.3d at 269-70.

These principles guide the analysis of the notice issue.

First, the Plaintiffs say that the RSAC alleges adequate notice to Ford. They argue that the tendering of their vehicles to the dealers for repair with complaints that their transmissions were troublesome because the transmissions were manifesting what

---

[24] That is not to say that Ford's pre-existing knowledge from any or all of those sources plays no role in resolving the presuit notice issue. <u>See</u> pp. 48 - 53, <u>infra</u>.

the dealers (Ford's agents) and Ford itself then well-knew to be the Transmission Defect coupled with the request that Ford's dealers perform services to remedy the transmission troubles that were reported to the dealer (and then by the dealers to Ford) constituted adequate notice to Ford.

As part of that argument, the RSAC pleads that the dealers were agents of Ford. Ford contests that its relationship with its dealers is an agency relationship. But, agency is adequately pleaded. And, agency is a factual question that cannot be resolved in deciding the MOTION TO DISMISS. The RSAC quite clearly asserts that the dealers were agents of Ford and that the dealers and Ford, through notice to the dealers and passed by the dealers to Ford, were fully on notice of the troublesome nature of the transmission from the time the first complaints were lodged by the Plaintiffs and their vehicles were tendered to have the troublesome transmissions repaired. E.g. RSAC ¶¶ 9-11, 30-31, 126-27, 136, 151. And, the RSAC alleges that the troublesome nature of the transmissions reported by the Plaintiffs were promptly, indeed almost simultaneously, passed along to Ford. Id. at ¶¶ 126-27, 136, 151. There is evidence to support that assertion. Where, as here, Ford received almost immediate notice of the troublesome transmissions and the repair requests lodged by the Plaintiffs when they tendered their vehicles for repair, and where, as here, those complaints reasonably described the very Transmission Defect

48

of which Ford was aware and that Ford knew was troublesome and needed attention, a jury reasonably could find Ford received adequate notice of the claims.

In addition to the notice provided to Ford by Plaintiffs through the dealerships, there are detailed allegations (supported by exhibits) showing that Ford was fully on notice of a breach in the form of the same Transmission Defect which had beset the Plaintiffs' vehicles and as to which they sought repair. For example, the RSAC alleges that Ford, through its key engineers, managers, and executives, fully knew about the defects in the transmission even before the first transmission was sold on the market and that Ford was informed of many consumer complaints about the transmission. RSAC ¶¶ 42-74. As is made clear in Aqualon, 149 F.3d at 266, that information does not itself constitute notice.

However, the fact that Ford was armed with longstanding, extensive, and detailed knowledge about the very troublesome transmission that the Plaintiffs presented to the dealers for repair and that the dealers passed along to Ford presents, at least, a factual issue whether Ford perceived the information provided by the Plaintiffs as notice of a breach as to Plaintiffs' vehicles.

For that matter, if these allegations are supported by proof (and documents tendered by the Plaintiffs suggest that is a possibility, perhaps a likelihood), a reasonable jury could find

49

that Ford was adequately notified that the Plaintiffs' transmissions were like all the thousands of others which Ford knew to be defective and that the transmissions were troublesome and needed to be watched.

The decisions on which Ford relies simply do not apply to the fact pattern alleged in the RSAC. For the same reason, Aqualon does not fit this case.

Moreover, considering the allegations of the RSAC (and the facts in Ford's documents cited therein), Ford's argument about notice elevates form over substance. And, on that point, it is necessary to remember the purposes of notice, as articulated in the decisions of the Fourth Circuit and in the comments to the Uniform Commercial Code.

So, we recall that the fundamental purpose of the notice requirement is "to defeat commercial bad faith, not to deprive a good faith consumer of his remedy." Va. Code Ann. § 8.2-607 cmt. 4 (2025). To that end, the notice requirement is intended to provide an opportunity for the seller to cure the defect, to give the seller a fair chance to prepare for litigation, to prompt negotiations and settlement of claims, and to protect the seller from stale claims. Aqualon, 149 F.3d at 269-70. The current record teaches that, at least for purposes of deciding a motion under Rule 12(b)(6), the purposes that underlie Section 8.2-607(3)(a) were served. Indeed, it is difficult to perceive how any further

50

notice would have provided Ford any further opportunity to cure the troublesome Transmission Defect, or would have given Ford any better chance to prepare for litigation, or would have prompted Ford to negotiate and settle what it knew were to be claims against it, or would have better protected Ford from stale claims. Indeed, if the allegations of the RSAC are proved, every one of the underlying purposes of the notice provision were fully satisfied before suit was filed here.

If the allegations in the RSAC are proved, the record will be that Ford knew that it had marketed a defective product and had ample opportunities to try to cure the defect. And, a jury reasonably could find that Ford, a sophisticated corporation, well-advised by competent lawyers, knew, or reasonably could have been expected to know, that putting the Transmission with a known defect on the market likely would prompt litigation. So, a jury reasonably could find that Ford had more than a fair chance to prepare for litigation before this suit was filed. And knowing, as it is alleged to have known, of the Transmission Defect and the problems the defect was presenting to its customers, the jury could find that Ford had every opportunity to negotiate and settle the claims represented by the Plaintiffs' requests for repairs to correct the known Transmission Defect. Finally, the jury could find that Ford needed no further protection from stale claims given

51

its already sophisticated and extensive knowledge about the problems that the Transmission Defect presented to customers.[25]

It is disingenuous of Ford to suggest that the notice requirement was necessary here to satisfy any of the purposes for which that requirement exists. The allegations of the RSAC, if proved, will show that Ford's reliance on the notice provision elevates form over substance. In any event, as the Fourth Circuit has held, where the evidence raises issues whether the purposes of the statute have been frustrated:

> the issue of notice under UCC § 2-607 [is to to be] submitted to the jury with instructions that it determine whether [the buyer's] conduct throughout [the delay] constituted adequate and timely notice to [the seller] that it was considered to be in breach of the contract.

Mgmt. Sys. Assoc., Inc. v. McDonnell Douglas Corp., 762 F.2d 1161, 1180 (4th Cir. 1985) (quoting E. Air Lines, Inc. v. McDonnell Douglas Corp., 532 F.2d 957, 979 (5th Cir. 1976)).

---

[25] The Plaintiffs also argue that, before this action was ever filed Ford had knowledge of several lawsuits percolating throughout the federal court system between 2019 and 2021 alleging breach of the same warranties. The allegation is that that the information made known to Ford in all of those lawsuits is highly pertinent in understanding what Ford knew when it was being told that there were troublesome transmissions involved in the class vehicles as those vehicles were being offered for repair of transmission troubles virtually identical to those of which Ford had long been aware and as to which it already was engaged in litigation. ECF No. 502, 29. That particular theory is not pleaded in the RSAC, but the facts on which it is based, if proved, might well be relevant to the jury question respecting the adequacy of notice.

Ford's response is that it was the obligation of the Plaintiffs to say to Ford that the buyer thought there was a breach of warranty and what the breach was, using precisely those words. That, however, is not the law in the Fourth Circuit. In this Circuit, as is reflected in the official comments to U.C.C. § 2-607(3), the notice from the buyer to seller suffices if the buyer advises that the transaction is troublesome and must be watched. U.C.C § 2-607 cmt. 4. And, in light of the knowledge that Ford is alleged to have had before it ever placed the defective product on the market, and while it was dealing with the aftermath of the decision to do that, a jury could find that that was well-satisfied when the Plaintiffs presented their vehicles for repair of the Transmission Defect of which Ford was fully aware, while complaining of that very defect.

Ford relies principally on Management Systems, 762 F.2d at 1179. For several reasons, Management Systems does not help Ford. First, the parties to the transaction were commercial entities. Id. at 1163. And, the notice requirement is less strict for consumers than for commercial parties. Second, Management Systems did not require that, in giving notice, the complaining party say the word "breach." To the contrary, citing Comment four to U.C.C. § 2-607(a)(3) noting that the plaintiff had brought a failure to timely deliver (the asserted breach) to the defendant's attention by making repeated complaints, the Fourth Circuit held that

53

"whether adequate notice of breach was given by [the buyer] was one for the jury." Id. at 1179-80.

### (iii) Was Notice Timely?

That leaves the question whether the notice of breach was timely. Ford says it was not. Whether notice of the breach was given within a reasonable time after the breach was discovered, or should have been discovered, is typically a question of fact. Cancun, 862 F.2d at 1047. Those decisions persuasively teach that a question like whether notice was reasonable in its substance or whether it was given within a reasonable time is a matter best determined after development of a factual record and generally by a jury. In any event, it is not appropriate to resolve those issues on the MOTION TO DISMISS the detailed RSAC which adequately presents factual matters from which a reasonable jury could conclude that the notice was given within a reasonable time.

### c.   The Statute of Limitations

Ford's final challenge to the express warranty claim in COUNT ONE is that it is barred by the statute of limitations. Under Virginia law, "[a]n action for breach of any contract for sale must be commenced within four years after the cause of action has accrued." Va. Code Ann. § 8.2-725(1) (2025). A breach of warranty claim accrues at tender of delivery. Va. Code Ann. § 8.2-725(2) (2025). Generally, affirmative defenses (such as statutes of limitations) are not appropriately addressed on a 12(b)(6) motion

54

unless the facts necessary "clearly appear on the face of the complaint." Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (citation modified) (internal citation omitted).

One exception to the accrual rule is when "a warranty explicitly extends to future performance of the goods." Id. In that case, the breach of claim accrues "when the breach is or should have been discovered." Va. Code Ann. § 8.2-725(2) (2025). As discussed previously, COUNT ONE is based on the express warranty in the window sticker, the meaning of that text in the automobile industry, and the expectation of both consumers generally and the Plaintiffs. The WARRANTY text by its wording is forward looking. It looks forward to three-year and five-year periods, respectively. That forward look is underscored by the mileage provisions which, of necessity, must occur in the future.

The Plaintiffs claim that they understood that the warranty meant that their vehicles would be free from defects and function properly for the specified time and mileage and that Ford would repair and replace any defects during those periods. RSAC ¶ 174. Ford argues that the express warranty did not explicitly say that the warranty was for future performance. ECF No. 493, 44.

Whether the warranty (if one is found by the trier of fact) extended to future performance does, as Ford contends, require a look at the words that Ford used. Here, Ford chose to describe the warranty as involving future performance (miles to be driven and

a specific number of years into the future). If Ford had intended to foreclose future performance, it could have said precisely that. It did not do so. Indeed, it chose to say in rather explicit terms (temporal and miles driven) that the warranty was for future performance. And a reasonable jury could conclude that the warranty was explicitly for future performance based on the words that Ford chose to use. Of equal importance, this record tells that the existence and the meaning of the express warranty is to be informed by evidence of how the mileage and temporal text chosen by Ford are understood in the automotive industry, in the consumer base, and to the Plaintiffs.

For the foregoing reasons, the statute of limitations on the express warranty claim cannot be resolved in a motion to dismiss under Rule 12(b)(6).

Moreover, fraudulent concealment can operate to toll the statute of limitations when "the filing of an action is obstructed by a defendant's . . . using any other direct or indirect means to obstruct the filing of an action." Va. Code Ann. § 8.01-229(D)(ii) (2025).[26] In that event, the time that the obstruction has continued is not to be counted as any part of the period within which the action must be brought. Id.

---

[26] The word "other" means other than the means specified in Va. Code Ann. § 8.01-299(D)(i), dealing with bankruptcy.

To successfully rely on fraudulent concealment tolling, the Plaintiffs must allege (and prove): (1) "an affirmative act designed or intended, directly or indirectly, to obstruct the plaintiff's right to file [the] action" and (2) the act must involve "moral turpitude, and must have the effect of debarring or deterring the plaintiff from his action." Mackey v. McDannald, 842 S.E.2d 379, 385 (Va. 2020) (quoting Grimes v. Suzukawa, 551 S.E.2d 644, 646 (Va. 2001); Newman v. Walker, 618 S.E.2d 336, 339-40 (Va. 2005)). In Mackey, the Supreme Court of Virginia explained that the obstruction that is sufficient to constitute tolling "must consist of some trick or artifice preventing inquiry, or calculated to hinder a discovery of the cause of action by the use of ordinary diligence." Id. (quoting Culpepper Nat. Bank v. Tidewater Improvement Co., 89 S.E. 118, 121 (Va. 1916)).

The RSAC sufficiently alleges an artifice that was calculated to hinder discovery of the cause of action by the use of ordinary diligence. Indeed, the RSAC lays out in detail the extent to which Ford was aware of the Transmission Defect and its extensive, unsuccessful efforts to conceal the defect from the public by, inter alia, using the TSBs and instructing dealership repair staff to state that the transmission's clunkiness and harsh shifting was not a defect, but, instead, was normal and would adjust over time. See e.g., RSAC ¶¶ 46-78 (knowledge); 82-92, 97-104 (affirmative

57

concealment efforts). Meanwhile, Ford was publicly representing the smoothness of the shifting.

The RSAC thus alleges affirmative, knowing and deliberate actions calculated to mislead the public into believing that there was no defect in the Transmission while all the time Ford was fully aware that the Transmission Defect existed and that Ford's efforts to bring about a cure were unsuccessful. If the allegations of the RSAC are proved, a reasonable jury could find that Ford committed affirmative acts that directly or indirectly obstructed the Plaintiffs' right to file an action seeking redress. After all, if the seller is representing that there is no defect and that the harsh shifting is normal, what reasonable person would be inclined to file suit? A jury could find that Ford's conduct was intended to, and did, obstruct the right to redress by aggressively asserting that no right existed.

Moral turpitude is generally accepted to mean "an act or behavior that gravely violates the sentiment or accepted standard of the community." Moral turpitude, Merriam-Webster, https://perma.cc/GT3F-XSW2 (last visited February 13, 2026). Taken as a whole, the RSAC alleges conduct that, by any description, would, if proved, constitute moral turpitude. If the allegations in the RSAC are proven, the record would establish "act[s] or behavior[s] that gravely violate[] the sentiment or accepted standard of the community" for it is unthinkable that a corporation

58

knowingly would put on the market a defective product, tout the defective product to consumers as effective, and then, when consumers complain about that very defect, make affirmative statements to be directed to those consumers that the defect was to be expected from the normal performance of the vehicle. The RSAC presents allegations which, if proved, would bring Ford's conduct into an arena in which a reasonable jury could conclude that moral turpitude had been established. That, of course, means that the statute of limitations defense cannot be decided under Rule 12(b)(6) because the facts necessary to establish the statute of limitations defense are not clear on the complaint's face. Goodman, 494 F.3d at 465-66.

For the foregoing reasons, the MOTION TO DISMISS COUNT ONE will be denied.

## B.   COUNT TWO: Breach of Implied Warranty

Both Dolan and Morris bring claims for breach of implied warranty of merchantability. Ford does not challenge Dolan's claim. So, the analysis will be directed to Morris's claim. ECF No. 493, 36-37.

A warranty of merchantability is implied in a contract for the sale of goods. Specifically, under Va. Code Ann. § 8.2-314, "[u]nless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Va. Code Ann.

§ 8.2-314 (2025)(citation omitted). Under subsection (2) of the statute:

> [g]oods to be merchantable must be at least such as
>
> > (a) pass without objection in the trade under their contract description; and
>
> > . . .
>
> > (c) are fit for the ordinary purposes for which such goods are used.

Va. Code Ann. §§ 8.2-314(2)(a), (c) (2025). In other words, if the goods do not meet the standards set out in the statute, they breach the implied warranty of merchantability.

In COUNT TWO, the RSAC alleges that:

- Ford was a merchant with respect to the vehicles involved (goods of that kind) RSAC ¶ 236;

- the vehicles at issue "left Ford's facilities and control with a defect caused by defective design incorporated into the manufacture of the [vehicles];" Id. at ¶ 242; and

- the Transmission Defect put the safety of consumers at risk when driving. Id. at ¶ 243.

Accordingly, it is said that, at the time of delivery, Ford breached the implied warranty of merchantability "in that the Class Vehicles transmissions were defective and posed a serious safety risk at the time of sale, would not pass without objection, are not fit for the ordinary purposes for which such goods are used, failed to conform to the standard performance of like products

60

used in the trade. . . ." Id. at ¶ 243. It is further alleged that Ford did not disclaim or exclude the implied warranty of merchantability. Id. at ¶ 244.

Ford attacks Morris's implied warranty claim "because he does not plausibly allege that his vehicle was unable to provide safe and reliable transportation" because Morris used the vehicle for over three years and, during that time, it did not exhibit symptoms sufficient to warrant him seeking repairs or to stop driving the vehicle. ECF No. 493, 37. Then, citing McCabe v. Ford Motor Co., 774 F. Supp. 3d 349, 381-82 (D. Mass. 2025), Ford says that, as a matter of fact, the vehicle was merchantable because Morris only started to notice issues with the transmission after years of serviceable driving. See also ECF No. 493, 37 n.15 (citing Szymczak v. Nissan N. Am., No. 10CV7493, 2011 WL 7095432, at *11 (S.D.N.Y. 2011)).

To begin, Ford's attack is factually erroneous because the RSAC alleges that it was approximately one year (not three years) after Morris purchased his vehicle that he started to notice that the "transmission was jerking, shifting harshly, and clunking in reverse. He experienced engagement delays and inability to accelerate." In other words, Morris experienced the Transmission Defect. RSAC at ¶ 145.

It is correct that Morris first sought to obtain repairs at the dealership in October 2023 (id. at ¶ 146), but the dealership

made no effort to remediate the transmission defect. Id. Morris continued to experience the Transmission Defect over the next four months, and he made another effort to have the vehicle repaired (the defect remedied). Id. at ¶ 147. That dealer declined to take appointments for transmission issues so Morris took the vehicle to another dealer and was told that a part needed repairing. Only then was Morris finally able to have a dealer undertake an effort to repair the vehicle. In sum, Morris purchased in September 2020. He first noticed the troubles in the transmission in September 2021, took the vehicle in for repairs in October 2023, and made the final effort for repair in early 2024. After he picked up the vehicle in April 2024, and while on the way home, Morris experienced further engagement delays and harsh shifting. So, he traded in the vehicle. If the allegations of the RSAC are proved, Morris's vehicle would not pass without objection in the trade or be fit for its ordinary purpose for which it was to be used. Bayliner Marine Corp. v. Crow, 509 S.E.2d 499, 503 (Va. 1999).

The allegations presented by the RSAC are not like those in McCabe on which Ford bases its request for dismissal of COUNT TWO. In McCabe, the plaintiff "only 'started to notice' issues with their transmissions after years of serviceable driving. . . ." McCabe, 774 F. Supp. 3d at 382. On those allegations, the court granted the motion to dismiss in McCabe.

McCabe does not do the same work here because the allegations here are factually distinct in a material way. Here, Morris noticed the effects of the Transmission Defect about a year after buying the vehicle, not "after years of serviceable driving." Id.[27] True, he did not seek repair for another two years, but, unlike McCabe, the RSAC does not say that, during that period, his vehicle gave serviceable driving.

Ford also cites Sheris v. Nissan North America Inc., Civ. No. 07-2516, 2008 WL 2354908 (D.N.J. June 3, 2008). Sheris cites several decisions that it describes as the "weight of authority" for the proposition that, "where plaintiffs have driven their cars without problems for years," a breach of implied warranty claim will fail. Id. at *6 (citation omitted). For starters, the cases cited for that proposition really do not support it. So, the decision is not persuasive. More to the point for today's case, those are just not the facts that are alleged in the RSAC.

Ford asserts the same notice issues as grounds to dismiss COUNT TWO that were pressed in seeking dismissal of COUNT ONE. The notice issues fail here for the same reasons that they failed as to the express warranty claim in COUNT ONE.

For the foregoing reasons, the MOTION TO DISMISS COUNT TWO will be denied.

---

[27] Even when Morris sought repair, the Ford dealership made none. That lapse of time may play a role in whether Morris's notice was timely, but it does not bring his claim within the reach of McCabe.

C.    **COUNT THREE: The Fraudulent Omission Claim**

In COUNT THREE, the RSAC alleges that:

- "Ford designed, manufactured and sold . . . vehicles with a Transmission that would not and will not operate as represented and necessary. . . [Ford] misrepresented that its Transmissions were smooth when they were the opposite of smooth." RSAC at ¶ 258.

- "Ford knew of the Transmission defect before and after" the plaintiffs purchased the vehicles "and knew with certainty that it had no repair or solution that would fix it." Id. at ¶ 259.

- "Ford made significant and successful efforts to suppress, hide, disguise and prevent investigation of its 10R80 defect." Id. at ¶ 260.

- The efforts to suppress, hide, disguise and prevent investigation of the defect included Ford's "attempts to undermine and dismiss claims that the Transmission is defective by asserting" that the defect (harsh, jerky, bumping, clunky, lunging, hesitating, and erratic shifting) "is 'normal' or simply a limited period of adjustment and adaptation." Id. at ¶ 261.

- Those attempts are alleged to have been made by Ford's "employees, authorized dealers, agents, sales representatives and/or repair technicians." Id.

The RSAC also alleges that, as a complement to the alleged efforts to undermine and discourage claims about the Transmission Defect, Ford "implemented a number of policies and strategies which discourage[d] [vehicle] owners and lessees from seeking and obtaining repairs" of the defective transmission. Id. at ¶ 262. For example, the RSAC says that it was Ford policy to "under-compensate[] dealerships for the warranty repairs required under

64

the relevant TSBs, increasing the incentive and motivation for dealerships to refuse to perform repairs" to the defective transmissions. Id. at ¶ 264. Another alleged Ford policy was to instruct service technicians to consistently "tell [vehicle] owners and lessees that their symptoms [the Transmission Defect] (1) were 'normal operation,' (2) would resolve with additional driving, (3) were the result of user error, or (4) could not be diagnosed or resolved without a check-engine light or diagnostic code," notwithstanding that Ford knew that those reasons were not true.  Id. at ¶ 265 (emphasis added).

The RSAC also alleges that, if the Plaintiffs and Class Members had known about the Transmission Defect at the time of sale or lease, as well as the associated costs associated with the Transmission Defect, they would not have purchased the class vehicles or would have paid less for them. Id. at ¶ 268.

COUNT THREE then alleges that Ford "had a duty to disclose the true performance of Class Vehicles and the Transmission Defect because knowledge thereof and the details related thereto were known and/or accessible only to Ford; Ford had superior knowledge and access to the facts; and knew the facts were not known to, or reasonably discoverable, by Plaintiff and the Class." Id. at ¶ 275.

Next, the RSAC alleges that Ford "also had a duty to disclose because it made many false affirmative representations about the

65

qualities" of the Transmission. Id. at ¶ 275. In other words, the allegation is that, having made certain statements about the Transmission, Ford had an obligation to make known the other facts which were pertinent to the truth or falsity of those previous misrepresentations.

The RSAC then asserts a duty under the TREAD Act, 49 U.S.C. § 30116, to repurchase defective vehicles or give the dealer at Ford's expense the part or equipment necessary to correct the defect and that in order that such duty could be implemented, that the federal statute "required Ford to report the Transmission Defect to customers and dealers." Id. Finally, the RSAC alleges a duty to disclose that the vehicles were "not first class" and were "imperfects" within the meaning of Va. Code Ann. § 59.1-200(7) and under certain criminal code provisions. RSAC at ¶¶ 276-280.

Ford raises several challenges to the legal sufficiency of COUNT THREE. First, Ford attacks COUNT THREE as inadequate under Fed. R. Civ. P. 9(b), the federal pleadings standard for fraud claims, asserting that the RSAC does not plead reliance, an element of a fraud claim, or the existence of an agency relationship. Then, Ford contends that the RSAC does not adequately allege that Ford owed a duty to disclose the alleged defect.

### 1.   The Rule 9(b) Pleading Issue

The analysis of Ford's challenges to COUNT THREE begins with the text of Fed. R. Civ. P. 9(b). It provides in full:

> Fraud or Mistake; Conditions of Mind. In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

Fed. R. Civ. P. 9(b). Ford acknowledges that the Fourth Circuit applies "a relaxed Rule 9(b) standard in cases involving alleged fraud by omission or concealment." ECF No. 493, 15 (quoting Scharpf v. Gen. Dynamics Corp., 137 F.4th 188, 195 (4th Cir. 2025)). And, it acknowledges that the relaxed standard applies to "facts [that] are peculiarly within the defendant's knowledge." Id. (citation omitted). From there, Ford draws the conclusion that the admittedly relaxed standard does not "eliminate" the particularity requirement. Id. (quoting Corder v. Antero Res. Corp., 57 F.4th 384, 402 (4th Cir. 2023)).

Ford's particularity attack does not, however, rely on any identified failure to satisfy the specific requirements of Rule 9(b). Rather, the pleading attack on the fraudulent omission claim is based upon state law and is that: "[a] complaint's fraud allegations must show, 'specifically and in detail, all the elements of the cause of action at a level which, if believed, would qualify as clear and convincing proof.'" (quoting Sweely Holdings, LLC v. SunTrust Bank, 820 S.E.2d 596, 604 (Va. 2018)). That, of course, is a state law pleading standard, not the standard identified by Fed. R. Civ. P. 9(b).

Ford then (properly) turns to state law to identify the elements of a fraud claim and cites several cases in which Virginia law expresses the view that reliance is a necessary element of a fraud by omission claim. Then, Ford draws the conclusion that "[r]eliance also must be pleaded with particularity and is not subject to the relaxed Rule 9(b) standard because those facts are uniquely known only to the plaintiff." ECF No. 493, 16 (citing Corder, 57 F.4th at 401-402). So, at bottom, Ford contends that COUNT THREE:

> should be dismissed with prejudice because [it is] based on allegations <u>lacking</u> the <u>specificity</u> required to show that, in making their purchase decisions, <u>Dolan or Morris relied</u> on <u>any Ford statement</u> that was misleading because it omitted material information concerning the alleged Transmission Defect.

ECF No. 493, 18 (emphasis added).

To begin, that contention ignores the import of the fact that the Rule 9(b) standard for pleading fraud is relaxed in cases alleging charges of fraud by omission or concealment. <u>Scharpf v. Gen. Dynamics Corp.</u>, 137 F.4th 188, 195 (4th Cir. 2025). That rule makes sense because by its very nature, a fraudulent omission claim is based on the lack of a specific statement, so no plaintiff could plead a specific statement it alleges was never made.

In fact, in <u>Edmonson v. Eagle National Bank</u>, 922 F.3d 535 (4th Cir. 2019), the Fourth Circuit instructed that district courts:

68

> should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.

Id. at 553 (quoting Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999)). Although the relaxed pleading standard does not relieve Plaintiffs of the need to allege facts with particularity, Corder, 57 F.4th at 402, it does allow plaintiffs who do not have access to all the necessary facts that only the defendants would have to "state the factual allegations that make their belief plausible." Id. So, to allege fraud by omission, the Plaintiffs must allege (1) duty to disclose (2) a material fact; (3) deliberate failure to disclose the material fact; (4) reliance; and (5) damages. Bank of Montreal v. Signet Bank, 193 F.3d 818, 826-27 (4th Cir. 1999).

Ford argues that Plaintiffs fail to plead with particularity as to two elements: (1) duty to disclose, and (2) reliance. Each argument is considered in turn.

### a.    Duty to Disclose

Plaintiffs must plead allegations sufficient to show that Ford had a duty to disclose the alleged Transmission Defect. A duty to disclose exists when, inter alia, (1) there is a fiduciary or confidential relationship, (2) there is a legal obligation to communicate facts, (3) a statement would be misleading if not

69

corrected, and (4) one party has superior knowledge and knows the other party is relying on the assumption that the fact does not exist. Doe ex rel. Doe v. Baker, 857 S.E.2d 573, 590 (Va. 2021); Bank of Montreal, 193 F.3d at 829. Plaintiffs do not allege a fiduciary or confidential relationship, so only the other three duty predicates will be assessed.

### (i) Plaintiffs Sufficiently Allege Superior Knowledge

The superior knowledge duty arises when a "fact is material and the one concealing has superior knowledge and knows the other is acting upon the assumption that the fact does not exist." Bank of Montreal, 193 F.3d at 829. Ford does not contest that the Transmission Defect is material, or that it had superior knowledge of the Transmission Defect. Nor could it reasonably do so. Rather, Ford contends that the RSAC does not satisfy the requirement that Ford knew that Plaintiffs acted upon the assumption the Transmission Defect did not exist.

At a common sense level, it is, to say the least, quite difficult to conclude that Ford did not understand that its consumers relied upon it not to market a car with material defects in the Transmission, a core component of vehicle operation, or that buyers of its cars acted on the assumption that no such defect existed if it was not disclosed (which it was not). Moreover, the RSAC alleges that Ford actually promoted the transmission as smooth and as providing "improved acceleration and performance" and

70

"enhanced shifting performance." RSAC ¶¶ 23; see also id. at ¶¶ 20-22, 24-34, 36-39. That, of course, is highly probative, if not conclusive, evidence that Ford knew that buyers would act on the belief that the Transmission Defect did not exist. It is reasonably inferable and plausible to conclude from those allegations that Ford well-knew that buyers would rely on, and take comfort in, the belief that Ford was telling the truth and was not concealing defects in the very Transmission that it was touting to the public as "smooth," providing "improved acceleration and performance," and providing enhanced shifting performance.

Further, Plaintiffs point to two cases in other districts in which the fraudulent omission claims survived a motion to dismiss under Virginia law where the plaintiffs alleged superior knowledge of a material defect without any specific claim the defendant had knowledge that the consumer had assumed the non-existence of the concealed fact. Matanky v. Gen. Motors LLC, 370 F. Supp. 3d 772, 796 (E.D. Mich. 2019); Chapman v. Gen. Motors LLC, 531 F. Supp. 3d 1257, 1291 (E.D. Mich. 2021). On the other hand, in Fleece v. HCA Virginia Health System, the court held that it is critical to allege that a defendant knew that the plaintiffs were relying upon the fact that the nondisclosed fact did not exist. Civil Action No. 3:19cv396, 2020 WL 7265851, at *4 (E.D. Va. Dec. 10, 2020).

However, unlike Fleece, Plaintiffs here do allege that Ford knew that the Plaintiffs were relying upon the belief that the

71

nondisclosed fact did not exist. Plaintiffs alleged that Ford recognized the importance of its transmission performance to consumers and took active steps to conceal the defects about which it had known since before the Class Vehicles were ever released. RSAC ¶¶ 22, 49, 61, 64. A jury reasonably could find that, had Ford not known customers would rely on the belief that no defect existed, it would not have actively promoted the Transmission as it undeniably did. Likewise, a jury reasonably could find that Ford would not have concealed, and instructed dealers to conceal, the Transmission Defect as alleged. Assuming the facts as alleged in the RSAC and according all reasonable inferences to Plaintiffs, COUNT THREE sufficiently alleges superior knowledge that required a duty to disclose.

### (ii) Plaintiffs Do Not Sufficiently Allege A Duty To Correct A Previous Misrepresentation

Ford also had a duty to disclose if there was a misrepresentation that needed to be corrected. Doe, 857 S.E.2d at 590. Ford argues that there is no allegation identifying what specific misrepresentations were made to the Plaintiffs that needed to be corrected. ECF No. 493, 19. Plaintiffs respond that Ford should have corrected the misrepresentations it had made when "its sales representatives discussed with Plaintiffs the features, components, and performance of Plaintiffs' vehicles." ECF No. 502, 11. However, Plaintiffs do not allege specific statements that

72

were made to the Plaintiffs, or of which they were aware, that should have been corrected. The predicate of the duty to correct is the existence of an antecedent misrepresentation. The RSAC identifies numerous statements by Ford that needed to be corrected. However, the RSAC does not allege which, if any, of those statements were made to the Plaintiffs. Therefore, the RSAC does not sufficiently allege a duty to disclose that serves to correct a previous misrepresentation on which the Plaintiffs relied. Hence, to the extent that COUNT THREE rests on that kind of duty to disclose, it is legally insufficient.[28]

> (iii) **Plaintiffs Sufficiently Allege an Obligation to Communicate Information Under the VCPA, TREAD Act, or Criminal Code**

Next, Ford owes a duty if there is a legal obligation to communicate information that was not communicated. Doe, 857 S.E.2d at 590. It is rather clear that a duty to disclose can arise by virtue of a statute. Fleece, 2020 WL 7265851, at *3. Plaintiffs point to three statutory duties to disclose: (1) Motor Vehicle Safety Act (49 U.S.C. § 30101-30170) ("TREAD Act"); (2) Virginia Consumer Protection Act; and (3) the Virginia Criminal Code. ECF No. 502, 12.

First, the TREAD Act. Ford argues that, in Jiminez v.

---

[28] Should the requisite predicate evidence present itself in the discovery phase of the case, a motion for leave to amend could, if granted, permit this theory of disclosure duty.

DaimlerChrysler Corp., 269 F.3d 439 (4th Cir. 2001), the Fourth Circuit held that the TREAD act does not create a statutory duty to disclose and cannot be the basis for a common law fraud claim. ECF No. 493, 21. Ford quotes Jiminez as stating that the plaintiff's argument in that case "fail[ed] to recognize that the South Carolina courts - like Virginia courts (supra § II.B.) - have made clear that a duty to disclose arises only in three circumstances." ECF No. 493, 21 (quoting Jiminez, 269 F.3d at 447). Not only does Ford misquote Jiminez, which makes no mention of Virginia courts or § II.B, but also Virginia courts do not limit the duty to disclose to three circumstances. Doe, 857 S.E.2d at 590; Bank of Montreal, 193 F.3d at 829.[29]

Plaintiffs rely on Talley v. General Motors, LLC, No. 1:20-cv-01137, 2021 WL 7209448, at *2 (D. Del. Nov. 26, 2021), for the proposition that Ford took none of the required steps under the TREAD Act. Talley does not speak to the TREAD Act. However, the cited statutory provisions do require that, when a defect is known by a manufacturer after a vehicle is sold to a dealer and before it goes to a consumer, the manufacturer shall buy the vehicle back or provide a fix for the vehicle's defect. 49 U.S.C. § 30116 (a). Quite obviously, that requirement cannot be satisfied without disclosing the defect. Moreover, the statute requires the

---

[29] In its Reply, Ford drops the incorrect quote but sticks to the argument that Virginia courts limit the duty to disclose to the three circumstances. ECF No. 508, 12. Not so.

manufacturer to report the defects. <u>Doll v. Ford Motor Co.</u>, 814 F. Supp. 2d 526, 537 (D. Md. 2011) (quoting 49 U.S.C. § 30118(c)). So, the TREAD Act does impose a duty to disclose a known defect.[30]

Next, Ford argues that the VCPA creates no common law duty to disclose because the VCPA was intended to be separate and distinct from common law fraud and therefore cannot be the basis for a duty to disclose under common law fraud. ECF No. 493, 21 (citing <u>Ballagh v. Fauber Enters.</u>, 773 S.E.2d 366, 367-68 (Va. 2015)). When deciding that the burden of proof for a VCPA claim is the preponderance of the evidence, rather than the clear and convincing evidence (the standard for common law fraud), <u>Ballagh</u> held that the claims that the VCPA permits are distinct from common law fraud claims. <u>Id.</u> But, <u>Ballagh</u> does not support the construction that Ford urges here. Indeed, the VCPA requires disclosure of the defective products. Va. Code. Ann. § 59.1-200(A)(7) (2025). But, <u>Ballagh</u> says nothing about the duty issue presented here.

It seems as if Ford's theory is based on the point that "[a] statutory provision will not be held to change the common law unless the legislative intent to do so is plainly manifested. ECF No. 493, 21 (quoting <u>Cherry v. Lawson Realty Corp.</u>, 812 S.E.2d 775, 779 (Va. 2018)). True, <u>Cherry</u> contains that statement, but <u>Cherry</u> does not support the view on which Ford's argument depends.

---

[30] However, that duty seems to run to the dealer. The briefs do not address that point. It can be pursued at summary judgment, if applicable.

Cherry, 812 S.E.2d at 779. However, Cherry simply says that the VCPA did not abrogate [lessen] the landlord's common law duties. Id. It broadened those duties. Here, the VCPA imposes a duty to disclose defects that does broaden the duty at common law. But, that is what Cherry permits. So the VCPA does establish a duty to disclose.

Finally, Ford argues the Virginia Criminal Code cannot create a duty to disclose defects under common law fraud by omission. Plaintiffs cite Va. Code Ann. §§ 18.2-216(A); 217(a); 218 (2025). The sections state:

> § 18.2-216(A): Any person . . . who, with intent to sell . . . merchandise . . . directly or indirectly . . . for sale or distribution . . . causes, directly or indirectly to be . . . published...an advertisement of any sort regarding merchandise . . . which is untrue, deceptive or misleading, or uses any other method, device or practice which is fraudulent, deceptive or misleading to induce the public to enter into any obligation, shall be guilty of a Class 1 misdemeanor.
>
> § 18.2-217(a): Any person, firm, corporation or association who in any manner advertises or offers for sale to the public any merchandise, goods, commodity, service or thing with intent not to sell, or with intent not to sell at the price or upon the terms advertised or offered, shall be guilty of a Class 1 misdemeanor.
>
> § 18.2-218: Any person, firm, corporation or association who in any manner knowingly advertises or offers for sale to the public any merchandise, goods, commodity or thing which is defective, blemished, secondhand or used, or which has been designated by the manufacturer thereof as "seconds," "irregulars," "imperfects," "not first class," or words of similar import without clearly and unequivocally indicating in the advertisement or offer of the merchandise, goods, commodity or thing or the articles, units or parts, thereof so advertised or offered for sale to the public is defective, blemished, secondhand or used or consists of "seconds,"

"irregulars," "imperfects" or "not first class," shall be guilty of a Class 1 misdemeanor.

Neither party cites any case that is probative of whether the criminal code can be a duty for fraud by omission. The Court could find none either. But, the cited criminal statutes do not appear to create a new or different duty to disclose that does not already exist. That textual circumstance thus forecloses reliance on the cited provisions of the Virginia Criminal Code to create a duty that supports the claims in COUNT THREE.

### (iv) Plaintiffs Sufficiently Allege Reliance

Second, Ford argues that reliance is not pleaded with particularity. ECF No. 493, 16. It is said that allegations of reliance, "lie at the core of Rule 9(b)'s mandate" because defendants "have little reason to know how a plaintiff learned of any misstatements or what role they played in a plaintiff's [] decisions." Xia Bi v. McAuliffe, 927 F.3d 177, 185 (4th Cir. 2019). However, in cases of fraud by omission, our Circuit applies a "relaxed Rule 9(b) standard." Scharpf v. Gen. Dynamics Corp., 137 F.4th 188, 195 (4th Cir. 2025) (quoting Corder v. Antero Res. Corp., 57 F.4th 384, 402 (4th Cir. 2023)).

Plaintiffs argue that it is not necessary in a fraud by omission claim to specify particular statements on which they relied that omitted a material fact. ECF No. 502, 7-8. They are correct. In Fravel v. Ford Motor Co., the Court held that the plaintiffs had adequately pleaded a fraudulent omission claim

77

where they identified the defendant entity, the general time and place of omissions, and alleged that they would have made a different decision had they known of the omission. 973 F. Supp. 2d 651, 657 (W.D. Va. 2013). In Fravel, the court also cited a series of out of state cases to support that Rule 9(b) was "less strictly applied" to misrepresentation by omission. Id. Unlike the need for reliance to support a duty to correct (which requires a statement that requires correction,[31] the reliance requirement for a fraudulent omission claim does not, and cannot, rely on a particular statement because omission indicates the lack of a particular statement.

Because the Plaintiffs have sufficiently alleged a duty to disclose information and reliance and Ford does not challenge the other elements, the MOTION TO DISMISS the fraud in the inducement by omission claim in COUNT THREE[32] will be denied.

Finally, Ford contends that the Plaintiffs have not sufficiently alleged agency, a requirement where an agent is alleged to have made a misrepresentation. For the reasons stated in Section II.A.3.b.ii supra, agency is sufficiently plead.

D.   **COUNT FOUR: Virginia Consumer Protection Act ("VCPA") Claim**

---

[31] See Section II.C.1.a.ii.

[32] COUNT THREE, however, cannot proceed on the theory that a disclosure duty arises because of a need to correct a previous misrepresentation or under Virginia's criminal code.

78

To state a VCPA claim, a plaintiff must allege "(1) fraud, (2) by a supplier, (3) in a consumer transaction." Enomoto v. Space Adventures, Ltd., 624 F. Supp. 2d 443, 456 (E.D. Va. 2009) (citation omitted). The Plaintiffs allege fraudulent acts that are encompassed by three subsections of the VCPA:

> 7. Advertising or offering for sale goods that are used, secondhand, repossessed, defective, blemished, deteriorated, or reconditioned, or that are "seconds," irregulars, imperfects, or "not first class," without clearly and unequivocally indicating in the advertisement or offer for sale that the goods are used, secondhand, repossessed, defective, blemished, deteriorated, reconditioned, or are "seconds," irregulars, imperfects, or "not first class";
>
> 8. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised.
> . . .
>
> 14. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

Va. Code Ann. §§ 59.1-200(A)(7); (8); (14) (2025) (emphasis added). The requirements of the VCPA are thus essentially those of a fraud claim plus the requirements that the fraudulent act is by a supplier and in a consumer transaction. A "supplier" includes a "seller." Va. Code Ann. § 59.1-198 (2025). Ford is a seller. A "consumer transaction" includes the sale of "goods or services to be used primarily for personal, family, or household purposes." Id. The Dolan and Morris vehicles were both goods purchased for

79

personal use.

First, the RSAC alleges that Ford knowingly advertised or sold defective goods without indicating that they were defective, thereby violating (A)(7). It also alleges that the Transmissions were defective, that Ford knew that to be the case, and did not inform consumers, thereby violating (A)(14). RSAC ¶ 296. Plaintiffs also must allege reliance on the omissions. See, e.g., Fravel v. Ford Motor Co., 973 F. Supp. 2d 651, 658 (W.D. Va. 2013). Plaintiffs do so. RSAC ¶ 303. As explained above, the lack of a specific statement of what advertisement was relied upon does not warrant granting the MOTION TO DISMISS as to COUNT FOUR because Plaintiffs relied upon omissions, not an affirmative statement.

The RSAC also alleges a violation of section A(8): advertising goods with intent to sell different goods than advertised. Plaintiffs allege that Ford advertised its vehicles as having "smooth" shifting, providing a "seamless transition to lower gears," RSAC ¶¶ 30-32, knowing at the time of advertisement that the transmission was defective and thus intended to sell different goods than advertised. RSAC ¶¶ 42-57. For the same reasons that the Section A(7) claim survives, so does the Section A(8) claim.

Finally, the RSAC alleges a violation of section A(14): any other fraud or misrepresentation. Other fraud is largely duplicative of the common law fraud allegations analyzed above and

80

survives for the reasons stated in the common law fraud analysis above.

Ford misapprehends Murphy v. Capella Education Co. as standing for the proposition that the VCPA always requires a misrepresentation. ECF No. 493, 24 (quoting Murphy v. Capella Educ. Co., 589 F. App'x 646, 657 (4th Cir. 2014)). Ford's quote is: "'By its terms, [the VCPA] requires a "misrepresent[ation]"'" Id. (emphasis added). The quote actually states "By its terms, subsection 5 requires a 'misrepresent[ation]'" Murphy, 589 Fed. App'x at 657 (emphasis added). And, indeed, subsection 5 of the VPCA specifically prohibits "misrepresenting." Va. Code Ann. § 59.1-200(A)(5) (2025).

Unlike subsection 5, subsections 7 and 8 do not contain the requirement of a misrepresentation, nor does the Fourth Circuit in Murphy analyze subsection 8 to require a "misrepresentation." Murphy, 589 F. App'x at 657. So, Ford's argument that a specific misrepresentation must be alleged in subsections (7) and (8) claims is incorrect.

Ford further argues that Plaintiffs fail to allege what was advertised with particularity. ECF No. 493, 25. That is not correct. Murphy dismissed a Section 8 claim because there were no details of what kind of program was advertised such that it did not conform to the program he was provided. Murphy, 589 F. App'x at 657. Here, Plaintiffs allege many different specific

advertisements that did not conform to the actual performance of the product. RSAC ¶¶ 24-32. So, Ford's argument fails.

**E.    Statute of Limitations on Fraud Claim (COUNT THREE) and VCPA CLAIM (COUNT FOUR)**

The fraud and VCPA claims in the RSAC have a two-year statute of limitations. Va. Code Ann. § 8.01-243(A) (2025) (fraud), § 59.1-204.1(A) (2025) (VCPA). Ford argues that both fraud claims are barred by the statute of limitations. The claims "accrue" for the purposes of the statute of limitations for both fraud or VCPA "when such fraud, mistake, misrepresentation, deception, or undue influence is discovered or by the exercise of due diligence reasonably should have been discovered." Va. Code Ann. § 8.01-249(1) (2025).

Ford argues that Plaintiffs discovered, or should have discovered, claims when they began noticing issues with their transmissions. ECF No. 493, 45-47. For Dolan, they argue that he discovered or should have discovered the claim by 2019, and for Morris, they argue he discovered or should have discovered by September 2021. Id. Plaintiffs argue that they did not know or could not reasonably have discovered the fraud until September 2022 for Dolan and April 2024 for Morris. ECF No. 502, 37.

When a fraud should have reasonably been discovered is a question to be resolved by a jury, not in a motion to dismiss under Rule 12(b)(6). Edmonson v. Eagle Nat'l Bank, 922 F.3d 535, 554 (4th Cir. 2019); Tysons Toyota, Inc. v. Globe Life Ins. Co., 45

82

F.3d 428 (Table), 1994 WL 717598, at *6 (4th Cir 1994); McPike v. Zero-Gravity Holdings, Inc., 280 F. Supp. 3d 800, 807 (E.D. Va. 2017); GIV, LLC v. Int'l Bus. Machs. Corp., Civil Action No. 3:07CV067, 2007 WL 1231443, at *5 (E.D. Va. April 24, 2007).

McPike is analogous to the facts here. In McPike, plaintiff and defendant disagreed on when the fraud was discovered or reasonably should have been discovered. 280 F. Supp. 3d at 807. The defendants said that plaintiffs should have discovered the fraud earlier; the plaintiff said he sought clarification when he noticed an inconsistency and was assured there was no issue. Id. The McPike court held that the factual issue respecting reasonable discovery was best resolved by a jury. Id. at 808-809. Here too, Ford argues that plaintiffs knew or reasonably should have known about the alleged defect as soon as their transmissions were not working. ECF No. 493, 45-47. Plaintiffs argue that, because they sought repairs and Ford continued to assure them there was no defect, they could not have known about their claim until much later, within the two year period. ECF No. 502, 36-38. Thus, there is a factual issue that is not appropriately resolved under a motion to dismiss.

Finally, as in COUNT THREE and for the same reasons, the statute of limitations tolling issue cannot be resolved on a Rule 12(b)(6) motion because it is a factual issue.

CONCLUSION

83

For the foregoing reasons, the MOTION TO DISMISS (ECF No. 492) will be denied.

It is so ORDERED.

/s/    REP
_____
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: March 19, 2026