IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JAMES DOLAN, individually
and on behalf of all
others Similarly situated,
et al.,

    Plaintiffs,

v.                       Civil Action No. 3:23cv512

FORD MOTOR COMPANY,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on PLAINTIFFS' RENEWED RULE 37(C)(1) MOTION TO EXCLUDE MATTHEW FYIE'S EXPERT REPORTS AND TESTIMONY (ECF No. 531) ("Fyie Rule 37C Motion"); the MEMORANDUM IN SUPPORT OF PLAINTIFFS' RENEWED RULE 37(C)(1) MOTION TO EXCLUDE MATTHEW FYIE'S EXPERT REPORTS AND TESTIMONY (ECF No. 533); FORD MOTOR COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' RENEWED RULE 37(C)(1) MOTION TO EXCLUDE MATTHEW FYIE'S EXPERT REPORTS AND TESTIMONY (ECF No. 577); and the REPLY IN SUPPORT OF PLAINTIFFS' RENEWED RULE 37(C)(1) MOTION TO EXCLUDE MATTHEW FYIE'S EXPERT REPORTS AND TESTIMONY (ECF No. 588). For the reasons set forth below, the Fyie 37C Motion (ECF No. 531) will be granted.

## FACTUAL BACKGROUND

The full factual background of this case was laid out in detail in the Memorandum Opinion on the Motion to Dismiss. ECF No.

618. So, here it is necessary only to recite an abbreviated version of the facts as alleged in the Revised Second Amended Complaint ("RSAC") (ECF No. 560).

On August 11, 2023, Plaintiff James Dolan filed suit on behalf of himself and a Virginia class of consumers ("Class Members") against Ford Motor Company ("Ford") claiming that Ford "(1)[] knowingly put a defective transmission into many of its vehicles over many years; (2) when marketing those vehicles to unsuspecting consumers, touted them as if there was no such defect; and (3) implemented elaborate schemes to conceal the defect." ECF No. 618, 3.

The allegedly defective product is referred to as Ford's 10R80 transmission (the "Transmission"). The Transmission is alleged to have been placed first in the 2017 F-150 pickup trucks which were made available to consumers in Virginia in late 2016. RSAC ¶ 12. The Transmission also was in some Expeditions, Mustangs, Rangers, Transits, and Lincoln Navigators. Id. (the "Class Vehicles"). "The [alleged] design defect (the 'Transmission Defect') is the inability of the Transmission to maintain the intended and necessary internal pressure to ensure secure and timely engagements of each clutch required for a specific gear." Id. at ¶ 14 The alleged defect causes "harsh, bumpy, rough and delayed shifting or gear engagement." Id. at ¶ 15 (citation modified).

2

It is alleged that the Plaintiffs were not told of the defect, would have been affected if Ford had disclosed the defect, experienced the defect, complained of the defect, and that the defect was never remedied. Id. at ¶¶ 120-51. Plaintiff Dolan experienced the defect with a 2018 Ford F-150. Id. at ¶ 120. Plaintiff Morris had a parallel experience with his 2020 Ford Expedition. Id. at ¶ 141.

The RSAC sets out four counts. Count I alleges a breach of express warranty (Va. Code Ann. § 8.2-313 (West)). Count II alleges a breach of the implied warranty of merchantability (Va. Code Ann. § 8.2-314 (West)). Count III alleges fraud in the inducement by omission under Virginia common law. Count IV alleges violations of the Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196 (West), et seq.).

Ford's motion to dismiss the RSAC was denied (ECF Nos. 618 and 619). The case is now proceeding to briefing on the proposed certification of a class action. The parties have exchanged reports of expert witnesses on many subjects. The expert reports are pertinent to the class certification decision. Almost all expert reports are the subject of a motion (or more than one) seeking to limit or exclude all or part of the expert's testimony. Most are brought under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and its progeny asserting perceived failures to

3

satisfy those decisions or Fed. R. Evid. 702. This one, however, is prompted by, and based on, Fed. R. Civ. P. 37(c)(1) which provides for the imposition of sanctions for violations of the rules regulating discovery. Here, the discovery rules that Fyie and Ford allegedly violated are Fed. R. Civ. P. 26(a)(2)(B)(i) and (ii). Before addressing Rule 37(c), it is necessary to understand Rule 26(a)(2)(B)(i) and (ii) and how the alleged violations came to pass.

Rule 26(a)(2)(B) requires that an expert witness must prepare and serve a written report on the opposing side. The rule also mandates what that report must contain:

> The report must contain . . . .
>
> (i)    a complete statement of all opinions the witness will express and the basis and reasons for them;

and

> (ii)   the facts or data considered by the witness in forming them.

Fed. R. Civ. P. 26(a)(2)(B)(i) and (ii) (emphasis added).[1]

Fyie issued two reports: the Opening Report (ECF No. 533-1) and a Rebuttal Report (ECF No. 533-2). The Opening Report is 54 pages in length, contains 213 numbered paragraphs of asserted facts (¶¶ 17-230), many of which are presented in multi-sentence

---

[1] There are other requisite contents (subsections (iii)-(vi), but they are not at issue here.

4

paragraphs. Some paragraphs contain multiple subparagraphs. See, e.g., ¶¶ 90, 200, 212. Although there are 108 footnotes, most of the many sentences in the Opening Report do not have citations that identify the source of, or the of authority for, their content.

The Opening Report has a "Summary of Opinions" set out in six paragraphs. Id. at ¶¶ 11-16. At the end, there is a section entitled "Conclusion" which presents Fyie's opinions in six (multi-paragraph, multi-sentence) sections. ECF No. 533-1, 52-54. There are four attachments. Pertinent here is Attachment C which is a list of the documents and data that Fyie says that he considered. ECF No. 533-1, ¶ 9; ECF No. 533-1, p. 61-65.

Fyie's Rebuttal Report is 42 pages in length and represents his critique of a report issued by one of the Plaintiffs' experts. ECF No. 533-2. It is structured in the same manner as is the Opening Report. It has two attachments. Pertinent here is Attachment B which is entitled "MATERIALS REVIEWED." Id. at 50. In the text of the Rebuttal Report, Fyie says: "A list of documents referenced or reviewed as part of this report is included as Attachment B." Id. at 5. There is no identification of documents or other matters "considered" by Fyie in forming the opinions in the Rebuttal Report. Those opinions appear in the "Conclusion" section in paragraphs 1-4. ECF No. 533-2, 46.

Fyie was deposed and was asked to specify the methodology he followed in arriving at his opinions. He responded:

> A.    It was—part of it was using my own knowledge and experience in automatic transmission design, which I'd done for 30 years at Ford. But as far as further methodology, it was <u>reviewing the documents</u> produced in this case, seeing all the extensive work that was done, and the design, and development, and testing. **And then talking with people at Ford engineering to further understand the work that went into it, and clarify that.** But, you know, I have examples in here, but that was kind of the methodology that I followed was <u>reviewing the documents</u>, taking that in, and <u>then meeting</u> with Ford engineering <u>folks involved in the design</u>.

ECF No. 588-1, 4 (emphasis added). Elaborating on that methodology, Fyie also testified that he took notes of what was covered in the meetings with the Ford employees and "used the information when [he] was drafting the report." ECF No. 533-3, 7. And, he explained that, in forming his opinions, he got facts from the Ford employees whom he interviewed. He was able to recall the identity of some, but not all, of Ford employees whose information went into the report. <u>Id.</u> at 6.

Although Fyie took notes of the interviews with Ford employees, those notes no longer exist, having been "typed over" when the Opening Report was prepared. <u>Id.</u> at 10. Neither Attachment C to the Opening Report nor Attachment B to the Rebuttal Report mention those notes or the fact that interviews occurred. ECF No.

533-1, 61-65; ECF No. 533-2, 50. The record reflects that Ford's lawyers were present for the interviews. ECF No. 315, 6.

Upon learning about the interviews with the Ford employees, the notes taken by Fyie, the destruction of the notes, and the use of information from the interviews in the reports (principally the Opening Report), the Plaintiffs filed the Fyie Rule 37C Motion.

**ANALYSIS**

Rule 37 states that, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Plaintiffs seek to exclude Fyie's reports for violating Fed. R. Civ. P. 26(a)(2)(B)(i) and (ii).

According to Plaintiffs, Fyie violated Rule 26(a)(2)(B) by failing to disclose the interviews that he had with Ford employees that: (1) he considered in writing both the Opening and Rebuttal reports; and (2) formed part of the basis for the opinions expressed in those reports. ECF No. 533, 3-4. Ford disagrees, arguing that: (1) the interviews were not part of the bases and reasons for his opinions; (2) Fyie did not "consider" the conversations; and (3) Fyie's notes about the conversations were draft reports protected by Rule 25(b)(3)(A) and (B). ECF No. 577, 15-19. Then, Ford argues, even if Fyie was found to have violated

Rule 26(a), the failure is harmless and substantially justified. Id. at 21-30.

### A.   Was there a Rule 26(a)(2)(B) Violation?

#### 1.   Subsection (i): The Basis And Reasons For Fyie's Opinions

First, Plaintiffs argue that Fyie failed to provide the basis and reasons for his opinions by not disclosing the interviews, the facts therein learned, and the notes memorializing the interviews. ECF No. 533, 24. They are correct.

Fyie admits that he "used the information [obtained from the employee interviews] when [he] was drafting the report." ECF No. 533-3, 7. He says that, during the interviews, he took notes which he then "form[ed] into the report." Id. at 6.

Fyie cannot now recall the detailed information that he obtained from the eight Ford employees whom he can recall interviewing. And, he acknowledges that he might have interviewed more than those eight employees.[2] Nor can Fyie tell how exactly he "used the information [obtained from the employee interviews] when [he] was drafting the report." Id. at 7. However, Fyie acknowledges that, without mentioning the employees as his sources, he incorporated the interviews of employees in the reports. See e.g.,

---

[2] ECF No. 533-3, 6 ("Those are the ones I remember right now."). If, as the Court is told, Ford's counsel were present for the interviews, the Court would expect counsel to have advised whether there were more than eight interviewees.  That has not been done.

8

ECF No. 533-3, 12 (Kinch), 15-18 (Deurloo), 19-21 (Norris), 33-35 (Diakiw), 42-44 (Leahy).

It is undisputed that we will never know what Fyie's notes would disclose about what the employees said. But, we also know that the information obtained in the interviews was used in drafting the reports: Fyie tells us so. And, Fyie tells that the notes were used to "form" the reports. Id. at 15. By any definition those acknowledgements confirm that the reports (which make no mention of the fact that the employees were interviewed, what they said, or that there were notes of the interviews) do not contain "[a] complete statement of . . . the basis and reasons for" Fyie's opinions. Fed. R. Civ. P. 26(a)(2)(B)(i).

Ford's response is that Fyie's reports are full of details that explain his opinions. And, indeed, it is true that Fyie's reports are long and detailed: there are 288 paragraphs of asserted facts (not counting subparagraphs) in the Opening Report and 58 (not counting subparagraphs) in the Rebuttal Report. But nowhere in them is there mention of the employee interviews or what parts of those interviews were used in drafting the reports, or in "form[ing]" them, as Fyie puts it. ECF No. 533-3, 15. That critical deficit is not made up by a profusion of details.

Knowing what parts of Fyie's opinions emanate from, or have their genesis in, the employee interviews is important in being

9

able to test those parts of Fyie's opinions that come from those interviews. The notes would, if available, show the role that those views have in Fyie's opinions. But there are no notes. Fyie cannot recall what he was told or how that affected his opinion. The Plaintiffs are left with the hope that the employees might recall what they were asked and what they said. And, according to Ford that satisfies the requirements of Rule 26(a)(2)(B)(i).

But that is not where subsection (B)(i) puts the responsibility. That task is placed on the expert and it is accomplished by requiring the expert to make "a complete statement of all opinions" and "the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Fyie and Ford failed to meet that clear directive. Thus, Rule 26(a)(2)(B)(i) has been offended.

### 2. Subsection (ii): Did Fyie "Consider" The Conversations With Ford Employees?

The next question is whether Fyie "considered" the information obtained in the employee interviews so that they had to be disclosed under Rule 26(a)(2)(B)(ii). The Advisory Committee Notes specify that the facts and data intended to be reached by Rule 26(a)(2)(B)(ii) includes what the expert "considered," not just the facts and data upon which the expert relied. Fed. R. Civ. P. 26 advisory committee's note to 2010 amendment. What the expert considered includes, "any information furnished to a testifying expert that such an expert generates, reviews, reflects upon,

10

reads, and/or uses in connection with the formulation of his opinions, even if such information is ultimately rejected." Carroll Co. v. Sherwin-Williams Co., No. WMN-11-1700, 2012 WL 4846167, at *3 (D. Md. Oct. 10, 2012) (quoting Synthes Spine Co., L.P. v. Walden, 232 F.R.D. 460, 463 (E.D. Pa. 2005)) (emphasis added); See also Trigon Ins. Co. v. United States, 204 F.R.D. 277, 282 (E.D. Va. 2001) ("considered" means "to reflect on" or "to think of: come to view, judge or classify" and is intended to be more broad than "relied upon.") (citation omitted).

Fyie testified at deposition that part of his methodology in this case was to have conversations with Ford employees. ECF No. 533-3, 4. He testified that he used the information he obtained from those conversations in "drafting the report[s]" and in "forming" the reports. Id. at 7, 9-10. Fyie also stated that the information he received from those conversations would help him find supporting documents. Id. at 10.

Assuming Fyie's statement that the conversations only helped him find documents is true, it does not change the fact that, in reaching his opinions, he considered the interviews and his notes memorializing them. What Fyie "considered" is not necessarily the same as what he "relied upon." The interviews (or "conversations," as Ford insists) were reviewed, reflected upon, and used by Fyie when formulating his opinions in this matter. And, the notes of

the interviews were generated, reviewed, and used, by Fyie in forming the opinions expressed in the reports.

Fyie's statement that he only used the interviews to find documents is directly contradicted by other statements in his deposition. First, his explanation of his own methodology contradicts the statement that he only used the conversations to find documents. ECF No. 588-1, 4 (stating he reviewed documents and then talked to employees). Fyie also noted multiple times that Ford employees explained topics to him that he discussed in his report. See, e.g., ECF No. 577-3, 24 ("I wanted to understand a little better the AVL process . . . so she spent time explaining that to me."); 27 ("She was explaining to me about the two different scorecards and how they're used."); 34 ("So he explained those to me, and then I was able to research and gather the information to include in the report based on that."). Fyie also acknowledged that he included, without attribution, portions of conversations with employees in certain paragraphs of the reports. See, e.g., 577-3, 25, 26, 28 (¶¶ 63, 64, and the second sentence of ¶ 71 in the Opening Report and ¶ 26 from the Rebuttal Report from Leahy); 10 (¶ 56 in the Opening Report from Kinch); 32 (¶ 52F in the Rebuttal Report from Menapace). He also admits that he did not always find supporting documents and could recall a few instances where that was true, meaning it is possible that he does

12

not recall other instances. ECF No. 577-3, 5. Fyie's statements just do not line up with Ford's argument that Fyie's conversations only were used to identify documents.

Because Fyie destroyed the notes of the interviews when drafting the reports, he struggled at deposition to reconstruct what information in which paragraphs came from which people. For example, Fyie testified that he discussed "AVL" with Celeste Leahy. ECF No. 577-3, 25. He identified that paragraphs 67-71 discussed the AVL, but he largely could not identify what, if any, information in those paragraphs came from Leahy. Id. at 25-26 ("I don't know if any of the information from her came directly into the report.") He testified that he discussed the CDF sleeve and the R2S3 surface finish with Deurloo but that "not all" the information on that subject in the report the came from Deurloo, and that he thought paragraphs 163, 164, 166, and 167 "primarily came from [] Deurloo." Id. at 12-14. He identified some topics he discussed with Diakiw, pointing to paragraphs 65 and 66 and saying he did not "think" there was anything else he discussed with Diakiw in the report. ECF No. 577-3, 21-23.

In sum, when forming his opinions and preparing his reports, Fyie considered the information from his interviews with Ford employees. He received information from the employees, reviewed that information, and reflected on it. Carroll Co., 2012 WL

4846167, at *3. He also directly incorporated information he learned from the employees (independent of any documents) into his report.

The destruction of the notes makes it impossible to accurately re-construct what information came from what conversations.[3] In other words, it is not really possible to identify the employee information that Fyie considered or what part(s) of that information he relied on, or what he rejected, in forming his opinions. But, the record proves beyond question that Fyie did in fact consider the information secured in the employee interviews and that he did not disclose either the fact that the interviews took place or the substance of the interviews. Thus, the requirements of Rule 26(a)(2)(B)(ii) were violated.

---

[3] Plaintiffs also discuss briefly that Fyie lied about reviewing all of the documents on which the Plaintiffs' expert, Dr. Greiner, relied. ECF No. 533, 21-22. Fyie's list of Materials Reviewed for his Rebuttal Report states that he reviewed all documents Greiner referenced. ECF No. 533-2, 50. Then, at deposition, he admitted that he did not review all documents that Greiner reviewed, and that he did not know if he had reviewed all the documents Greiner referenced specifically in the text of his report. ECF No. 533-3, 24. Plaintiffs make no further argument on this point, but the conflicting statements on that point are relevant to assessing the fact that Fyie also gave conflicting testimony about his methodology. Giving conflicting testimony on important matters calls Fyie's credibility into question.

### 3. Are Fyie's Notes On The Employee Interviews Protected As Draft Reports Under Rule 26(b)(3)(A) and (B)?

Next, says Ford, because Fyie's notes were incorporated into his report drafts, he was not required to disclose them under Fed. R. Civ. P. 26(b)(3)(A) and (B). Rule 26(b)(4)(B) states, "Rules 26(b)(3)(A) and (B) protect drafts of any report or disclosure required under Rule 26(a)(2), regardless of the form in which the draft is recorded." Fed. R. Civ. P. 26(b)(4)(B). According to Ford, Fyie was not required to disclose his notes about his conversations with Ford's employees because he incorporated them into his report drafts directly, and there is no separate document which is just notes. ECF No. 577, 17-18.

At the outset, it is important to note the fundamentally troubling nature of Ford's argument. According to Ford, if an expert takes notes on conversations and then puts them into a report, the expert need not disclose the information given by the witnesses as they appeared in the notes. Adopting Ford's argument would allow experts to skirt the disclosure requirements of Rule 26(a) and conceal information that they considered, thereby frustrating subsection (ii)'s consideration requirement.

Ford's argument is also contrary to case law. As Plaintiffs note, three Courts of Appeal have weighed in on the scope of what is discoverable under Rule 26(a). The Ninth Circuit highlighted the distinction between "materials containing 'factual

15

ingredients'" which are discoverable, and "opinion work product," which is not. Republic of Ecuador v. Mackay, 742 F.3d 860, 870 (9th Cir. 2014). The same was true for the Tenth and Eleventh Circuits. Republic of Ecuador v. For Issuance of a Subpoena Under 28 U.S.C. Sec. 1782(a), 735 F.3d 1179, 1187 (10th Cir. 2013); Republic of Ecuador v. Hinchee, 741 F.3d 1185, 1191 (11th Cir. 2013). Fyie's interviews are not the impressions of counsel or trial strategy. They are interviews in which Fyie sought facts that he intended to use, and did use, in his opinions. Thus, they are not protected as draft reports or work product. See Kinsale Ins. Co. v. JDBC Holdings, Inc., No. 3:20-CV-8, 2021 WL 1554073, at *6 (N.D.W. Va. Apr. 20, 2021) (ordering disclosure of expert's notes where they are not a critique of the opposing report nor a list of questions for the opposing expert).

Ford points to Green v. AMF Bowling Centers, Inc., Civil No. ELH-19-1410, 2020 WL 13602748 (D. Md. Oct. 6, 2020) in support of its argument that Fyie's notes from his interviews with Ford employees are draft reports that need not be disclosed. ECF No. 577, 18. In Green, the defendant requested plaintiff to produce an expert's work product, including "the research conducted." Green, 2020 WL 13602748, at *1. The court held that notes drafted "in developing the opinions *that he will provide at trial'* are discoverable, whereas an expert's notes drafted 'to prepare []

16

counsel for deposing [the opposing party's] expert and to help counsel understand the reports provided by [the opposing party's] expert . . . are protected work product.'" Id. at *2 (citation omitted). That is not what happened here. Fyie's notes were not drafted "to prepare counsel for deposing" an opposing expert or to help counsel understand the opposing expert's report. Id.

It is also true that the court, in Green, distinguished between research notes that were part of a draft report and those that were not, but clarified that, if there were separate notes, those would need to be disclosed. Id. at *2. As Green observes, the Rules Committee cautioned that Rule 26(b)(4)(B) was not intended to "impede discovery about the opinions to be offered by the expert or the development, foundation, or basis of those opinions." Id. (quoting Int'l Aloe Sci. Council, Inc. v. Fruit of the Earth, Inc., Civil Action No. DKC-11-2255, 2012 WL 1900536, at *1 (D. Md. May 23, 2012)). In other words, as pointed out in Green, the Rules Committee did not want the new protection to be used to prevent the other side from uncovering the basis of the expert's opinion. So Green is consistent with the approach taken by the Ninth, Tenth, and Eleventh Circuits. It certainly does not help Ford's argument that the notes are protected by Rule 26(b)(4)(B).

Next, Ford cites Atlantic Coast Pipeline, LLC v. 0.07 Acre, More or Less, in Nelson County, Virginia, 396 F. Supp. 3d 628 (W.D.

17

Va. 2019). In Atlantic Coast, the court held that sufficient information was provided in the expert report notwithstanding the exclusion of some measurements, sketches, photographs, and cost data relied upon by the expert. Id. at 639. However, as Ford points out, in that case, the handwritten notes "would not provide any additional information because the information contained in those notes led to the figures given in the Report." Id. That is just not the case here. The report in Atlantic Coast disclosed the relevant information and the source of the information. Id. Here, the existence of interviews was not disclosed, nor was there any notation in the report related to what information came from what source.

Ford next cites Familias Unidas Por La Educacion v. El Paso Independent School District, EP-20-CV-170, 2022 WL 2671864 (W.D. Tex. July 11, 2022). Familias Unidas is not helpful to Ford because the expert in that case disclosed the existence and substance of the interview in the report. Familias Unidas, Case No. 3:20-cv-00170, ECF No. 90-1, 18 (W.D. Tex. May 17, 2022). Fyie did not.

Ford also cites two cases decided before the 2010 Rule Amendments that clarified the breadth of disclosure required by Rule 26. See Gillespie v. Sears, Roebuck & Co., 386 F.3d 21, 34-35 (1st Cir. 2004); Patel v. Verde Valley Med. Ctr., Nos. CV-05-1129, CV-05-2926, 2009 WL 5842048, at *1-2 (D. Ariz. March 31,

18

2009) (no rule citations and one paragraph of analysis). Those cases do not help Ford either.

Nor is Ford's argument aided by Whitesell Corp. v. Electrolux Home Products, Inc., CV 103-050, 2021 WL 796147 (S.D. Ga. March 2, 2021). In Whitesell, the court held that an expert's working papers need not be disclosed. Id. at *4. But there, the expert had disclosed his procedure, methodology, and the underlying data on which he relied in coming to his conclusions. Id. In other words, there were no facts which the expert considered that were not disclosed. Id. That just is not what happened here. Also unhelpful is the citation to CSX Transportation, Inc. v. Kirkland, CV416-117, 2017 WL 2271120 (S.D. Ga. May 24, 2017). There, the court held that "facts or data" must be produced, but that "working notes" did not. Id. at *4. In that case, the "working notes" included written annotations regarding calculations which were eventually disclosed. Id. In other words, those notes were not facts or data obtained from employees. Fyie's undisclosed interviews put to record facts and data that he admittedly considered in forming his opinions.

In sum, no case cited by Ford supports its effort to classify the notes of the interviews as a draft report that is protected by the rules on which Ford relies. Moreover, the record here is that the interviews were memorialized in notes. Once those notes were

19

recorded, they were required to be disclosed if the expert considered the information in them in forming his opinions or if they, even in part, were the basis and reason for the opinions. By the time Fyie destroyed the notes, he had already considered them and used them to form his opinions. Having done so, he was not permitted to excuse their destruction by making the facile assertion that the acts of destruction converted the notes into a draft protected by Rule 26(b)(4)(B).

B.    Was Fyie's Failure To Disclose Harmless Or Substantially Justified?

Ford argues that, even if there is no Rule 26(a) violation, the failure to disclose the employee interviews was harmless and substantially justified. ECF No. 577, 20. There are five factors to consider when determining substantial justification and harmlessness: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003). The first four factors go to harmlessness and the fifth factor to justification. It is the non-moving party's burden to establish these factors. Wilkins v. Montgomery, 751 F.3d 214, 222 (4th Cir. 2014).

20

First, surprise. Ford argues that Plaintiffs should not be surprised by this information because: (1) Fyie also relied on his interviews with Ford employees in another action[4] which involved many of the same attorneys who represent the Plaintiffs in this case, and (2) "[i]t is well documented . . . that each of the Ford employees possesses knowledge relevant to the litigation." ECF No. 577, 21. Nothing in the rules supports Ford's point. To begin, it does not follow that, because Fyie may have relied on undisclosed interviews in another case, that he would necessarily do it again in this case. Moreover, that argument makes no sense because it is premised on the notion that a previous undiscovered violation forecloses a challenge to a repetition of the same conduct.

Relatedly, Ford argues that courts have found that there was no surprise that a party would have an expert for essential aspects of their cases. Thurman v. Sedlak, Case No. 2:23-cv-536, 2024 WL 4443841, at *3 (E.D. Va. Aug. 14, 2024). But that proposition does not help Ford because the facts of those cases are not remotely analogous to those presented here. Plaintiffs, of course, may be expected to anticipate that Ford would have designated an automotive expert. However, Plaintiffs should not be expected to have anticipated that Fyie would rely on undisclosed interviews in forming opinions or preparing his reports, or that Fyie would not

_____

[4] O'Connor v. Ford Motor Co., No. 19-cv-5045 (N.D. Ill.)

comply with the clear text of the rules as to disclosure of information that he considered in forming his opinions.

Ford's second point is that Plaintiffs should not be surprised by reliance on information that came from the witnesses who were interviewed by Fyie because those individuals were all previously disclosed as having relevant information. ECF No. 577, 21-24. In support of this theory, Ford devotes many pages to explain that Plaintiffs were aware of the Rule 26(a) disclosures that those employees had knowledge of discoverable information.

This argument fundamentally misapprehends the governing rules which, respectively, require the expert to set out "a complete statement of . . . the basis and reasons for" his opinions and the "facts or data considered . . . in forming" the opinions. Fed. R. Civ. P. 26(a)(2)(B)(i), (ii). The mere fact that the name of a person has been disclosed as having discoverable information is far different that whether an interview with that person is a basis or reason for an expert's opinion or whether the expert considered those interviews in forming his opinions.

Not only are the two topics (identifying persons with discoverable information vs. disclosing the things considered by experts and the things that are the basis and reason for the expert's opinion) far different substantively, they serve materially different offices in the conduct of litigation and the

22

preparation for trial. The former allows for planning discovery. The latter allows the lawyer to prepare for trial by knowing how to meet expert trial testimony (by arranging opposing testimony and by cross-examination). It does Ford no credit to suggest that the former satisfies the latter. Moreover, the notion just ignores Rule 26(a)(2)(B)(i) and (ii) and the important role that they play in helping counsel prepare for the trial of a case. So, Ford's argument on the surprise factor falls flat.

Second, the curability of the surprise. Ford argues that, even if there is surprise, it can easily be cured by depositions of the Ford employees whom Fyie interviewed. ECF No. 577, 24. True, discovery has not closed, so Plaintiffs may conduct additional depositions. But the burden is not on Plaintiffs to spend time and money deposing eight people about what they told Fyie in interviews conducted years ago. Carr v. Deeds, 453 F.3d 593, 605 (4th Cir. 2006), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010). As explained above, the disclosure obligation is on the expert and the party that offers his reports. In any event, there is no reason to believe that Ford's proposed cure would be successful. These interviews occurred years ago, and Fyie could not even identify everyone with whom he spoke, much less what he asked and what the employees responded. Under the circumstances it is difficult to see how depositions would be curative. So, this

23

factor augurs against a finding of curability, and against harmlessness.

Next, disruption of the trial. Ford argues that, because there is no trial date yet and discovery is still open, there will be no disruption of trial. ECF No. 577, 26. Plaintiffs argue that trial will necessarily be disrupted because the nondisclosure cannot be cured and the jury will be unable to understand what information came from Fyie's interviews (because he does not remember now and likely will not remember later). ECF No. 588, 19. And, say the Plaintiffs, Fyie's cross-examination at trial (no matter when the trial is held) will be longer and more confusing because of the need to show the flows in Fyie's method.

When a trial is set to occur months later, or when a trial has not been scheduled, courts have found that there is no trial disruption. See, e.g., Kinlaw v. Nwaokocha, Civil Action No. 3:17-cv-772, 2019 WL 2288445, at *7 (E.D. Va. May 29, 2019); M.D. Russell Constr., Inc. v. Consol. Staffing, Inc., No. 7:19-CV-221-BO, 2022 WL 857041, at *4 (E.D.N.C. Mar. 22, 2022). But, in both cases, the court also held that any surprise could be cured. Id. That is not the case here. As explained above, there is no cure possible.

Further, given the complexity of the issues about which Fyie would testify and the facts about the interviews, and their role

24

in Fyie's opinions, it is reasonably predictable that what he has done (and not done) will be a key aspect of his testimony—both on direct and cross examination. And, it is a virtual certainty that the jury would become confused and the issues would become obscured by the efforts to explain the flaws in Fyie's methods and opinions. That is true trial disruption. The importance of the interviews to the examination of Fyie and the confusion it will cause will not change between now and trial because the nondisclosure is uncurable. This factor too cuts against a finding of harmlessness.

There is, however, another aspect of disruption to be considered here: disruption of the class certification process that is underway. The same factors that portend trial disruption also will be disruptive of the class certification process. Of course, it is true that the certification process will not be before a jury. But the identified difficulties nonetheless affect the briefing, argument and decision on the certification question.

Finally, the importance of the evidence. Because Fyie is Ford's only expert witness on the potential defect, Fyie's testimony is important. Ford says that the interviews relate only to 21 paragraphs of 288 total paragraphs in both reports. ECF No. 577, 27. That is not at all clear. Nor is it clear that, as Ford argues, the interviews affect only a few of Fyie's opinions. The destruction of the notes of the interviews and Fyie's limited

25

recollection of the interviews make it impossible to know. On the other hand, the record is clear that Fyie both considered and used the employee interviews to form his opinions and draft his reports. Thus, it is beyond the pale to argue that the notes taken during the interviews of those witnesses are not important. Equally important is that Fyie did not disclose the fact of the interviews, that he took notes, and that the notes were destroyed.

How then to assess this factor? In reality, it cuts both ways. Loss of Fyie is a serious loss for Ford. Allowing his opinions, notwithstanding the violations of Rule 26(a)(2)(B)(i) and (ii) would limit the Plaintiffs' ability to cross-examine Fyie, a key Ford witness. And, Fyie's violations are a clear affront to the rules.

Weighing all of the Southern States factors necessitates a conclusion that the Rule 26(a)(2)(B)(i) and (ii) violations were not harmless. The fact is that what happened seriously and adversely limits the ability of the Plaintiffs' counsel to test the legitimacy of Fyie's opinions. That, in a very real sense, is harm.

Next, the justification for the nondisclosure. Ford's argument on that point is that it reasonably believed the notes did not have to be disclosed. That contention is the recycling of earlier arguments that: (1) Fyie did not consider the interviews;

(2) the notes were draft reports; and (3) in O'Connor, some of the same attorneys as in this case did not complain of the nondisclosure. ECF No. 577, 28-30. Ford cites a case from the Southern District of New York for the proposition that, if there was reasonable disagreement about whether an expert was obligated to disclose information, the failure to do so is substantially justified. Id. at 28 (quoting Diaz v. N.Y. Paving Inc., 553 F. Supp. 3d 11, 21-22 (S.D.N.Y. 2021)). However, here there was no reasonable disagreement. It just is not possible to give the offended rules an interpretation that would make it reasonable to do what has been done here.

Moreover, the record here shows that nondisclosure of the information required by subsections (B)(i) and (ii) was accomplished by a deliberate method that had been previously used and of which Ford's counsel was fully aware.[5] The chosen technique has several serious adverse consequences that were readily understood by Fyie and Ford. First, the method allowed Fyie to disregard any adverse information provided in an employee interview because the proof that adverse information was provided in that interview will have been destroyed. Thus, Fyie was free to

---

[5] Ford's counsel sat in on the interviews. And, certainly counsel reviewed Fyie's reports before they were served and could see that the reports neither mentioned the interviews nor disclosed the notes (or their destruction).

express opinions untethered to any adverse information from the employee interviews. Second, the method (not disclosing that the employee information was considered by Fyie or used in forming his opinions or in drafting his reports) makes it impossible for an opposing lawyer to use any information from the employee interviews to test the veracity of any opinion expressed by Fyie. Third, it forecloses the Plaintiffs' experts from assessing the entire basis for Fyie's opinions (that use the information obtained in employee interviews) against what the notes reflect that the employees actually said (or were understood to have said). Fourth, the method forecloses the Plaintiffs' experts from using what the employees told Fyie in formulating their own opinions. And, those consequences, which are usual incidents of litigation, were reasonably foreseeable to Fyie (an experienced witness), and to Ford's counsel (seasoned trial lawyers).

More importantly, for today's case, those consequences are precisely what the requirements of subsection (B)(i) and (ii) are intended to keep from happening. So, it just is not possible to find that employing the "consider/use/destroy non-disclosure" method shown by the record can be substantially justified. Certainly, Ford has not met the burden to establish justification.

C.    What Sanction Should Be Imposed?

Having found there are discovery violations that cannot be cured, and that it was neither harmless nor substantially justified, it is necessary now to consider what sanction is appropriate.

In Campbell v. United States, 470 F. App'x 153, 156 (4th Cir. 2012), the Court held that, when there is no finding of harmlessness or substantial justification, there is an automatic sanction of the expert. However, that does not square with the text of the Rule, which states that "[i]n addition to **or instead of** [exclusion]," the court may "impose other appropriate sanctions." Fed. R. Civ. P. 37(c)(1) (emphasis added). Ford does not address Campbell. The Court previously has recognized the conflicting language of Rule 37 and the description of an "automatic sanction." And, the Court, and others, have recognized the "automatic" nature of the Rule 37 sanction, and then analyzed what sanction is appropriate. See, e.g., Rambus, Inc. v. Infineon Techs., AG, 145 F. Supp. 2d 721, 724 (E.D. Va. 2001).

In sum, the Court should consider the following four factors: "(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that non-compliance caused the adversary, (3) the need for deterrence of the particular sort of noncompliance, and (4) whether less drastic sanctions [than exclusion] would have

29

been effective." <u>Law Enf't All. of Am., Inc. v. USA Direct, Inc.</u>, 61 F. App'x 822, 830 (4th Cir. 2003) (quoting <u>Anderson v. Found. for Advancement, Educ. & Employment of Am. Indians</u>, 155 F.3d 500, 504 (4th Cir. 1998)).

First, bad faith. Ford argues that Fyie made robust disclosures and that non-compliance, if any, was an honest mistake and thus cannot be bad faith. ECF No. 577, 33 (citing <u>Samsung Elec. Co., Ltd. v. Nvidia Corp.</u>, 314 F.R.D. 190, 200-201 (E.D. Va. 2016)). Plaintiffs argue that the conduct is a flagrant violation of clear rules. They are right on that point. And, that is evidence that could point toward bad faith.

Plaintiffs also point out that Ford's counsel was present for Fyie's interviews with Ford employees, meaning that counsel had actual knowledge of what information Fyie received, that he considered and relied on it, that disclosure was required; and that such disclosure was not made. Plaintiffs then note that the Court has repeatedly admonished Ford for its overly-zealous discovery practices in this case and its attempts to reframe what is required of them. ECF No. 533, 11-13. All this, say the Plaintiffs, warrants a finding of bad faith.

A finding of bad faith is a most serious one. Here, it is clear that Fyie and Ford should have known that disclosure of the fact of the employee interviews and their content (the notes) was

required. And, there is evidence that the particular method has been used by Fyie and Ford in other cases. That is evidence that shows a seriously flawed view of the applicable rules and the exercise of poor judgment. But, at its core, bad faith is a matter of intent. So, the Court must find substantial evidence of intent to make a finding of bad faith. Considered as a whole, this record does not support a finding of bad faith. It is true that the Court has found fault with some of Ford's overly-zealous discovery conduct. But, overly-zealous practice is not bad faith. And, it is true that what happened here reflects a seriously flawed view of the rules and bad judgment. But, neither of those is bad faith.

Second, prejudice. Ford claims that there is no prejudice to the Plaintiffs. ECF No. 577, 34. However, the prejudice here is quite clear. Plaintiffs cannot reconstruct which parts of Fyie's reports come from his interviews. Even Fyie cannot recall exactly what he relied on from whom or where in his reports. While Ford argues that depositions can cure the prejudice, it defies logic and experience to believe that the eight Ford witnesses, Fyie, or counsel for Defendants ever could reconstruct what happened in interviews from years ago of which there is no record. And, as explained previously, there are serious prejudices related to both the trial and the certification process. The bottom line is that

31

the violations seriously, adversely affect the Plaintiffs' ability to test Fyie's opinions.

Third, deterrence. The rules are clear. The violations are clear. Courts cannot tolerate the clear violation of clear rules. Certainly not where, as here, the obfuscating method frustrates the objects of the rules.

Fourth, whether a less drastic sanction (than exclusion) would be effective. A possible lesser sanction would be to exclude the parts of Fyie's opinions and report that relate to the topics which he discussed with Ford employees.[6] But, it is unclear from the report which paragraphs relate to which opinions, if any. And, there is no way to assess the extent to which those opinions play a role in Fyie's ultimate opinions. Nor is it possible to know how any of Fyie's ultimate opinions emanate from the undisclosed interviews and the undisclosed facts and data that were discussed therein.

---

[6] Those topics include: contamination sensitivity (ECF No. 533-3, 11); CDF sleeve and R2S3 surface finish (id. at 15); sharing testing information with GM, the CIDAS solenoids, the ITC torque converter, and the transmission launch timing (id. at 20-21); dynamic seals and seal performance (id. at 30-32); shift scheduling (id. at 33-34); AVL process and metrics (id. at 36); the URD process and torque base control software (id. at 42); single step shifting, broken idler teeth, and pump gear noise (id. at 44); air bleeds (id. at 45); and three clutch rotating module and dynamic seals (id. at 46).

On this record, no sanction short of excluding Fyie's testimony can reasonably be expected to produce a result that the violated rules sought to achieve or that would be fair to the Plaintiffs. Therefore, exclusion, albeit bitter medicine, is called for.[7]

## CONCLUSION

For the foregoing reasons, PLAINTIFFS' RENEWED RULE 37(C)(1) MOTION TO EXCLUDE MATTHEW FYIE'S EXPERT REPORTS AND TESTIMONY (ECF No. 531) will be granted and neither Matthew Fyie's reports nor his testimony will be considered in the class certification phase of the case.

It is so ORDERED.

/s/ _ReP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May 5, 2026

---

[7] However, considering the posture of the case, that stiff medicine can be ameliorated by allowing Ford to obtain the services of a different defect expert for the merits of the case if a class is certified or if the case is tried as a non-class action.

33