IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JAMES DOLAN, et al.,
Individually and on behalf
of all others similarly situated,

    Plaintiffs,

v.                            Civil Action No. 3:23cv512

FORD MOTOR COMPANY,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on FORD MOTOR COMPANY'S RENEWED MOTION TO EXCLUDE THE TESTIMONY OF JÜRGEN GREINER (the "MOTION") (ECF No. 542), the supporting, opposing, and reply memoranda (ECF Nos. 543, 583, and 592, respectively); and the argument of counsel. For the reasons set forth below, the MOTION (ECF No. 542) will be denied.

## I. FACTUAL BACKGROUND

On October 25, 2018, Plaintiff James Dolan purchased a new 2018 Ford F-150 with a 10R80 10-speed automatic transmission (the "Dolan Vehicle") from a Ford dealership in Richmond, Virginia. REVISED SECOND AMENDED CLASS ACTION COMPLAINT (ECF No. 560) ("Compl.") ¶ 120. The Dolan Vehicle came with a Monroney sticker which included a "Warranty" stating "3 YR/36,000 BUMPER TO BUMPER" "5 YR/60,000 POWERTRAIN." Compl. ¶¶ 169, 172.

Within the first year, Dolan began to notice harsh shifting while driving the Dolan Vehicle. Compl. ¶ 124. Dolan scheduled a service appointment on October 14, 2019, but his concerns were ignored. Compl. ¶ 124. He scheduled a service appointment with Richmond Ford on October 14, 2019, but afterwards, the harsh shifting and gear engagement failures continued to occur. Compl. ¶¶ 125, 128-29. Two years later, on October 14, 2021, Dolan returned to Richmond Ford for service and repairs and expressed his concerns about the harsh shifting he had been experiencing. Compl. ¶ 129. Yet, the problem persisted. So, in September 2022, Dolan visited Richmond Ford a third time. Compl. ¶ 130. This time Ford made repairs which ameliorated some of the shifting problems, but the gear engagement failures continued on a regular basis. Compl. ¶ 135.

On September 13, 2020, Plaintiff Morris purchased a new 2020 Ford Expedition with a 10R80 transmission ("Morris Vehicle") from an authorized Ford Dealership. Compl. ¶ 141.

Approximately a year after purchasing the Morris Vehicle, Morris noticed transmission issues. Compl. ¶ 145. In October 2023, Morris dropped his vehicle off at Purvis Ford for service, but there is no record of any service being conducted. Compl. ¶ 146. In January 2024, Morris notified Purvis Ford he wanted an appointment for transmission service, and Purvis stated they would not take such appointments. Compl. ¶ 147. In February 2024, Morris

2

took his vehicle to Bayside Ford. Compl. ¶ 148. Bayside Ford failed to fix the problem, and Morris experienced the same transmission issues driving home from the dealership. Compl. ¶ 149-50.

On August 11, 2023, Dolan filed suit on behalf of himself and a Virginia class of consumers ("Class Members") against Ford Motor Company ("Ford") claiming that Ford knowingly designed, manufactured, distributed, advertised, marketed, sold, and/or leased vehicles from 2017 to the present with defective 10R80, 10-speed automatic transmissions. ¶¶ 12, 14. The design defect allegedly causes some vehicles equipped with the 10R80 transmission (the "Class Vehicles") to shift harshly and erratically, resulting in jerking, lunging, clunking, hesitating, or slipping between gears. Compl. ¶¶ 14-15, 43.

The Complaint also alleges that the vehicles with the defective transmission are unreasonably dangerous and that Ford should have promptly disclosed and remedied the defect, but it did neither. Compl. ¶¶ 17-18, 81. Instead, Ford chose not to disclose, and misrepresented the safety, performance, and reliability of the 10R80 Transmission. Compl. ¶¶ 28, 42, 81. Moreover, says the Complaint, Ford refused to repair or replace the defective transmissions, instead stating to customers that the abrupt shifting is "normal," and at most, reprogramming the Powertrain or Transmission Control Modules to default settings. Compl. ¶¶ 83, 85.

3

The Complaint sets out four counts. Count I alleges a breach of express warranty (Va. Code Ann. § 8.2-313). Count II alleges a breach of the implied warranty of merchantability (Va. Code Ann. § 8.2-314). Count III alleges fraud in the inducement by omission under Virginia common law. Count IV alleges violations of the Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196, et seq.).

Ford moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). ECF No. 492. That motion was denied (ECF Nos. 618 and 619), and the case is now in the class certification phase.

As required, the parties have designated expert witnesses, submitted expert reports, and deposed the expert witnesses. The plaintiffs identified Dr.-Ing. Jürgen Greiner ("Dr. Greiner") as their expert on the central feature of their claims: the defective 10R80 transmission. Dr. Greiner has submitted an opening and rebuttal report that addresses the defective nature of the 10R80 Transmission. The opening report is ECF No. 543-1 which is a 114 page report with four attached appendices. The rebuttal report is ECF No. 543-3. It is 27 pages. The MOTION constitutes Ford's effort to exclude Dr. Greiner's testimony.

Dr. Greiner's opening report contains a number of opinions explaining why the 10R80 Transmission is defective. The bottom-line opinions are set forth in several places of the opening report. First, the Executive Summary (ECF No. 543-1, 9-15); then

4

Section 5 (Root Causes of Complaints: Architecture and Components, 63-66); and finally, Section 7 (Conclusion, 114). The support for, and the explanation of, those opinions are then presented in detail in the body of the report. In sum, Dr. Greiner's report identifies both architectural defects in the design and composition of the transmission as well as defective component parts in it. And, the opening report explains how the component defects operate to worsen the effects of each architectural defect. A good summary of Dr. Greiner's views is expressed in the Conclusion of the Executive Summary:

> The mechanical condition of Ford's 10R transmission system is of unsatisfactory quality and defective primarily due to the design architecture, but also component-related issues. Software controls and Calibration are inadequate in itself and unable to overcome or compensate the mechanical deficiencies.

ECF No. 543-1, 15. That same articulation appears in the Conclusion of the report Id. at 114.

In the MOTION, Ford makes the following challenges to Dr. Greiner's testimony :

- Dr. Greiner's theories are unsupported by any industry standard or inspection or testing of any of the class vehicles (ECF No. 543, p. (i), II.A)

- Dr. Greiner's flawed methodology (Id., p. (i), II.B)

- Dr. Greiner's opinions are not based on sufficient facts or

5

data (Id., p. (i), II.C)

- Dr. Greiner's opinions rely on impermissible state of mind testimony (Id., p. (i), III)

- Dr. Greiner's opinions about vehicle safety are inadmissible (Id., p. (i), IV)

## II.  APPLICABLE LAW AND ANALYTICAL FRAMEWORK

Resolution of any question respecting the admissibility of expert testimony begins with the text of Fed. R. Evid. 702.  As originally promulgated, Rule 702 provided that:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Daubert v. Merrell Dow Pharmas., Inc., 509 U.S. 579, 588 (1993). The rule remained unchanged until 2000 when it was amended to reflect the decisions in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).

Rule 702 was amended again in 2023.  The 2000 version, as amended by the 2023 amendments, is set out below: the text added in 2023 being reflected in highlight, and the text deleted in 2023 being reflected by interlineation.

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in

6

the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

> (d) the ~~expert has reliably applied~~ expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Because the 2000 iteration of Rule 702 was intended to reflect the decisions in Daubert and Kumho, and because those decisions are the guideposts for assessing the admissibility of expert testimony, it is appropriate briefly to recall those decisions. In Daubert, the Supreme Court considered the original version of Rule 702[1] and made clear that, "under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. (emphasis

---

[1] If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. Daubert at 588.

added).[2] The Supreme Court identified the "primary locus of this obligation" to be Rule 702, id., and then cited Fed. R. Evid. 402, as the baseline for admitting evidence: "All relevant evidence is admissible. . . . Daubert, 509 U.S. at 587. Then, Daubert reminded that Fed. R. Evid. 401 defined relevant evidence "as that which has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" Id. But, as to expert testimony, Daubert added that Rule 702 also required that, to be relevant, expert evidence had to "assist the trier of fact to understand the evidence or to determine a fact in issue" (instructing that "[t]his condition goes primarily to relevance"). Id. at 591 (emphasis added).

"An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Id. (quoting United States v. Downing, 753 F.2d 1224, 1242 (3rd Cir. 1985)) (emphasis added). Daubert explained that "consideration has been aptly described by Judge Becker as one of 'fit'" and instructing that the word "'[f]it' is not always obvious, and scientific validity

---

[2] Daubert, of course, was limited to the "scientific" context because that was the nature of the expertise at issue in that case. 509 U.S. at 590, n. 8.

for one purpose is not necessarily scientific validity for other, unrelated purposes." Id. (citations omitted) (emphasis added).

Turning to Rule 702's reliability component, the Supreme Court in Daubert explained that "the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." Id. at 590 (emphasis added). "The adjective 'scientific' implies a grounding in the methods and procedures of science . . . [and] the word 'knowledge' connotes more than subjective belief or unsupported speculation." Id. And, knowledge "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truth on good grounds." Id. But, knowledge to a certainty is not required. Id. These requisites establish "a standard of evidentiary reliability." Id.

Most importantly, Daubert tasks district courts with a "gatekeeping responsibility:" the duty to assure that the expert testimony is both relevant and reliable. Recognizing that it was asking district judges to undertake an often difficult kind of review, the Supreme Court explained that a number of factors would be involved in the gatekeeping task. In so doing, the Supreme Court did not provide a definitive checklist of those factors, but it did provide some general guidance. The first step is to determine whether the expert is testifying to "(1) scientific knowledge that (2) will assist the trier of fact to understand or

9

determine a fact in issue." Id. at 592.  That task requires a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592-93 (emphasis added).

The Supreme Court also identified, as a key factor in assessing admissibility, whether the particular scientific knowledge that is found to assist the trier of the fact "can be (and has been) tested." Id. at 593 (emphasis added). "Another pertinent consideration [was] whether the theory or technique has been subjected to peer review and publication." Id. (emphasis added). And, "the court ordinarily should consider the known or potential rate of error." Id. at 594 (emphasis added). Finally, the Supreme Court explained that the reliability assessment permits (but does not require) an "explicit identification of a relevant scientific community and an expressed determination of a particular degree of acceptance within that community." Id.[3]

Six years later came Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). Kumho required the Supreme Court "to decide how Daubert applies to the testimony of engineers and other experts who are not scientists." Id. at 141.  The Supreme Court granted

---

[3] Also, the Court explained that, the discharge of the gatekeeping function it had outlined for Rule 702 required the district courts to be mindful of other evidentiary rules such as Rules 703 and 706 as well as Rule 403. Id. at 595.

10

"certiorari in light of uncertainty among the lower courts about whether, or how, Daubert applies to expert testimony that might be characterized as based not upon 'scientific' knowledge, but rather upon 'technical' or 'other specialized' knowledge." Id. at 146-47. And, to begin, the Supreme Court instructed that it was the word "'knowledge,' not the words (like 'scientific') that modify that word [knowledge] that 'establishes a standard of evidentiary reliability.'" Id. at 147. And, with that in mind, the Supreme Court instructed that, where the "factual basis, data, principles, methods, or other application [of an expert's opinion testimony] are called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" Kumho, 526 U.S. at 149. To that end, the expert's testimony must "reflect[] . . . [the] specialized knowledge." Id.

So it was that, in Kumho, the Court held that "Daubert's general holding — setting forth the trial judge's general 'gatekeeping obligation' — applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge," including experience-based expert opinions. Id. at 141. Recognizing the difference between scientific and experience-based knowledge, the Supreme Court explained that "a trial court may consider one or more of the more specific factors that Daubert mentioned when doing so will help

11

determine that testimony's reliability," while instructing that "Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case." Id. (emphasis added).

Kumho also made clear that the gatekeeping function imposed by Daubert "is simply 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Benedict v. Hankook Tire Co., Ltd., 290 F. Supp. 3d 488, 496 (E.D. Va. 2018) (quoting Kumho, 526 U.S. at 152) (emphasis added). To ensure implementation of that instruction from Daubert and Kumho, the Fourth Circuit, in United States v. Wilson, 484 F.3d 267 (4th Cir. 2007), held that, when assessing experiential testimony, the gatekeeping function is to "require an experiential witness to 'explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." Id. at 274 (citation omitted).

Mindful of the Supreme Court's decisions in Daubert and Kumho, the Federal Rules of Evidence were amended in 2000 to provide that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if
>
> (a) the expert's scientific, technical, or other

12

> specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2000). The 2000 version of Rule 702 thus captured the essence of both Daubert and Kumho. However, "[d]espite the clear guidance provided by the 2000 amendments, many courts 'continued to apply significantly more lenient standards for expert testimony than Rule 702 permits."[4] "In a landmark 2015 article, Professor Bernstein and co-author Eric Lasker showed conclusively that many courts had not been applying Rule 702 as intended, or even as written." Behrens & Trask, supra at 44 (citing David E. Bernstein & Eric G. Lasker, Defending Daubert: It's Time to Amend Federal Rules of Evidence 702, 57 Wm. & Mary L. Rev. 1, 25-26 (2015)). A principal factor thought to be the source of the problem identified in the Bernstein and Lasker article was identified in a letter from the Chair of the Advisory

---

[4] Mark A. Behrens & Andrew J. Trask, Federal Rule of Evidence 702: A History and Guide to the 2023 Amendments Governing Expert Evidence, 12 Tex. A&M L. Rev. 43, 44 (2024) (citing David E. Bernstein, The Misbegotten Judicial Resistance to the Daubert Revolution, 89 Notre Dame L. Rev. 27, 30 (2013)).

Committee on Evidence Rules.  In particular, in a memorandum to the Committee on Rules of Practice and Procedure, the Chair stated as follows:

> [M]any courts have declared that the reliability requirements set forth in Rule 702(b) and (d)—that the expert has relied on sufficient facts or data and has reliably applied a reliable methodology—are questions of weight and not admissibility, and more broadly that expert testimony is presumed to be admissible.  These statements misstate Rule 702, because its admissibility requirements must be established to a court by a preponderance of the evidence.  The Committee concluded that in a fair number of cases, the courts have found expert testimony admissible even though the proponent has not satisfied the Rule 702(b) and (d) requirements by a preponderance of the evidence—essentially treating these questions as ones of weight rather than admissibility, which is contrary to the Supreme Court's holdings that Rule 104(a), admissibility requirements are to be determined by court under the preponderance standard.

Behrens & Trask, supra at 45 (citations omitted) (emphasis added).

The 2023 version of Rule 702 was enacted to address those problems.

In particular, the amended Rule [2023 version] is intended to:

> (1) "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule" and (2) "emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology."

Behrens & Trask, supra at 47-48 (emphasis added) (citation

14

omitted).

The analysis of Ford's objections to Dr. Greiner's testimony is guided by the foregoing fundamental principles that regulate the admissibility of expert testimony and that govern the applicability of Rule 702.

### A.    Ford's Generalized Attack On Dr. Greiner's Opinions

Ford mounts generalized attacks on Dr. Greiner's "defect theories" and "opinions." However, Ford's arguments are difficult to follow for the related reason that they make points rather randomly without linking the point to identified opinions. Having sorted through Ford's somewhat difficult to follow positions, the Court construes Ford's objections to be addressed both to the bottom-line opinions offered by Dr. Greiner respecting how and why the 10R80 transmission is defective and to those opinions that support those bottom-line opinions. That is, Ford's objections are, indeed, a broad-side attack on most everything Dr. Greiner has to say.

Ford's generalized attack rather much ignores the detailed articulation given by Dr. Greiner to explain the views he expresses about the defective architecture of the 10R80 transmission, about the defective components, and about the relationship between the two and how that further explains the defective transmission. That is particularly significant in resolving the MOTION because Dr.

Greiner's opening report (to which most of Ford's attack is directed) offers thoroughly documented and well-explained opinions. Dr. Greiner's rebuttal report likewise is careful to explain the reasons for the underlying opinions and how and why he arrived at them, and the application of the "how and why" to the facts.

With that in mind, and instructed by the applicable analytical framework, the analysis now turns to Ford's several contentions seeking to foreclose Dr. Greiner's testimony.

## B.    Dr. Greiner's Background And Experience

Ford does not challenge Dr. Greiner's qualifications. It is nonetheless helpful to review them because they assist in understanding how and why his experience relates to the assessment of the relevance and reliability of his opinions.

The assessment of Dr. Geiner's knowledge and opinions begins with an understanding of the education, and experience from which comes the knowledge expressed in his opinions. Dr. Greiner has undergraduate and graduate degrees in mechanical engineering. ECF No. 543-1, 16. He bases his opinions on that education and on the extensive knowledge acquired, and the many analyses undertaken, during his lengthy experience in the development, testing, and manufacture of transmissions. That experience included service over 14 years as a Design Engineer, then Manager of the Basic

16

Transmission Analysis Team, then Senior Manager for Transmission Series Production Development, then Director of Development of Passenger Car Transmissions and Powertrains, all at Daimler AG, the manufacturer of Maybach, Mercedes-Benz, Smart, Jeep, Dodge and Chrysler vehicles. Id. at 17. Thereafter, Dr. Greiner was Vice-President of Transmission Systems for Luk GmbH & Co oHG, a subsidiary of one of the biggest automotive component suppliers in Germany, where he was responsible for the development and the manufacture of the clutch and actuation system for a dry DCT system and seeing that system into production. Id. at 18. From September 2007 to December 2017, Dr. Greiner worked with ZF Friedrichshafen AG, the third largest automotive component supplier in Germany, where he served as Vice-President/Head of Engineering and Executive Vice President/Head of Development (Passenger Car Driveline Technology) and was responsible for the production and development of manual and automated transmission technologies. Id. Since 2018, Dr. Greiner has operated a consulting company providing services, inter alia, for suppliers of transmissions and transmission components. Id. at 18-19. He also has served as an expert witness another lawsuit. Id. at 126.

   C.   Ford's Objections II.A And II.B

   Ford's first three objections to Dr. Greiner's opening report and testimony fall under the general heading: "Dr. Greiner's

17

Theories Are Unreliable and Irrelevant." ECF No. 543, 10. The first component of that broad contention is that "Dr. Greiner's Theories Are Unsupported By Any Industry Standard Or Inspection Or Testing Of Any Of The Class Vehicles." ECF No. 543, II.A, 11-14. The second, and integrally related, component is "Dr. Greiner's Flawed Methodology." ECF No. 543, II.B, 14-16.

To make its point on the first component (no industry standard, no testing), Ford argues that Dr. Greiner's opinions are based solely "on personal standards that he supposedly developed and applied during his work in Germany for a German OEM." ECF No. 543, 11 (citing ECF. No. 543-1, 42). That, however, misstates the record.

To evaluate the 10R80 transmission, Dr. Greiner applied an evaluative process that was developed, refined, and used over a period of 20 years to assure the satisfactory design, development, and manufacture of transmissions by an automobile manufacturer, Daimler AG (maker of Maybach, Mercedez-Benz, Smart, Jeep, Dodge and Chrysler) and, thereafter, by two, large, independent manufacturers of transmissions and their components. ECF No. 543-1, 16-18. The record shows that Dr. Greiner used the same level of intellectual rigor when employing that process to evaluate the 10R80 transmission that characterized its use in the commercial design, development and manufacture of transmissions and their components over two decades. Ford really does not say otherwise.

18

Instead, Ford finds fault in the fact that the evaluation system used here was developed by Dr. Greiner and his team(s).[5] Ford cites no authority that would foreclose use of an evaluative system actually used in design, development and manufacturing settings for two decades because an expert witness was one of the designers of the evaluative system.

Instead, Ford fastens this component of its reliability argument on the fact that Dr. Greiner did not personally test the 10R80 transmission in the Class Vehicles. And, that is true: he did not. Instead, Dr. Greiner relied on the analyses and testing of the 10R80 transmission done by Ford's own engineers as reflected in Ford's own documents. In fact, there is no opinion tendered by Dr. Greiner that does not find some support in analyses previously made, or testing previously done, by Ford's own engineers, or (most often, and), in documents created by knowledgeable Ford engineers and executives.

So Ford is wrong to say that Dr. Greiner's opinions are not based on testing. And, Ford cites no authority that forecloses the ability of an expert witness to rely on testing done by others, much less testing done by the defendant's own personnel and reflected in its own documents.

---

[5] In so doing, Ford ignores that Dr. Greiner and his team(s) developed and used those evaluative methods while employed by major manufacturers of transmissions and their components to assure that the end products were reliable and free of defect.

19

Lacking such authority, Ford turns to Belville v. Ford Motor Co., 919 F.3d 224 (4th Cir. 2019) for the proposition that testing of a defect theory is required to permit an expert to testify as to the defect. ECF No. 543, 12 (citing Belville, 919 F.3d at 234). Ford correctly notes that Belville affirmed a district court's exclusion of expert testimony as to the existence of a defect because the expert did no testing to confirm that the electronic throttle control defect would cause the unintended acceleration and disclaimed any finding of causation. Id. at 234-35. But, there is nothing in Belville to suggest that the experts considered testing done by the vehicle manufacturer. Here, Dr. Greiner relied in part on his review of the mechanical systems, and design documents, and in part on Ford's own testing of its transmission and Ford's own analyses of the testing it had done. While testing is important to support the opinions of engineering experts, Dr. Greiner need not have reinvented the wheel by conducting his own testing.  He was entitled to rely on what Ford had already done.

Ford also cites Peters-Martin v. Navistar International Transportation Corp., 410 F. App'x 612 (4th Cir. 2011) to support its proposition that testing is necessary. Peters-Martin is unhelpful for the same reasons that Belville is. In Peters-Martin, the Court of Appeals found that there was a lack of factual basis for the expert's opinion where the expert relied on no testing, research, or specific evidence. Id. at 621. Here, Dr. Greiner cites

20

extensive testing on which he relied.  True, Dr. Greiner did not personally conduct the testing, but, as explained above, that is not a requirement.  See Milazzo v. Elite Contracting Grp., Inc., Civil Action No. 1:19-cv-1067, 2022 WL 479900, at *4 (E.D. Va. Jan. 14, 2022).

Having concluded that Ford's objection to the relevance and reliability of Dr. Greiner's opinion based on the assertion that his methodology is flawed, and not supported by an industry standard or testing (Objections II.A and II.B) is without merit, the Court finds that the relevance and reliability standards of Rule 702 are met fully by a preponderance of the evidence.  Dr. Greiner assessed whether the 10R80 transmission was defective by using an assessment method that has been used for more than 20 years to assess the development, design, manufacture, and operation of automatic transmissions.  It has been used by a respected automobile manufacturer and by two large transmission component manufacturers to assure the proper design, development, manufacture, and operation of automatic transmissions in real world settings.  In other words, the method was developed and used over time and has been accepted where it counts most.  Although the approach has not been specifically designated as an industry standard, it has been effectively used for many years across the transmission industry.  So, the absence of a formal designation as

21

an industry standard does not in any way detract from its relevance or reliability.

And, contrary to Ford's rather disingenuous view, Dr. Greiner's opinions are grounded in part on testing and analyses: testing and analyses done by Ford itself. Thus, the fact that Dr. Greiner did not perform testing does not affect the reliability or relevance of Dr. Greiner's method or his opinions. Ford does not say that its own testing analyses lack relevance and reliability. Nor does it lie in Ford's mouth to utter such assertions considering that it used that testing and analyses as part of its own efforts to address the harsh shifting issues.

For the reasons set forth above, Ford's Objections II.A & B are without merit. Therefore, they do not detract from the relevance or reliability of Dr. Greiner's opinions. They are overruled.

D.    Ford's Objection II.C

Ford's third objection to Dr. Greiner's opinions is that they "Are Not Based On Sufficient Facts Or Data." ECF No. 543, 17-25. The grounds for that assertion meander over seven pages and is rather hard to follow largely because it does not specify what facts or data are thought to be insufficient as to any particular opinion that Dr. Greiner gave or in what report the deficiency appears. As best as can be discerned there are five points.

22

First, Ford seems to find insufficiency of facts or data by pointing to all the Ford documents that were examined by Dr. Greiner and arguing that those documents were "cherry-picked." ECF No. 543, 17-18. That is said to be so because, in Ford's view, Dr. Greiner acknowledged that he reviewed only documents selected by Plaintiffs' counsel. That, however, does not accurately depict the record. True, Dr. Greiner explained that he did not review all of the several million pages of documents produced by Ford. Rather, he worked with Plaintiffs' counsel by instructing counsel to secure the kind of documents that Dr. Greiner identified as pertinent to the analysis he was to make. Dr. Greiner then determined which of the retrieved documents to use in his reports. ECF No. 543-2, 9. He provided a 31-page list of the documents on which he relied and which he reviewed and considered. ECF No. 543-1, 128-158; ECF No. 583, 22.

The decisions on which Ford relies for its "cherry-picking" argument do not apply to the facts here. ECF No. 543, 18-19. In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II) MDL 2502, 892 F.3d 624, 634 (4th Cir. 2018) (describing expert's choice to exclude from his report a test he conducted because it showed a non-statistically significant finding in favor of a test with a significant finding as "cherry-picking"); Alford v. The NFL Player Disability & Survivor Benefit Plan, Civil Action No. JRR-23-358, 2025 WL 3274428, at *9 (D. Md.

Nov. 24, 2025) (cherry-picking where expert "acknowledge[d] that his analysis was driven by his desire to illustrate a particular point and that he did so because it was supportive of Plaintiffs' claims."). Dr. Greiner's reliance on Plaintiffs' counsel to help him locate, out of the millions of pages of documents produced, documents addressing topics that he himself had specified is not the results-based analysis discussed in Lipitor or Alford.

Second, Ford asserts "insufficiency" because the warranty claims information on which Dr. Greiner relies is assertedly beyond his expertise. ECF No. 543, 19-21. To the extent that this objection involves Dr. Greiner's rebuttal to Mr. Fyie's report, it is no longer pertinent. That is because Mr. Fyie's report has been excluded. ECF Nos. 643 and 644.

Apart from responding to Mr. Fyie, Dr. Greiner did consider warranty claim data in forming his defective transmission opinions. ECF No. 543-1, Section 4, 47-59.[6] Thus, in Section 4, Dr. Greiner says that he considered so-called "Field Data" in arriving at his opinion that the 10R80 transmission was defective. ECF No. 543-1, 47-62. One type of Field Data is Warranty Repair Data. Id. at 47.[7] Ford objects to Dr. Greiner's opinion as to the

---

[6] He also considered warranty claim data in rebuttal of the opinions of Dr. Nathan Soderborg, Ford's warranty analysis expert. ECF No. 543-3, 17-27.

[7] There are four other types of data: TGW reports, NHTSA reports, articles, and customer information in their reports and depositions. These are not at issue in this aspect of Ford's

24

import of the warranty Rate Data because Dr. Greiner is not an expert in the field of "data analytics." ECF No. 543, 19. That contention misses the mark, however, because Dr. Greiner actually has experience in examining the Warranty Repair Data as part of the previously described method used to evaluate transmission design, development, manufacture, and performance. So, contrary to Ford's view, he can explain how that kind of data is regularly used in evaluating the design, development, manufacture, and performance of transmission.[8]

Relatedly, Ford also says that Dr. Greiner's views on Warranty Repair Data is "flawed" because he does not know "Ford's warranty policies." ECF No. 543, 19-20. However, Ford does not explain why that knowledge deficit would foreclose Dr. Greiner's testimony that the 10R80 transmission is defective. Nor does Ford cite authority for this aspect of its objection. And, contrary to what Ford says, Dr. Greiner does recite experience in considering Warranty Repair Data in evaluating the design, development, manufacture, and performance of transmission. So, Ford is wrong to say that the topic is beyond Dr. Greiner's experiential expert competence.

Third, Ford makes an objection because Dr. Greiner cited

---

Objection II.C.

[8] There may be limits to what Dr. Greiner can say but those are not presented by the MOTION.

25

Wikipedia in his report. ECF No. 543, 21. Dr. Greiner's report does cite Wikipedia, pointing to a picture of an automatic transmission for illustrative purposes: to illustrate "speed and torque," and to illustrate a so-called "bath-tub curve." This aspect of objection II.C is just frivolous. The Wikipedia citations are for illustrative purposes. They play no substantive role in Dr. Greiner's opinions.

Fourth, Ford finds insufficiency because, in its view, Dr. Greiner "ignores evidence of other causes for a harsh shift." ECF No. 543, 21-23. That argument fails because Dr. Greiner, in fact, does discuss at length how problems with components can affect the architectural defect that is the root cause of the defective 10R80 transmission and how remedy of defective component deficits do not remedy the root cause. E.g., ECF No. 543-1, 10, 64, 69. As part of this argument, Ford asserts that Dr. Greiner ignored a JD power study. However, Dr. Greiner actually considered the JD power data ECF No. 583-3, 52-56. He did not give it any weight but that does not mean that he ignored it.

Fifth, according to Ford, Dr. Greiner's opinion also lacks sufficient factual support because his opinion as to the commonality of the defect is based on his analysis of documents pertaining only to the F-150. Relatedly, then, Ford argues that, because Dr. Greiner did not consider materials from other models of cars that used the 10R80 transmission, his opinion lacks

26

sufficient factual and data bases.  That, of course, ignores the fundamental fact (which is clearly established by Dr. Greiner and not disputed by Ford) that the 10R80 transmission is the same transmission no matter the model of vehicle into which it is installed.  Its architectural and component defects remain the same no matter the vehicle into which the transmission is installed.  Dr. Greiner clearly has opined that the defective 10R80 transmission is fundamental and inherent to the transmission itself and that none of the differences in the Class Vehicles alter that fact, even if the size, shape or weight of the vehicle may alter the severity of the manifestation of the fundamental and inherent faults in the transmission. ECF No. 556-9, 4-5.  That is clear from assessing the entirety of Dr. Greiner's report.

For the foregoing reasons, Ford's Objection II.C lacks merit.

E.    Ford's Objection III: State of Mind Testimony

In this objection, Ford specifies several opinions that, in its view, constitute testimony about Ford's "motive, intent, or state of mind."  ECF No. 543, 25-26.  First, Ford challenges the statement that "Ford uses [TSBs] to deny the 'existence of the 10R transmission defect.'"  Id. at 25. Second, Ford argues that Greiner's statement that Ford "green-lit production of the F-150 despite receiving information about wear and tear issues with certain components . . . impermissibly implying that Ford acted

27

improperly." Id. at 26. Finally, Ford challenges the statement that "Ford underestimated the totality of contamination and supplier problems by continuing their fix-on-fail strategy for a lengthy period of time." Id.

It is correct that experts may not testify to a corporation's state of mind. See, e.g., Zp No. 332, LLC v. Huffman Contractors, Inc., Civil Action No. 2:24-cv-611, 2025 WL 3174929, at *9 (E.D. Va. Nov. 13, 2025). However, none of the three statements of which Ford complains are impermissible state of mind evidence. They state facts about what information was available to Ford respecting the 10R80 transmission, what Ford stated about the transmission, and the actions that Ford took.

For the foregoing reasons, Ford's Objection III lacks merit.

## F.   Ford's Objection IV

Here, Ford objects to Dr. Greiner's opinion about vehicle safety. ECF No. 543, 26-27. Those opinions, says Ford, are ipse dixit. Ford also objects to Dr. Greiner's statement that "shifting issues may cause drivers to feel scar[ed]." Id. at 27.

Contrary to Ford's view, the opinions on causing accidents and driver reaction to harsh shifting are based on Dr. Greiner's experience.   But neither side has adequately addressed the admissibility of Dr. Greiner's statements.   Therefore, Ford's objection IV will be overruled without prejudice to renewing it if

28

counsel can locate a legitimate basis for it.

## CONCLUSION

For the foregoing reasons, Ford's objections to Dr. Greiner's testimony lack merit. But that is not the end of the matter because, to exercise its gatekeeping function, the Court cannot admit expert testimony unless it finds that the proponent of the expert evidence has demonstrated that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Having studied Dr. Greiner's report, the MOTION, and the supporting, opposing, and reply memoranda, and having heard the argument of counsel, the Court finds that the Plaintiffs have established that it is more likely than not that:

(a) Dr. Greiner's proposed opinions will help the finder of the fact to understand the evidence and to determine facts in issue; and

29

(b) Dr. Greiner's proposed opinions are based on sufficient facts or data; and

(c) Dr. Greiner's proposed opinions are the product of reliable principles and methods; and

(d) Dr. Greiner's proposed opinions reflect a reliable application of the principles and methods to the facts of the case.

The requirements of Rule 702 having been satisfied, FORD MOTOR COMPANY'S RENEWED MOTION TO EXCLUDE THE TESTIMONY OF JÜRGEN GREINER (ECF No. 542) will be denied.

It is so ORDERED.

_____ /s/ _REP___

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: June _17_, 2026