**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

JAMES DOLAN, et al.,
Individually and on behalf
of all others similarly situated,

Plaintiffs,

v. Civil Action No. 3:23-cv-512

FORD MOTOR COMPANY,

Defendant.

**MEMORANDUM OPINION**

This matter is before the Court on FORD MOTOR COMPANY'S RENEWED MOTION TO EXCLUDE THE TESTIMONY OF STEVEN GASKIN (the "GASKIN MOTION") (ECF No. 544), the supporting, opposing, and reply memoranda (ECF Nos. 545, 572, and 593, respectively); FORD MOTOR COMPANY'S RENEWED MOTION TO EXCLUDE THE TESTIMONY OF COLIN WEIR (the "WEIR MOTION") (ECF No. 535), the supporting, opposing, and reply memoranda (ECF Nos. 536, 566, and 590, respectively); and the argument of counsel. For the reasons set forth below, the GASKIN MOTION and the WEIR MOTION (ECF Nos. 544, 535, respectively) will be denied.

## I. FACTUAL BACKGROUND

On October 25, 2018, Plaintiff James Dolan purchased a new 2018 Ford F-150 with a 10R80 10-speed automatic transmission (the "Dolan Vehicle") from a Ford dealership in Richmond, Virginia.

REVISED SECOND AMENDED CLASS ACTION COMPLAINT (ECF No. 560) ("JAC") ¶ 120. The Dolan Vehicle came with a "Monroney sticker" which included a "Warranty" stating "3 YR/36,000 BUMPER TO BUMPER" "5 YR/60,000 POWERTRAIN." JAC ¶¶ 169, 172.

Within the first year, Dolan began to notice harsh shifting while driving. JAC ¶ 124. Dolan scheduled a service appointment on October 14, 2019, but his concerns were ignored. JAC ¶ 124. He scheduled a service appointment with Richmond Ford on October 14, 2019, but after he retrieved the car, the harsh shifting and gear engagement failures continued to occur. JAC ¶¶ 125, 128-29. Two years later, on October 14, 2021, Dolan returned to Richmond Ford for service and repairs and expressed his concerns about the harsh shifting that he had been experiencing. JAC ¶ 129. Yet, the problem persisted. So, in September 2022, Dolan visited Richmond Ford a third time. JAC ¶ 130. This time Ford made repairs which ameliorated some of the shifting problems, but the gear engagement failures continued on a regular basis. JAC ¶ 135.

On September 13, 2020, Plaintiff Morris purchased a new 2020 Ford Expedition with a 10R80 transmission ("Morris Vehicle") from an authorized Ford Dealership. JAC ¶ 141. Approximately a year after purchasing the Vehicle, Morris noticed transmission issues. JAC ¶ 145. In October 2023, Morris dropped his vehicle off at Purvis Ford for service, but there is no record of any service work having been conducted. JAC ¶ 146. In January 2024, Morris

notified Purvis Ford that he wanted an appointment for transmission service, and Purvis stated it could not then take such appointments. JAC ¶ 147. So, in February 2024, Morris took his vehicle to Bayside Ford. JAC ¶ 148. Bayside Ford failed to fix the problem, and Morris experienced the same transmission issues driving home from the dealership. JAC ¶ 149-50.

On August 11, 2023, Dolan filed suit on behalf of himself and a Virginia class of consumers ("Class Members") against Ford Motor Company ("Ford") claiming that Ford knowingly designed, manufactured, distributed, advertised, marketed, sold, and/or leased vehicles from 2017 to the present with defective 10R80, 10-speed automatic transmissions. ¶¶ 12, 14. The design defect allegedly causes some vehicles equipped with the 10R80 transmission (the "Class Vehicles") to shift harshly and erratically, resulting in jerking, lunging, clunking, hesitating, or slipping between gears. JAC ¶¶ 14-15, 43.

The Complaint also alleges that the vehicles with the defective transmission are unreasonably dangerous and that Ford should have promptly disclosed and remedied the defect, but it did neither. JAC ¶¶ 17-18, 81. Instead, Ford chose not to disclose, and misrepresented the safety, performance, and reliability of the 10R80 Transmission. JAC ¶¶ 28, 42, 81. Moreover, says the Complaint, Ford refused to repair or replace the defective transmissions, instead stating to customers that the abrupt

shifting is "normal," and at most, reprogramming the Powertrain or Transmission Control Modules to default settings. JAC ¶¶ 83, 85.

The Complaint sets out four counts. Count I alleges a breach of express warranty (Va. Code Ann. § 8.2-313). Count II alleges a breach of the implied warranty of merchantability (Va. Code Ann. § 8.2-314). Count III alleges fraud in the inducement by omission under Virginia common law. Count IV alleges violations of the Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196, et seq.).

Ford moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). ECF No. 492. That motion was denied (ECF Nos. 618 and 619), and the case is now in the class certification phase.

As required, the parties have designated expert witnesses, submitted expert reports, and deposed the expert witnesses. The Plaintiffs identified Steven P. Gaskin and Colin B. Weir as their damages experts. Together, Gaskin and Weir constructed a damages model using a conjoint based choice survey. Gaskin's Declaration is 31 pages plus attachments. Weir's Declaration is 17 pages plus attachments. The MOTION constitutes Ford's effort to exclude Gaskin and Weir's testimony.

Gaskin and Weir's reports propose a "choice-based conjoint analysis" to provide an overpayment damages calculation for the defective transmissions. ECF No. 545-1, ¶¶ 10-12; ECF No. 545-2, ¶¶ 13-15. Gaskin will conduct a choice-based conjoint survey and

use Hierarchical Bayes regression and a market simulation to calculate an overpayment percentage. ECF No. 545-1, ¶¶ 9, 16-26, 54. Weir will use Gaskin's overpayment percentage calculation to calculate overpayment damages. ECF No. 545-2, ¶ 58.

## II. APPLICABLE LAW AND ANALYTICAL FRAMEWORK

Resolution of any question respecting the admissibility of expert testimony begins with the text of Fed. R. Evid. 702. As originally promulgated, Rule 702 provided that:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Daubert v. Merrell Dow Pharmas., Inc., 509 U.S. 579, 588 (1993). The rule remained unchanged until 2000 when it was amended to reflect the decisions in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).

Rule 702 was amended again in 2023. The 2000 version, as amended by the 2023 amendments, is set out below: the text added in 2023 being reflected in highlight, and the text deleted in 2023 being reflected by interlineation.

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than

not:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the ~~expert has reliably applied~~ expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Because the 2000 iteration of Rule 702 was intended to reflect the decisions in Daubert and Kumho, and because those decisions are the guideposts for assessing the admissibility of expert testimony, it is appropriate briefly to recall them. In Daubert, the Supreme Court considered the original version of Rule 702[1] and made clear that, "under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. (emphasis added).[2] The Supreme Court identified the "primary locus of this obligation" to be Rule 702,

---

[1] "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Daubert at 588.

[2] Daubert, of course, was limited to the "scientific" context because that was the nature of the expertise at issue in that case. 509 U.S. at 590, n. 8.

id., and then noted that Fed. R. Evid. 402 is the baseline for admitting evidence: "All relevant evidence is admissible. . . . Daubert, 509 U.S. at 587. Then, Daubert reminded that Fed. R. Evid. 401 defined relevant evidence "as that which has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" Id. But, as to expert testimony, Daubert added that Rule 702 also required that, to be relevant, expert evidence had to "assist the trier of fact to understand the evidence or to determine a fact in issue" (instructing that "[t]his condition goes primarily to relevance"). Id. at 591 (emphasis added).

"An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Id. (quoting United States v. Downing, 753 F.2d 1224, 1242 (3rd Cir. 1985)) (emphasis added). Daubert explained that "consideration has been aptly described by Judge Becker as one of 'fit'" and instructing that the word "'[f]it' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." Id. (citations omitted) (emphasis added).

Turning to Rule 702's reliability component, the Supreme Court in Daubert explained that "the requirement that an expert's

testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." Id. at 590 (emphasis added). "The adjective 'scientific' implies a grounding in the methods and procedures of science . . . [and] the word 'knowledge' connotes more than subjective belief or unsupported speculation." Id. And, knowledge "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truth on good grounds." Id. But, knowledge to a certainty is not required. Id. These requisites establish "a standard of evidentiary reliability." Id.

Most importantly, Daubert tasks district courts with a "gatekeeping responsibility:" the duty to assure that the expert testimony is both relevant and reliable. Recognizing that it was asking district judges to undertake an often difficult kind of review, the Supreme Court explained that a number of factors would be involved in the gatekeeping task. In so doing, the Supreme Court did not provide a definitive checklist of those factors, but it did provide some general guidance. The first step is to determine whether the expert is testifying to "(1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Id. at 592. That task requires a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. at

592-93(emphasis added).

The Supreme Court also identified, as a key factor in assessing admissibility, whether the particular scientific knowledge that is found to assist the trier of the fact "can be (and has been) tested." Id. at 593 (emphasis added). "Another pertinent consideration [was] whether the theory or technique has been subjected to peer review and publication." Id. (emphasis added). And, "the court ordinarily should consider the known or potential rate of error." Id. at 594 (emphasis added). Finally, the Supreme Court explained that the reliability assessment permits (but does not require) an "explicit identification of a relevant scientific community and an expressed determination of a particular degree of acceptance within that community." Id.[3]

Six years later came Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). Kumho required the Supreme Court "to decide how Daubert applies to the testimony of engineers and other experts who are not scientists." Id. at 141. The Supreme Court granted "certiorari in light of uncertainty among the lower courts about whether, or how, Daubert applies to expert testimony that might be characterized as based not upon 'scientific' knowledge, but rather upon 'technical' or 'other specialized' knowledge." Id. at 146-

[3] Also, the Court explained that, the discharge of the gatekeeping function it had outlined for Rule 702 required the district courts to be mindful of other evidentiary rules such as Rules 703 and 706 as well as Rule 403. Id. at 595.

47. And, to begin, the Supreme Court instructed that it was the word "'knowledge,' not the words (like 'scientific') that modify that word [knowledge] that 'establishes a standard of evidentiary reliability.'" Id. at 147. And, with that in mind, the Supreme Court instructed that, where the "factual basis, data, principles, methods, or other application [of an expert's opinion testimony] are called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" Kumho, 526 U.S. at 149. To that end, the expert's testimony must "reflect[] . . . [the] specialized knowledge." Id.

So it was that, in Kumho, the Court held that "Daubert's general holding – setting forth the trial judge's general 'gatekeeping obligation' – applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge," including experience-based expert opinions. Id. at 141. Recognizing the difference between scientific and experience-based knowledge, the Supreme Court explained that "a trial court may consider one or more of the more specific factors that Daubert mentioned when doing so will help determine that testimony's reliability," while instructing that "Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case." Id. (emphasis added).

Kumho also made clear that the gatekeeping function imposed by Daubert "is simply 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Benedict v. Hankook Tire Co., Ltd., 290 F. Supp. 3d 488, 496 (E.D. Va. 2018) (quoting Kumho, 526 U.S. at 152) (emphasis added). To ensure implementation of that instruction from Daubert and Kumho, the Fourth Circuit, in United States v. Wilson, 484 F.3d 267 (4th Cir. 2007), held that, when assessing experiential testimony, the gatekeeping function is to "require an experiential witness to 'explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." Id. at 274 (emphasis added) (citation omitted).

Mindful of the Supreme Court's decisions in Daubert and Kumho, the Federal Rules of Evidence were amended in 2000 to provide that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable

> principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2000). The 2000 version of Rule 702 thus captured the essence of both Daubert and Kumho. However, "[d]espite the clear guidance provided by the 2000 amendments, many courts 'continued to apply significantly more lenient standards for expert testimony than Rule 702 permits."[4] "In a landmark 2015 article, Professor Bernstein and co-author Eric Lasker showed conclusively that many courts had not been applying Rule 702 as intended, or even as written." Behrens and Trask, supra at 44 (citing David E. Bernstein and Eric G. Lasker, Defending Daubert: It's Time to Amend Federal Rules of Evidence 702, 57 Wm. and Mary L. Rev. 1, 25-26 (2015)). A principal factor thought to be the source of the problem identified in the Bernstein and Lasker article was identified in a letter from the Chair of the Advisory Committee on Evidence Rules. In particular, in a memorandum to the Committee on Rules of Practice and Procedure, the Chair stated as follows:

> [M]any courts have declared that the reliability requirements set forth in Rule 702(b) and (d)—that the expert has relied on

[4] Mark A. Behrens & Andrew J. Trask, Federal Rule of Evidence 702: A History and Guide to the 2023 Amendments Governing Expert Evidence, 12 Tex. A&M L. Rev. 43, 44 (2024) (citing David E. Bernstein, The Misbegotten Judicial Resistance to the Daubert Revolution, 89 Notre Dame L. Rev. 27, 30 (2013)).

> sufficient facts or data and has reliably applied a reliable methodology—are questions of weight and not admissibility, and more broadly that expert testimony is presumed to be admissible. These statements misstate Rule 702, because its admissibility requirements must be established to a court by a preponderance of the evidence. The Committee concluded that in a fair number of cases, the courts have found expert testimony admissible even though the proponent has not satisfied the Rule 702(b) and (d) requirements by a preponderance of the evidence—essentially treating these questions as ones of weight rather than admissibility, which is contrary to the Supreme Court's holdings that Rule 104(a), admissibility requirements are to be determined by court under the preponderance standard.

Behrens and Trask, supra at 45 (citations omitted) (emphasis added). The 2023 version of Rule 702 was enacted to address those problems. In particular, the amended Rule [2023 version] is intended to:

> (1) "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule" and (2) "emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology."

Behrens and Trask, supra at 47-48 (emphasis added) (citation omitted).

The analysis of Ford's objections to Gaskin and Weir's testimony is guided by the foregoing fundamental principles that

regulate the admissibility of expert testimony and that govern the applicability of Rule 702.

## III. ANALYSIS

### 1. Common Arguments Relating to Both Gaskin and Weir

#### A. Gaskin and Weir sufficiently consider supply-side factors.

Ford first attacks Gaskin and Weir's opinions because, according to Ford, conjoint surveys measure "only the demand side of the supply-and-demand equation that determines prices" and assume the supply curve would remain static. ECF No. 545, 12. Therefore, says Ford, such a survey cannot reliably be used to determine market price. See Saavedra v. Eli Lilly and Co., No. 2:12-cv-9366, 2014 WL 7338930, at *3-4 (C.D. Cal. Dec. 18, 2014); In re Gen. Motors LLC Ignition Switch Litig., 407 F. Supp. 3d 212, 235-37 (S.D.N.Y. 2019); In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab. Litig., 500 F. Supp. 3d 940, 949 (N.D. Cal. Nov. 12, 2020); Mier v. CVS Health, No. 22-55665, 2023 WL 4837851, at *1 (9th Cir. July 28, 2023) (district court "reasonably concluded" the damages model did not properly account for market supply); Schechner v. Whirlpool Corp., Case No. 2:16-cv-12409, 2019 WL 4891192, at *7 (E.D. Mich. Aug. 13, 2019); In re Emerson Elec. Co. Wet/Dry Vac Mktg. and Sales Litig., 2021 WL 5003102, at *6 (E.D. Mo. Oct. 28, 2021).[5]

---

[5] Defendants also cite In re: Pella Corp. Architect & Designer

Ford's cases are largely distinguishable, and some, in fact, work to refute Ford's argument. In Saavedra, the court excluded an expert conjoint survey analysis in part because of the lack of supply-side consideration. 2014 WL 7338930, at *3-5. However, the court's conclusion also turned on the fact that the prescription drug market, the market at issue in that case, is "not an efficiently functioning market." Id. at *5. The court stated that, in a normal market, price is a proxy for value, and if the expert had tied his analysis to a normal market price that would "at least tether[] it to a functioning market and thus to the product's fair market value." Id. In other words, based on the analysis in Saavedra, Gaskin and Weir's analysis would be sufficiently tied to the market and to the value. Schechner, another of Ford's cases, also states that conjoint analysis can account for supply-side factors when the analysis uses actual prices and actual quantities sold during the class period. 2019 WL 4891192, at *7. Gaskin and Weir meet that requirement. ECF No. 545-1, ¶ 26; ECF No. 545-2, ¶ 59.

In re General Motors LLC also fails. In that case, the court found that the proposed conjoint survey did not consider the potential for the car manufacturer to lower prices in response to

---

Series Window Marketing Sales Practices and Products Liability Litigation, 214 F. Supp. 3d 478, 485-86 (D.S.C. 2016). In re Pella does not relate to conjoint analysis or consideration of supply-side factors. Id.

decreased demand. 407 F. Supp. 3d at 235-36. In re Volkswagen, relying on In re General Motors, similarly held that the conjoint survey there did not evaluate the same effect. 500 F. Supp. 3d at 949. Gaskin and Weir do undertake this analysis. ECF No. 545-2 ¶¶ 35-37 (indicating that their methodology considers the willingness of Ford to have changed prices in response to demand).

Finally, Mier does not hold much weight one way or the other. The court briefly mentions that the district court "reasonably concluded" that the conjoint analysis at issue did not consider supply-side factors. 2023 WL 4837851, at *2. As explained below, this Court concludes that Gaskin and Weir's report does consider those factors.

In response, Plaintiffs cite decisions from numerous courts which held that the same kind of conjoint survey analysis - also done by Gaskin and Weir - was sufficiently reliable for measuring overpayment damages to survive a Daubert challenge. Beaty v. Ford Motor Co., C17-5201, 2021 WL 3109661, at *4-5 (W.D. Wash. July 22, 2021) (holding that Ford's disagreements with Gaskin and Weir about how to consider supply-side considerations in their conjoint analysis go to weight not admissibility); Johnson v. Nissan N. Am., Inc., 2022 WL 2869528, at *7-8 (N.D. Cal. July 21, 2022); Cardenas v. Toyota Motor Corp. ("Cardenas I"), Case No. 18-cv-22798, 2021 WL 6926418, at *17-18 (S.D. Fla. Aug. 12, 2021); Cardenas v. Toyota Motor Corp. ("Cardenas II"), Case Number: 18-

22798-CIV, 2021 WL 5811741, at *3-5 (S.D. Fla. Dec. 6, 2021) (any concerns with whether Gaskin and Weir considered appropriate supply-side factors go to weight and not admissibility); Stevens v. Ford Motor Co., Civil Action No. 2:18-cv-00456, 2022 WL 19978265, at *12 (S.D. Tex. Sep. 29, 2022); Lessin v. Ford Motor Co., Case No.: 19-cv-01082 2024 WL 5007092, at *4-5 (S.D. Cal. Oct. 31, 2024). After the filing of these MOTIONS, and in conjunction with another expert dispute, Ford provided the Court with the decision in O'Connor v. Ford Motor Co. ("O'Connor I"), No. 19-cv-5045, 2026 WL 579329, at *7-8 (N.D. Ill. March 2, 2026). It supports the conclusion that Gaskin and Weir's testimony should not be excluded.

The decisions cited by Plaintiffs are persuasive. Ford's complaints with Gaskin and Weir's methodology are complaints with how the methodology accounts for supply-side considerations, not whether the methodology considers supply-side factors at all. Lessin, 2024 WL 5007092, at *4-5; O'Connor I, 2026 WL 579329, at *7-8. Ford is free to argue to the fact-finder that Gaskin and Weir are wrong as a matter of economics.

Ford spills a lot of ink arguing that the decisions cited by the Plaintiffs are inapposite because many pre-dated the 2023 Amendments to Rule 702 and improperly fail to consider the sufficiency of an expert's basis by couching the opponent's concerns in "weight not admissibility." ECF No. 593, 11. True, the

amendments clarify that the proponent of an expert must demonstrate reliability by a preponderance of the evidence. 2023 Advisory Committee Notes. The Advisory Committee Notes do indeed criticize some courts' reliance on "weight not admissibility" as a method to dodge assessing whether the expert's opinion is sufficiently reliable. And rightly so. However, the 2023 Advisory Committee Notes do not change the results here. As the Committee Notes clarify, the standard to be assessed is not one of correctness, but of reliability. Ford's criticisms of Gaskin's work go to whether his opinion is correct, not to whether his method is reliable. Therefore, those criticisms do not undermine the finding that Plaintiffs have demonstrated the admissibility of Gaskin and Weir's testimony by a preponderance of the evidence.

The method used by Gaskin and Weir is grounded in economic theory and practice and is widely used. Which experts are correct (Ford's experts or the Plaintiffs' experts) is a matter appropriately determined by the jury.

**B. Gaskin and Weir need not have executed their survey and calculations.**

Next, says Ford, Gaskin and Weir's testimony should be excluded because Gaskin has yet to conduct his proposed survey and Weir has yet to do the calculation of the overpayment damages. ECF No. 545, 25; ECF No. 536, 24-25.

In Lytle v. Nutramax Laboratories, Inc., 114 F.4th 1011 (9th

Cir. 2024), the Ninth Circuit analyzed whether a damages model must be carried out at the class certification stage. The Ninth Circuit held that damages models did not need to be carried out at the class certification stage so long as the court could find there was a reliable model by a preponderance of the evidence. Id. at 1024. And, indeed, it is correct that Plaintiffs do not have to prove the quantum of their alleged damages at class certification, only that they will be able to reliably prove those damages by way of an acceptable method at trial. Id.; see also In re Zetia (Ezetimibe) Antitrust Litig., 2020 WL 5778756, at *23 (E.D. Va. Aug. 14, 2020) (plaintiffs just have to show available reliable method, not specific damages); Johnson v. Nissan N. Am., Inc., 2022 WL 2869528, at *5-6 (N.D. Cal. July 21, 2022) (rejecting Daubert challenge to Weir and Gaskin because they did not actually do their conjoint analysis yet, because Daubert focuses on the methodology, not conclusions of expert testimony); Lessin v. Ford Motor Co., 2024 WL 5007092, at *3-4 (S.D. Cal. Oct. 31, 2024); Price v. L'Oreal USA, Inc., 17 Civ. 614, 2018 WL 3869896, at *11 (S.D.N.Y. Aug. 15, 2018).

Ford has identified some cases from district courts in this Circuit that take the other view, holding that an expert must have carried out their survey before class certification to survive a Daubert challenge. In re Marriott Int'l, Inc. Customer Data Security Breach Litig., 602 F. Supp. 3d 767, 786 (D. Md. 2022); In

re Blackbaud, Inc., Customer Data Breach Litig., Case No.: 3:20-mn-02972, 2024 WL 2155221, at *9-10, *13-14 (D.S.C. May 14, 2024).[6] But, the reasoning of Lytle is more persuasive. So, the Court elects to apply that analysis here.

The choice not to require Plaintiffs to carry out the conjoint analysis at the base of their damages theory does not mean that the Court will not subject Gaskin and Weir to any scrutiny under Daubert. Gaskin and Weir's methodology will be carefully scrutinized so that, when Gaskin and Weir conduct the survey and analysis, Ford may move in limine for their opinions to be excluded, if there is some reason that the results indicate their methodology was not reliable or was not properly applied. See Johnson v. Nissan N. Am., Inc., 2022 WL 2869528, at *5-6 (N.D. Cal. July 21, 2022).

Ford cites Davis v. Capital One N.A., No. 24-1507, 2025 WL 2445880 (4th Cir. Aug. 26, 2025) for the proposition that a

---

[6] Ford's citation to Lee v. City of Richmond, Va., is misplaced. 2014 WL 5092715, at *7 (E.D. Va. Sep. 30, 2014). In Lee, the Court excluded the testimony of an expert who conceded that he followed no scientific analysis and was not an expert in the topics about which he would testify. Id. at *6-7. That is not the case here. Nease v. Ford Motor Co. is also of little help. 848 F.3d 219, 231 (4th Cir. 2017). Nease excluded an expert who stated a product was unreasonably dangerous because it was "susceptible to binding" but never tested whether it was "susceptible to binding." Id. Finally, Creekmore v. Truist Bank, is unhelpful to Ford because it addresses the exclusion of a damages expert in an individual damages case, not at the class certification stage. Civil Action No. 2:24-cv-209, 2025 WL 1717647, at *7-8 (E.D. Va. May 29, 2025).

methodology must be fully carried out before the class certification stage. In Davis, the plaintiff's expert proposed a method for identification of class members. Id. at *4. In testing the methodology on a smaller sample than the full data set, the expert did not fully carry out all the proposed steps of her methodology. Id. And, the defendant's expert tested the proposed methodology and revealed a high error rate. Id. at *5. For those reasons, the Fourth Circuit held that the district court did not abuse its discretion by excluding the expert's testimony. Id. However, in Davis, the question was whether the methodology was reliable. Here, Gaskin and Weir's conjoint survey method is standard in their field of expertise. It is reliable. Ford's attack is directed to the application of that method: Davis does not address that question.

**2. Arguments Relating Only to Gaskin**

**A. Gaskin's survey is reliable because it will apply to all Class Vehicles.**

Ford argues that Gaskin's proposed survey only applies to F-150s and his failure to propose a method to combine the results of different surveys into one classwide number makes his methodology unreliable. ECF No. 545, 28. While Gaskin has only specifically provided the proposed survey questions as to the F-150, he explains that he will create other substantially similar surveys for the other Class Vehicles. Id. at 29. Ford argues that, without knowing

the specifics of all the surveys, the Court cannot assess the reliability of those surveys. Ford also argues that Gaskin's method is unreliable because he does not propose a method by which to combine the results of the different surveys into one class-wide overpayment percentage. Ford is wrong on both counts.

Gaskin's proposal is to create "substantially similar" surveys for the different Class Vehicles. ECF No. 572, 14. For the same reasons that Gaskin and Weir should not be excluded for their failure to conduct the proposed conjoint-based choice survey, they should not be excluded because they have not proposed exactly what survey they will do for each of the class vehicles. Plaintiffs and Gaskin represent that the surveys will be conducted using the same method, and the only real difference will be the distractor attributes. ECF No. 639, 67-69. If, once Ford receives the surveys that Gaskin will actually use, Ford detects any reliability issues, it can file a motion in limine or a motion to decertify class (if a class is certified).

Ford also cites LeGrand v. Abbott Laboratories, 2025 WL 2323352, at *6 (N.D. Cal. Aug. 12, 2025), where the court excluded Gaskin and Weir's proposed methodology because Gaskin and Weir did not propose to test for the "thousands of surveys necessary" to address the full scope of the Plaintiff's claims. However, LeGrand does not help Ford because the decision turned on the fact that Gaskin could not "practically account for all the Challenged

Statements." Id. That is not the case here because Gaskin does propose to conduct surveys for the Class Vehicles.[7]

At this stage, the Court will not delve into whether Gaskin and Weir must propose one overall percentage, or whether their opinions together are sufficient to certify a class. That is an issue best addressed at the class certification stage.[8]

**B. Whether Gaskin uses proper survey research principles goes to weight, not to admissibility.**

Ford also argues that Gaskin's opinions should be excluded because he fails to consider "Generally-Accepted Principles Of Survey Research." ECF No. 545, 33. Ford attacks the representativeness of Gaskin's sample, the wording of the language he uses to describe the defect, and the omission of attributes that real-world customers would consider. Id. at 34-35. Those contentions argue that the accepted method is flawed in its execution. But, even after the 2023 Amendments to Rule 702, those critiques go to weight and not admissibility. Johnson v. Glock,

[7] There is some disagreement between the parties about whether Gaskin will conduct a separate survey for the Ford F-150 Raptors. Ford says Plaintiffs' counsel claim that the Raptors should be included as part of the F-150 survey. The Court cannot find evidence of this in the record and no evidence is cited. From Gaskin's deposition, it appears that he has not yet decided on whether to do a separate survey for the Raptor. ECF No. 545-4, 8.

[8] Ford argues in its papers that Gaskin & Weir's method does not fit Plaintiff's damages theory, but at the hearing on April 17, 2026, Plaintiffs stipulated they are seeking only overpayment damages, so that issue was mooted. ECF No. 639, 36-40.

Inc., Case No. 20-cv-08807, 2024 WL 4479863, at *4 n. 8, *17 (N.D. Cal. Sep. 30, 2024); PBM Products, LLC v. Mead Johnson and Co., 639 F.3d 111, 123 (4th Cir. 2011) ("[O]bjections based on flaws in the survey's methodology are properly addressed by the trier of fact.").[9]

**C. Gaskin's proposed method is not cherrypicking.**

Ford also argues that Gaskin's selection of the overpayment percentage is cherrypicking. ECF No. 545, 36. To understand Ford's argument, it is necessary briefly to explain the relevant piece of Gaskin's methodology. Gaskin will conduct different simulations at different price levels to generate different overpayment dollar amounts. ECF No. 572-1, 7. Then, he intends to select the lowest overpayment dollar amount because it is the most conservative. ECF No. 545-1, 31-32. He will then create a fraction of the lowest overpayment amount over the highest price point at which he tested the vehicles. Id. Ford states that there is no basis for his selection of the lowest percentage and that, therefore, it is unreliable cherrypicking. ECF No. 545, 36. Plaintiffs argue that Gaskin bases his choice on his experience in conducting these kinds

[9] Ford cites PBM Products on its substantive argument that Gaskin should survey only Virginia residents instead of surveying nationwide, which is his proposed universe. ECF No. 545, 34. But, according to Gaskin, because the automobile market is nationwide, using a nationwide sample is appropriate. ECF No. 572-1, 6. So, Ford's substantive argument on that point fails as well.

of surveys in multiple cases. ECF No. 572, 20. Further, according to Plaintiffs, cherrypicking occurs when a party intentionally ignores information that is bad for it. In contrast, Gaskin is not ignoring bad information, he is selecting a conservative overpayment figure. Id. at 21.

Ford made an identical argument in Stevens v. Ford Motor Co., and the court rejected it. 2022 WL 19978265, at *13 (S.D. Tex. Sep. 29, 2022). The court in Stevens noted that Plaintiffs pointed to an authority specifying that Gaskin's methodology is standard in the field. Id. (citing Bryan K. Orme and Keith Chrzan, Becoming an Expert in Conjoint Analysis: Choice Modeling for Pros 114 (2017)).[10] It is true that other courts have gone the other way, finding Gaskin's choice unreliable. In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab. Litig. ("In re Volkswagen"), 500 F. Supp. 3d 940, 950 (N.D. Cal. 2020).[11] However, in In re Volkswagen, the court took issue with the range of Gaskin's overpayment percentages (from 8.5% to 60.5%) and found that Gaskin's choice of 8.5% overpayment did not make his unreliable method more reliable. 500 F. Supp. 3d at 950. Therefore, the real issue In in re Volkswagen was not the choice of the lowest

[10] Plaintiffs in this case did not provide a citation to any literature supporting that Gaskin's choice was a standard method in the field. But Stevens shows that it is.

[11] Some of Ford's cases cited are not on point at all. See Belville v. Ford Motor Co., 919 F.3d 224, 229 (4th Cir. 2019) (unrelated to a conjoint analysis of any kind)

percentage itself, but the underlying methodology — a methodology distinguishable from the instant case by its failure to consider supply-side factors. See supra Section III.1.A.

In sum, Ford's critique that Gaskin cherrypicks fails.

**3. Arguments Relating only to Weir.**

**A. Weir's class-wide damages formula is reliable.**

Ford attacks Weir's class-wide overpayment damages formula as unreliable for two reasons.[12] First, says Ford, Weir's formula is unreliable because his calculation for "Total Dollar Sales of Class Vehicles" is not an accurate reflection of what was paid by the class. Instead, Weir relies upon "Dealer Invoice Price" as a proxy for the class's actual cost. ECF No. 536, 18. A Dealer Invoice Price is what the dealer pays Ford for the vehicle, not what the consumer pays. Id.

In Johnson v. Nissan North America, Inc., the court rejected that argument where the expert chose to use MSRP as a proxy for vehicle price, explaining that using MSRP is simply an assumption in the model that can be the subject of cross-examination. Id. at *7. Even though it is likely not true that every Class Member paid dealer invoice price for their vehicle, that does not make Weir's testimony unreliable. Ford's first argument fails.

[12] In the briefs, Ford discusses three reasons, with the third being fit. ECF No. 536, 20-22. However, as discussed supra note 8, Gaskin & Weir's methodology fits the damages theory.

Second, Ford argues that Weir's formula fails to account for leases. Johnson rejected the same argument, finding that MSRP was a reasonable assumption that could be attacked on cross-examination. Id. at *8. Weir also explains that vehicles being leased does not change the value of the vehicle or the overpayment percentage and thus leases are properly included in his formula. ECF No. 566-1, 8-9. Ford's second argument fails.

Finally, Ford argues that Weir's formula is unreliable because it relies on Gaskin's unreliable calculation of overpayment percentage. ECF No. 536, 19-20. Because the argument that Gaskin's methodology is unreliable is rejected, so too is this one as to Weir's reliance on it.

**B. Weir's opinions are not impermissible bolstering.**

Ford then argues that Weir impermissibly bolsters Gaskin's opinions and methodology. ECF No. 536, 22-24. Ford is incorrect. Gaskin and Weir worked together in devising the methodology by which they would calculate classwide damages. It is not impermissible bolstering to collaborate. Indeed, the O'Connor Court rejected Ford's same argument. See O'Connor v. Ford Motor Co., No. 19-cv-5045, 2026 WL 579329, at *11 (N.D. Ill. March 2, 2026) (rejecting improper bolstering argument).

**C. Weir's Opinion is not ipse dixit.**

Ford attacks Weir's opinion that the results of Gaskin's conjoint survey will indicate whether the defect was material to

the class members. ECF No. 536, 25. As Plaintiffs and Weir explain, if there is a statistically significant reduction in market value, it follows that consumers find the defect important to consumers.[13] Because the conclusion follows logically from the evidence, it is not ipse dixit.

But, says Ford, Weir provides no explanation for how he will determine what reduction in market value indicates the defect is "material" or "important" to consumers. ECF No. 590, 24. Weir explains that he is looking for a statistically significant finding, which would not exist if there was a small change in market value.[14] To the extent that Ford disagrees with Weir's conclusion, it is free to attack it with evidence to the contrary.

**CONCLUSION**

For the foregoing reasons, Ford's objections to Gaskin and Weir's testimony lack merit. But that is not the end of the matter because, to exercise its gatekeeping function, the Court cannot admit expert testimony unless it finds that the proponent of the expert evidence has demonstrated that it is more likely than not that:

(a) the expert's scientific, technical, or other

[13] At oral argument, given the legal meaning of "materiality" in this case, Plaintiffs agreed that they and the experts must avoid the word "materiality" and instead state only that the results showed the defect was important to consumers. ECF No. 639, 102-103.

[14] Statistical significance is a standard calculation in statistics.

> specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Having studied Gaskin and Weir's reports, the MOTIONs, and the supporting, opposing, and reply memoranda, and having heard the argument of counsel, the Court finds that, at this stage of the proceedings, the Plaintiffs have established that it is more likely than not that:

(a) Gaskin and Weir's proposed opinions will help the finder of the fact to understand the evidence and to determine facts in issue; and

(b) Gaskin and Weir's proposed opinions are based on sufficient facts or data; and

(c) Gaskin and Weir's proposed opinions are the product of reliable principles and methods; and

(d) Gaskin and Weir's proposed opinions reflect a reliable application of the principles and methods to the facts of the case.

The requirements of Rule 702 having been satisfied, the GASKIN MOTION (ECF No. 544) and WEIR MOTION (ECF No. 535) will be denied.

Should those conclusions be shaken after the survey is conducted and the actual damages are specified, Ford may bring those issues to the Court's attention.

It is so ORDERED.

/s/ REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: September 18, 2026